## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

    Plaintiff,

vs.

Case No:

_____

WP COMPANY LLC d/b/a The Washington
Post,

    Defendant.

_____/

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, defendant WP Company LLC d/b/a The Washington Post (the "Post") removes the above-referenced action currently pending in the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida (the "State Court Action"). Removal is proper because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

## BACKGROUND

1.    On or about May 20, 2023, plaintiff Trump Media & Technology Group Corp. ("TMTG") filed the removed case, *Trump Media & Technology Group Corp. v. WP Company LLC*, Case No. 2023-CA-04552, in the Circuit Court of the Twelfth

Judicial Circuit in and for Sarasota County, Florida. Plaintiff served the Complaint on June 9, 2023.

2.    In its Complaint, Plaintiff asserts a claim for defamation and a claim for conspiracy to defame against the Post.  Compl. at ¶¶ 21-32. Plaintiff operates a social media platform called "Truth Social."  *Id.* at ¶1.  Plaintiff alleges that on May 13, 2023, the Post published an article allegedly reporting that plaintiff arranged an $8 million loan from a Caribbean bank associated with servicing the adult entertainment industry.  *Id.* at ¶¶11-12.  Plaintiff asserts causes of action for defamation and conspiracy.  Plaintiff alleges compensatory damages of at least $2,780,000.00 and punitive damages of at least $1,000,000.00.  *Id.* at ¶¶ 1, 27, 32 & p.18-19.

3.    In accordance with Local Rule 1.06(b) and 28 U.S.C. §1446(a), true and legible copies of all papers on file with the state court are attached hereto as Exhibit 1.[1]  These papers include Plaintiff's Complaint, as well as service documents, case management order and hearing notice.  The Post has not yet filed a responsive pleading or motion in the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida.  The Post is not aware of any other pending motions or briefs.

4.    Pursuant to 28 U.S.C. §1446(d), the Post is serving written notice of the

---

[1] For clarity of the record, the Complaint has been isolated into a separate PDF for the docket.

removal of this case on Plaintiff's counsel, a copy will be promptly filed with the Clerk of the Twelfth Judicial Circuit in and for Sarasota County, Florida. A true and correct copy of the Notice of Filing Notice of Removal to be filed in the Twelfth Judicial Circuit is attached within Exhibit 1.

5.      Nothing in this notice shall constitute a waiver of the Post's right to assert any defense, including a motion to dismiss, as the case progresses.  The Post further reserves all defenses and objections to the Complaint, including but not limited to: lack of personal jurisdiction, improper venue, *forum non conveniens*, insufficiency of process, insufficiency of service of process, failure to join necessary parties, lack of standing, and failure to state a claim.

## VENUE

6.      Venue is proper under 28 U.S.C. § 1441(a) because this Court is the United States District Court for the district and division embracing the place where the State Court Action is pending.

## REMOVAL IS TIMELY

7.      The removal is timely under 28 U.S.C. §1446(b). Plaintiff filed its Complaint on May 20, 2023 and served the Post on June 9, 2023.  A true and correct copy of Plaintiff's proof of service is attached within Exhibit 1.  The Post filed this Notice of Removal within thirty (30) days of service, as required by law.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999)

("[A] named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons."). Accordingly, removal is timely as it falls within this thirty-day period.

## JURISDICTION

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

9.     United States District Courts are vested with original jurisdiction where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." 28 U.S.C. § 1332(a)(1).

### A. <u>The Diversity Requirement.</u>

10.     The diversity requirement is met in this case.

11.     <u>Citizenship of Plaintiff.</u> TMTG is a Delaware corporation headquartered in Sarasota, Florida. Compl. ¶ 3. For diversity purposes, a corporation is a citizen of both the state where it is incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). Thus, TMTG is a citizen of Delaware and Florida.

12.     <u>Citizenship of Defendant.</u> The Post is a Delaware limited liability company organized under the laws of Delaware. "For the purpose of determining diversity jurisdiction, 'a limited liability company is a citizen of any state of which

a member of the company is a citizen.'" *Flintlock Const. Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1224 (11th Cir. 2013) (quoting *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004)). The Post's sole member is Nash Holdings LLC, a limited liability company organized under the laws of Delaware.  Nash Holdings LLC's two members are Nash Parallel Investment LLC, organized under the laws of Delaware, and Explore Holdings LLC, organized under the laws of the State of Washington.  Explore Holdings LLC is the sole member of Nash Parallel Investment LLC.  Explore Holdings LLC's sole member is Jeff Bezos, who is a citizen of the State of Washington.

13.    Thus, complete diversity exists between TMTG, a citizen of Delaware and Florida, and the Post, a citizen of Delaware and the State of Washington.

## B. <u>Value of the Matter in Controversy.</u>

14.    The amount in controversy requirement is satisfied because TMTG's alleged claims exceed the sum or value of $75,000, exclusive of interests and costs. TMTG alleges that it seeks "compensatory damages and punitive damages in the sum of $3,780,000,000.00."  Compl. at p.1 (emphasis omitted); *see also id.* at ¶¶ 27, 32 & p.18-19.  Based on the face of the Complaint, the amount in controversy exceeds the jurisdictional minimum, and diversity jurisdiction is satisfied.

## CONCLUSION

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, the Post removes the above-captioned action from the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida, to the United States District Court for the Middle District of Florida, Tampa Division.

Dated:  July 10, 2023.

Respectfully submitted,

THOMAS & LoCICERO PL                WILLIAMS & CONNOLLY LLP


/s/ Carol J. LoCicero                    /s/ Thomas G. Hentoff
Carol Jean LoCicero (FBN 603030)    Thomas G. Hentoff (Lead Counsel)
Linda R. Norbut (FBN 1011401)        Nicholas G. Gamse
601 South Boulevard                  680 Maine Avenue SW
Tampa, FL  33606                     Washington, DC  20024
Telephone: (813) 984-3060            Telephone: (202) 434-5000
Facsimile:  (813) 984-3070           Facsimile: (202) 480-8371
clocicero@tlolawfirm.com             ngamse@wc.com
lnorbut@tlolawfirm.com               thentoff@wc.com

*Counsel for Defendant*                  *Counsel for Defendant*
                                     (*Pro Hac Vice* Motions forthcoming)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing

document is being electronically filed and will be furnished via CM/ECF and via

Electronic Mail on July 10, 2023, to:

Jason R. Kobal, Esquire            Steven S. Biss
KOBAL LAW, P.A.                    300 West Main Street, Ste. 102
12169 W. Linebaugh Ave.            Charlottesville, VA  22903
Tampa, FL  33626                   stevenbiss@earthlink.net
koballaw@yahoo.com

*Counsel for the Plaintiff*            *Counsel for the Plaintiff*


/s/ Carol J. LoCicero
Attorney

# EXHIBIT 1

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.      CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>TWELFTH</u>   JUDICIAL CIRCUIT, IN AND FOR <u>SARASOTA</u>   COUNTY, FLORIDA

Plaintiff                                                            Case # _____

                                                                         Judge _____

vs.

