Filing # 173606585 E-Filed 05/20/2023 05:28:12 PM

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, STATE OF FLORIDA
CIRCUIT CIVIL DIVISION**

| | | |
|---|---|---|
| TRUMP MEDIA & TECHNOLOGY GROUP CORP. | ) ) ) | CASE NO. _____ |
| Plaintiff, | ) ) | CASE TYPE: CA Libel / Slander |
| v. | ) ) ) | JUDGE: _____ |
| WP COMPANY, LLC d/b/a The Washington Post | ) ) ) | **TRIAL BY JURY IS DEMANDED** |
| Defendant. | ) ) | |

# <u>COMPLAINT</u>

Plaintiff, Trump Media & Technology Group Corp. ("Plaintiff" or "TMTG"), by counsel, files the following Complaint against defendant, WP Company, LLC d/b/a The Washington Post ("Defendant" or "WaPo").

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$3,780,000,000.00** or such greater amount as is determined by the Jury, (b) prejudgment interest on the principal sum awarded by the Jury from May 13, 2023 to the date of Judgment at the rate of 6.58 percent per year, and (c) costs – arising out of Defendant's defamation and conspiracy.

## I. <u>INTRODUCTION</u>

1.      TMTG is a private Sarasota-based media and technology company that operates a flagship social media platform called "Truth Social". On May 13, 2023, WaPo, acting in concert with a former employee of TMTG who was terminated for

cause, published an egregious hit piece that falsely accused TMTG of securities fraud and other wrongdoing.  WaPo's false criminal charges exposed TMTG to public ridicule, contempt and distrust, and injured TMTG's business and reputation.

2.      WaPo has been on a years-long crusade against TMTG characterized by the concealment of relevant information in its possession—a bitterly ironic truth for a publication whose motto is "*Democracy Dies in Darkness*".  WaPo's latest defamation creates an existential threat for TMTG, causing enormous loss.  TMTG brings this case to recover special damages to its business and good will, actual injury to its name and reputation, and punitive damages for WaPo's gross misconduct.

## II.  PARTIES

3.      TMTG is a Delaware corporation headquartered in Sarasota, Florida.

4.      WaPo is a Delaware limited liability company, whose sole member is Nash Holdings, LLC, a Delaware limited liability company, whose members include citizens of Delaware.  The *Washington Post* has more than 2,500,000 digital subscribers in the United States, including tens of thousands in Florida.  20,000,000 people follow WaPo on Twitter (@washingtonpost), including millions in Florida.  WaPo is at home in Florida.  WaPo has agents and offices in Florida.  It transacts substantial business in Florida, including the sale of newspapers, advertising and online subscriptions to residents of Sarasota, and the operation of an active website that is accessible in Florida, www.washingtonpost.com.      In April 2023, over 132,300,000 people visited Washingtonpost.com, including millions in Florida.  The article at issue in this action targeted a Florida business, and was accessed and read by thousands of Floridians.

### III.  JURISDICTION AND VENUE

5.      The Circuit Court of Sarasota County has subject matter jurisdiction over this action.

6.      WaPo is subject to the Court's general personal jurisdiction and specific personal jurisdiction.

7.      Venue is proper in Sarasota County, where the false and defamatory statements were published and where TMTG suffered substantial damage.

### IV.  STATEMENT OF MATERIAL FACTS

8.      On March 15, 2023, the Guardian published an online article entitled "***Federal investigators examined Trump Media for possible money laundering, sources say***".    [https://www.theguardian.com/us-news/2023/mar/15/trump-media-investigated-possible-money-laundering (the "Guardian Article")].  The Guardian Article contained false statements and defamatory implications, including that Federal investigators had examined TMTG "for possible money laundering"; that "New York prosecutors expanded criminal inquiry of company last year and examined acceptance of $8m with suspected Russian ties"; and that "Federal prosecutors in New York involved in the criminal investigation into Donald Trump's social media company last year started examining whether it violated money laundering statutes in connection with the acceptance of $8m with suspected Russian ties".

