**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

**CASE NO. 8:23-cv-01535-TPB-AAS**

TRUMP MEDIA & TECHNOLOGY          )
      GROUP CORP.                             )
                                       )
        Plaintiff,                              )
                                         )
v.                                                        )
                                       )
                                       )
WP COMPANY, LLC                          )
                                       )
        Defendant.                             )
_____)

# PLAINTIFF'S MEMORANDUM IN OPPOSITION
# TO DEFENDANT'S MOTION TO DISMISS

      Plaintiff, Trump Media & Technology Group Corp. ("TMTG"), by counsel, pursuant to Local Civil Rule 3.01(b), respectfully submits this Memorandum in Opposition to the motion to dismiss pursuant to Rule 12(b)(6) [*ECF No. 12*] filed by defendant, WP Company, LLC ("WaPo").

## I.  INTRODUCTION

      This is an action for defamation per se and conspiracy arising out of WaPo's publication of false statements both online and to 20+ million readers via social media. In an article whose click bait headline refers to a "porn friendly bank" and "Trump's Truth Social," WaPo falsely accused TMTG of securities fraud and other criminal and deceptive business practices. [*ECF No. 1 ("Compl."), ¶¶ 11-12*].  TMTG demanded retraction of the false statements.  WaPo refused.

TMTG commenced this action on May 20, 2023 by filing a two-count complaint for defamation and conspiracy in the Circuit Court for Sarasota County, Florida. WaPo removed the case to this Court on July 10, 2023, alleging that "complete diversity exists between TMTG, a citizen of Delaware and Florida, and the Post, a citizen of Delaware and the State of Washington." [*ECF No. 1 ("Notice of Removal"), ¶ 13*]. After TMTG filed a motion to remand the case to State Court [*ECF No. 7*],[1] WaPo filed a "corrected" notice of removal. On July 17, 2023, WaPo filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The matter is before the Court on WaPo's motion to dismiss.

For the reasons stated below, the Court should deny WaPo's motion.

## II.   BACKGROUND

TMTG is a private Sarasota-based media and technology company that operates a flagship social media platform called "Truth Social". [*Compl., ¶ 1*]. WaPo publishes the *Washington Post*, a newspaper with more than 2,500,000 digital subscribers in the United States and more than 20,000,000 followers on Twitter. [*Id., ¶ 4*].

On March 15, 2023, Guardian News & Media (the "Guardian") published an online article entitled "***Federal investigators examined Trump Media for possible money laundering, sources say***" (the "Guardian Article")]. The Guardian Article contained false statements and defamatory implications, including that federal investigators had examined TMTG "for possible money laundering"; that "New York prosecutors expanded [a] criminal inquiry of [the] company last year and examined acceptance of $8m with suspected Russian ties"; and that "Federal prosecutors in New York involved in the criminal investigation into Donald Trump's social media company

---

[1]       TMTG's motion to remand is pending.

last year started examining whether it violated money laundering statutes in connection with the acceptance of $8m with suspected Russian ties". [*Compl., ¶ 8*].  The source of the Guardian's false and defamatory "money laundering" charges was a former employee of TMTG, Will Wilkerson ("Wilkerson"), who had been terminated for cause because of his unauthorized disclosures of TMTG's confidential information to the press.  Beginning in 2022, separate and apart from any purported disclosures he may have made to the government, Wilkerson began to concoct and publicly shop false stories about TMTG to numerous media outlets, including WaPo – which published sympathetic profiles of Wilkerson on October 15, 2022, and April 29, 2023.  By May 2023, Wilkerson had come up with yet another fake news story.  Wilkerson knew that WaPo eagerly published false stories about TMTG, its CEO, Devin Nunes ("Nunes") and, of course, former President Donald Trump.  Wilkerson contacted WaPo with a salacious story about a porn-friendly bank and securities fraud involving a Trump-owned company led by Nunes.  Through a series of meetings and conversations with Wilkerson and his lawyers, WaPo undertook with Wilkerson to publish agreed false and defamatory statements to injure TMTG and its business. [*Id., ¶¶ 9-10*].

A.     **_The WaPo Article_**

On May 13, 2023, WaPo published an online article entitled, "**_Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social_**" (the "WaPo Article"). [*Id., ¶ 11*].  Ex. A to WaPo's motion to dismiss is a true copy of the Article.  In the Article and contemporaneous social media posts, WaPo and its reporters published the following statements of fact about TMTG:

- "An obscure financial entity … would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds";

- "[T]he role ES Family Trust would assume in Trump Media and Technology Group has never been officially disclosed to the Securities and Exchange Commission ["SEC"] or to shareholders in Digital World Acquisition ["DWAC"], the special purpose acquisition company, or SPAC, that has proposed merging with Trump's company";

- "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust";

- "the recipient of that fee was an outside brokerage associated with Patrick Orlando ["Orlando"], then Digital World's CEO";

- "Orlando's finder's fee could affect the value of the shares";

- "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC";

- "Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC"; and

- "A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents".

In addition, WaPo republished false statements that originally appeared in the Guardian

Article:[2]

- "The Guardian reported in March that federal prosecutors in New York have been investigating whether the Trump Media loans violated money-laundering statutes".

