## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

     Plaintiff,

v.                                     Case No. 8:23-cv-1535-TPB-AAS

WP COMPANY LLC,

     Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN
## PART DEFENDANT'S MOTION TO DISMISS

This matter is before the Court on "Defendant WP Company LLC's Motion to

Dismiss with Supporting Memorandum of Law," filed on July 17, 2023.  (Doc. 12).

Plaintiff filed a response in opposition on August 9, 2023.  (Doc. 23).  Upon review of the

motion, response, court file, and record, the Court finds as follows:

### Background[1]

This lawsuit for defamation by Plaintiff Trump Media & Technology Group Corp.

("TMTG") against Defendant WP Company LLC (the "Post") arises from an article titled

"Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social,"

published by the Post on May 13, 2023, and circulated on Twitter (now known as "X") by

---

[1] The Court accepts as true the facts alleged in Plaintiff's complaint for purposes of ruling on the pending motion to dismiss.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). The Court is not required to accept as true any legal conclusions couched as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Post personnel.  The article described events related to a contemplated merger between TMTG and Digital World Acquisition Corp. ("DWAC") as part of taking TMTG's "Truth Social" business public.  The article noted there had been a delay in obtaining SEC approval for the merger, which supporters of former President Donald Trump and TMTG attributed to political bias.  The article offered an alternative explanation: concerns over a loan or loans obtained by TMTG, the identities of the lenders, and whether those loans had been properly disclosed by DWAC in its public filings.  The article cited various sources for its story, including "internal documents a company whistleblower has shared with federal investigators and [the Post]" and statements expressly attributed to the whistleblower, former TMTG officer Will Wilkerson.

The article related that in late 2021, with the proposed merger "frozen" and TMTG concerned about paying its bills, DWAC president Patrick Orlando announced he had arranged for $8 million in loans from an entity known as "ES Family Trust."  According to the article, the loans were part of a deal in which TMTG would receive the loans, and in exchange, ES Family Trust would acquire an equity interest in the public entity to be formed from the merger of TMTG and DWAC.  This loan-for-stock deal was reflected, according to the article, in a convertible promissory note, although the article acknowledged that the only copy of the note the Post had been able to locate was unsigned.  The article also reported that some of the funds were wired by another entity, Paxum Bank, which had ties to ES Family Trust and to the adult film industry.  Also, according to the article, TMTG paid a finder's fee of $240,000 in connection with the loans to Entoro Securities, a Texas entity of which Orlando was a managing director.

The article stated that neither the loan-for-stock deal nor the finder's fee had been disclosed to shareholders of DWAC or the SEC, and that New York University law professor Michael Ohlrogge opined that these matters could affect the value of the shares and should have been disclosed. The article also noted that the British journal *The Guardian* had earlier reported that federal prosecutors in New York were investigating whether TMTG violated money laundering statutes in connection with these loans, and that TMTG Chief Executive Officer Devin Nunes filed a lawsuit against Wilkerson and others (including *The Guardian*) asserting that the *Guardian* story was "fabricated."

TMTG filed suit against the Post for defamation and conspiracy in state court in Sarasota County, Florida, and the Post removed the case to this Court. TMTG alleges that specific statements in the article and other statements made by Post personnel in circulating the article on Twitter were false, defamatory, and made with "actual malice," that is, with knowledge that they were false or with reckless disregard as to whether they were true or false. The suit also alleges the Post published and circulated the article maliciously, intending to injure TMTG. In addition to defamation, the complaint alleges the Post conspired with others, including Wilkerson and his attorneys, to publish false and defamatory information in order to injure TMTG. The Post has moved to dismiss the complaint.

## **Legal Standard**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). While Rule 8(a) does not demand "detailed factual allegations," it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Id.* at 570.

