**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

        Plaintiff,

v.                                   Case No.: 8:23-cv-1535-TPB-AAS

WP COMPANY, LLC,
d/b/a The Washington Post

        Defendant.

_____/

**AMENDED COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiff, TMTG Sub Inc. f/k/a Trump Media & Technology Group Corp. ("**Plaintiff**" or "**TMTG**"), files this Amended Complaint and Demand for Jury Trial against Defendant, WP Company, LLC d/b/a The Washington Post ("**Defendant**" or "**WaPo**"). This Amended Complaint concerns an article published by Defendant related to a contemplated merger between TMTG and Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp. ("**DWAC**") and the defamatory statements contained therein as well as Defendant's conspiracy to harm Plaintiff's finances and reputation. Plaintiff seeks (a) compensatory and punitive damages in excess of $3,780,000,000.00 as determined by a Jury; (b) prejudgment interest on the principle sum in accordance with applicable statutory rates; and (c) costs arising from

Defendant's defamation and conspiracy and reasonably incurred in prosecuting claims herein.

## INTRODUCTION

1.    TMTG is a Sarasota-based media and technology company that operates a flagship social media platform called "Truth Social."

2.    On May 13, 2023, WaPo, acting in concert with a former employee of TMTG, who had been terminated for cause, published an egregious hit piece falsely accusing TMTG of securities fraud and other wrongdoing, which was then amplified by WaPo on social media. WaPo's false statements of criminality and nefarious business transactions exposed TMTG to public ridicule, contempt and distrust in the public sphere, and injured TMTG's business and reputation.

3.    WaPo and the false story's primary author, Drew Harwell ("**Harwell**"), have been on a years-long crusade against TMTG characterized by the willful concealment of relevant information in its possession as well as re-publication of dubious and unverified accusations of illegal or untoward actions by TMTG – a bitter irony for a publication whose motto is "*Democracy Dies in Darkness*." *See* Exhibit A.

4.    WaPo's defamatory and malicious statements addressed in this action created an existential threat to TMTG and caused enormous loss and hardship. TMTG brings this case to recover compensatory and special damages

caused to its business and good will, and punitive damages for WaPo's gross misconduct.

## PARTIES AND JURISDICTION[1]

5.    TMTG is a Delaware corporation headquartered in Sarasota, Florida.

6.    WaPo is a Delaware limited liability company, whose sole member is Nash Holdings, LLC, a Delaware limited liability company, whose ultimate owner was at the time of the commencement of this action a citizen of the State of Washington. The *Washington Post* has more than 2,500,000 digital subscribers in the United States, including Florida. Defendant's Twitter/X page has more than 20,000,000 followers, including in Florida. WaPo has agents and offices in Florida. It transacts substantial business in Florida, including the sale of newspapers, advertising, and online subscription services to residents of Sarasota, and the operation of an active website accessible in Florida, www.washingtonpost.com. The article at issue in this action targeted a Florida business and was accessed and read by thousands of Floridians. To the best of Plaintiff's knowledge, WaPo's ultimate owner owns multiple

---

[1] TMTG does not waive its contention that WaPo is subject to jurisdiction of Florida State Courts.

properties in Florida and publicly announced in November 2023 his intent to reside in Florida.

7.    Venue is proper in this Court, where the false and defamatory statements were published and where TMTG suffered substantial damages.

## STATEMENT OF MATERIAL FACTS

8.    On March 15, 2023, The Guardian published an online article entitled "Federal investigators examined Trump Media for possible money laundering, sources say." [https://www.theguardian.com/us-news/2023/mar/15/trump-media-investigated-possible-money-laundering (the "Guardian Article")]. The Guardian Article contained false statements and defamatory implications.

9.    The source of the Guardian's false and defamatory charges was a former employee of TMTG, Will Wilkerson ("**Wilkerson**"), who was previously terminated by TMTG for cause. Beginning in 2022, separate and apart from any purported disclosures he may have made to the government, Wilkerson began to concoct and publicly shop false stories about TMTG to numerous media outlets.

10.    By May 2023, Wilkerson had devised another fake news story to discredit and harm TMTG.

11.     By May 2023, it was well-known that WaPo and Harwell eagerly published false and injurious stories about TMTG, its CEO, Devin Nunes ("**Nunes**"), and former President Donald Trump. *See* Exhibit A.