Defendant

**II.      AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.     TYPE OF CASE**      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☒ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.   REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.   NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  2

**VI.   IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.   HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.
    N/A

**VIII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.   DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Jason R. Kobal        Fla. Bar # 542253
      Attorney or party           (Bar # if attorney)

Jason R. Kobal          05/20/2023
  (type or print name)         Date

# Sarasota County Receipt of Transaction

## Receipt #    2023049985

Karen E. Rushing
Clerk of the Circuit Court and County Comptroller
Sarasota County, FL
www.SarasotaClerk.com

**Received From:**
KOBAL, JASON R
12169 W. LINEBAUGH AVE.
TAMPA, FL  33626

**On Behalf Of:**

On: 5/22/23  5:24 pm  By:  eburgos
Transaction # 101342767

| CaseNumber  2023 CA 004552 NC |
|---|

**Judge  STEPHEN WALKER**

**TRUMP MEDIA & TECHNOLOGY GROUP CORP**  *VS*  **WP COMPANY LLC**

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (CPL) COMPLAINT | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| **Total:** | **400.00** | **0.00** | **0.00** | **400.00** | **400.00** | **0.00** |
| **Grand Total:** | **400.00** | **0.00** | **0.00** | **400.00** | **400.00** | **0.00** |

| PAYMENTS |
|---|

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| E-Portal | 7755767 | OK | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 |
| | | **Payments Total:** | **400.00** | **0.00** | **0.00** | **0.00** | **400.00** |

## IN THE COUNTY COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

TRUMP MEDIA AND TECHNOLOGY
GROUP CORP.
      Plaintiff,

v.                                 Case No.: 2023-CA-004552

    WP COMPANY, LLC.,

    D/B/A/ THE WASHINGTON POST

      Defendants.
_____/

### SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition

in this action on defendant, WP Company, LLC., d/b/a The Washington Post, at 4701 Cox Road,

Suite 285, Glen Allen, VA 23060.

      Each defendant is required to serve written defenses to the complaint or petition on Jason

R. Kobal, Esq., plaintiff's attorney, whose address is **Kobal Law, P.A., 12169 W. Linebaugh**

**Ave., Tampa, FL 33626**, within 20 days after service of this summons on that defendant, exclusive

of the day of service, and to file the original of the defenses with the clerk of this court either before

service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will

be entered against that defendant for the relief demanded in the complaint or petition.

**DATED** at _5/31/2023_, Florida, on _____.

                                        KAREN E. RUSHING
                                        CLERK OF THE CIRCUIT COURT

                                        Clerk of Court

# Sarasota County Receipt of Transaction

## Receipt #    2023051748

Karen E. Rushing
Clerk of the Circuit Court and County Comptroller
Sarasota County, FL
www.SarasotaClerk.com

**Received From:**
KOBAL, JASON R
12169 W. LINEBAUGH AVE.
TAMPA, FL  33626

**On Behalf Of:**

On:  5/26/23   5:43 pm   By:  eburgos
Transaction # 101344615

| CaseNumber   2023 CA 004552 NC |
|---|

**Judge   STEPHEN WALKER**

**TRUMP MEDIA & TECHNOLOGY GROUP CORP** *VS* **WP COMPANY LLC**

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (CPL) COMPLAINT | 400.00 | 400.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (SUMCIRE) SUMMONS CIRCUIT EFILED - REQUEST | 10.00 | 0.00 | 0.00 | 10.00 | 10.00 | 0.00 |
| **Total:** | **410.00** | **400.00** | **0.00** | **10.00** | **10.00** | **0.00** |
| **Grand Total:** | **410.00** | **400.00** | **0.00** | **10.00** | **10.00** | **0.00** |

| PAYMENTS |
|---|

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| E-Portal | 7822860 | OK | 10.00 | 0.00 | 0.00 | 0.00 | 10.00 |
| | | **Payments Total:** | **10.00** | **0.00** | **0.00** | **0.00** | **10.00** |

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

TRUMP MEDIA & TECHNOLOGY
GROUP CORP,
   Plaintiff,

v.

WP COMPANY LLC,
   Defendant.

_____

CASE NO.  2023 CA 004552 NC
   DIVISION A CIRCUIT

**CIRCUIT CIVIL CASE MANAGEMENT ORDER AND**
**ORDER SETTING INITIAL CASE MANAGEMENT HEARING**
**(for Streamlined Track cases)**

   The Twelfth Judicial Circuit's Civil Case Management Protocol requires the parties to meet and confer within 30 days after the last party is served with initial process to discuss, and jointly complete, the attached Case Management Report. A fillable Case Management Report may be found at https://www.jud12.flcourts.org/About/Divisions/Civil. The parties must submit the completed Case Management Report to the Court within 5 days after the initial meet and confer (not 5 days after the last conference, if more than one meet and confer).

   Separately, the Court sets a mandatory Initial Case Management Conference as follows:

| | |
|---|---|
| **Date & Time:** | 10/30/2023 at 1:30PM |
| **Location:** | Silvertooth Judicial Center<br>2002 Ringling Boulevard<br>Sarasota, FL 34237 |
| **Courtroom:** | 7-C |
| **Zoom credential:** | https://www.zoom.us/ Click "Join A Meeting"<br>Meeting ID:   465 693 0098<br>Password:   568290<br>Audio:   1.786.635.1003—only if no video access |

   Appearance at that Initial Case Management Conference is mandatory, ***unless excused by the Court***. Fla. R. Civ. P. 1.200(a). Failure to attend could result in the Court dismissing the action, striking the pleadings, limiting proof or witnesses, or taking other appropriate action. Fla. R. Civ. P. 1.200(c). Appearance shall be as follows:

   [ ]  The parties must appear in person at the Courthouse.

**Filed 5/31/2023 7:55 AM - Karen E Rushing, Clerk of the Circuit Court, Sarasota County, FL**

[ ]     The parties must appear by Zoom.
[X]     The parties may choose to appear in person at the Courthouse or by Zoom.

The Court's expectation is that the parties in most cases will agree to various deadlines in the Case Management Report and will not have to appear at the Initial Case Management Conference. If, however, there is disagreement on completing the Case Management Report, the parties must appear at the Initial Case Management Conference.