9.      The source of the Guardian's false and defamatory "money laundering" charges was a former employee of TMTG, Will Wilkerson ("Wilkerson"), who was terminated for cause.  Beginning in 2022, separate and apart from any purported

disclosures he may have made to the government, Wilkerson began to concoct and publicly shop false stories about TMTG to numerous media outlets.

10.     By May 2023, Wilkerson had come up with yet another fake news story. Wilkerson knew that WaPo eagerly published false stories about TMTG, its CEO, Devin Nunes ("Nunes") and, of course, former President Donald Trump.  Wilkerson contacted WaPo with a salacious story about a porn-friendly bank and securities fraud.  Through a series of meetings and conversations with Wilkerson and his lawyers, WaPo undertook with Wilkerson to publish agreed false and defamatory statements to injure TMTG.

11.     On May 13, 2023, WaPo published an online article with the clickbait headline, "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***".     [https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/ (the "WaPo Article")].

12.     The WaPo Article and follow-on social media republications contain the following false statements of fact of or concerning TMTG:

- "An obscure financial entity … would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds";

- "[T]he role ES Family Trust would assume in Trump Media and Technology Group has never been officially disclosed to the Securities and Exchange Commission ["SEC"] or to shareholders in Digital World Acquisition ["DWAC"], the special purpose acquisition company, or SPAC, that has proposed merging with Trump's company";

- "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust";

- "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO";

- "Orlando's finder's fee could affect the value of the shares";

- "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC";

- "Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC";

- "A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents";

- "The Guardian reported in March that federal prosecutors in New York have been investigating whether the Trump Media loans violated money-laundering statutes".

(each of the above is a "Statement" and together the "Statements").[1]

13.     WaPo was not content with publication of the false Statements to its 2,500,000 subscribers and republication to its 20,000,000 Twitter followers.  The primary author of the WaPo Article, Drew Harwell ("Harwell"), republished the Article to his 48,000 Twitter followers, which included correspondents at CNN, New York Times, NBC News, The Atlantic, Huffington Post, the Daily Beast, Business Insider, and the Guardian.  [https://twitter.com/drewharwell/status/1657351704419917825 ("New:  The Truth Social saga just keeps getting weirder.  Our latest includes a porn-friendly bank on a Caribbean island and an $8 million mystery loan").  In order to further spread the smear and increase the damage to TMTG, WaPo engaged agents from both within and outside the company to broadly republish the defamation.  Harwell and Washington Post "cyber reporter" Joseph Menn ("Menn") "boosted" (republished) the WaPo Article on the

---

[1]     At 3:24 p.m. on May 13, 2023, WaPo republished the WaPo Article to a new target audience – its 20,000,000+ Twitter followers.  WaPo's tweet falsely states that "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC").  To date, the tweet has been viewed over 331,500 times, retweeted 971 times, quote tweeted 54 times, and liked 1,953 times by Twitter followers and users.  [https://twitter.com/washingtonpost/status/1657466763611717633].  One WaPo reader posted a meme that stated it was "TIME to Arrest" Donald Trump.

Mastodon social media network.  Menn republished the Article to his 6,658 followers on Mastodon.   Harwell republished Menn's post to his 67,000 Mastodon followers. [https://mastodon.social/@JosephMenn@infosec.exchange/110363703525631648 ("Wild tale about mysterious backing for Truth Social")].  On May 13, 2023, Washington Post technology editor Mark Seibel (Seibel") joined the smear campaign.  Seibel republished the Article to 7,014 more Twitter followers, while falsely claiming that TMTG "borrowed money from a bank [Paxum Bank] best known for servicing the adult entertainment." [https://twitter.com/markseibel/status/1657407145535500288 ("More on the crazy doings at Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC")].  Harwell "liked" Seibel's tweet.[2]  Washington Post business editor, Lori Montgomery ("Montgomery"), the author of WaPo's May 17, 2023 response to TMTG's retraction demand (*see infra*), joined the fray on May 13, 2023 by retweeting the WaPo Article to her 6,805 Twitter followers.  Co-author of the WaPo Article, freelance journalist Matt Bernardini ("Bernardini"), also retweeted the Article to his 427 followers.      [https://twitter.com/MattBernardini7/status/1657346969365364737?s=20 ("NEW with @drewharwell and @mateirosca.  A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents")]. The second co-author of the WaPo Article, Matei Rosca ("Rosca"), tweeted the Article to his 2,518 followers [https://twitter.com/mateirosca/status/1657350755848683520?s=20], retweeted Harwell *and* Seibel, *and* republished the Article on his website.