---

[2]     WaPo is liable for its republication of the Guardian's false and defamatory statements. *See, e.g., Doe v. Am. Online, Inc.*, 783 So.2d 1010, 1017 (Fla. 2001) ("[E]very repetition of a defamatory statement is considered a publication."); *id. Lewis v. Abramson*, 2023 WL 3322009, at * 18 (D. N.H. 2023) ("Abramson argues that he cannot be held liable for this statement because it is 'simply a quote from a Guardian article.' However, 'one who repeats ... defamatory matter is subject to liability as if he had originally published it.'") (citations and quotations omitted); *Butowsky v. Folkenflik*, 2019 WL 2518833, at * 13 (E.D. Tex. 2019) ("It is a well-settled legal principle that one is liable for republishing the defamatory statement of another.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own")).

(Each of the above is a "Statement" and together they are hereinafter referred to as the "Statements") [*Compl., ¶¶ 12-13*].

### 1. *Material Falsity*

TMTG alleges that the Statements are materially false. [*Compl., ¶ 18*].  Contrary to WaPo's Statements, TMTG did not conceal from or improperly fail to disclose (or cause DWAC to improperly fail to disclose) to the SEC or DWAC shareholders that ES Family Trust would gain a stake in TMTG if TMTG consummated a merger with DWAC.  In truth, DWAC properly disclosed TMTG's debt in its registration statement filed with the SEC.  TMTG did not conceal material facts from any shareholder or the SEC.  TMTG also ***never*** paid a $240,000 "finder's fee" to anyone for helping to arrange the loans from ES Family Trust.[3]  Neither Orlando nor any brokerage with which he was affiliated ever received any finder's fee.  TMTG did not improperly fail to disclose (or cause DWAC to improperly fail to disclose) payment of a finder's fee to the SEC, DWAC shareholders, and/or the investing public.  Comparing WaPo's Statements to the truth, WaPo's Statements are not only false, but materially false. *See Nunes v. WP Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("A reasonable juror could conclude that there is a material difference between stating that Nunes had made a claim supported by evidence (that the Obama administration had undertaken intelligence activities related

---

[3]     In its motion to dismiss, WaPo attempts to distance itself from the actual Statements published in the Article.  In the Article, WaPo positively represented, without caveat, qualification or caution, that TMTG **paid** the $240,000 finder's fee.  WaPo recognizes that this Statement is materially false.  And so, in its motion to dismiss, p. 6, WaPo suggests to the Court that it merely reported that TMTG "agreed to pay" a finder's fee.  **WaPo did not report that TMTG "agreed to pay" a finder's fee.  WaPo repeatedly and emphatically stated that TMTG actually *paid* the fee.  WaPo made this positive misrepresentation to support its core accusation that TMTG concealed material facts from shareholders and the SEC.**

to individuals involved in the Trump campaign) and stating that Nunes had made a baseless claim (that the Obama administration had wiretapped Trump Tower).   A reasonable juror could therefore conclude that the article was materially false because it stated that Nunes had made such a baseless claim (when he had not).”); *One for Israel v. Reuven*, 2022 WL 4465389, at * 4 (S.D. Fla. 2022) (“Plaintiffs allege facts that would plausibly establish falsity.  Not only do both Eitan and Mordechai claim that the story Reuven told was false, but also Rabbi Asor who was the person allegedly attacked at the café stated that the story was false.”); *see also Bustos v. A&E Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (Gorsuch, J.) (“Comparing the challenged defamatory statement (membership in the Aryan Brotherhood) to the truth (conspiring with and aiding and abetting the Aryan Brotherhood), we cannot see how any juror could find the difference to be a material one—that is, likely to cause a reasonable member of the general public to think significantly less favorably of Mr. Bustos”).

## 2.   *Defamatory Meaning*

TMTG alleges that the Statements “exposed TMTG to public ridicule, contempt and distrust, and injured TMTG’s business and reputation.” [*Compl., ¶ 1*].  The WaPo Article and the tweets by WaPo and its reporters [*Id., ¶ 12 fn. 1*; *¶ 13*] identify TMTG by name and expressly include TMTG as one of the “companies” that hid material facts[4] from the SEC.  The complaint states that the WaPo Article conveyed a defamatory meaning to readers, including that TMTG had committed securities fraud or aided,

---

[4]      The WaPo Article represents that TMTG’s failure to disclose payment of the “$240,000 finder’s fee” was a material omission and, therefore, securities fraud. WaPo states, “Orlando’s finder’s fee could affect the value of the shares”.  To be clear, WaPo’s Statements are baseless because no finder’s fee was ever paid to anyone. [*Compl., ¶ 15 fn. 3*].

abetted and participated in improper acts designed to conceal material facts from the SEC and shareholders of DWAC, and that TMTG was being investigated for money laundering.  The complaint states that WaPo imputed to TMTG crimes, dishonesty, want of integrity and corporate malfeasance.  Indeed, TMTG points out that readers concluded that TMTG and its executives could go to jail because of the non-disclosures described in the WaPo Article.   Readers of the WaPo Article concluded that TMTG operated underhandedly and openly disregarded the rule of law. [*Compl., ¶¶ 15, 17*];[5] *see Williamson v. Digital Risk, LLC*, 2018 WL 3870064, at * 3 (M.D. Fla. 2018) (in assessing whether the defendant's statements are capable of a defamatory meaning, the language used should be interpreted as the 'common mind' would normally understand it); *Perry v. Cosgrove*, 464 So.2d 664, 666 (Fla. 2nd DCA 1985) ("The language of the document should not be interpreted by extremes, but should be construed as the common mind would naturally understand it").