When deciding a Rule 12(b)(6) motion, review is generally limited to the four corners of the complaint. *Rickman v. Precisionaire, Inc.*, 902 F. Supp. 232, 233 (M.D. Fla. 1995). Furthermore, when reviewing a complaint for facial sufficiency, a court "must accept [a] [p]laintiff's well pleaded facts as true, and construe the [c]omplaint in the light most favorable to the [p]laintiff." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[A] motion to dismiss should concern only the complaint's legal sufficiency, and is not a procedure for resolving factual questions or addressing the merits of the case." *Am. Int'l Specialty Lines Ins. Co. v. Mosaic Fertilizer, LLC*, 8:09-cv-1264-T-26TGW, 2009 WL 10671157, at *2 (M.D. Fla. Oct. 9, 2009) (Lazzara, J.).

## <u>Analysis</u>

The Post makes several arguments for dismissal. First, the Post argues that because it is a public figure, TMTG must allege "actual malice," and that the complaint's allegations of actual malice are insufficient. The Post also argues the article is protected by the "neutral reporting privilege," and that the challenged statements are not materially false, reflect non-actionable statements of opinion, or are protected by the "fair report privilege." In addition, the Post argues that the second count of the complaint, for conspiracy, must be dismissed because it fails to state a claim for the underlying tort of defamation, among other reasons.

The Court will begin its analysis of the Post's arguments by listing the statements challenged by TMTG as false and defamatory.  The Court will then describe the basic elements of defamation under Florida and law and address the Post's arguments in turn.

### *The Challenged Statements*

The statements TMTG challenges as defamatory, grouped by topic and numbered sequentially for ease of reference, are:

<u>Loan Statements</u>

1. "An obscure financial entity .... would gain a sizable stake in former president Donald Trump's media company if its merger deal proceeds"

2. "[T]he role ES Family Trust would assume in [TMTG] has never been officially disclosed to the Securities and Exchange Commission ("SEC") or to shareholders in Digital World Acquisition ["DWAC"] the special purpose acquisition company or SPAC, that has proposed merging with Trump's company"

3. "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC"

4. "Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment, pledged a stake in the company for the loan and didn't tell the SEC"

5. "A Russian banker connected to the porn industry could have gained a stake in Trump's Truth Social according to documents"

<u>Finder's Fee Statements</u>

6. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust"

7. "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"

8. "Orlando's finders fee could affect the value of the shares"

<u>Investigation Statement</u>

9. "The Guardian reported in March that federal prosecutors in New York have been investigating whether the Trump Media loans violated money-laundering statutes."

### *Elements of Defamation*

"Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). "A statement is defamatory if it 'tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation.'" *Sloan v. Shatner*, No. 8:17-cv-332-T-27AAS, 2018 WL 3769968, at *4 (M.D. Fla. June 22, 2018) (quoting *Jews for Jesus*, 997 So. 2d at 1109).

### *Actual Malice*

<u>Public Figure</u>

The Post first argues that TMTG is a public figure and therefore is required to plead "actual malice," that is, to plead "facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). The Post argues that the actual malice standard applies because TMTG, a prominent social media company founded by and named for a former President of the

United States, is a public figure generally.  Alternatively, the Post contends TMTG is a limited purpose public figure for purposes of the public controversy surrounding the delay in approval by the SEC of TMTG's merger with DWAC.  The Post argues that the article relates to that controversy because it offers a reason for the delay as an alternative to the allegations of political bias put forward publicly by supporters of TMTG.

TMTG offers no response to the argument that it is a general purpose public figure.  As to the limited purpose public figure issue, TMTG responds that the purported "public controversy" was manufactured by the Post's article, but it offers no specific response to the Post's point that there was a preexisting public controversy regarding a delay in approval of the proposed merger.

Whether a plaintiff is a public figure is a question of law to be determined by the court.  *Michel*, 816 F.3d at 702.  Two fundamental differences distinguish public and private figures.  First, public figures have greater access to the media and therefore have a "more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Silvester v. Am. Broadcasting Companies*, 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  Second, public figures "voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them."  *Id.* (quoting *Gertz*, 418 U.S. at 345).