12.     Wilkerson contacted WaPo with a salacious story about a porn-friendly bank and its alleged dealings with TMTG allegedly amounting to securities fraud and other potential crimes or misdeeds. Through a series of meetings and conversations with Wilkerson and his lawyers, WaPo undertook with Wilkerson to publish agreed false and defamatory statements to intentionally injure TMTG.

13.     On May 13, 2023, WaPo published an online article with the clickbait headline, "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***." [https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions (the "**WaPo Article**")]. This sensational brand of "reporting" was in line with WaPo and Harwell's global campaign to publish salacious headlines and stories to increase media traffic and defame TMTG and others related to TMTG.

14.     The WaPo Article and follow-on social media republications contain the following false statements of fact of or concerning TMTG:

### a. False Non-Disclosure of Loan Statements

i. "[T]he role ES Family Trust would assume in Trump Media and Technology Group has never been officially disclosed to the Securities and Exchange Commisson ["SEC"] or to shareholders in Digital World Acquisition ["DWAC"], the special purpose acquisition company, or SPAC, that has proposed merging with Trump's company";

ii. "Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC"; and

iii. "Trump Media:  this time they borrowed money from a bank best known for servicing the adult entertainment [sic], pledged a stake in the company for the loan and didn't tell the SEC."  (referred to collectively as the "**Loan Disclosure Statements**").

### b. False Finder's Fee Statements

i. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust";

ii. "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"; and

iii. "Orlando's finder's fee could affect the value of the shares." (referred to collectively as the "**Finder's Fee Statements**").[2]

The Loan Disclosure Statements and Finder's Fee Statements are referred to collectively as the "**Statements**."

15.    WaPo was not content with publication of the Statements set forth above to its subscribers and republished such Statements to its Twitter followers.

16.    Harwell republished the WaPo Article to his 48,000 Twitter followers, which included correspondents at CNN, New York Times, NBC News, The Atlantic, Huffington Post, the Daily Beast, Business Insider, and the Guardian. [http://twitter.com/drewharwell/status/1657351704419917825 (New: The Truth Social saga just keeps getting weirder. Our latest includes a porn-friendly bank on a Caribbean island and an $8 million mystery loan").

17.    In order to further spread the smear and increase damage to TMTG, WaPo engaged agents from both within and outside the company to broadly republish the defamatory statements. Harwell and Washington Post "cyber reporter" Joseph Menn ("**Menn**") "boosted" (republished) the WaPo Article on the Mastodon social media network.

---

[2] Note that the Finder's Fee Statements contain inferences and accusations of illegal or nefarious non-disclosure by TMTG similar to the Loan Disclosure Statements.

[https://mastodon.social/@JosephMenn@infosec.exchange/110363703525631648 ("Wild tale about mysterious backin for Truth Social")]. On May 13, 2023, WaPo technology editor Mark Seibel ("**Seibel**") joined the smear campaign and republished the WaPo Article on Twitter while falsely claiming that TMTG "borrowed money from a bank [Paxum Bank] best known for servicing the adult                                          entertainment                                          [sic]." [https://twitter.com/markseibel/status/1657407145535500288 ("More on the crazy doings at Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment [sic], pledged a stake in the company for the loan and didn't tell the SEC")]. Harwell "liked" Seibel's tweet.[3]

18.    WaPo business editor Lori Montgomery ("**Montgomery**"), the author of WaPo's May 17, 2023 response to TMTG's retraction demand (*see infra*), joined the fray by retweeting the WaPo Article to her followers.

19.    Co-author of the WaPo Article, freelance journalist Matt Bernardini ("**Bernardini**"), also retweeted the WaPo Article to his followers. [https://twitter.com/MattBernardini7/status/1657346969365364737?s=20 ("NEW with @drewharwell and mateirosca. A Russian banker connected to the

---

[3] "Likes" are represented on Twitter by a small heart figure and are used to show appreciation for a tweet. A user can view the tweets that another user has liked from that user's profile page by clicking or tapping on the "Likes" tab. [https://help.twitter.com/en/using-twitter/liking-tweets-and-moments].

porn industry could have gained a stake in Trump's Truth Social according to documents")].

20.     The second co-author of the WaPo Article, Matei Rosca ("**Rosca**"), tweeted the WaPo Article to his followers [https://twitter.com/mateirosca/status/1657350755848683520?s=20], retweeted Harwell and Seibel, *and* republished the WaPo Articled on his website. [https://reporter.tondon/]. Rosca lead readers to believe that the WaPo Article was "just scratching the surface," and that there were additional undisclosed facts and wrongdoing by TMTG. [https://twitter.com/mateirosca/status/1657396995709890561/s=20 (@MattBernardini7 @mateirosca @drewharwell the Washington Post ES Trust/Trump Media story is just the surface right?  Great work")].