Based on the Case Management Report, the Court will enter a Case Management Order, a Trial Order, or both. The Case Management Order will tell the parties whether they are excused from attending the Initial Case Management, and it will set various deadlines that will govern the progression of the case. The parties must adhere to these deadlines unless changed by the Court upon a showing of good cause. Procrastination in completing discovery or the known unavailability of counsel not timely addressed will not constitute good cause for a change to these deadlines. The failure to abide by these deadlines may result in sanctions by the Court, including the award of attorney's fees, the striking of pleadings, and/or a dismissal of the action.

This case has been designated as a "streamlined track" case. Cases are expected to be resolved well within the timeframes established by Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

**The Court hereby orders:**

1. Plaintiff shall serve a copy of this Order upon all defendants within 7 days of initial process and file a Certification of Compliance in the court file that specifies, at a minimum, the date of service, the method of service, and specific address served.

2. The parties, or their attorneys, shall meet and confer within 30 days after the last party is served with initial process to meet and confer and jointly complete the Case Management Report, which is attached to this Order.

3. The parties, or their attorneys, shall file the signed, completed Case Management Report within 5 days after the first meet and confer conference in the Court file. If there is no agreement, each party shall file their proposed Case Management Report.

4. Each attorney that appears on behalf of a party must file in the Court file a notice of appearance and designation of email address. If multiple attorneys from the same law firm appear, each attorney must file a separate notice of appearance and designation of email address. If an attorney represents multiple parties, the attorney must file a separate notice of appearance and designation for each party that attorney represents. This is an on-going requirement for any new attorney that appears during the litigation. Each attorney that appears is fully responsible for the case.

5. The attorneys shall comply with the Local Rules of the Twelfth Judicial Circuit and the Standards of Professionalism of the Twelfth Judicial Circuit, each of which is posted on the Court's website: www.jud12.flcourts.org.

**Filed 5/31/2023 7:55 AM - Karen E Rushing, Clerk of the Circuit Court, Sarasota County, FL**

### Court Reporters

The Court does not provide a court reporter. If a party wishes to have a court reporter present, that party must arrange for the court reporter's attendance and must notify all other parties before the hearing.

### No Recording Proceedings

By court rule and court order, you are not authorized to make your own audio or visual recording of a court proceeding. No one may take "screenshots" or other audio or visual depictions of a court proceeding. Recording a court proceeding is strictly prohibited unless approved by the Judge. If you violate these rules, you may be held in contempt of court. Members of the media must comply with rule 2.450 and administrative order 2020-23.2 regarding media coverage. Please contact the Court's Public Information Officer for further information.

### Late entry or Technical Difficulties

If the hearing is to be by Zoom, and if you are not logged in when the hearing begins, the judge may not interrupt the proceedings to admit you to the hearing. If you have trouble logging in, and you wish to participate in the hearing, contact the Court's Judicial Assistant immediately.

### ADA Notice

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Sarasota County Jury Office, P.O. Box 3079, Sarasota, Florida 34230-3079, (941) 861-8000, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on 05/30/2023.

e-Signed 5/31/2023 7:55 AM 2023 CA 004552 NC

STEPHEN WALKER CIRCUIT JUDGE

### SERVICE CERTIFICATE

On 05/30/2023, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). ~~On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individual who do not have an email address on file with the Clerk of Court.~~

**Plaintiff's counsel shall provide a copy of the foregoing by U.S. Mail to:**

WP COMPANY LLC
1301 K STREET NW
WASHINGTON, DC  20071

KOBAL, JASON R                        koballaw@gmail.com
KOBAL, JASON R                        koballaw@yahoo.com

**Filed 5/31/2023 7:55 AM - Karen E Rushing, Clerk of the Circuit Court, Sarasota County, FL**

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

_____
    Plaintiff(s) / Petitioner(s),

v.                                  Case No.:   _____

                                            Division:   _____

_____
    Defendant(s) / Respondent(s).
_____

## CASE MANAGEMENT REPORT
### (for use in Streamlined Cases – Circuit Civil)

**Did all parties meet and confer as required?**
- ☐ Yes.
- ☐ No. (Must attend Initial Case Management Conference unless the Court excuses you.)

**Are one or more Defendants defaulted?**
- ☐ Yes.
- ☐ No.

**This Case Management Report is submitted on behalf of:**
- ☐ All parties named in this lawsuit, each of whom agrees to this Report.
- ☐ Only on behalf of the following party or parties: _____

**The parties in this lawsuit request a:**
- ☐ Jury trial (to begin within 12 months of the date of filing of the lawsuit).
      ***Proposed*** *trial date:* _____     *Estimated Days:*____
- ☐ Nonjury trial (to begin within 9-12 months of the date of filing of the lawsuit).
      ***Proposed*** *trial date:* _____     *Estimated Days:*____
- ☐ Residential foreclosure trial (to begin within 7 months of the date of filing).
      ***Proposed*** *trial date:* _____     *Estimated Days:*____

**Setting the case for trial:**
- ☐ The parties waive the "at issue" requirement and request the Court to enter an order setting the case for trial for the date agreed to above.
- ☐ The parties do not waive the "at issue" requirement, and the Plaintiff must send the Court a proposed order setting the case for the date agreed to above within 15 days of the case being at issue. The Court will set a firm trial date when at issue.
- ☐ The parties do not agree to a proposed trial date and will attend Initial Case Management Conference and will discuss with the Court setting the case for trial.

**Trial calendars are posted at https://www.jud12.flcourts.org/About/Divisions/Civil under "DeSoto," "Manatee," "Sarasota," and "South County (Venice)" tabs.**

The Court in establishing Case Management deadlines will give due regard to the parties' proposed deadlines. As required by various administrative orders, Case Management deadlines established in the case management order will be strictly enforced. A party must demonstrate good cause for a date to be changed.

| DEADLINE, EVENT, OR QUESTION | RESPONSE |
|---|---|
| **Do all parties agree to this Case Management Report?** (If no, you must attend the Initial Case Management Conference unless excused by the Court.) | ☐ Yes    ☐ No |
| **Date this lawsuit was filed.** | |
| **Have all Defendants been served?** | ☐ Yes    ☐ No |
| **If all Defendants have not been served, what deadline do you propose by when the last Defendant will be served?** | |
| **Deadline for all motions to dismiss directed to the pleadings or objections to the pleadings to be resolved, including motions to strike.** (If greater than 60 days, parties must appear at the Initial Case Management Conference, unless excused by the Court.) | |
| **Deadline to file expert witness lists for experts used to oppose affirmative claims.** (The Court recommends 60 days before the Pre-Trial Conference date in jury cases and 60 days before the Trial Period in nonjury cases.) | |
| **Deadline to file final witness and exhibit lists, which list includes designation of those witnesses and exhibits a party reasonably believes the party will call or use in trial.** (The Court recommends 45 days before the Pre-Trial Conference date in jury cases and 45 days before the Trial Period in nonjury cases.) | |
| **Discovery deadline. No discovery may occur after this date without Court permission or, only if permitted by the Court, agreement of all parties.** (The Court recommends the Pre-Trial Conference Date for jury cases and 30 days before the first day of the Trial Period for nonjury cases.) | |

| | |
|---|---|
| **Deadline for all motions to be heard.** (The Court will not permit motions to be heard after Docket Sounding without Court permission. Any pending motion after this date will be denied.) | |
| **Mediation deadline** (The Court recommends no later than the Pre-Trial Conference date.) | |

### Magistrate Referral

The Court refers certain matters to a general magistrate as permitted by Florida Rule of Civil Procedure 1.490(a). The Court will refer all motions directed to the pleadings and all discovery motions. The parties may agree to additional matters to be referred.