---

[2]      "Likes" are represented on Twitter by a small heart and are used to show appreciation for a tweet.  A user can view the tweets that another user has liked from that user's profile page by clicking or tapping on the "Likes" tab. [https://help.twitter.com/en/using-twitter/liking-tweets-and-moments].

[https://reporter.london/].  Rosca led readers to believe that the WaPo Article was "just scratching the surface", and that there were additional undisclosed facts and wrongdoing by TMTG. [https://twitter.com/mateirosca/status/1657396995709890561?s=20 ( ⌣ ⌣ ) ("@MattBernardini7 @mateirosca @drewharwell the Washington Post ES Trust/Trump Media story is just scratching the surface, right?  Great work")].  WaPo's republication frenzy and repeated concerted harassment evidences a knowing, deliberate, organized and systemic effort to promote the false and defamatory Statements worldwide in order to inflict the greatest possible injury on TMTG.

14.     The clickbait headline of the WaPo Article – ***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social*** – immediately grabbed the common mind of readers, falsely insinuating that TMTG was involved in shady business dealings. [*See* https://twitter.com/ericgarland/status/1657772179793256450 ("Yo WaPo, you buried the lede here, even by calling it a loan from a 'porn-friendly bank.'  It's PAXUM BANK, one that's almost surely tied to Russian Mafiya $$$ from sex trafficking of cam girls in Romania and around the world.  Its owner just resigned yesterday.")].

15.     The Statements immediately conveyed a defamatory meaning to readers. The express meaning and defamatory gist of WaPo's Statements is that TMTG committed securities fraud or aided, abetted and participated in improper acts designed to conceal material facts[3] from the SEC and shareholders of DWAC, and that TMTG was being investigated for money laundering.  The WaPo Statements impute to TMTG

---

[3]     The WaPo Article represents that TMTG's failure to disclose payment of the "$240,000 finder's fee" was a material omission and, therefore, securities fraud. WaPo states, "Orlando's finder's fee could affect the value of the shares".  To be clear, WaPo's Statements are baseless because no finder's fee was ever paid to anyone.

crimes, dishonesty, want of integrity and corporate malfeasance. Readers concluded that TMTG and its executives could go to jail because of the non-disclosures described in the WaPo Article. [*See, e.g.,* https://twitter.com/dave_winx/status/1657723934677008390 ("The beautiful thing about this is that it could potentially lead to charges against Devon [sic] Nunes"); https://twitter.com/KeyLargo2/status/1657502055047614472 ("Someone, please put this corrupt mf'er in jail!")]. Readers of the WaPo Article concluded that TMTG operated underhandedly and openly disregarded the rule of law. [*See, e.g.,* https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/?commentID=99e03c41-0803-41cc-8340-fbd718941d86].