To reinforce the WaPo's Article central thesis – that TMTG engaged in or was a party to securities fraud – WaPo included in the Article the story of an "investor", Tom Sas, a Trump supporter, who was "injured" due to TMTG's non-disclosures after he spent $561,000, "his life savings", on DWAC stock.  On May 13, 2023, WaPo quote tweeted the Article and highlighted Sas' misfortune, implying and insinuating that TMTG's concealment of material facts caused DWAC's stock price to plummet to $13

---

[5]     At 3:24 p.m. on May 13, 2023, WaPo republished the WaPo Article to a new target audience – its 20,000,000+ Twitter followers.  WaPo's tweet falsely states that "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC").  To date, the tweet has been viewed over 331,500 times, retweeted 971 times, quote tweeted 54 times, and liked 1,953 times by Twitter followers and users. [https://twitter.com/washingtonpost/status/1657466763611717633].   One WaPo reader posted a meme that stated it was "TIME to Arrest" Donald Trump. [*Compl., ¶ 12 fn. 1*].

per share.  WaPo reporter Drew Harwell ("Harwell") ridiculed Sas and other investors similarly situated.  WaPo's readers similarly mocked and laughed at Sas, calling him a "sucker".  After reading the WaPo Article, they quote tweeted that Sas was the victim of a stock "scam" and "grift". [*Compl., ¶ 16*].

In its complaint, TMTG asserts that the Statements constitute defamation *per se* because they accuse TMTG of infamous crimes, including securities fraud, other actual misconduct, incompetence, dishonesty and deception in its trade and business.  Further, TMTG alleges that the Statements are inherently injurious to its business and tend to subject TMTG to distrust, public ridicule and contempt. [*Compl., ¶ 24*]; *see Martinez v. Miami Children's Health System, Inc.*, 2021 WL 10131975, at * 5 (S.D. Fla. 2021) (statement that plaintiff is a "crook" "imputed upon Martinez conduct that was criminal and incompatible with the exercise of his lawful business.").

### 3.    *Republication of False Statements*

WaPo was not content with publication of the false Statements to its 2,500,000 subscribers and republication to its 20,000,000 Twitter followers.  The primary author of the WaPo Article, Harwell, republished the Article to his 48,000 Twitter followers, which included correspondents at CNN, the New York Times, NBC News, The Atlantic, Huffington Post, the Daily Beast, Business Insider, and the Guardian. [*Compl., ¶ 13*].  In order to further spread the smear and increase the damage to TMTG, WaPo engaged agents from both within and outside the company to broadly republish the defamation.  Harwell and WaPo "cyber reporter" Joseph Menn ("Menn") "boosted" (republished) the WaPo Article on the Mastodon social media network.  Menn republished the Article to his 6,658 followers on Mastodon.  Harwell republished Menn's post to his 67,000

Mastodon followers.  On May 13, 2023, WaPo technology editor Mark Seibel (Seibel")

joined the smear campaign.  Seibel republished the Article to 7,014 more Twitter

followers, while falsely claiming that TMTG "borrowed money from a bank [Paxum

Bank] best known for servicing the adult entertainment."  In his tweet, Seibel

reemphasized the defamatory gist of the WaPo Article by repeating that "Trump Media

… didn't tell the SEC".  WaPo business editor, Lori Montgomery ("Montgomery"),

joined the fray.  Co-author of the WaPo Article, freelance journalist Matt Bernardini

("Bernardini"), retweeted the Article to his 427 followers.  Bernardini falsely stated that a

"Russian banker connected to the porn industry could have gained a stake in Trump's

Truth Social according to documents".  Matei Rosca ("Rosca"),[6] the second co-author of

the WaPo Article, tweeted the Article to his 2,518 followers, retweeted Harwell *and*

Seibel, *and* republished the WaPo Article on his website.  Rosca led readers to believe

that the WaPo Article was "just scratching the surface", and that there were additional

undisclosed facts and wrongdoing by TMTG.  TMTG alleges that WaPo's republication

frenzy and repeated concerted harassment evidences a knowing, deliberate, organized and

systemic effort to promote the false and defamatory Statements worldwide in order to

inflict the greatest possible injury on TMTG. [*Compl., ¶ 13*].