The Court finds that TMTG is a public figure generally. Even if that were not so, by virtue of CEO Devin Nunes's public statements concerning the SEC's delay in approving the merger and accusing the SEC of bias, TMTG thrust itself into a public

controversy, and the Post's article relates to that controversy.  Accordingly, TMTG is a limited purpose public figure as well.

### Meaning of Actual Malice

As a public figure, TMTG must allege for each false statement "sufficient facts to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (quoting *New York Times Co. v. Sullivan*, 376 U.S. at 280).  The test for actual malice "is not an objective one and the beliefs or actions of a reasonable person are irrelevant." *Id*. at 702-03.  "Rather, we ask whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Id*. at 703.  Actual malice can be found where it is shown that the defamatory statements are wholly fabricated, or so inherently improbable that it would be reckless to circulate them, or where there are obvious reasons to doubt the veracity of the story's source.  *Id*. at 703.  On the other hand, certain facts tend to weigh against a finding of actual malice, such as the publisher's including information contrary to the article's general conclusions.  *Id*.  By including such information, the publisher "reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has." *Id*.

### TMTG's Allegations of Actual Malice

The Post argues that TMTG's allegations of ill-will, malicious intent, and the like are conclusory and insufficient by themselves to plead actual malice.  That is true as far as it goes, but TMTG's allegations must be considered as a whole, and some of TMTG's

allegations relating to the Post's knowledge are more specific.   The Court turns to these allegations, addressing each category of challenged statement in turn.

*Loan Statements*

At one level, TMTG's allegations of actual malice as to the Loan Statements appear specific and straightforward.  The article and associated tweets stated that the loan-for-stock deal with ES Family Trust was not disclosed to shareholders and the SEC, and TMTG alleges those statements were false.  According to TMTG, the truth was that the deal had been properly disclosed in DWAC's SEC filings, and the Post knew that was the case because it had reviewed those filings.

On closer inspection, however, things became more complicated.  First, while Loan Statements Nos. 2, 3, and 4 refer to non-disclosure, Nos. 1 and 5 describe the deal itself but say nothing about whether it was disclosed.  If the latter statements are false, then the falsity must have something to do with the existence or description of the deal with ES Family Trust, not with disclosure.  And while TMTG's allegations of falsity and actual malice appear to focus on whether the deal was disclosed, TMTG appears to suggest, inconsistently, that there was no such deal in the first place because it alleges that "no real or authentic documents" showed the deal existed.  If there was no loan-for-stock deal, it could not have been disclosed to the SEC or shareholders.

It is also unclear precisely what information TMTG alleges the public filings disclosed.  TMTG's allegations as to DWAC's SEC filings do not attach copies of those filings as exhibits or set forth precisely what information they contained that demonstrated the falsity of each statement and the Post's knowledge of that falsity.  In short, it is not clear precisely what aspect of each of the challenged Loan Statements

TMTG contends is false, and why the Post knew it was false.  Therefore, to the extent the complaint is based on the Loan Statements, it fails to sufficiently allege actual malice. [2]

> *Finder's Fee Statements*

The article asserted that TMTG paid a finder's fee for the loans to a brokering entity affiliated with then DWAC President Orlando, and that this fact also was not disclosed to shareholders or the SEC but should have been disclosed because, according to Professor Ohlrogge, it presented a conflict of interest.  TMTG alleges that no finder's fee was paid, and that the Post knew that to be the case from discussions with Wilkerson, who arranged the wire transfers in connection with the loans.  TMTG alleges:

> WaPo also knew that Wilkerson had arranged the wires from ES Family Trust, and, thus, that no finder's fee had been paid to anyone. From discussions with Wilkerson and his lawyers and his review of documents, WaPo reporter Harwell knew there was no evidence that any finder's fee had been paid. In spite of knowing the story was fake or at least having no evidence of payment of any finder's fee, and, therefore, serious doubts as to the truth of the story, WaPo accused TMTG of hiding payment of the fictitious "$240,000 finder's fee" from the SEC and shareholders.