21.     WaPo's and its confederates' frenzy and repeated, concerted harassment evidence a knowing, deliberate, organized, and systemic effort to promote the false and defamatory Statements worldwide in order to inflict the greatest possible injury on TMTG and its business status and opportunities.

22.     The clickbait headline of the WaPo Article – "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***" – was intended to grab the immediate attention of common-minded readers by falsely insinuating that TMTG was involved in shady business dealings. [*See* https://twitter.com/ericgarland/status/1657772179793256450 ("Yo WaPo, you

9

buried the lede here, even calling it a loan from a porn-friendly bank.' It's PAXUM BANK, one that's almost surely tied to Russian Mafiya $$$ from sex trafficking of cam girls in Romania and around the world.  Its owner just resigned yesterday.")].

23.    The Statements immediately conveyed a defamatory, intentional, and inescapable meaning to readers; the gist of which is that TMTG committed securities fraud or aided, abetted, and participated in improper acts to conceal material facts[4] from the SEC and shareholders of DWAC, and that TMTG was being investigated for money laundering.

24.    The WaPo Article imputed to TMTG crimes, dishonesty, want of integrity, and corporate malfeasance guiding readers to conclude that TMTG and its executives could go to jail because of the non-disclosures, suffer humiliation, and/or fail in its business endeavors. [*see*, *e.g.*, https://twitter.com/dave_winx/status/1657723934677008390 ("The beautiful thing about this is that it could potentially lead to charges against Devon [sic] Nunes"); https://twitter.com//KeyLargo2/status/1657502055047614472 ("Someone, please put this corrupt mf'er in jail!")].  Readers of the WaPo Article

---

[4] The WaPo Article represents that TMTG's failure to disclose payment of the "$240,000 finder's fee" was a material omission and, therefore, securities fraud. WaPo states, "Orlando's finder's fee could affect the value of the shares." To be clear, WaPo's Statements are baseless because no finder's fee was paid to anyone.

concluded that TMTG operated underhandedly and openly disregarded the rule of law. *See, e.g.,* https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/?commentID=99e03c41-0803-41cc-8340-fbd718941d86].

25.    To prop up the WaPo Article's central thesis – namely, that TMTG engaged in or was a party to securities fraud – WaPo included in the Article the story of an "investor," Tom Sas, a purported Trump supporter, who was "injured" after he spent $561,000 on DWAC stock, "his life savings," because of TMTG's non-disclosures. On May 13, 2023, WaPo tweeted the Article and highlighted Sas's misfortune, insinuating that TMTG's concealment of material facts caused DWAC's stock price to plummet to $13 per share.  In his quote tweet, Harwell ridiculed Sas and other investors similarly situated. [https://twitter.com/drwharwell/status/1657366474032381952 ("No matter how your day is going, at least you didn't spend your life savings on Truth Social-related stock, paying $175 for share that now sell for $13")]. WaPo readers similarly commented and mocked Sas as a "sucker" and that Sas was a victim of a stock "scam" or "grift."

26.    As was naturally and foreseeably intended by WaPo and Wilkerson, the WaPo Article and its defamatory Statements were republished thousands of times, including by prominent anti-TMTG Twitter users.

27.    The Statements are materially false.

28.     TMTG did not conceal from or improperly fail to disclose (or cause DWAC to improperly disclose) to the SEC or DWAC shareholders that ES Family Trust would gain a stake in TMTG as accused in the Loan Disclosure Statements. In truth, DWAC properly disclosed TMTG's debt in its registration statement filed with the SEC in May 2022.

29.     TMTG never paid a $240,000 "finder's fee" to anyone who purportedly assisted to arrange an $8 million loan from ES Family Trust as accused in the Finder's Fee Statements.  Neither Orlando nor any brokerage associated with Orlando received any finder's fee.  Accordingly, TMTG did not improperly fail to disclose (or cause DWAC to fail to disclose) payment of a finder's fee to the SEC, DWAC shareholders, and/or the investing public.

30.     Comparing the truth of these facts to the Statements, individually and in their accumulated totality, the WaPo Article was plainly, materially false, defamatory, and specifically intended to disrupt, disparage, injure, condemn, and besmirch TMTG's business reputation and its financial standing.

31.     Fla. Stat. § 770.01 provides that a plaintiff in a civil action against a publication for libel or slander "shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory."