### Attorney Appearance

Each attorney that appears on behalf of a party must file a separate notice of appearance and designation of email address. (Multiple attorneys within the same firm must each file a separate notice of appearance and designation of email address.) This is an on-going requirement for any new attorney that appears during the litigation. Each attorney that appears is fully responsible for the case.

Please identify all known attorneys currently appearing for each party for each status that parties holds, such as Plaintiff or Defendant. Some parties may have more than one status, such as Defendant and Counterclaim Plaintiff, and will have multiple entries in the table below. If a party does not have an attorney, simply complete the Party Name and Status of the table below. Please remember that each corporate entity must have an attorney represent it. Additionally, an individual sued in a representative capacity, such as Trustee, must have an attorney represent the person in the person's representative capacity.

| Party Name | Status | Attorney Name | FL Bar # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The parties agree to this Case Management Report in Case Number _____:

Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____
Date: _____


_____
Signature


Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____
Date: _____


_____
Signature


Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____
Date: _____


_____
Signature

**Certificate of Service**

On _____, I certify (1) that I sent a copy of the Case Management Report directly to the assigned judge's Judicial Assistant AND (2) I either (check one box):

☐   electronically filed the foregoing Case Management Report with the Clerk of Court by using the Florida Court, which will send a copy to:

**or**

☐   served a copy of the foregoing Case Management Report by First Class U.S. Mail to:

Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____


Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____


Name: _____
Bar Number: _____
Firm: _____
Email: _____
Address 1: _____
Address 2: _____
Address 3: _____
Attorney for: _____


_____
Signature

# Affidavit of Service

X Standard _ Rush    Case # 2023-CA-004552
Attorney: Steven Biss
Style: Trump Media and Technology Group Corp. v. WP Company d/b/a The Washington Post
Reference #

**Service by Private Process**

I, the undersigned _Derek Baylor_ do hereby certify that I am over eighteen years of age, am not a party to or otherwise interested in the subject matter in controversy, and I further attest that on the _9th_ day of _June_, 2023, at _1:25_ am / pm, I served:

### WP Company d/b/a The Washington Post
### Serve: CT Corporation System, Registered Agent
### 4701 Cox Road, Suite 285
### Glen Allen, VA 23060

the attached:

O  Subpoena Duces Tecum        O  Witness Subpoena        **X  Summons & Complaint**

O  Motion for Judgment           O  Warrant in Debt          O  Other: _____

o  Personal Service: _____

x  Registered Agent: _Julie Parrish_____

Being unable to make personal service, a copy was delivered in the following manner:

o  Delivered to person found in charge of the usual place of business or employment during business hours and giving information of its purport,

• Name and Title: _____

o  Delivered to a family member, not a temporary sojourner or guest, aged sixteen or older, at the usual place of abode of the above named party,

• Individual Name: _____

o  Posted on the front door or other such entrance as appears to be the main entrance

o  Not Found / Unable to Serve

**Process Server:**

_(signature)_ _____

Notes: _____

Attempt(s): _____

_____

Subscribed and sworn to before me this _12th_ day of _June_, 2023, _(signature) proved to me on the basis of satisfactory evidence to be the person(s) who_ by _Derek Baylor_ appeared before me.

Notary Public for the Commonwealth of Virginia

City of Richmond

My Commission Expires: _May 2025_                    _Signature of Notary Public_

# Service Authorization
# CT Corporation System

CT Corporation System ("CT") is registered agent for service of process for numerous corporations and similar entities. CT receives the process only in its capacity as a commercial registered agent. The individuals designated below are employees of CT Corporation System and in receiving the process, do so only on CT's behalf and in CTs capacity as registered agent.

**PLEASE NOTE:** The Code of Virginia §§ 13.1-634 provides in part:
"Registered office and registered agent.
A....
B. The sole duty of the registered agent is to forward to the corporation at its last known address any process, notice or demand that is served on the registered agent."

*As such, neither CT Corporation System., nor its individual employees designated below, have the duty or the ability to respond to any legal process, notice or demand that is served on CT's clients.*

The following natural persons are designated in the office of the registered agent upon whom any process, notice or demand may be served:

Katie Bush                    Lauren Phillips                    Julie Parrish

This authorization does not certify the receipt or acceptance of any specific process

Katie E Bush
Senior Fulfillment Specialist
CT Corporation System

State of Virginia
County of Henrico

This day personally appeared before me, Katie E Bush, who name is signed above and who, being first duly sworn, upon her oath, state that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this _13th_ day of January, 2023.

Notary Public

DORINDA NESBITT SLAUGHTER
NOTARY
PUBLIC
REG # 7529659
MY COMMISSION
EXPIRES
4/30/2024
COMMONWEALTH OF VIRGINIA

Filing # 174075968 E-Filed 05/26/2023 12:51:11 PM

## IN THE COUNTY COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

TRUMP MEDIA AND TECHNOLOGY
GROUP CORP.
     Plaintiff,

v.                        Case No.: 2023-CA-004552

  WP COMPANY, LLC.,

  D/B/A/ THE WASHINGTON POST

     Defendants.

_____/

### SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

     YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition

in this action on defendant, WP Company, LLC., d/b/a The Washington Post, at 4701 Cox Road,

Suite 285, Glen Allen, VA 23060.

     Each defendant is required to serve written defenses to the complaint or petition on Jason

R. Kobal, Esq., plaintiff's attorney, whose address is **Kobal Law, P.A., 12169 W. Linebaugh**

**Ave., Tampa, FL 33626**, within 20 days after service of this summons on that defendant, exclusive

of the day of service, and to file the original of the defenses with the clerk of this court either before

service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will

be entered against that defendant for the relief demanded in the complaint or petition.

                                                          KAREN E. RUSHING
                *5/31/2023*           CLERK OF THE CIRCUIT COURT
**DATED** at _____, Florida, on _____.