16.     To reinforce the WaPo's Article central thesis – that TMTG engaged in or was a party to securities fraud – WaPo included in the Article the story of an "investor", Tom Sas, a Trump supporter, who was "injured" after he spent $561,000 on DWAC stock, "his life savings", because of TMTG's non-disclosures. On May 13, 2023, WaPo quote tweeted the Article and highlighted Sas' misfortune, implying and insinuating that TMTG's concealment of material facts caused DWAC's stock price to plummet to $13 per share. In his quote tweet, Harwell ridiculed Sas and other investors similarly situated. [https://twitter.com/drewharwell/status/1657366474032381952 ("No matter how your day is going, at least you didn't spend your life savings on Truth Social-related stock, paying $175 for shares that now sell for $13")]. WaPo's readers similarly mocked and laughed at Sas. They called him a "sucker". After reading the WaPo Article, they quote tweeted that Sas was the victim of a stock "scam" and "grift".

17.     As was naturally and foreseeably intended by WaPo and Wilkerson, the

Statements were republished millions of times on May 13, 2023 and thereafter, including

by prominent anti-TMTG Twitter users, *see, e.g.*:

> https://twitter.com/MuellerSheWrote/status/1657865291794382848
> ("HA!  The Russian tied to the bank that loaned Truth Social $8M to stay afloat
> also donated $30K to Ron DeSantis, and the bank is the '#1 trusted payment
> service' for the porn industry.  Oh, the tangled web they weave");

> https://twitter.com/john_sipher/status/1657512249605382144
> ("Seems up-and-up.  Trump appears to be secretly seeking a loan from a relative
> of a Putin ally via a secretive porn financing bank, and is arranging w/o telling it's
> own shareholders.  Normal stuff");

> https://twitter.com/svdate/status/1657375596484218881
> ("Has Trump ever been involved in a normal business that provided a normal
> good or service that didn't get investigated for fraud in some manner?");

> https://twitter.com/eztempo/status/1657525579548344320
> ("Who woulda guessed that Trump's Truth Social is snarled in a Federal
> investigation of money laundering and that the cash is linked to a Putin-allied
> oligarch and that Trump Media shareholders are being kept in the dark?");

> https://twitter.com/craigunger/status/1657399351088390145
> ("So much corruption.  So little time: Trust linked to porn-friendly bank could
> gain a stake in Trump's Truth Social");

> https://twitter.com/rhonda_harbison/status/1658550092968742913
> ("Trump Media took $8 million loan from porn-tied bank, unknown trust");

> https://reporter.london/?p=1044
> ("Washington Post and Reporter shed light on Trump social media firm
> financing");

> https://www.rawstory.com/trump-truth-social-2660106914/
> ("Sketchy funding for Trump's Truth Social was hidden from SEC and investors:
> report").

18.     The Statements are materially false.   Contrary to WaPo's Statements,

TMTG did not conceal from or improperly fail to disclose (or cause DWAC to

improperly fail to disclose) to the SEC or DWAC shareholders that ES Family Trust

would gain a stake in TMTG if TMTG consummated a merger with DWAC. In truth, DWAC properly disclosed TMTG's debt in its registration statement filed with the SEC. TMTG did not conceal material facts from any shareholder or the SEC. WaPo's Statements are blatantly false. TMTG also ***never*** paid a $240,000 "finder's fee" to anyone for helping to arrange the $8 million loan from ES Family Trust. No brokerage associated with Orlando received any finder's fee. Orlando did not receive any fee. WaPo's Statements are knowing falsehoods. TMTG did not improperly fail to disclose (or cause DWAC to improperly fail to disclose) payment of a finder's fee to the SEC, DWAC shareholders, and/or the investing public. Comparing WaPo's Statements to the truth, WaPo's Statements are plainly materially false and defamatory. [*Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1107-1109 (Fla. 2008); *Nunes v. W.P. Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("Taken as a whole, the article says (or at least a reasonable juror could understand the article to say) that Nunes had made baseless claims about spying on Trump Tower and then visited the White House to inspect documents that might support those baseless claims. And a reasonable juror could conclude that an elected official is ridiculous or unfit for office if he searched for evidence to support baseless claims. Indeed, the online article stated that Nunes had searched for this evidence 'late at night,' suggesting something untoward about the outing")].