    **4.**   ***Actual Malice***

The complaint alleges that WaPo published the false and defamatory Statements

with actual malice. [*Compl., ¶ 26*].  In support of its contention, TMTG first alleges that

WaPo and Wilkerson fabricated facts and published and republished Statements that were

a product of their imagination.  They made up facts out of whole cloth in order to impute

---

[6]    According to his tweets, Rosca is a freelance reporter based in London.

securities violations, fraud, deception and intentional wrongdoing to TMTG.  For example, although WaPo represents in the Article that "internal documents" supplied by Wilkerson showed that ES Family Trust "would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds", TMTG states that WaPo knew this was false or had a serious doubt as to its veracity.[7]  TMTG also alleges that WaPo had documents in its possession, including "wire transfer" documents, that showed no finder's fee had been paid to anyone, but WaPo nonetheless represented in the Article – as undisputed fact, not opinion – that a $240,000 finder's fee had been paid and that this material fact had been hidden from the SEC and DWAC shareholders by TMTG.[8]  In addition to direct knowledge of falsity, TMTG alleges that WaPo – which was aware that TMTG had fired Wilkerson for cause – knew about Wilkerson's resentment and the bad blood between Wilkerson and TMTG and, therefore, had an obvious reason to doubt Wilkerson's veracity and the accuracy of his statements.  TMTG alleges that in spite of serious doubts as to the veracity of Wilkerson's words, WaPo published the false and defamatory Statements anyway.  TMTG also asserts that WaPo intentionally violated its own code of ethics and consciously abandoned all journalistic standards and integrity in writing, editing and publishing the Statements, and in relying on Wilkerson.  Finally,

---

[7]     Although the WaPo Article claims that the "internal documents" show that the loan came from ES Family Trust and that the "Trust" stood to gain a stake in TMTG, WaPo's various reporters told far different stories. [*Compl., ¶ 13*].  Seibel told readers that TMTG "borrowed money from a bank".   Bernardini, co-author of the Article, represented that the "documents" showed that a "Russian banker connected to the porn industry" stood to gain a stake in TMTG.  WaPo's own conflicting statements show that they harbored a serious doubt as to the veracity of the documents supplied by Wilkerson.

[8]     TMTG alleges that WaPo concealed the fact that Wilkerson arranged the wire transfers himself, and would have known, therefore, that no finder's fee had been paid to TMTG or anyone else. [*Compl., ¶ 26(a) fn. 4*].

prior to publication on May 13, 2023, WaPo knew that TMTG's CEO (Nunes) had filed a lawsuit against Guardian in which Nunes contended that the statements in the Guardian Article were false and defamatory.  In spite of Nunes' lawsuit, which WaPo read prior to publication of the WaPo Article, WaPo brazenly republished the Guardian's false and defamatory statements online and via Twitter millions of times.  The complaint alleges that WaPo's republications of the Guardian article constitute reckless disregard for the truth. [*Compl., ¶ 26(f)*].

**B.**     ***WaPo Refuses to Retract***

Before filing this action, TMTG served notice on WaPo pursuant to Fla. Stat. § 770.01, and requested retraction.  In a May 17, 2023 response written by Montgomery – the same business editor who had promoted the WaPo Article on May 13, 2023 by republishing it to her 6,805 Twitter followers [*Compl., ¶ 13*] – WaPo admitted that payment of the "$240,000 finder's fee" was "information" that was "material to investors", but WaPo refused to recognize that no finder's fee had ever been paid, that TMTG did not fail or refuse to disclose anything to the SEC or shareholders, and that its Statements were materially false.  To this day, WaPo refuses to retract the false and defamatory Statements. [*Compl., ¶ 19*].

### III.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.  The threshold for surviving a motion to dismiss for failure to state a claim under Rule 12(b)(6) is a "low one." *Farmer v. Humana, Inc.*, 2022 WL 432126, at * 2 (M.D. Fla. 2022) (citing *Quality Foods de*

*Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A. et al.*, 711 F.2d 989, 995 (11ᵗʰ Cir. 1983)).  The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).  Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.*  "While the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them." *Hatfill v. New York Times*, 416 F.3d 320, 329 (4ᵗʰ Cir. 2005) (cited with approval in *Selinger v. Kimera Labs, Inc.*, 2022 WL 34444, at * 10 (S.D. Fla. 2022)).

In evaluating the sufficiency of a complaint in light of a motion to dismiss. the District Court construes the complaint liberally, accepts the pleaded facts as true and construes the facts in the light most favorable to the plaintiff. *Yachera v. Westminster Pharmaceuticals, Inc.*, 477 F.Supp.3d 1251, 1262 (M.D. Fla. 2020) (citing *Quality Foods*, 711 F.2d at 994-995)).  Thus, dismissal is warranted if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue that precludes relief. *Id.* (citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)).

## IV.  **DISCUSSION**

"Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 170 (1967) (Warren, C.J., Concurring).  The press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972).  The press has no right to "invent facts" or to "comment on the facts so invented" and, thereby, convince readers that the invented facts are true.  Simply put:

> "[l]iberty of the press is not license, and newspapers have no privilege to publish falsehoods or to defame under the guise of giving the news.  It is held that the press occupies no better position than private persons publishing the same matter; that it is subject to the law, and if it defames it must answer for it."

*Williams Printing Co. v. Saunders*, 113 Va. 156, 73 S.E. 472, 477 (1912) (numerous citations and quotations omitted); *Dexter v. Spear*, 7 F. Cas. 624-625 (1st Cir. 1825) (Story, J.) ("No man has a right to state of another that which is false and injurious to him.  A fortiori no man has a right to give it a wider and more mischievous range by publishing it in a newspaper.  The liberty of speech, or of the press, has nothing to do with this subject.  They are not endangered by the punishment of libellous publications. The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation.  There can be no right in printers, any more than in other persons, to do wrong.").

WaPo published wholly invented facts about TMTG.  It did so with actual malice and the intent to inflict harm of TMTG's business.  The motion to dismiss should be denied.