(Doc. 1-2, at ¶ 26).

The Post argues that TMTG's allegations of actual malice with regard to the finder's fee payment are insufficient because they "fail[] to address the Article's disclosed sources for these very points."  Those sources consist of two documents: an agreement to pay the finder's fee and an invoice for the fee.  The Post argues that the complaint fails to

---

[2] To the extent TMTG wishes to support its allegations of actual malice by assertions that the Post intended to "sensationalize the news and injure TMTG's business and reputation," and that the Post "harbored extreme bias, ill-will and desire to inflict harm on TMTG through knowing falsehoods," TMTG must allege facts plausibly supporting the allegations of intent.  *See Michel*, 816 F.3d at 702 (noting that "*Iqbal* itself directly held that malice and other degrees of intent are subject to the plausibility pleading standard).

allege facts showing why the Post would hold serious doubts about or would "not believe the veracity" of those documents.

But the issue as framed by the complaint is not the "veracity" of those documents – which presumably show only that there was an agreement to pay the fee.  TMTG appears to challenge the Post's assertion that the fee was actually *paid*.  The issue then is whether the Post knew *that* statement regarding payment was false or entertained serious doubts as to its truth.  The Post's focus on these two documents, therefore, without addressing the article's statement that TMTG actually made the payment, appears to miss the point.

At the same time, it is not clear to the Court why Wilkerson's role in arranging wire transfers of loan payments would necessarily mean he knew the finder's fee had not been paid.  TMTG's point perhaps is that Wilkerson was in charge of wire transfers generally and therefore he knew about the absence of any payment, and through him so did the Post.

While the issue is a close one, the Court concludes that the complaint's allegations of actual malice regarding the finder's fee payment are insufficient.  Although the Post appears to acknowledge Wilkerson was generally knowledgeable, clearer and more specific allegations in the complaint itself are called for.  In addition, TMTG should include in any amended complaint allegations regarding the impact of the fee agreement and the invoice, if any, on whether the Post entertained serious doubts regarding its statement that the fee was paid.

*Investigation Statement*

The article's reference to *The Guardian*'s reporting on a federal money laundering investigation is brief.  As quoted in TMTG's complaint, it stated:

> The Guardian reported in March that federal prosecutors in New York have been investigating whether the Trump Media loans violated money-laundering statutes.

(Doc. 1-2, at ¶ 12).

The article also reported that TMTG's CEO Devin Nunes stated in a lawsuit that the story was "fabricated."  TMTG argues that the Post's awareness of Nunes's denials in his lawsuit is a sufficient basis to plausibly infer the Post knew *The Guardian* report regarding an investigation was false.  The Court agrees with the Post's argument that these allegations, without more, do not plausibly suggest the Post knew that no money laundering investigation existed or entertained serious doubts about whether it did.  As the Supreme Court observed in *Harte-Hanks Comm's, Inc. v. Connaughton*, 491 U.S. 657 (1989), "the press 'need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"  491 U.S. at 691 n.37 (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)).  Accordingly, the complaint fails to allege actual malice with respect to the Investigation Statement.