32.    On May 14, 2023, TMTG served written notice on WaPo pursuant to Fla. Stat. § 770.01 and requested retraction of the WaPo Article.

33.    On May 17, 2023, a response written by Montgomery admitted that payment of the "$240,000 finder's fee" was "information" that was "material to investors," but WaPo refused to recognize that no finder's fee had ever been paid, that TMTG did not fail or refuse to disclose anything to the SEC or shareholders, and that its Statements were materially false. WaPo continues to refuse to retract its defamatory Statements.

34.    WaPo's Statements were not published in good faith.  The falsity of the Statements is not due to an honest mistake of the facts.  There are no reasonable or verifiable grounds for believing the Statements are true. Publication of the Statements and republication of the Guardian Article were part of a concerted effort to damage TMTG and damage is business.

## CAUSES OF ACTION

### COUNT I
### Defamation Arising From Loan Disclosure Statements

35.    TMTG realleges and incorporates herein paragraphs 1 through 34 above.

36.    WaPo made and published to third-parties, including WaPo's subscribers, advertisers, viewers, and followers in Sarasota County and world-

wide the false Loan Disclosure Statements. WaPo also republished the false and defamatory statements contained in the Guardian Article.

37.   By publishing the false Loan Disclosure Statements on the Internet and by amplifying the same on social media, WaPo knew or should have known that the false Loan Disclosure Statements would be republished over and over again by third parties to TMTG's detriment and injury. Such republication was the natural and intended consequence of WaPo's actions and presumptively authorized and encouraged by WaPo as part of its regular course of business. In addition to the original publication, WaPo is liable for the republications of the Loan Disclosure Statements by its agents and third parties.

38.   The Loan Disclosure Statements constitute defamation *per se*. The Loan Disclosure Statements accuse TMTG of infamous crimes, including securities fraud, misconduct, incompetence, dishonesty, and/or deception in its trade and business.

39.   The Loan Disclosure Statements subject TMTG to distrust by the public, potential investors, and regulating agencies, and thus are inherently injurious to TMTG's business.

40.   The Loan Disclosure Statements damaged TMTG's business, brand, and good will, causing potential investors and/or users of Truth Social to refrain from joining the platform, jeopardizing and further delaying the

14

SEC's review of the proposed merger with DWAC, and causing loss of future earning capacity.

41.    Publication of the WaPo Article destroyed at least $2.78 billion of implied equity value in TMTG.  Furthermore, after publication of the WaPo Article, TMTG's banker, JP Morgan Chase & Co., contacted TMTG to inquire about the year-plus old transaction with Paxum Bank. Prior to this contact, JP Morgan had expressed no concerns with the prior transaction.

42.    WaPo acted with actual malice and reckless disregard for the truth of the Loan Disclosure Statements as follows:

    a.    WaPo and Wilkerson fabricated "facts" about securities fraud, and published and republished the Loan Disclosure Statements as truth.  The existence and relevant information regarding TMTG convertible promissory notes were collectively and appropriately disclosed in DWAC's securities filing, which was well-known to and reviewed by WaPo.  Such securities filing did not disclose the identities of TMTG's individual noteholders **because it was not required to do so**.

    b.    WaPo knew that DWAC's registration statement did not disclose *any* individual noteholders, and therefore that the lack of reference to any particular noteholder was not in any way suspicious, anomalous, or indicative of wrongdoing.  Accordingly, based on its own consultations with supposed experts, WaPo knew, or was reckless in not knowing, that the

disclosure of individual noteholders was not required. The WaPo Article suggested otherwise, not out of ignorance or mistake, but out of a malicious desire to harm TMTG.

c.    WaPo knew Wilkerson had been "ousted" from TMTG, and that there was bad blood between TMTG and Wilkerson.  In spite of this and the serious doubts thus raised as to the veracity of Wilkerson's "story," WaPo published the Loan Disclosure Statements anyway.

d.    The Loan Disclosure Statements were intentionally extreme and outrageous. WaPo knew that publication of the Loan Disclosure Statements would cause a media frenzy (which continues to this day). WaPo deliberately and recklessly conveyed a false narrative about TMTG in order to sensationalize the news and injure TMTG's business reputation and financial standing.

e.    WaPo intentionally violated its code of ethics and consciously abandoned all journalist standards and integrity in writing, editing, and publishing the Loan Documents Statements, and relying upon Wilkerson concerning the same. WaPo published the Loan Documents Statements with the intent to inflict injury on TMTG.