                          Clerk of Court

Filing # 173606585 E-Filed 05/20/2023 05:28:12 PM

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, STATE OF FLORIDA
CIRCUIT CIVIL DIVISION

| | | |
|---|---|---|
| TRUMP MEDIA & TECHNOLOGY GROUP CORP. | ) ) ) | CASE NO. _____ |
| Plaintiff, | ) ) | CASE TYPE: CA Libel / Slander |
| v. | ) ) ) | JUDGE: _____ |
| WP COMPANY, LLC d/b/a The Washington Post | ) ) ) | **TRIAL BY JURY IS DEMANDED** |
| Defendant. | ) ) | |

# **COMPLAINT**

Plaintiff, Trump Media & Technology Group Corp. ("Plaintiff" or "TMTG"), by

counsel, files the following Complaint against defendant, WP Company, LLC d/b/a The

Washington Post ("Defendant" or "WaPo").

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of

**$3,780,000,000.00** or such greater amount as is determined by the Jury, (b)

prejudgment interest on the principal sum awarded by the Jury from May 13, 2023 to the

date of Judgment at the rate of 6.58 percent per year, and (c) costs – arising out of

Defendant's defamation and conspiracy.

## I.  **INTRODUCTION**

1.     TMTG is a private Sarasota-based media and technology company that

operates a flagship social media platform called "Truth Social".  On May 13, 2023,

WaPo, acting in concert with a former employee of TMTG who was terminated for

cause, published an egregious hit piece that falsely accused TMTG of securities fraud and other wrongdoing.  WaPo's false criminal charges exposed TMTG to public ridicule, contempt and distrust, and injured TMTG's business and reputation.

2.      WaPo has been on a years-long crusade against TMTG characterized by the concealment of relevant information in its possession—a bitterly ironic truth for a publication whose motto is "*Democracy Dies in Darkness*".  WaPo's latest defamation creates an existential threat for TMTG, causing enormous loss.  TMTG brings this case to recover special damages to its business and good will, actual injury to its name and reputation, and punitive damages for WaPo's gross misconduct.

## II.  PARTIES

3.      TMTG is a Delaware corporation headquartered in Sarasota, Florida.

4.      WaPo is a Delaware limited liability company, whose sole member is Nash Holdings, LLC, a Delaware limited liability company, whose members include citizens of Delaware.  The *Washington Post* has more than 2,500,000 digital subscribers in the United States, including tens of thousands in Florida.  20,000,000 people follow WaPo on Twitter (@washingtonpost), including millions in Florida.  WaPo is at home in Florida.  WaPo has agents and offices in Florida.  It transacts substantial business in Florida, including the sale of newspapers, advertising and online subscriptions to residents of Sarasota, and the operation of an active website that is accessible in Florida, www.washingtonpost.com.    In  April  2023,  over  132,300,000  people  visited Washingtonpost.com, including millions in Florida.  The article at issue in this action targeted a Florida business, and was accessed and read by thousands of Floridians.

### III.   JURISDICTION AND VENUE

5.    The Circuit Court of Sarasota County has subject matter jurisdiction over this action.

6.    WaPo is subject to the Court's general personal jurisdiction and specific personal jurisdiction.

7.    Venue is proper in Sarasota County, where the false and defamatory statements were published and where TMTG suffered substantial damage.

### IV.   STATEMENT OF MATERIAL FACTS

8.    On March 15, 2023, the Guardian published an online article entitled "***Federal investigators examined Trump Media for possible money laundering, sources say***".    [https://www.theguardian.com/us-news/2023/mar/15/trump-media-investigated-possible-money-laundering (the "Guardian Article")].   The Guardian Article contained false statements and defamatory implications, including that Federal investigators had examined TMTG "for possible money laundering"; that "New York prosecutors expanded criminal inquiry of company last year and examined acceptance of $8m with suspected Russian ties"; and that "Federal prosecutors in New York involved in the criminal investigation into Donald Trump's social media company last year started examining whether it violated money laundering statutes in connection with the acceptance of $8m with suspected Russian ties".

9.    The source of the Guardian's false and defamatory "money laundering" charges was a former employee of TMTG, Will Wilkerson ("Wilkerson"), who was terminated for cause.   Beginning in 2022, separate and apart from any purported

disclosures he may have made to the government, Wilkerson began to concoct and publicly shop false stories about TMTG to numerous media outlets.

10. By May 2023, Wilkerson had come up with yet another fake news story. Wilkerson knew that WaPo eagerly published false stories about TMTG, its CEO, Devin Nunes ("Nunes") and, of course, former President Donald Trump. Wilkerson contacted WaPo with a salacious story about a porn-friendly bank and securities fraud. Through a series of meetings and conversations with Wilkerson and his lawyers, WaPo undertook with Wilkerson to publish agreed false and defamatory statements to injure TMTG.

11. On May 13, 2023, WaPo published an online article with the clickbait headline, "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***". [https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/ (the "WaPo Article")].

12. The WaPo Article and follow-on social media republications contain the following false statements of fact of or concerning TMTG:

- "An obscure financial entity … would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds";

- "[T]he role ES Family Trust would assume in Trump Media and Technology Group has never been officially disclosed to the Securities and Exchange Commission ["SEC"] or to shareholders in Digital World Acquisition ["DWAC"], the special purpose acquisition company, or SPAC, that has proposed merging with Trump's company";

- "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust";

- "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO";

- "Orlando's finder's fee could affect the value of the shares";

- "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC";

- "Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC";

- "A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents";

- "The Guardian reported in March that federal prosecutors in New York have been investigating whether the Trump Media loans violated money-laundering statutes".

(each of the above is a "Statement" and together the "Statements").[1]

13.     WaPo was not content with publication of the false Statements to its 2,500,000 subscribers and republication to its 20,000,000 Twitter followers. The primary author of the WaPo Article, Drew Harwell ("Harwell"), republished the Article to his 48,000 Twitter followers, which included correspondents at CNN, New York Times, NBC News, The Atlantic, Huffington Post, the Daily Beast, Business Insider, and the Guardian. [https://twitter.com/drewharwell/status/1657351704419917825 ("New: The Truth Social saga just keeps getting weirder. Our latest includes a porn-friendly bank on a Caribbean island and an $8 million mystery loan"). In order to further spread the smear and increase the damage to TMTG, WaPo engaged agents from both within and outside the company to broadly republish the defamation. Harwell and Washington Post "cyber reporter" Joseph Menn ("Menn") "boosted" (republished) the WaPo Article on the

---

[1]     At 3:24 p.m. on May 13, 2023, WaPo republished the WaPo Article to a new target audience – its 20,000,000+ Twitter followers. WaPo's tweet falsely states that "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC"). To date, the tweet has been viewed over 331,500 times, retweeted 971 times, quote tweeted 54 times, and liked 1,953 times by Twitter followers and users. [https://twitter.com/washingtonpost/status/1657466763611717633].  One WaPo reader posted a meme that stated it was "TIME to Arrest" Donald Trump.