19.     Fla. Stat. § 770.01 provides that before any civil action is brought for publication in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff "shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." On May 14, 2023, TMTG served notice on WaPo

pursuant to § 770.01 and requested retraction.  In a May 17, 2023 response written by Montgomery, WaPo admitted that payment of the "$240,000 finder's fee" was "information" that was "material to investors", but WaPo refused to recognize that no finder's fee had ever been paid, that TMTG did not fail or refuse to disclose anything to the SEC or shareholders, and that its Statements were materially false.  To this day, WaPo refuses to retract the false and defamatory Statements.

20.    WaPo's Statements were not published in good faith.  The falsity of the Statements is not due to an honest mistake of the facts.  There are no reasonable grounds for believing that the Statements are true.  Publication of the Statements and republication of the Guardian article was part of a concerted effort to damage TMTG and interfere with its business.

## FIRST CAUSE OF ACTION – DEFAMATION

21.    TMTG restates paragraphs 1 through 20 of this Complaint, and incorporates them herein by reference.

22.    WaPo made and published to third-parties, including WaPo's subscribers, advertisers, viewers, and followers in Sarasota County, Florida, false factual Statements, which are detailed verbatim above, of or concerning TMTG.  WaPo also republished the false and defamatory statements published by the Guardian. *See, e.g., Doe v. Am. Online, Inc.*, 783 So.2d 1010, 1017 (Fla. 2001) ("[E]very repetition of a defamatory statement is considered a publication."); *id. Lewis v. Abramson*, 2023 WL 3322009, at * 18 (D. N.H. 2023) ("Abramson argues that he cannot be held liable for this statement because it is 'simply a quote from a Guardian article.'  However, 'one who repeats ... defamatory

matter is subject to liability as if he had originally published it.'") (citations and quotations omitted).

23.     By publishing the false and defamatory Statements on the Internet and by tweeting the false Statements to its 20,000,000+ followers, WaPo knew or should have known that its false and defamatory Statements would be republished over and over and over by third-parties to TMTG's detriment and injury.  Republication was the natural and probable consequence of WaPo's actions and was actually and/or presumptively authorized by WaPo as part of its regular way of doing business.  In addition to the original publications, WaPo is liable for the republications of the false and defamatory Statements by its agents and by third-parties.

24.     WaPo's false Statements constitute defamation *per se*.  The Statements accuse TMTG of infamous crimes, including securities fraud, other actual misconduct, incompetence, dishonesty and deception in its trade and business.  The Statements tend to subject TMTG to distrust, public ridicule and contempt.  The Statements are inherently injurious to TMTG's business.

25.     WaPo's publication and republication of the false and defamatory Statements damaged TMTG's business, brand and good will, causing potential users of Truth Social to refrain from joining the platform, jeopardizing and further delaying the SEC's review of the proposed merger with DWAC, and causing loss of future earning capacity.  Publication of the WaPo Article destroyed at least $2.78 Billion of implied equity value in TMTG.  To make matters worse, after reading the WaPo Article TMTG's banker, JP Morgan Chase & Co., contacted TMTG to inquire about the year-plus old transactions with Paxum Bank.  Prior to this call, JP Morgan had expressed no concerns

with the transfers.  The calls on May 17 and 18, 2023 evidenced JP Morgan's concerns about TMTG's business caused by the false and defamatory Statements published and republished by WaPo.

26.    WaPo acted with actual malice and reckless disregard for the truth for the following reasons:

a.    First, WaPo and Wilkerson fabricated facts about securities fraud, and published and republished Statements that were a product of their imagination.  They made up facts out of whole cloth in order to impute securities violations, fraud and intentional wrongdoing to TMTG. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination").  In the Article, WaPo represents that "internal documents" supplied by Wilkerson showed that ES Family Trust "would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds".  WaPo knew this was false because no real or authentic documents showed this.  Further, the existence and relevant terms of all TMTG convertible promissory notes were collectively and appropriately disclosed in DWAC's securities filings, which was well-known to WaPo because it read all of DWAC's SEC filings.  WaPo also knew that Wilkerson had arranged the wires from ES Family Trust, and, thus, that no finder's fee had been paid to anyone.  From discussions with Wilkerson and his lawyers and his review of documents, WaPo reporter Harwell knew there was no evidence that any finder's fee had been paid.  In spite of knowing the story was fake or at least having no evidence of payment of any finder's fee and, therefore, serious doubts as to the truth of the story, WaPo accused TMTG of hiding payment of the fictitious