A.      ***COUNT I – Defamation***

Under Florida law, "[d]efamation has the following five elements: (1) publication; (2) falsity;[9] (3) [the] actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) [the] statement must be defamatory."[10] *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).  In defamation *per se* cases, plaintiffs "do not need to show any special damages" because the defamation is actionable on its face. *Johnson v. Fin. Acceptance Co. of Georgia*, 118 Fla. 397, 400, 159 So. 364 (1935).  Defamation *per se* occurs when, *inter alia*, the defendant (1) imputes to the plaintiff the commission of an "infamous crime"; or (2) subjects the plaintiff to "hatred, distrust, ridicule, contempt, or disgrace"; or (3) injures the plaintiff "in his trade or profession." *Richard v. Gray*, 62 So.2d 597, 598 (Fla. 1953).

WaPo challenges TMTG's claim of defamation on several grounds.  Those challenges are addressed in order:

---

[9]      As to the element of falsity, "[t]he common law of libel takes but one approach ... regardless of the form of the communication.   It overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-517 (1991).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.*  Therefore, "[a] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 517 (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

[10]      "Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to determine whether the communication was understood in the defamatory sense." *Kieffer v. Atheists of Fla., Inc.*, 269 So.3d 656, 659 (Fla. 2nd DCA 2019) (quoting *Perry*, 464 So.2d at 666)).

1. ***TMTG Plausibly Pleads Actual Malice***

In a defamation case, the presumption is that a plaintiff is a private individual, subject to the defendant's burden of proving that the plaintiff is a public figure. *See, e.g., Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1533 (4th Cir. 1994); *see Michaelis v. CBS, Inc.*, 119 F.3d 697, 702 (8th Cir. 1997) ("Our discussion begins with the district court's finding that Michaelis was a public official.  Defendants bear the burden on this issue").

TMTG is a private company. [*Compl., ¶ 1*].  The loans purportedly at issue in the WaPo Article were private transactions, subject to confidentiality obligations binding the parties thereto.  The "public controversy" in this case is not one of TMTG's making.  TMTG did not "voluntarily place [itself] in the public eye." *One for Israel*, 2022 WL 4465389 at * 3.  Rather, WaPo and Wilkerson manufactured the public controversy at the heart of this defamation case, and thrust TMTG into its vortex, by relying on leaked documents to suggest that the loans from the ES Family Trust "offer[] a possible explanation for why the SEC has yet to approve" the merger with DWAC. *See Hutchison v. Proxmire*, 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.") (citations omitted).  TMTG is not a public figure because it was "founded by" and bears, in part, the name of former President Trump.  There are dozens of businesses registered in Florida alone that bear the Trump name.  They are not public figures.  WaPo's statement that TMTG has "such fame and notoriety that [it] will be a public figure in any case" is purely conclusory.  WaPo offers no evidence.

Assuming, *arguendo*, that TMTG is a limited purpose public figure, the complaint plausibly alleges that WaPo published the Statements with actual malice.

A defamatory statement is made with "actual malice" if it was made with knowledge of its falsity or with a reckless disregard as to whether it was true or not. *Miami Herald Pub. Co. v. Ane*, 458 So.2d 239, 241 (Fla. 1984) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-280 (1964)).   "The existence of actual malice may be shown in many ways.   As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration." *Herbert v. Lando*, 441 U.S. 153, 164 fn. 12 (1979).

Typically, actual malice is shown by an "accumulation" of evidence and inferences. *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 183 (2nd Cir. 2000) (in order to infer actual malice, the facts alleged "should provide evidence of 'negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice.'") (quoting *Bose Corp. v. Consumers Union of the United States*, 692 F.2d 189, 196 (1st Cir. 1982) (emphasis added in original)); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2nd Cir. 1969) ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's

recklessness or of his knowledge of falsity."); *see Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.") (citations omitted).

In paragraph 26 of the complaint, TMTG alleges that WaPo knew the Statements were false or harbored a serious doubt as to the truth of the Statements, but published them anyway. WaPo had the "internal documents" in its possession. It knew, therefore, that the documents did not provide a basis to claim that the ES Family Trust stood to acquire a "sizable stake" in TMTG if the merger deal proceeded. WaPo's serious doubts about the documents are confirmed by the conflicting Statements offered by its various reporters on May 13, 2023. Contradicting Harwell, Seibel said TMTG "borrowed money from a bank". Bernardini claimed that a mysterious "Russian banker" stood to gain "a stake in Trump's Truth Social according to documents". [*Compl., ¶ 13*]. WaPo also knew that no finder's fee had been "paid"[11] because it had the "wire transfer" documents. Wilkerson himself executed the wires. WaPo knew that no money had been wired to **anyone**, including Orlando or some "outside brokerage" with whom he was suspected to have an affiliation; yet, WaPo positively represented and categorically reported that a $240,000 finder's fee had been "paid" to bolster the theme that TMTG had concealed material facts from DWAC shareholders and the SEC. Coupled with its knowledge of falsity, WaPo knew about the "bad blood" between Wilkerson and TMTG and that their

---

[11]     The fact that WaPo had an "[brokerage firm] invoice" does not mean or imply that the invoice was "paid", as WaPo obviously knew from its reliance on the "wire transfer" documents.

relationship had "gone sour". [*Compl., ¶ 26(b)*]; *AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090, at * 8 (E.D. Va. 2015) ("If, in fact, TME knew of the bad blood between Plaintiffs and Defendant Cartner, it would have indeed had obvious reason to doubt Cartner's veracity and the accuracy of his statements").  Finally, WaPo knew that TMTG's CEO, Nunes, had filed a lawsuit in which he expressly denied the Guardian's false and defamatory statements.  WaPo republished the Guardian's false statements anyway. *Nunes v. Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.' Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977)).