### Neutral Reporting Privilege

As an alternative ground for dismissal, the Post asserts the entire article is protected by the "neutral reporting privilege," a qualified privilege under Florida law for "disinterested" and "neutral" reporting on "matters of public concern."  The few Florida

cases on this issue contain seemingly very broad statements of this privilege.  *See Abram v. Odham*, 89 So. 2d 334, 336 (Fla. 1956) (referring to a newspaper's "qualified privilege to publish matters of great public interest").  However, this broad language cannot be taken out of the factual context in which the courts have applied the privilege.  *See Miami Herald Pub. Co. v. Ane*, 458 So. 2d 239, 242 (Fla. 1984) (noting broad language but holding that the privilege had never been extended to suits by private persons as opposed to public figures).  The privilege has been applied in situations in which a media defendant has republished a defamatory statement made by another person, where the making of the statement itself was a newsworthy event.  *See, e.g., Abram*, 89 So. 2d at 335-37 (newspaper republished statement by candidate at political rally, along with response of the plaintiff); *Huszar v. Gross*, 468 So. 2d 512, 515-16 (Fla. 1st DCA 1985) (republication of matters asserted by government officials); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1124-25 (S.D. Fla. 2021) (statements made in televised debate hosted by the defendant).

The Post tries to bring itself within these cases, relying principally on *Rendon v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269 (S.D. Fla 2019).  In *Rendon*, the defendant published an article relating the statements of a hacker who claimed he was hired by a political consultant to engage in cyber-attacks against political opponents.  *Id*. at 1271, 1276-77.  The consultant sued the publisher of the article.  The district court dismissed the complaint, noting that the article consistently made it clear that the matters reported did not reflect the reporters' opinions but those of their source, the hacker.  *Id*. at 1276. The court also noted that the article reported that the plaintiff denied the hacker's

allegations, and that it reported that emails the hacker had provided were "fake." *Id.* **at** 1277.

The Post argues that, just as in *Rendon*, its article concerning TMTG was a "disinterested account of a source's story," made it clear that it relied on "documents and facts provided by Wilkerson," and repeatedly noted it was restating "Wilkerson's version of the facts." The Post argues the article also "[took] care to point out where the documents were not fully conclusive," such as noting that the convertible promissory notes were not executed and that no more "updated" documents had been found, and that it noted denials by TMTG or its personnel.

TMTG argues that the Post cannot claim the neutral reporting privilege because the Post is not, in fact, "neutral," but is instead a "Democratic Party broadsheet" that has engaged in a "years-long crusade against TMTG," and because the article is a "hit piece." TMTG points out that the facts here differ from those in which the privilege has been applied. The article did not, as did the publication in *Rendon*, simply reflect the position of the article's source, Wilkerson. Rather, TMTG argues, "the body of the article makes clear that the story is being told by WaPo and its reporter, Harwell." In addition, TMTG argues the Post's cited source was an ousted employee with an axe to grind, and the article "took sides and exclusively reported that TMTG had engaged in criminal, fraudulent or unethical behavior."

The Court agrees with TMTG that the neutral reporting privilege does not apply, at least not to the entire article or all the challenged statements. The article does not simply republish statements made by Wilkerson or relate his point of view. It attributes only certain specific statements to Wilkerson, and the challenged statements are not

among them.  Instead, the challenged statements are presented as the Post's own conclusions or inferences based on its review of admittedly "inconclusive" documents, the statements expressly attributed to Wilkerson, and whatever other evidence the Post may have gathered from Wilkerson or other sources.  TMTG is correct that the article appears to "take sides" to that extent.

The exception to the foregoing would appear to be the Investigation Statement, which recites *The Guardian's* report of a money laundering investigation.  *The Guardian* has been described as a "well respected, left-of-center, nationally circulated newspaper generally regarded as being among the top three or four newspapers in Great Britain." Charles D. Ablard, *Judicial Review of National Security Decisions: United States and United Kingdom*, 27 Wm. & Mary L. Rev. 753, 766 n.7 (1986).  *The Guardian's* report and Nunes's denial in the lawsuit he filed, particularly in the context of public discussion of the reason for the SEC's delay in approving the merger, are independently newsworthy and touch on an area of public interest.  In the Investigation Statement, the Post merely recited the opposing positions of both sides on this narrow issue.  This aspect of the article appears to fit squarely within the type of reporting to which the neutral reporting privilege has been applied.