f.    WaPo harbored extreme bias, ill-will, and desire to inflict harm on TMTG through publishing knowing falsehoods. WaPo has a long and well-documented history of antipathy toward TMTG, Nunes, and former

16

President Trump and publication of the Loan Disclosure Statements evidences the same.

g.     Prior to publication of the WaPo Article, WaPo knew that TMTG's CEO (Nunes) had filed suit against the Guardian in which Nunes contended that the statements contained in the Guardian Article were false and defamatory. In spite of this knowledge, WaPo brazenly published and republished the defamatory Guardian Article online and via Twitter to millions of viewers. At the very least, WaPo's willful avoidance of this circumstance constitutes reckless disregard for the truth.

43.     As a direct result of WaPo's defamation, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000 or such greater amount as determined by the Jury.

## COUNT II
## Defamation Arising From Finder's Fee Statements

44.     TMTG realleges and incorporates herein paragraphs 1 through 43 above.

45.     WaPo made and published to third-parties, including WaPo's subscribers, advertisers, viewers, and followers in Sarasota County and world-

wide, the false Finder's Fee Statements. WaPo also republished the false and defamatory statements contained in the Guardian Article.

46.     By publishing the false Finder's Fee Statements on the Internet and by tweeting the same, WaPo knew or should have known that the false Finder's Fee Statements would be republished over and over again by third parties to TMTG's detriment and injury. Such republication was the natural and intended consequence of WaPo's actions and presumptively authorized and encouraged by WaPo as part of its regular course of business. In addition to the original publication, WaPo is liable for the republication of the Finder's Fee Statements by its agents and third parties.

47.     The Finder's Fee Statements constitute defamation *per se*. The Finder's Fee Statements accuse TMTG of infamous crimes, including securities fraud, misconduct, incompetence, dishonesty, and/or deception in its trade and business.

48.     The Finder's Fee Statements subject TMTG to distrust by the public, potential investors, and regulating agencies, and thus are inherently injurious to TMTG's business.

49.     The Finder's Fee Statements damaged TMTG's business, brand, and good will, causing potential investors and/or users of Truth Social to refrain from joining the platform, jeopardizing and further delaying the SEC's

review of the proposed merger with DWAC, and causing loss of future earning capacity.

50.    Publication of the WaPo Article destroyed at least $2.78 billion of implied equity value in TMTG. Furthermore, after publication of the WaPo Article, TMTG's banker, JP Morgan Chase & Co., contacted TMTG to inquire about the year-plus old transaction with Paxum Bank. Prior to this contact, JP Morgan had expressed no concerns with the prior transaction.

51.    WaPo acted with actual malice and reckless disregard for the truth of the Loan Disclosure Statements as follows:

a. In the WaPo Article, WaPo asserts that "internal documents" supplied by Wilkerson showed that former DWAC CEO Patrick Orlando, or a brokerage associated with him, was paid a finder's fee for the loan.  No such finder's fee was ever paid. As the WaPo Article itself makes clear, WaPo knew that Wilkerson had arranged wires and other payments from TMTG and had access to TMTG's books, records, and bank accounts. Indeed, records leaked to WaPo reflected that Wilkerson was TMTG's point of contact for wire transfers. Furthermore, as the WaPo Article also makes clear - and as is common sense - there are certain types of records that reflect whether a payment has in fact occurred. Despite its unfettered access to Wilkerson and TMTG documents leaked by him, WaPo had no records or other basis demonstrating that a finder's fee was paid. WaPo, based upon discussions with Wilkerson and his

lawyers, knew there was no evidence that a finder's fee had been paid. Therefore, it was knowingly false and defamatory, or at least evinced a reckless disregard for the truth, for WaPo to assert otherwise. In spite of knowing the allegations were fake or at least having no evidence to substantiate the finder's fee, WaPo accused TMTG of hiding the fictitious payment to an Orlando-associated entity from the SEC and shareholders.[5] If true, TMTG's fraudulent and deceptive concealment of material facts from the SEC and shareholders would have been, at the least, a colossal lack of good business judgment - especially given the then-ongoing SEC enforcement investigations that focused on the conduct of Orlando.  Given this context, the alleged failure to disclose a finder's fee payment could have been grounds for the SEC to further delay or deny effectiveness of DWAC's registration statement pertaining to its then-pending merger with TMTG.

      b.    WaPo knew Wilkerson had been "ousted" from TMTG, and that there was bad blood between TMTG and Wilkerson. In spite of this and

---

[5] The WaPo Article states: "A wire transfer document dated [December 23, 2021] shows that $2 million was sent to Trump Media by Paxum Bank, whose main office is on the small Caribbean island of Dominica.  A separate wire transfer document, dated Feb. 17, 2022, shows Trump Media being paid another $6 million by ES Family Trust."