Mastodon social media network.  Menn republished the Article to his 6,658 followers on Mastodon.   Harwell republished Menn's post to his 67,000 Mastodon followers. [https://mastodon.social/@JosephMenn@infosec.exchange/110363703525631648 ("Wild tale about mysterious backing for Truth Social")].  On May 13, 2023, Washington Post technology editor Mark Seibel (Seibel") joined the smear campaign.  Seibel republished the Article to 7,014 more Twitter followers, while falsely claiming that TMTG "borrowed money from a bank [Paxum Bank] best known for servicing the adult entertainment." [https://twitter.com/markseibel/status/1657407145535500288 ("More on the crazy doings at Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC")].  Harwell "liked" Seibel's tweet.[2]  Washington Post business editor, Lori Montgomery ("Montgomery"), the author of WaPo's May 17, 2023 response to TMTG's retraction demand (*see infra*), joined the fray on May 13, 2023 by retweeting the WaPo Article to her 6,805 Twitter followers.  Co-author of the WaPo Article, freelance journalist Matt Bernardini ("Bernardini"), also retweeted the Article to his 427 followers.      [https://twitter.com/MattBernardini7/status/1657346969365364737?s=20 ("NEW with @drewharwell and @mateirosca.  A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents")]. The second co-author of the WaPo Article, Matei Rosca ("Rosca"), tweeted the Article to his 2,518 followers [https://twitter.com/mateirosca/status/1657350755848683520?s=20], retweeted Harwell *and* Seibel, *and* republished the Article on his website.

---

[2]      "Likes" are represented on Twitter by a small heart and are used to show appreciation for a tweet.  A user can view the tweets that another user has liked from that user's profile page by clicking or tapping on the "Likes" tab. [https://help.twitter.com/en/using-twitter/liking-tweets-and-moments].

[https://reporter.london/].  Rosca led readers to believe that the WaPo Article was "just scratching the surface", and that there were additional undisclosed facts and wrongdoing by TMTG. [https://twitter.com/mateirosca/status/1657396995709890561?s=20 ( ☙ ❧ ) ("@MattBernardini7 @mateirosca @drewharwell the Washington Post ES Trust/Trump Media story is just scratching the surface, right?  Great work")].  WaPo's republication frenzy and repeated concerted harassment evidences a knowing, deliberate, organized and systemic effort to promote the false and defamatory Statements worldwide in order to inflict the greatest possible injury on TMTG.

14.     The clickbait headline of the WaPo Article – ***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social*** – immediately grabbed the common mind of readers, falsely insinuating that TMTG was involved in shady business dealings. [*See* https://twitter.com/ericgarland/status/1657772179793256450 ("Yo WaPo, you buried the lede here, even by calling it a loan from a 'porn-friendly bank.'  It's PAXUM BANK, one that's almost surely tied to Russian Mafiya $$$ from sex trafficking of cam girls in Romania and around the world.  Its owner just resigned yesterday.")].

15.     The Statements immediately conveyed a defamatory meaning to readers. The express meaning and defamatory gist of WaPo's Statements is that TMTG committed securities fraud or aided, abetted and participated in improper acts designed to conceal material facts[3] from the SEC and shareholders of DWAC, and that TMTG was being investigated for money laundering.  The WaPo Statements impute to TMTG

---

[3]     The WaPo Article represents that TMTG's failure to disclose payment of the "$240,000 finder's fee" was a material omission and, therefore, securities fraud. WaPo states, "Orlando's finder's fee could affect the value of the shares".  To be clear, WaPo's Statements are baseless because no finder's fee was ever paid to anyone.

**Complaint**
7

crimes, dishonesty, want of integrity and corporate malfeasance. Readers concluded that TMTG and its executives could go to jail because of the non-disclosures described in the WaPo Article. [*See, e.g.,* https://twitter.com/dave_winx/status/1657723934677008390 ("The beautiful thing about this is that it could potentially lead to charges against Devon [sic] Nunes"); https://twitter.com/KeyLargo2/status/1657502055047614472 ("Someone, please put this corrupt mf'er in jail!")]. Readers of the WaPo Article concluded that TMTG operated underhandedly and openly disregarded the rule of law. [*See, e.g.,* https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/?commentID=99e03c41-0803-41cc-8340-fbd718941d86].

16.    To reinforce the WaPo's Article central thesis – that TMTG engaged in or was a party to securities fraud – WaPo included in the Article the story of an "investor", Tom Sas, a Trump supporter, who was "injured" after he spent $561,000 on DWAC stock, "his life savings", because of TMTG's non-disclosures. On May 13, 2023, WaPo quote tweeted the Article and highlighted Sas' misfortune, implying and insinuating that TMTG's concealment of material facts caused DWAC's stock price to plummet to $13 per share. In his quote tweet, Harwell ridiculed Sas and other investors similarly situated. [https://twitter.com/drewharwell/status/1657366474032381952 ("No matter how your day is going, at least you didn't spend your life savings on Truth Social-related stock, paying $175 for shares that now sell for $13")]. WaPo's readers similarly mocked and laughed at Sas. They called him a "sucker". After reading the WaPo Article, they quote tweeted that Sas was the victim of a stock "scam" and "grift".

17.     As was naturally and foreseeably intended by WaPo and Wilkerson, the

Statements were republished millions of times on May 13, 2023 and thereafter, including

by prominent anti-TMTG Twitter users, *see, e.g.*:

> https://twitter.com/MuellerSheWrote/status/1657865291794382848
> ("HA!  The Russian tied to the bank that loaned Truth Social $8M to stay afloat
> also donated $30K to Ron DeSantis, and the bank is the '#1 trusted payment
> service' for the porn industry.  Oh, the tangled web they weave");

> https://twitter.com/john_sipher/status/1657512249605382144
> ("Seems up-and-up.  Trump appears to be secretly seeking a loan from a relative
> of a Putin ally via a secretive porn financing bank, and is arranging w/o telling it's
> own shareholders.  Normal stuff");

> https://twitter.com/svdate/status/1657375596484218881
> ("Has Trump ever been involved in a normal business that provided a normal
> good or service that didn't get investigated for fraud in some manner?");

> https://twitter.com/eztempo/status/1657525579548344320
> ("Who woulda guessed that Trump's Truth Social is snarled in a Federal
> investigation of money laundering and that the cash is linked to a Putin-allied
> oligarch and that Trump Media shareholders are being kept in the dark?");

> https://twitter.com/craigunger/status/1657399351088390145
> ("So much corruption.  So little time: Trust linked to porn-friendly bank could
> gain a stake in Trump's Truth Social");

> https://twitter.com/rhonda_harbison/status/1658550092968742913
> ("Trump Media took $8 million loan from porn-tied bank, unknown trust");

> https://reporter.london/?p=1044
> ("Washington Post and Reporter shed light on Trump social media firm
> financing");

> https://www.rawstory.com/trump-truth-social-2660106914/
> ("Sketchy funding for Trump's Truth Social was hidden from SEC and investors:
> report").