"$240,000 finder's fee" from the SEC and shareholders.[4]  If true, TMTG's fraudulent and deceptive concealment of material facts from the SEC and shareholders would have been, at the very least, a colossal lack of good business judgment and grounds for the SEC to delay or deny effectiveness of DWAC's registration statement pertaining to its merger with TMTG.

        b.     Second, WaPo knew Wilkerson had been "ousted" from TMTG, and that there was bad blood between TMTG and Wilkerson following Wilkerson's termination for cause. *AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090, at * 8 (E.D. Va. 2015) ("If, in fact, TME knew of the bad blood between Plaintiffs and Defendant Cartner, it would have indeed had obvious reason to doubt Cartner's veracity and the accuracy of his statements given the blatantly hostile and sarcastic tone of the Article.").  In spite of serious doubts as to the veracity of Wilkerson's words, WaPo published the false and defamatory Statements anyway.

        c.     Third, WaPo's Statements were intentionally extreme and outrageous.  WaPo knew that publication of the Statements would cause a media frenzy. WaPo deliberately and recklessly conveyed a false narrative about TMTG in order to sensationalize the news and injure TMTG's business and reputation. *See, e.g., Tomblin v.*

---

    [4]     The WaPo Article states that:

    "A wire transfer document dated [December 23, 2021] shows that $2 million was sent to Trump Media by Paxum Bank, whose main office is on the small Caribbean island of Dominica.  A separate wire transfer document, dated Feb. 17, 2022, shows Trump Media being paid another $6 million by ES Family Trust."

WaPo and Wilkerson concealed from readers that Wilkerson himself arranged the wires. Wilkerson and WaPo knew that nothing had been concealed from shareholders or the SEC.  The failure to disclose Wilkerson's role in the wire transfers was intentional.  It demonstrates WaPo's actual malice.

*WCHS-TV8*, 2011 WL 1789770, at * 5 (4th Cir. 2011) (unpublished) ("on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts").

        d.    Fourth, WaPo intentionally violated its code of ethics and consciously abandoned all journalistic standards and integrity in writing, editing and publishing the Statements, and relying on Wilkerson. WaPo knew it had no evidence that TMTG had paid a $240,000 finder's fee to anyone or that TMTG had concealed that fact from the SEC and shareholders. WaPo published the Statements with the intent to inflict injury. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse").

        e.    Fifth, WaPo harbored extreme bias, ill-will and desire to inflict harm on TMTG through knowing falsehoods. *Don King Productions, Inc. v. Walt Disney Co.*, 40 So.3d 40, 45 (Fla. 4th DCA 2010) ("[a]n intention to portray a public figure in a negative light, even when motivated by ill will or evil intent, is not sufficient to show actual malice unless the publisher intended to inflict harm through knowing or reckless falsehood.") (citing *Garrison v. Louisiana*, 379 U.S. 64, 73 (1964)); *see Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 186 (2nd Cir. 2000) ("Plaintiff introduced sufficient circumstantial evidence to establish clearly and convincingly that defendant Pelayo entertained serious doubts about the truth of the headline 'US judge finds Celle