The facts plausibly show that WaPo deliberately chose to ignore the truth and deliberately chose to perpetuate false and baseless allegations against TMTG.[12]  Accepted as true, the facts suffice to show that WaPo published the Statements with constitutional malice. *See, e.g., Dershowitz v. Cable News Network, Inc.*, 541 F.Supp.3d 1354, 1368 (S.D. Fla. 2021) ("The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements."); *Zimmerman v. Buttigieg*, 521 F.Supp.3d 1197, 1214 (M.D. Fla. 2021) ("The complaint alleges that Buttigieg and Warren's tweets implied that Zimmerman had killed Trayvon

---

[12]     WaPo's "attempts" to contact "numerous individuals or entities" after it had already written the WaPo Article and prior to publication does not absolve WaPo of liability for fabricating facts – it is a pretext solely designed to support a "good faith" defense in the event of a lawsuit.  No comment from TMTG or Orlando or anyone else would have stopped WaPo from publishing these falsehoods.  Indeed, the story fits comfortably in WaPo's long, well-documented history of animus toward TMTG and Nunes.

Martin because Zimmerman is racist or a white supremacist, or due to other like reasons, even though both were aware that he was acquitted of all charges based on evidence that he acted out of self-defense.  Based on the allegations of the complaint, taken as true, Count I and Count II sufficiently plead that Buttigieg and Warren knew the falsity of what their respective tweets implied and therefore acted with malice in publishing them."); *Sirer v. Aksoy*, 2021 WL 4952610, at * 5 (S.D. Fla. 2021) ("the Complaint alleges Defendant was aware, when he published his YouTube video in which he made the statements, that those statements were false, and that he knew that they would cause substantial harm to Plaintiff.  Taken as true, this allegation is sufficient to plausibly state that Defendant acted with actual malice."); *Grayson v. No Labels, Inc.*, 2021 WL 2869870, at * 3 (M.D. Fla. 2021) ("the Complaint alleges that Defendants intended 'to ruin' Plaintiff's congressional campaign for 'personal profit,' that their business model relies on 'money from right-wing millionaires and billionaires' to 'denigrate, disparage, and destroy the reputations of progressive political candidates' with negative advertisements, and that they 'knowingly published' recanted statements without any disclaimer as well as 'edited and altered' news reports in 'misleading' ways."); *100PlusAnimal Rescue, Inc. v. Butkus*, 2020 WL 13517903, at * 9 (S.D. Fla. 2020) ("The May 2, 2017 assertion that Plaintiff Roman stole $120,000 in charitable donations was in direct contravention of the findings contained in the Supplemental Report and the other documentation that Defendant received *and* viewed on February 13, 2017.").

**2.** **_The Neutral Reporting Privilege Does Not Apply_**

"Under Florida law, it is well settled that disinterested communications of matters of public concern are privileged, even if defamatory." *Rendon v. Bloomberg, L.P.*, 403

F.Supp.3d 1269, 1276 (S.D. Fla. 2019) (citing *Abram v. Odham*, 89 So.2d 334, 336 (Fla. 1956)).  However, this privilege, known as the "neutral reporting privilege," "is only extended to disinterested and neutral reporting by members of the media." *Id.* (citing *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F.Supp.2d 1334, 1338 (S.D. Fla. 1998)).

The "neutral reporting privilege" does not apply.  WaPo is not neutral.  It is a well-known "Democratic Party broadsheet". *Tah v. Global Witness Publishing, Inc.*, 2021 WL 1045205, at * 17 (D.C. Cir. 2021) (Silberman, J., dissenting).  WaPo does not impartially disseminate information, at least insofar as TMTG, Nunes and President Trump are concerned.  TMTG alleges that WaPo has been on a years-long crusade against TMTG. [*Compl., ¶ 2*].  WaPo was not "hosting and moderating" a debate, *Corsi v. Newsmax Media, Inc.*, 519 F.Supp.3d 1110, 1124-1125 (S.D. Fla. 2021), or a "political rally", *Abram supra*.  Unlike the article in *Rendon*, the body of the WaPo Article makes clear that the story is being told by WaPo and its reporters, including Harwell.  WaPo's source in this case is an "ousted" ex-employee of TMTG, someone with an axe to grind.  WaPo took sides and exclusively reported that TMTG had engaged in criminal, fraudulent or unethical behavior.  TMTG describes the WaPo Article as a "hit piece". [*Id., ¶ 1*].[13]  The Article can hardly be called an act of disinterested or neutral reporting.