The parties agree that the neutral reporting privilege is a qualified privilege. Even if the privilege would otherwise apply, it may be defeated where the defendant abused the privilege by acting with express malice, that is, with the primary motive of injuring the plaintiff.  *Nodar v. Galbreath*, 462 So. 2d 803, 806, 810 (Fla. 1984).  TMTG argues that the Post abused any privilege because it published the statements "maliciously and excessively" and that it intended to injure TMTG.  Under the

*Twombly/Iqbal* standard, TMTG must plead facts to plausibly suggest the Post acted with a primary intent or motive to injure TMTG in order to negate the privilege, but it does not do so in its current complaint.

### The Post's Other Arguments as to Defamation

#### Material Falsity

The Post argues that the Loan Statements are non-actionable for the additional reason that they were not materially false.  The Court in discussing actual malice has already explained the difficulty of discerning precisely what TMTG alleges was false in the Loan Statements and why the Post knew it was false.  Because the Court is requiring TMTG to replead its claims, it will not address the Post's arguments on this point.  These matters may be clarified by TMTG's allegations in an amended complaint.  In any further motion to dismiss, the Post is free to raise this argument again if appropriate.

#### Non-Actionable Statement of Opinion

The Post argues that the Finder's Fee Statement is not actionable because even if the Post's allegation that the fee was paid was incorrect, that is no matter because the "sting" of the statement "derives from" non-actionable opinion, specifically, Professor Ohlrogge's statement that the fee should have been disclosed due to potential conflicts of interest.  That statement by Ohlrogge, the Post argues, is a non-actionable statement of opinion.  As TMTG points out, however, TMTG's challenge is to the Post's allegedly false factual statement that a finder's fee was paid but not disclosed.  That the article also quotes Ohlrogge as saying that payment of the fee should have been disclosed does not insulate the Post from liability if the underlying statement of fact is false.  *See Lipsig v.*

*Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000) (a speaker cannot argue a statement is non-actionable opinion if the opinion is based on stated facts that are false). [3]

<u>Fair Report Privilege</u>

The Post argues that its statement that *The Guardian* had reported that federal prosecutors were investigating whether the loans to TMTG violated money laundering statutes is protected by the "fair report" privilege.  This privilege protects reasonably accurate and fair reports of information in public records or from governmental sources, including reporting on complaints filed in court.  *See, e.g.*, *Larreal v. Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1318 (S.D. Fla. 2020); *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. 3d DCA 1993).  The Post argues that the article fairly reported on a lawsuit filed by TMTG CEO Devin Nunes, and to do that, it was "necessary" to explain the basis of the dispute, i.e., the contents of *The Guardian* article that Nunes's lawsuit complained about as defamatory.  Accordingly, it argues, the fair report privilege extends to the Post's reporting on *The Guardian* article as well as Nunes's lawsuit.

This argument has a certain "tail wagging the dog" feel to it.  The Post's article did not focus on Nunes's lawsuit; it focused on the ES Family Trust loans and potential improprieties connected to the loans.  It was in that context that the Post reported on *The Guardian*'s earlier article.  The reference to the Nunes lawsuit challenging *The*

---

[3] The Post also argues that to be actionable, a defamatory statement must be one concerning the plaintiff, and the article's assertion that the fee should have been disclosed does not relate to TMTG, which has no shareholders.  Instead, it could only relate to DWAC, which does have shareholders, or to Orlando.  The statements TMTG challenges, however, are broad enough to defame TMTG.  The article states that "the companies" failed to disclose the fee to shareholders or the SEC.  The Court rejects this argument.

*Guardian's* reporting appears added for context.  The Court therefore concludes that the fair report privilege does not apply to the Investigation Statement.

<u>Retraction Statute</u>

Florida's retraction statute requires that a plaintiff give notice to the defendant before filing suit, "specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory."  § 770.01, *F.S.*  TMTG wrote to the Post on May 14, 2023, demanding that the Post's article be retracted and listing specific statements as false and defamatory.  The Investigation Statement, however, was not listed.