WaPo and Wilkerson concealed from readers that Wilkerson himself arranged the wires.  Wilkerson and WaPo knew that nothing had been concealed from shareholders or the SEC.  The failure to disclose Wilkerson's rile in the wire transfers was intentional and demonstrates WaPo's actual malice.

the serious doubts thus raised as to the veracity of Wilkerson's "story," WaPo published the Finder's Fee Statements anyway.

c.    The Finder's Fee Statements were intentionally extreme and outrageous. WaPo knew that publication of the Finder's Fee Statements would cause a media frenzy (which continues to the present day). WaPo deliberately and recklessly conveyed a false narrative about TMTG in order to sensationalize the news and injure TMTG's business reputation and financial standing.

d.    WaPo intentionally violated its code of ethics and consciously abandoned all journalistic standards and integrity in writing, editing, and publishing the Finder's Fee Statements, and relying upon Wilkerson concerning the same. WaPo published the Finder's Fee Statements with the intent to inflict injury on TMTG.

e.    WaPo harbored extreme bias, ill-will, and desire to inflict harm on TMTG through publishing knowing falsehoods. WaPo has a long and well-documented history of antipathy toward TMTG, Nunes, and former President Trump and publication of the Finder's Fee Statements evidences the same.

f.    Prior to publication of the WaPo Article, WaPo knew that TMTG's CEO (Nunes) had filed suit against the Guardian in which Nunes contended that the statements contained in the Guardian Article were false

and defamatory. In spite of this knowledge, WaPo brazenly published and republished the defamatory Guardian Article online and via Twitter to millions of viewers. At the very least, WaPo's willful avoidance of this circumstance constitutes reckless disregard for the truth.

52.     As a direct result of WaPo's defamation, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damages and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000 or such greater amount as determined by the Jury.

## COUNT III
## Conspiracy

53.     TMTG realleges and incorporates herein paragraphs 1 through 52 above.

54.     Beginning in October 2022 and continuing through present, WaPo, outside third parties (including the WaPo Article's freelance co-authors), Wilkerson and his lawyers combined, associated, agreed or acted in concert together for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation.

55.     In furtherance of the conspiracy and preconceived plan, WaPo worked together with others to write, publish, and republish a scandalous story about securities fraud, adult entertainment, and shady business deals. They

engaged in a joint scheme to publish and republish false and defamatory Statements about TMTG to harm its business.

56.    Wilkerson supplied leaked documents to WaPo and the parties jointly crafted a fraudulent narrative about securities fraud.

57.    The WaPo Article and its publication were overt acts in furtherance of the conspiracy.

58.    WaPo and its co-conspirators acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming TMTG.

59.    WaPo's actions constitute a conspiracy at common law.

60.    As a direct result of WaPo's willful misconduct, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000 or such greater amount as determined by the Jury.

TMTG alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession. TMTG believes that substantial additional evidentiary support, which is in the exclusive possession of WaPo and others, exists for the allegations and claims set forth above.

TMTG reserves the right to amend this Amended Complaint upon discovery of additional evidence of WaPo's wrongdoing.

## JURY DEMAND

TMTG demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, TMTG demands judgment against WaPo, as follows:

a. Compensatory damages in the amount of $2,780,000,000.00 or such greater amount as is determined by the Jury;

b. Punitive damages in the amount of $1,000,000,000.00 or the maximum amount allowed by law;

c. Prejudgment interest from May 13, 2023 until the date Judgment is entered at the maximum rate allowed by law;

d. Prejudgment interest at the maximum rate allowed by Florida law; and

e. Such other relief this Court deems just and proper.

Dated: April 8, 2024                        Respectfully submitted,

*/s/  Stephen B. French*
Stephen B. French
Fla. Bar No. 0078761
Jesse R. Binnall, *pro hac vice*
Jared J. Roberts

Fla. Bar No. 1036550
Shawn Flynn
Fla. Bar No. 104091
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
stephen@binnall.com
jesse@binnall.com
shawn@binnall.com
jared@binnall.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on April 8, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

<u>/s/  Stephen B. French</u>
Stephen B. French
Fla. Bar No. 0078761

*Attorney for Plaintiff*