18.     The Statements are materially false.  Contrary to WaPo's Statements,

TMTG did not conceal from or improperly fail to disclose (or cause DWAC to

improperly fail to disclose) to the SEC or DWAC shareholders that ES Family Trust

would gain a stake in TMTG if TMTG consummated a merger with DWAC.  In truth, DWAC properly disclosed TMTG's debt in its registration statement filed with the SEC. TMTG did not conceal material facts from any shareholder or the SEC.  WaPo's Statements are blatantly false.  TMTG also *never* paid a $240,000 "finder's fee" to anyone for helping to arrange the $8 million loan from ES Family Trust.  No brokerage associated with Orlando received any finder's fee.  Orlando did not receive any fee. WaPo's Statements are knowing falsehoods.  TMTG did not improperly fail to disclose (or cause DWAC to improperly fail to disclose) payment of a finder's fee to the SEC, DWAC shareholders, and/or the investing public.  Comparing WaPo's Statements to the truth, WaPo's Statements are plainly materially false and defamatory. [*Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1107-1109 (Fla. 2008); *Nunes v. W.P. Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("Taken as a whole, the article says (or at least a reasonable juror could understand the article to say) that Nunes had made baseless claims about spying on Trump Tower and then visited the White House to inspect documents that might support those baseless claims.  And a reasonable juror could conclude that an elected official is ridiculous or unfit for office if he searched for evidence to support baseless claims.  Indeed, the online article stated that Nunes had searched for this evidence 'late at night,' suggesting something untoward about the outing")].

19.     Fla. Stat. § 770.01 provides that before any civil action is brought for publication in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff "shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory."  On May 14, 2023, TMTG served notice on WaPo

pursuant to § 770.01 and requested retraction.  In a May 17, 2023 response written by Montgomery, WaPo admitted that payment of the "$240,000 finder's fee" was "information" that was "material to investors", but WaPo refused to recognize that no finder's fee had ever been paid, that TMTG did not fail or refuse to disclose anything to the SEC or shareholders, and that its Statements were materially false.  To this day, WaPo refuses to retract the false and defamatory Statements.

20.   WaPo's Statements were not published in good faith.  The falsity of the Statements is not due to an honest mistake of the facts.  There are no reasonable grounds for believing that the Statements are true.  Publication of the Statements and republication of the Guardian article was part of a concerted effort to damage TMTG and interfere with its business.

**FIRST CAUSE OF ACTION –
DEFAMATION**

21.   TMTG restates paragraphs 1 through 20 of this Complaint, and incorporates them herein by reference.

22.   WaPo made and published to third-parties, including WaPo's subscribers, advertisers, viewers, and followers in Sarasota County, Florida, false factual Statements, which are detailed verbatim above, of or concerning TMTG.  WaPo also republished the false and defamatory statements published by the Guardian. *See, e.g., Doe v. Am. Online, Inc.*, 783 So.2d 1010, 1017 (Fla. 2001) ("[E]very repetition of a defamatory statement is considered a publication."); *id. Lewis v. Abramson*, 2023 WL 3322009, at * 18 (D. N.H. 2023) ("Abramson argues that he cannot be held liable for this statement because it is 'simply a quote from a Guardian article.'  However, 'one who repeats ... defamatory

matter is subject to liability as if he had originally published it.'") (citations and quotations omitted).

23.     By publishing the false and defamatory Statements on the Internet and by tweeting the false Statements to its 20,000,000+ followers, WaPo knew or should have known that its false and defamatory Statements would be republished over and over and over by third-parties to TMTG's detriment and injury.  Republication was the natural and probable consequence of WaPo's actions and was actually and/or presumptively authorized by WaPo as part of its regular way of doing business.  In addition to the original publications, WaPo is liable for the republications of the false and defamatory Statements by its agents and by third-parties.

24.     WaPo's false Statements constitute defamation *per se*.  The Statements accuse TMTG of infamous crimes, including securities fraud, other actual misconduct, incompetence, dishonesty and deception in its trade and business.  The Statements tend to subject TMTG to distrust, public ridicule and contempt.  The Statements are inherently injurious to TMTG's business.

25.     WaPo's publication and republication of the false and defamatory Statements damaged TMTG's business, brand and good will, causing potential users of Truth Social to refrain from joining the platform, jeopardizing and further delaying the SEC's review of the proposed merger with DWAC, and causing loss of future earning capacity.  Publication of the WaPo Article destroyed at least $2.78 Billion of implied equity value in TMTG.  To make matters worse, after reading the WaPo Article TMTG's banker, JP Morgan Chase & Co., contacted TMTG to inquire about the year-plus old transactions with Paxum Bank.  Prior to this call, JP Morgan had expressed no concerns

with the transfers.  The calls on May 17 and 18, 2023 evidenced JP Morgan's concerns about TMTG's business caused by the false and defamatory Statements published and republished by WaPo.

26.    WaPo acted with actual malice and reckless disregard for the truth for the following reasons:

a.    First, WaPo and Wilkerson fabricated facts about securities fraud, and published and republished Statements that were a product of their imagination.  They made up facts out of whole cloth in order to impute securities violations, fraud and intentional wrongdoing to TMTG. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination").  In the Article, WaPo represents that "internal documents" supplied by Wilkerson showed that ES Family Trust "would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds".  WaPo knew this was false because no real or authentic documents showed this.  Further, the existence and relevant terms of all TMTG convertible promissory notes were collectively and appropriately disclosed in DWAC's securities filings, which was well-known to WaPo because it read all of DWAC's SEC filings.  WaPo also knew that Wilkerson had arranged the wires from ES Family Trust, and, thus, that no finder's fee had been paid to anyone.  From discussions with Wilkerson and his lawyers and his review of documents, WaPo reporter Harwell knew there was no evidence that any finder's fee had been paid.  In spite of knowing the story was fake or at least having no evidence of payment of any finder's fee and, therefore, serious doubts as to the truth of the story, WaPo accused TMTG of hiding payment of the fictitious

"$240,000 finder's fee" from the SEC and shareholders.[4]  If true, TMTG's fraudulent and

deceptive concealment of material facts from the SEC and shareholders would have been,

at the very least, a colossal lack of good business judgment and grounds for the SEC to

delay or deny effectiveness of DWAC's registration statement pertaining to its merger

with TMTG.

        b.      Second, WaPo knew Wilkerson had been "ousted" from TMTG,

and that there was bad blood between TMTG and Wilkerson following Wilkerson's

termination for cause. *AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090, at

* 8 (E.D. Va. 2015) ("If, in fact, TME knew of the bad blood between Plaintiffs and

Defendant Cartner, it would have indeed had obvious reason to doubt Cartner's veracity

and the accuracy of his statements given the blatantly hostile and sarcastic tone of the

Article.").  In spite of serious doubts as to the veracity of Wilkerson's words, WaPo

published the false and defamatory Statements anyway.

        c.      Third, WaPo's Statements were intentionally extreme and

outrageous.  WaPo knew that publication of the Statements would cause a media frenzy.