'negligent.' This conclusion is based in part on evidence indicating ill will and personal animosity between Celle and Pelayo at the time of publication"); *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 315 fn. 19 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."); *ExpertConnect, LLC v. Fowler*, 2020 WL 3961004, at * 3 (S.D.N.Y. 2020) (plaintiff alleged that the defendants "'engaged in a concerted effort to deliberately disparage the business reputations of Fowler, Parmar, and Strafluence with false statements' that they had committed a serious crime and were under investigation.  These statements were made 'with full knowledge of their falsity' because '[t]here has never been any criminal action commenced against Fowler or Parmar, no investigation of any sort and, to be sure, no allegations of criminal conduct.'").  WaPo has a long and well-documented history of spite and hatred for TMTG, Nunes and President Trump.  The WaPo Article is another in a long line of hit pieces.

       f.      Finally, prior to publication on May 13, 2023, WaPo knew that TMTG's CEO (Nunes) had filed a lawsuit against the Guardian in which Nunes contended that the statements in the Guardian Article were false and defamatory.  In spite of Nunes' lawsuit, which WaPo read, WaPo brazenly published and republished the false and defamatory Guardian statements online and via Twitter millions of times. *Nunes v. Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.' Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977).  Lizza tweeted the article in November 2019 after Nunes filed this lawsuit and denied the article's implication.  The pleaded facts are suggestive enough to

render it plausible that Lizza, at that point, engaged in 'the purposeful avoidance of the truth.'").  WaPo's republications of the Guardian article constitute reckless disregard for the truth.

27.    As a direct result of WaPo's defamation, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000.00 or such greater amount as is determined by the Jury.

### SECOND CAUSE OF ACTION – CONSPIRACY

28.    TMTG restates paragraphs 1 through 27 of this Complaint, and incorporates them herein by reference.

29.    Beginning in October 2022 and continuing through the present, WaPo, outside third parties, Wilkerson and his attorneys combined, associated, agreed or acted in concert together for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation.  In furtherance of the conspiracy and preconceived plan, WaPo worked together with others to write, publish and republish a scandalous story about securities fraud.  They engaged in a joint scheme the unlawful purpose of which was to publish and republish false and defamatory Statements about TMTG in order to harm TMTG's business.  Wilkerson supplied documents to WaPo and the parties jointly worked on the fraudulent narrative about securities fraud.  WaPo engaged and worked with outside third parties to republish the WaPo Article to a worldwide audience.  The WaPo Article and its publication and republications were overt acts in furtherance of the conspiracy.

30.     WaPo and its co-conspirators acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming TMTG.

31.     WaPo's actions constitute a conspiracy at common law.

32.     As a direct result of WaPo's willful misconduct, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000.00 or such greater amount as is determined by the Jury.

TMTG alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession.  TMTG believes that substantial additional evidentiary support, which is in the exclusive possession of WaPo, Guardian, Wilkerson and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

TMTG reserves its right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

**CONCLUSION AND REQUEST FOR RELIEF**

WHEREFORE, TMTG respectfully requests the Court to enter Judgment against WaPo as follows:

A.     Compensatory damages in the amount of $2,780,000,000.00 or such greater amount as is determined by the Jury;

B.     Punitive damages in the amount of $1,000,000,000.00 or the maximum amount allowed by law;

C.     Prejudgment interest from May 13, 2023 until the date Judgment is entered at the maximum rate allowed by law;

D.     Postjudgment interest at the maximum rate allowed by Florida law;

E.     Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      May 20, 2023

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.

By:___ */s/ Jason Kobal*_____
            Jason R. Kobal, Esquire
            KOBAL LAW, P.A.
            12169 W. Lindebaugh Ave.
            Tampa, FL 33626
            (813) 873-2440
            koballaw@yahoo.com
            Florida Bar No.: 0542253

            *Counsel for the Plaintiff*

            Steven S. Biss (VSB # 32972)
            300 West Main Street, Suite 102
            Charlottesville, Virginia 22903
            Telephone:  (804) 501-8272
            Facsimile:  (202) 318-4098
            Email:  stevenbiss@earthlink.net

            *Counsel for the Plaintiff*
            *(Application for Admission Pro Hac Vice*
                 *To be Filed)*

**Complaint**
19