Even if the "neutral reporting privilege" applies in this case – and it does not – it is a "qualified privilege" than can be abused and lost. *Healy v. Suntrust Serv. Corp.*, 569 So.2d 458, 460 (Fla. 5th DCA 1990) ("[t]he existence of a qualified privilege vanishes if the statement is made with malice, or to too wide an audience").  Here, WaPo and its

---

[13]    https://www.washingtonpost.com/blogs/erik-wemple/post/whats-a-hit-piece/2012/05/11/gIQAYmblIU_blog.html ("**What's A Hit Piece?**") ("'hit piece' connotes intent, a plan to go out and get the subject").

reporters maliciously and excessively published and republished the false and defamatory Statements to over 2,500,000 digital subscribers and 20,000,000 Twitter followers.  Any privilege that existed has been lost.  At the very least, these issues "should be determined by the trier of fact". *Id.*

### 3.   *The Statements Are Materially False*

As stated above, TMTG alleges that the Statements are materially false and why they are materially false. [*Compl., ¶ 18*].

In its motion to dismiss, p. 20, WaPo argues that TMTG does not "contest that the company **may have** considered granting ES Family Trust TMTG stock or the Article's description of a partially signed convertible promissory note to that effect." (Emphasis added).  However, the WaPo Article does not say "may have" or that ES Family Trust "could have" or "might" acquire a stake in TMTG.  WaPo categorically stated that ES Family Trust "would gain" a stake in TMTG if the merger deal proceeded.[14]  Paragraph 12 of the complaint states that the Loan Statements are "false".  Other paragraphs allege the same thing in stronger language. [*See also Compl., ¶ 18 ("WaPo's Statements are blatantly false.")*].  The complaint further alleges that WaPo falsely accused the "companies" (including TMTG) of hiding ES Family Trust's future stake in TMTG from DWAC shareholders and the SEC.  The gist or sting of the Loan Statements is that TMTG committed or participated in securities fraud or other deceptive or unlawful securities practices.  It did not.  The Loan Statements are not substantially true at all.

---

[14]      Although the WaPo Article indicates that the "convertible promissory note dated December 23, 2021" was not signed by all parties, WaPo advised readers that the "money was sent anyway."  WaPo mislead readers into believing that it had knowledge of facts that were not known to the general public, and that TMTG and ES Family Trust had agreed to convert the $8 million loans into stock.

**4.      _Whether The Finder's Fee Was "Paid" Is Not Pure Opinion_**

The right of free speech provides absolute protection to statements which are "purely opinions". _Gertz v. Robert Welch, Inc._, 418 U.S. 323, 339-340 (1974).   A statement is pure opinion when it is "commentary or opinion based on facts that are set forth in the subject publication or which are otherwise known or available to the reader or listener." _Turner v. Wells_, 879 F.3d 1254, 1262 (11th Cir. 2018) ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.").  By contrast, a statement is mixed opinion "when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." _From v. Tallahassee Democrat, Inc._, 400 So.2d 52, 57 (Fla. 1st DCA 1981).   A mixed expression of opinion is not constitutionally protected. _Madsen v, Buie_, 454 So.2d 727, 729 (Fla. 1st DCA 1984).  "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' _is_ actionable." _Eastern Air Lines, Inc. v. Gellert_, 438 So.2d 923, 927 (Fla. 3rd DCA 1983), _disapproved on other grounds_, _Ter Keurst v. Miami Elevator Co._, 486 So.2d 547 (Fla. 1986) (quoting Restatement (Second) of Torts § 566 (1977) (emphasis in original)).  Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise." _Zambrano v. Devanesan_, 484 S.2d 603, 607 (Fla. 4th DCA 1986).

"In assessing whether an allegedly libelous statement is opinion, the court must construe the statement in its totality, examining not merely a particular phrase or

sentence, but all of the words used in the publication.  The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. It must take into account all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." *Rasmussen v. Collier County Pub. Co.*, 946 So.2d 567, 571 (Fla. 2nd DCA 2006) (citation omitted).

The "Finder's Fee Statements" are not opinions at all.  The WaPo Article states as unequivocal fact that "**Trump Media paid a $240,000 finder's fee** for helping to arrange the $8 million loan deal with ES Family Trust". (Emphasis added).  WaPo further states without caveat or qualification that "the recipient of **that fee** was an outside brokerage associated with Patrick Orlando, then Digital World's CEO". (Emphasis added).  Finally, WaPo states, again without the slightest caution, that payment of the finder's fee was a material fact that had to be disclosed, but was concealed by the "companies" (including TMTG) from both shareholders ***and*** the SEC.  These are all stone, cold, demonstrably false facts, and, contrary to WaPo's suggestion (Motion, p. 23), TMTG is directly implicated in the wrongdoing.  The gist or "sting" of the Finder's Fee Statements is that TMTG committed securities fraud or aided and abetted securities fraud by failing to disclose material facts to DWAC shareholders and/or the SEC.

WaPo's Finder's Fee Statements do not magically become "nonactionable opinion" simply because WaPo also included statements in the defamatory Article by a "New York University law professor".  In *Milkovich v. Lorain Journal Co.*, the United States Supreme Court ruled that:

> "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications".