TMTG argues that the retraction letter identified *The Guardian* article, which is the subject of the Investigation Statement, and stated that the article was defamatory. TMTG argues that reference was sufficient to support inclusion of the Investigation Statement in this suit.  The Court disagrees.  The reference to *The Guardian* appeared only in the retraction letter's opening paragraph and appears to have been included merely for context.  When TMTG's letter listed the statements challenged as false and defamatory in numbered paragraphs, the Investigation Statement was not listed.  TMTG therefore did not "specify" the Investigation Statement as one it contended was false and defamatory, and it has not complied with the statute as to that statement.  Failure to comply with the notice provisions of section 770.01 requires dismissal for failure to state a cause of action.  *Skupin v. Hemisphere Media Group, Inc.*, 314 So. 3d 353, 357 (Fla. 3d DCA 2020).  Accordingly, the Post's argument on this point appears technically correct, and the motion to dismiss as to the Investigation Statement is granted as to this ground. It appears, however, TMTG can remedy this defect by sending another retraction letter

and then, assuming the Post declines to retract the statement, including the statement in an amended complaint.

### *Conspiracy*

The complaint's second count asserts a claim for common law conspiracy, alleging that the Post "combined, associated, agreed or acted in concert" with Wilkerson, his attorneys, and others "for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation."  The Post argues that because the complaint fails to state a claim for the underlying tort of defamation, it necessarily fails to state a claim for conspiracy to commit that tort, and that TMTG's allegations of an agreement between the Post and others are merely conclusory.  The Court agrees.  To TMTG's basic narrative that the Post published a defamatory article based on information provided by Wilkerson and other sources, TMTG has merely added generalized, conclusory allegations of an "agreement."  Moreover, because the defamation claim fails, TMTG's claim of conspiracy also fails for lack of an underlying wrong.  *See Corsi*, 519 F. Supp. 3d at 1120 n.6 ("There being no defamation – the gist of the defamation conspiracy – there can be no conspiracy claim.").[4]

### <u>Conclusion</u>

For the foregoing reasons, the complaint fails to plead actual malice as to any of the challenged statements.  The Investigation Statement is also protected by the neutral reporting privilege in the absence of sufficient allegations of express malice.  A claim

---

[4] Because the second count must be dismissed on the foregoing grounds, the Court need not reach the Post's argument that TMTG's conspiracy claim is barred under the "single publication/single action" rule.

based on that statement is also precluded by TMTG's failure to list it in TMTG's retraction letter as one of the statements it challenged as false and defamatory.

Defamation is a highly technical and often confusing area of the law, and case law imposes unusual obstacles on a public figure plaintiff suing a media defendant. TMTG, however, may file an amended complaint to attempt to surmount those obstacles. In any amended complaint, as to each challenged statement, TMTG should clearly allege what aspect of the statement is false, what documents or other information demonstrate the specific aspect was false, and how the Post was aware of the documents or information. The Court will not dictate the exact form any amendment should take, but it appears that organizing the allegations of falsity and actual malice on a statement-by-statement basis would help avoid the problems identified above, particularly with respect to the Loan Statements. To the extent TMTG alleges that the Post harbored ill-will, intended to harm TMTG, or the like, it must include allegations of facts plausibly supporting such allegations.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendant WP Company LLC's Motion to Dismiss with Supporting Memorandum of Law" (Doc. 12) is **GRANTED IN PART** and **DENIED IN PART**.

2. The complaint (Doc. 1-2) is hereby **DISMISSED WITHOUT PREJDUICE**.

3. The motion is otherwise **DENIED**.

4. Plaintiff shall have up to and including April 8, 2024, to file an amended complaint. Failure to file an amended complaint will result in this Order

becoming a final judgment.  *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 719-20 (11th Cir. 2020).

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>8th</u> day of March, 2024.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**