WaPo deliberately and recklessly conveyed a false narrative about TMTG in order to

sensationalize the news and injure TMTG's business and reputation. *See, e.g., Tomblin v.*

---

[4]      The WaPo Article states that:

"A wire transfer document dated [December 23, 2021] shows that $2 million was
sent to Trump Media by Paxum Bank, whose main office is on the small
Caribbean island of Dominica.  A separate wire transfer document, dated Feb. 17,
2022, shows Trump Media being paid another $6 million by ES Family Trust."

WaPo and Wilkerson concealed from readers that Wilkerson himself arranged the wires.
Wilkerson and WaPo knew that nothing had been concealed from shareholders or the
SEC.  The failure to disclose Wilkerson's role in the wire transfers was intentional.  It
demonstrates WaPo's actual malice.

*WCHS-TV8*, 2011 WL 1789770, at * 5 (4th Cir. 2011) (unpublished) ("on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts").

        d.     Fourth, WaPo intentionally violated its code of ethics and consciously abandoned all journalistic standards and integrity in writing, editing and publishing the Statements, and relying on Wilkerson. WaPo knew it had no evidence that TMTG had paid a $240,000 finder's fee to anyone or that TMTG had concealed that fact from the SEC and shareholders. WaPo published the Statements with the intent to inflict injury. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse").

        e.     Fifth, WaPo harbored extreme bias, ill-will and desire to inflict harm on TMTG through knowing falsehoods. *Don King Productions, Inc. v. Walt Disney Co.*, 40 So.3d 40, 45 (Fla. 4th DCA 2010) ("[a]n intention to portray a public figure in a negative light, even when motivated by ill will or evil intent, is not sufficient to show actual malice unless the publisher intended to inflict harm through knowing or reckless falsehood.") (citing *Garrison v. Louisiana*, 379 U.S. 64, 73 (1964)); *see Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 186 (2nd Cir. 2000) ("Plaintiff introduced sufficient circumstantial evidence to establish clearly and convincingly that defendant Pelayo entertained serious doubts about the truth of the headline 'US judge finds Celle

'negligent.' This conclusion is based in part on evidence indicating ill will and personal animosity between Celle and Pelayo at the time of publication"); *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 315 fn. 19 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."); *ExpertConnect, LLC v. Fowler*, 2020 WL 3961004, at * 3 (S.D.N.Y. 2020) (plaintiff alleged that the defendants "'engaged in a concerted effort to deliberately disparage the business reputations of Fowler, Parmar, and Strafluence with false statements' that they had committed a serious crime and were under investigation.  These statements were made 'with full knowledge of their falsity' because '[t]here has never been any criminal action commenced against Fowler or Parmar, no investigation of any sort and, to be sure, no allegations of criminal conduct.'").  WaPo has a long and well-documented history of spite and hatred for TMTG, Nunes and President Trump.  The WaPo Article is another in a long line of hit pieces.

       f.      Finally, prior to publication on May 13, 2023, WaPo knew that TMTG's CEO (Nunes) had filed a lawsuit against the Guardian in which Nunes contended that the statements in the Guardian Article were false and defamatory.  In spite of Nunes' lawsuit, which WaPo read, WaPo brazenly published and republished the false and defamatory Guardian statements online and via Twitter millions of times. *Nunes v. Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.' Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977).  Lizza tweeted the article in November 2019 after Nunes filed this lawsuit and denied the article's implication.  The pleaded facts are suggestive enough to

render it plausible that Lizza, at that point, engaged in 'the purposeful avoidance of the truth.'").  WaPo's republications of the Guardian article constitute reckless disregard for the truth.

27.     As a direct result of WaPo's defamation, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000.00 or such greater amount as is determined by the Jury.

**SECOND CAUSE OF ACTION –
CONSPIRACY**

28.     TMTG restates paragraphs 1 through 27 of this Complaint, and incorporates them herein by reference.

29.     Beginning in October 2022 and continuing through the present, WaPo, outside third parties, Wilkerson and his attorneys combined, associated, agreed or acted in concert together for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation.  In furtherance of the conspiracy and preconceived plan, WaPo worked together with others to write, publish and republish a scandalous story about securities fraud.  They engaged in a joint scheme the unlawful purpose of which was to publish and republish false and defamatory Statements about TMTG in order to harm TMTG's business.  Wilkerson supplied documents to WaPo and the parties jointly worked on the fraudulent narrative about securities fraud.  WaPo engaged and worked with outside third parties to republish the WaPo Article to a worldwide audience.  The WaPo Article and its publication and republications were overt acts in furtherance of the conspiracy.

30.     WaPo and its co-conspirators acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming TMTG.

31.     WaPo's actions constitute a conspiracy at common law.

32.     As a direct result of WaPo's willful misconduct, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000.00 or such greater amount as is determined by the Jury.

TMTG alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession.  TMTG believes that substantial additional evidentiary support, which is in the exclusive possession of WaPo, Guardian, Wilkerson and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

TMTG reserves its right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, TMTG respectfully requests the Court to enter Judgment against WaPo as follows:

A.     Compensatory damages in the amount of $2,780,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $1,000,000,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest from May 13, 2023 until the date Judgment is entered at the maximum rate allowed by law;

D.      Postjudgment interest at the maximum rate allowed by Florida law;

E.      Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED:      May 20, 2023

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.

By:___*/s/ Jason Kobal*_____
        Jason R. Kobal, Esquire
        KOBAL LAW, P.A.
        12169 W. Lindebaugh Ave.
        Tampa, FL 33626
        (813) 873-2440
        koballaw@yahoo.com
        Florida Bar No.: 0542253

        *Counsel for the Plaintiff*

        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:  (804) 501-8272
        Facsimile:  (202) 318-4098
        Email:  stevenbiss@earthlink.net

        *Counsel for the Plaintiff*
        *(Application for Admission Pro Hac Vice*
                *To be Filed)*

**Complaint**
19



Sarasota County Clerk of the Circuit
Court
P.O. Box 3079
Sarasota, FL 34230-3079