497 U.S. 1, 18-19 (1990).  The "facts" upon which WaPo based its statement that "**Trump Media paid a $240,000 finder's fee**" to "Entoro Securities" – a "referral fee agreement" and an "Entoro invoice" – do not show that any finder's fees was ever paid to anyone, and WaPo, despite all its resources, made no attempt to contact Entoro to confirm receipt of the "$240,000 finder's fee".  Because WaPo provided its audience with an incorrect factual foundation for the Finder's Fee Statements, the Statements are not entitled to any First Amendment protection. *Lipsig v. Ramlawi*, 760 So.2d 170, 184 (Fla. 3rd DCA 2000) ("[A] speaker cannot invoke a 'pure opinion' defense, if the facts underlying the opinion are false or inaccurately presented.").

## 5.      *The Fair Report Privilege Is Inapplicable*

The "fair report privilege" is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodward v. Sunbeam Television Corp.*, 616 So.2d 501, 502 (Fla. 3rd DCA 1993).  "If the report of a public official proceeding is accurate or a fair abridgement," an action cannot constitutionally be maintained for defamation. *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)).  "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen*, 946 So2d at 571.

The Guardian is not a "government official", and, thus, WaPo's republication of the false statements in the Guardian Article are not subject to the "fair report privilege".[15]

### 6.    *TMTG Complied With Florida's Retraction Statute*

Finally, WaPo claims that TMTG's complaint as to the Investigation Statement should be dismissed because its retraction demand failed to meet the specificity requirements of Fla. Stat. § 770.01.[16]  But, with respect to the Investigation Statement, TMTG's retraction demand identifies the Guardian Article, informs WaPo that it is "defamatory", and specifies that the false statements are itemized in Nunes' April 3, 2023 complaint against the Guardian.  WaPo had a copy of Nunes' lawsuit and, therefore, the best possible notice (actual notice) of the false statements at issue in the Guardian Article.  Consistent with the "design" of Florida's retraction statute, WaPo was "put on notice so as to take necessary steps to mitigate potential damages and perhaps avoid precisely the type of litigation now before the Court." *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1475 (S.D. Fla. 1987).  WaPo fully understood TMTG's retraction demand and hastily refused TMTG's demand.

## B.    *COUNT II – Conspiracy*

The Court should deny WaPo's motion to dismiss TMTG's civil conspiracy claim for three (3) reasons.  First, TMTG plausibly states a claim of defamation.  Second, TMTG sufficiently alleges [*Compl., ¶¶ 10, 29*] that WaPo conspired with Wilkerson to publish false and defamatory Statements about TMTG.  WaPo argues (impermissibly) in

---

[15]     The Investigation Statement [*Compl., ¶ 12*] is not a report on "Nunes' lawsuit against the Guardian".  It is straight-up republication of a statement that appears in the Guardian Article.

[16]     WaPo concedes that TMTG's retraction demand satisfied § 770.01 with respect to the Loan Statements and Finder's Fee Statements.

its motion, p. 25, that TMTG "improperly recasts basic newsgathering activity as evidence of a tortious conspiracy". Whether WaPo was involved in "basic newsgathering activity" or a concerted effort to inflict harm on TMTG is an issue of fact that cannot be resolved on a motion to dismiss. Third, TMTG's complaint does not violate the "single publication/single action rule". *Block v. Matesic*, 2023 WL 3816693, at * 6 fn. 5 (S.D. Fla. 2023) ("the single-publication rule only prohibits 'multiple actions when they arise from the same publication upon which a *failed* defamation claim is based.'") (emphasis in original) (citing *Grayson v. No Labels, Inc.*, 2022 WL 1222597, at * 4-5 (M.D. Fla. 2022) ("the rule only prevents a plaintiff from recasting defamation as other actions, thereby potentially extending the statute of limitations or blocking defenses inherent in defamation actions. The rule does not prevent one from pleading defamation and civil conspiracy to commit defamation, as both actions have the same defenses and the same statute of limitations.").

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above, Plaintiff, Trump Media & Technology Group Corp., respectfully requests the Court to deny WaPo's motion to dismiss.

DATED:        July 27, 2023

Signature of Counsel on Next Page

Respectfully Submitted,

TRUMP MEDIA & TECHNOLOGY
     GROUP CORP.


By:    */s/ Jason R. Kobal*
       Jason R. Kobal, Esquire
       KOBAL LAW, P.A.
       12169 W. Lindebaugh Ave.
       Tampa, FL 33626
       (813) 873-2440
       koballaw@yahoo.com
       Florida Bar No.: 0542253

       *Counsel for the Plaintiffs*

       Steven S. Biss (VSB # 32972)
       300 West Main Street, Suite 102
       Charlottesville, Virginia 22903
       Telephone:  (804) 501-8272
       Facsimile:  (202) 318-4098
       Email:  stevenbiss@earthlink.net

       *Counsel for the Plaintiffs*
       *(Application for Admission Pro Hac Vice*
          *To be Filed)*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2023 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendant and all interested parties receiving notices via CM/ECF.

By:  */s/ Jason R. Kobal*
Jason R. Kobal, Esquire
KOBAL LAW, P.A.
12169 W. Lindebaugh Ave.
Tampa, FL 33626
(813) 873-2440
koballaw@yahoo.com
Florida Bar No.: 0542253

*Counsel for the Plaintiffs*

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:  (804) 501-8272
Facsimile:  (202) 318-4098
Email:  stevenbiss@earthlink.net

*Counsel for the Plaintiffs*
*(Application for Admission Pro Hac Vice*
*To be Filed)*