UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

    Plaintiff,

v.                                                 Case No. 8:23-cv-1535-TPB-AAS

WP COMPANY LLC,

    Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS AMENDED COMPLAINT**

This matter is before the Court on "Defendant WP Company LLC's Motion to Dismiss with Supporting Memorandum of Law," filed on April 22, 2024. (Doc. 49). Plaintiff filed a response in opposition on May 13, 2024. (Doc. 53). Upon review of the motion, response, court file, and record, the Court finds as follows:

**Background**[1]

*The Post's May 13, 2023, Article*

This lawsuit for defamation by Plaintiff Trump Media & Technology Group Corp. ("TMTG") against Defendant WP Company LLC (the "Post") arises from an article titled "Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social,"

---

[1] The Court accepts as true the facts alleged in Plaintiff's amended complaint for purposes of ruling on the pending motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). The Court is not required to accept as true any legal conclusions couched as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

published by the Post on May 13, 2023, and circulated on Twitter (now known as "X") by Post personnel. The article described events related to a contemplated merger between TMTG and a special purpose acquisition company ("SPAC") known as Digital World Acquisition Corp. ("DWAC") as part of taking TMTG's "Truth Social" business public. The article noted there had been a delay in obtaining SEC approval for the merger, which supporters of former President Donald Trump and TMTG attributed to political bias.[2] The article offered a "possible" alternative explanation: concerns by the SEC and other regulators regarding a loan obtained by TMTG, the identity of the lender, and whether the loan had been properly disclosed by TMTG and/or DWAC to DWAC's shareholders or the SEC.[3] The article cited various sources for its story, including "internal documents a company whistleblower has shared with federal investigators and [the Post]," as well as statements expressly attributed to the whistleblower, former TMTG officer Will Wilkerson.

      The article related that in late 2021, with the proposed merger "frozen" and TMTG concerned about paying its bills, then-DWAC president Patrick Orlando announced he had arranged for an $8 million loan from an entity known as "ES Family Trust." According to the article, the loan was part of a deal in which TMTG would receive the loan and, in exchange, ES Family Trust would acquire an equity interest in the public entity to be formed from the merger of TMTG and DWAC. This loan-for-stock deal was reflected, according to the article, in a convertible promissory note,

---

[2] The SEC approved the merger in early 2024.

[3] The Post's article and the parties' filings refer at times to "loans" and at other times to a "loan." For consistency, the Court will refer throughout to the "loan" in the singular. The Court notes also that the parties' arguments do not turn on a distinction between TMTG and DWAC in terms compliance with a duty of disclosure.

although the article acknowledged that the only copy of the note the Post had been able to locate was unsigned. The article reported that some of the funds were wired by another entity, Paxum Bank, which had ties to ES Family Trust and to the adult film industry. Also, according to the article, TMTG paid a finder's fee of $240,000 in connection with the loan to Entoro Securities, a Texas entity of which Orlando was a managing director. Although the article did not refer to a specific document evidencing the payment, it pointed to a broker agreement regarding the fee and an invoice for payment from Entoro.

The article stated that neither the loan-for-stock deal nor the finder's fee had been disclosed to shareholders of DWAC or the SEC. It further reported the opinion of Michael Ohlrogge, a New York University law professor who studies SPACs, that these matters could affect the value of the shares and should have been disclosed. The article also noted that the British journal *The Guardian* had earlier reported that federal prosecutors in New York were investigating whether TMTG had violated money laundering statutes in connection with the loan, and that TMTG Chief Executive Officer Devin Nunes had filed a lawsuit against Wilkerson and others (including *The Guardian*) asserting that the *Guardian* story was "fabricated."

As will be discussed in greater detail below, TMTG alleges that a number of statements in the Post's article were false and defamatory.

***TMTG's Complaint***

TMTG filed suit against the Post for defamation and conspiracy in state court in Sarasota County, Florida, and the Post removed the case to this Court. TMTG originally alleged that nine specific statements set forth in the article or in tweets by

Post personnel circulating the article were false, defamatory, and made with "actual malice," that is, with knowledge that they were false or with reckless disregard as to whether they were true or false. Some of these statements related to the loan itself (the "Loan Statements") and others related to the finder's fee the article stated had been paid in connection with the loan (the "Finder's Fee Statements"). TMTG also alleged the article's references to *The Guardian*'s report on the loan included statements that were false and defamatory. Finally, the complaint alleged the Post conspired with others, including Wilkerson and his attorneys, to publish this false and defamatory information to injure TMTG. The Post moved to dismiss the complaint on various grounds.

***The Court's First Dismissal Order***

By Order dated March 8, 2024 (Doc. 46), the Court granted the Post's motion to dismiss in part and denied it in part, giving TMTG leave to amend. Among other things, the Court ruled that TMTG was a public figure and therefore required to plead and prove actual malice. The Court ruled that TMTG's allegations of actual malice as to the Loan Statements were insufficient because the Court could not determine from the complaint precisely what aspects of the statements were alleged to be false and how the Post would have had access to information showing they were false. The Court ruled that actual malice was also insufficiently pleaded as to the Finder's Fee Statements, and that any amended complaint should include clearer and more specific allegations, including allegations relating to the impact of the fee agreement on whether the Post believed the fee had been paid.

In concluding, the Court noted the obstacles facing a public figure plaintiff pursuing a defamation claim. To bring as much clarity as possible to this situation, the Court directed that any amended complaint should clearly allege as to each challenged statement what aspect of the statement was false, what documents or other information demonstrate the specific aspect was false, and how the Post was aware of the documents or information.

### *TMTG's Amended Complaint*

TMTG's amended complaint narrows and clarifies some aspects of its claims, although the bulk of the allegations are identical to or substantially similar to those in the original complaint. Count I of the amended complaint is based on the Loan Statements, and Count II is based on the Finder's Fee Statements. The amended complaint narrows the challenged Loan Statements from five to three statements and drops any challenge to the Post's statements relating to the *Guardian* article. The challenged Finder's Fee Statements remain the same. Count III, as before, asserts a claim for conspiracy.

As a result of TMTG's amendments, it is now clear that TMTG does not challenge the accuracy of the bulk of the story set forth in the Post's article, including the assertions that TMTG borrowed $8 million from an entity or entities with connections to the adult film industry, that the loan deal involved a pledge of stock in the company to be formed by the merger, and that some TMTG executives were concerned about the lack of information regarding the lender. TMTG's defamation claims now center on the Post's statements regarding the disclosure of the loan and the finder's fee to the SEC and investors. The Post has moved to dismiss the latest

complaint, arguing that TMTG has again failed to allege facts showing the challenged statements were materially false or that the Post published them with actual malice.

## Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). While Rule 8(a) does not demand "detailed factual allegations," it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Id.* at 570.

When deciding a Rule 12(b)(6) motion, review is generally limited to the four corners of the complaint. *Rickman v. Precisionaire, Inc.*, 902 F. Supp. 232, 233 (M.D. Fla. 1995). Furthermore, when reviewing a complaint for facial sufficiency, a court "must accept [a] [p]laintiff's well pleaded facts as true, and construe the [c]omplaint in the light most favorable to the [p]laintiff." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[A] motion to dismiss should concern only the complaint's legal sufficiency, and is not a procedure for resolving factual questions or addressing the merits of the case." *Am. Int'l Specialty Lines Ins. Co. v. Mosaic Fertilizer, LLC*, 8:09-cv-1264-T-26TGW, 2009 WL 10671157, at *2 (M.D. Fla. Oct. 9, 2009) (Lazzara, J.).

## Analysis

The Court's previous dismissal order discussed the principles governing claims for defamation. That discussion is incorporated by reference here. The Court's analysis of the amended complaint will address each of the Loan Statements and

Finder's Fee Statements in turn, discussing the relevant legal principles and authorities as appropriate. With the clarification now provided by TMTG's amended complaint and the parties' most recent round of briefing, the Court finds TMTG has failed to allege facts showing that any of the Loan Statements or Finder's Fee Statements were both materially false and made with actual malice, as required to state a viable claim for defamation. Because there is no viable underlying claim for defamation, the conspiracy count also fails to state a claim.

*Loan Statements*

The first statement TMTG challenges is the following, taken from the text of the Post's May 13, 2023, article:

> **[T]he role ES Family Trust would assume in Trump Media and Technology Group has never been officially disclosed to the Securities and Exchange Commission ["SEC"] or to shareholders in Digital World Acquisition ["DWAC"], the special purpose acquisition company, or SPAC, that has proposed merging with Trump's company[.]**

TMTG's amended complaint alleges that this and the two other Loan Statements discussed below were false for the same reason – they "accused" TMTG of failing to disclose the identity and role of the lender, ES Family Trust. *See* (Doc. 48 at ¶¶ 27, 28, 42). This accusation was false, TMTG asserts, because TMTG did not "conceal or *improperly* fail to disclose (or cause DWAC to improperly disclose)" the involvement of ES Family Trust as the article asserted, but instead DWAC "*properly* disclosed TMTG's debt" in its public filings. (*Id*. at ¶ 28) (emphasis added). TMTG further alleges DWAC's public filings "collectively and appropriately" disclosed the "*existence and relevant* information regarding TMTG convertible promissory notes," and that there was no requirement to disclose ES Family Trust's involvement. (*Id*. at ¶

42a) (emphasis added).  As to the Post's knowledge of the statement's falsity, TMTG alleges that the Post knew that disclosure of ES Family Trust's involvement was not required based on (1) the Post's consultation with "supposed experts," (2) the fact that the identities of TMTG's other lenders were not disclosed in DWAC's public filings reviewed by the Post, and (3) general allegations aimed at presenting a circumstantial case for actual malice.  (*Id.* at ¶ 42b-g).

The Court agrees with the Post that these allegations fail to plead either falsity or actual malice.  TMTG's allegation that disclosure of the involvement of ES Family Trust was not required does not suggest the falsity of the Post's assertion that no disclosure was made.  TMTG argues, however, that the first Loan Statement falsely *implied* that disclosure of ES Family Trust's involvement was required.  Assuming the statement could be reasonably read to imply that requirement, and further assuming no such requirement exists, TMTG as a public figure must allege actual malice by setting forth "facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).[4]  The test for actual malice is a subjective one, looking to whether the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."  *Id.* at 702-03.

---

[4] TMTG cites Florida procedural rules and case law to argue, in essence, that it need only recite the words "actual malice" to avoid dismissal.  Federal law controls this pleading issue, however, and holds that the complaint must allege facts plausibly supporting an inference of malice.  *See Michel*, 816 F.3d at 702 ("*Iqbal* itself directly held that malice and other degrees of intent are subject to the plausibility pleading standard.").

TMTG alleges no facts supporting the proposition that the Post acted with actual malice in publishing the statement. TMTG's conclusory allegation that the Post knew disclosure of ES Family Trust was not required based on the Post's "consultation with supposed experts" is belied by Ohlrogge's opinions quoted in the article. Based on those opinions, the Post reasonably would have believed that disclosure was required, and TMTG's amended complaint contains no facts plausibly suggesting the Post was aware of contrary expert or other authority from which it would have known Ohlrogge's opinions were wrong or had serious doubts on that score.[5]

Equally insufficient are TMTG's allegations that the Post "knew" that disclosure of ES Family Trust was not required based on the absence of any disclosure of other lenders in DWAC's public filings. The article did not assert that TMTG or DWAC should have disclosed the ES Family Trust loan because disclosure of lenders is generally required. It reported Ohlrogge's opinion that disclosure was required in this instance due to issues relating to this specific loan. Accordingly, the lack of disclosure of other lenders in DWAC's filings is irrelevant.

Finally, TMTG's attempt to allege a circumstantial case for actual malice with respect to this and the other challenged statements likewise falls short. TMTG alleges,

---

[5] TMTG's responsive memorandum also refers to the "SEC's declaration of effectiveness of a subsequent registration statement," but this is not mentioned in the amended complaint and TMTG offers no explanation how it supports a contention that disclosure of ES Family Trust was not required or that the Post knew it was not required when it published the article. TMTG attempts to cast doubt on Professor Ohlrogge's reliability by citing "recent" appearances by Ohlrogge on "left wing" media sites such as CNN, NBC, the New York Times, and the BBC. The Court rejects this argument because TMTG offers no specific information suggesting that any of these "recent" appearances would have been relevant to the Post's reliance on Ohlrogge when it published the article. Moreover, the amended complaint contains no allegations regarding Ohlrogge or his reliability, only a generic reference to the Post's "consultation with supposed experts."

for example, that Will Wilkerson, a key source relied on by the Post, had been "terminated for cause" and "ousted" from TMTG and that "bad blood" existed between Wilkerson and TMTG. TMTG, however, offers no further details as to Wilkerson's departure from TMTG or his attitude toward the company. Reliance on a potentially biased source does not by itself establish actual malice. *See e.g., Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (holding that facts that might undermine a source's credibility "do not show that a publisher necessarily acted with malice by relying on the source"); *see also Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 274 (4th Cir. 2022); *Talley v. Time, Inc.*, 923 F.3d 878, 903 (10th Cir. 2019). The article described Wilkerson as a "former executive" and a whistleblower who had shared information with government authorities as well as the Post. The fact that Wilkerson – an insider positioned to provide accurate information and supporting documents to the Post – was to some unspecified extent hostile to TMTG does not, without more, support an inference that he gave vent to that hostility by fabricating facts regarding the loan. *See Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 92-93 (S.D.N.Y. 1980) (noting that there was no evidence that the defendant's "sources, even if biased, would necessarily provide false information"); *see also Don King Productions, Inc. v. Walt Disney Co.*, 40 So. 3d 40, 45 (Fla. 4th DCA 2010) ("An intention to portray a public figure in a negative light, even when motivated by ill will or evil intent, is not sufficient to show actual malice unless the publisher intended to inflict harm through knowing or reckless falsehood.").

Further undermining any inference of actual malice, the article reflected the Post's reliance on sources apart from Wilkerson, including DWAC's public filings and

other documents, as well as the opinions of Professor Ohlrogge. The article also noted that the Post had reached out to TMTG for comment before publication. Although TMTG did not respond, the article reported TMTG's criticism of a previous Post story as based on "discredited hit pieces, defamatory allegations and false statistics." In contrast to *Hunt v. Liberty Lobby, Inc.*, 720 F.2d 631 (11th Cir. 1983), relied on by TMTG, there are no allegations showing that the statements in the article were inherently improbable, that the Post actually entertained doubts about the reliability of Wilkerson, or that the Post's investigation was grossly inadequate under the circumstances. *See id*. at 643-46. Nor do the allegations suggest that the Post "purposefully avoided further investigation with the intent to avoid the truth." *See Michel*, 816 F.3d at 703.

TMTG argues that it may rely on the "sum total" of proper inferences to allege a circumstantial case for actual malice. While this is correct as a general proposition, TMTG's allegations, even taken collectively, do not support a reasonable inference the Post acted with actual malice. TMTG alleges, for example, that the Post harbored ill-will, bias, and "antipathy," and had engaged in a years-long crusade against TMTG characterized by "willful concealment of relevant information" and "re-publication of dubious and unverified accusations of illegal or untoward actions by TMTG." But TMTG alleges no specifics or factual support for these conclusions, just a series of negative headlines from previous Post articles. TMTG alleges that the Post's conduct departed from its code of ethics and professional standards, but offers no specifics as to what standards were breached or how. Controlling case law holds that conclusory allegations of this type are insufficient to support an inference of malice. *See, e.g.,*

*Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (holding that conclusory allegations that the defendants "'knowingly and recklessly' ignored or deliberately avoided learning information," unsupported by factual allegations showing they did so, were insufficient to allege actual malice); *Harvey*, 48 F.4th at 274 (holding that "naked assertions" unsupported by "further factual enhancement" are insufficient to plausibly allege actual malice) (quoting *Nunes v. Lizza*, 486 F. Supp. 3d 1267, 1297 (N.D. Iowa 2020)).

Finally, the amended complaint points to the fact that TMTG's CEO Devin Nunes filed a lawsuit (later dismissed) against *The Guardian* alleging that statements in the *Guardian* article, some of which the Post reported, were false. TMTG does not allege the Nunes lawsuit presented specific information that would have caused the Post to doubt the accuracy of statements made in its article. As the Court noted in its previous dismissal order, the Post's awareness of this lawsuit challenging the *Guardian* article is not necessarily probative of actual malice on the part of the Post. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989) ("Of course, the press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'") (quoting *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)). Accordingly, TMTG's allegations of actual malice are insufficient as to the first Loan Statement.

The second Loan Statement appears in a tweet republishing the Post's May 13, 2023, article:

> **Trump's media company took out an $8 million loan in exchange for stock, but no one told the SEC[.]**

The amended complaint alleges this statement was false, and the Post knew it was false, for the same reasons it alleged as to the first Loan Statement. *See* (Doc. 48 at ¶¶ 27, 28, 42). Accordingly, for the same reasons discussed above, TMTG fails to allege falsity or actual malice as to the second Loan Statement as well.

TMTG's responsive memorandum argues the second Loan Statement was false because DWAC's public filings disclosed TMTG's debt in the aggregate and thereby disclosed "the loan." The Court rejects this argument. First, this is not the basis for falsity or actual malice alleged in the amended complaint. The Court's prior dismissal order directed TMTG to allege in its complaint in what respect each challenged statement was false, what information showed it was false, and why the Post would have been aware of that information. The Court will not allow TMTG to sustain its complaint based on different, unpleaded allegations set forth in its responsive memorandum. *See Michel*, 816 F.3d at 705-06 (rejecting arguments against dismissal based on facts not alleged in complaint). Second, TMTG offers no explanation why disclosure of its aggregate "debt" equates to disclosure of "the loan," particularly in the context of an article that addressed concerns about the circumstances surrounding a particular loan, not TMTG's "debt" or "convertible notes" in general. Accordingly, TMTG has failed to allege facts showing the second Loan Statement was false and that it was made with actual malice, as required to allege a claim for defamation.

The third of the challenged Loan Statements is the following, also in a tweet circulating the article:

> **Trump Media: this time they borrowed money from a bank best known for servicing the adult entertainment [sic], pledged a stake in the company for the loan and didn't tell the SEC.**

For the same reasons discussed above as to the first and second Loan Statements, TMTG fails to allege falsity or actual malice, and its defamation claim therefore fails to the extent it is based on this statement.

*Finder's Fee Statements*

The statements TMTG challenges relating to the finder's fee remain the same as in the original complaint. The first Finder's Fee Statement is:

> **The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust[.]**

The amended complaint asserts this statement was false because no fee was paid, and therefore there was no failure to disclose a payment. The amended complaint, however, does not challenge the article's assertion that there was an agreement to pay the fee. The Post accordingly argues that the defamatory "sting" of this statement would be the same whether the undisclosed finder's fee was actually paid or merely agreed to. Therefore, the Post argues, its statement was substantially true.

The Court agrees. "[U]nder the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Parekh v. CBS Corp.*, 820 F. App'x 827, 834 (11th Cir. 2020) (quoting *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999)). A statement is considered false only where it is "substantially and materially false," that is, where the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Smith*, 731 So. 2d at 706 (internal quotations omitted). In

determining whether a statement is substantially true, the statement must be read in the full context of its publication. *See id*. at 705-06.

TMTG does not deny there was an agreement to pay the fee to an affiliate of Orlando nor does it contend that the agreement was disclosed.[6] Instead, it argues that a statement that payment was made and not disclosed "arguably implies fraud," whereas a statement merely asserting that "there was an agreement reached" does not imply fraud. Thus, TMTG argues, the defamatory sting of the two statements is different. This argument is unpersuasive. As reflected in Ohlrogge's opinions reported in the article, the potential impropriety concerning the undisclosed finder's fee – and therefore the defamatory "sting" of the article – related to the potential conflict of interest involved when Orlando, an insider, arranged a payment to a company in which he had a financial interest. That conflict of interest would have existed whether TMTG merely undertook an undisclosed obligation to pay the fee to Orlando's company, or actually paid the fee. In the context of the entire article, then, whether the fee was paid, as the Post reported, or whether there was merely an agreement to pay the fee, the effect on the mind of a reader would be the same. *See Smith*, 731 So. 2d at 706. Accordingly, the Post's statement was substantially true, even if incorrect on the issue of actual payment.

---

[6] The Post's motion to dismiss asserts that TMTG does not contest the existence of the fee agreement. TMTG's response does not disagree. TMTG argues that the invoice does not demonstrate the existence of the agreement, but it carefully avoids arguing that, in fact, no agreement existed. TMTG therefore appears to concede there was an agreement to pay the fee. *See, e.g.*, *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001) (holding that arguments not made in a summary judgment response are waived). However, in any further amended pleading, TMTG may allege the nonexistence of the fee agreement, if it can do so in good faith.

Even if the statement were not substantially true, the defamation claim based on the first Finder's Fee Statement also fails because TMTG does not allege facts showing actual malice. Despite the Court's directive in its prior dismissal order, TMTG's amended complaint fails to address the impact of the fee agreement and the invoice on whether the Post acted with actual malice in stating that the fee was paid. In particular, TMTG offers no explanation why the Post could not reasonably have assumed that TMTG fulfilled the obligation evidenced by the agreement and the invoice by paying the fee.

TMTG alleges that internal documents to which the Post had access contained no records reflecting a payment, but it does not allege the existence of any document that affirmatively showed the fee had not been paid. TMTG also alleges the Post had "unfettered access to Wilkerson," who handled wire transfers, and alleges in conclusory fashion that the Post knew from discussions with Wilkerson that "there was no evidence" that the fee had been paid. But it does not allege that Wilkerson told the Post the fee had not been paid.

The standard for actual malice is not whether the defendant objectively *should have* doubted the accuracy of its statements, but whether it "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Michel*, 816 F.3d at 703. Even if the documents reviewed by the Post contained no specific confirmation that payment had been made, that would not necessarily show the Post knew the fee had not, in fact, been paid or had a high degree of awareness it had probably not been paid. Accordingly, the amended complaint fails to state a claim for relief based on the first Finder's Fee Statement.

The second Finder's Fee Statement is:

**[T]he recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO[.]**

This statement simply adds a detail to the first statement by identifying the recipient of the payment. The Court's analysis of this statement is therefore the same as for the first statement. Even if technically inaccurate in that no fee was actually paid or received, the second statement was substantially true because it would have no different effect on the mind of a reader than the literal truth, which was that there was an agreement to pay the fee to the outside brokerage associated with Orlando. In addition, for the same reasons discussed above as to the first Finder's Fee Statement, actual malice is not sufficiently alleged. Accordingly, the amended complaint fails to state a claim for relief based on this statement.

The third Finder's Fee Statement is:

**Orlando's finder's fee could affect the value of the shares.**

TMTG's allegations as to falsity and actual malice in the amended complaint relate only to the first two Finder's Fee Statements. Neither the amended complaint nor TMTG's responsive memorandum offers anything specific to show the third statement was false or was published by the Post with actual malice and, as set forth above, TMTG has failed to plead facts making out a circumstantial case for actual malice.[7] Accordingly, the amended complaint fails to state a claim for relief based on the third Finder's Fee Statement.

---

[7] This statement also appears to express an opinion by Professor Ohlrogge based on the facts stated in the article, rather than on undisclosed defamatory facts, and as such would constitute protected "pure" opinion. *See Turner*, 879 F.3d at 1262 ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.") (citing *Keller v. Miami Herald Pub'g Co.*, 778

*Conspiracy*

The amended complaint's second count asserts a claim for common law conspiracy, alleging that the Post "combined, associated, agreed or acted in concert" with Wilkerson, his attorneys, and others "for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation," pursuant to which the Post published the allegedly defamatory article. The Post argues that because the amended complaint fails to state a claim for the underlying tort of defamation, it necessarily fails to state a claim for conspiracy to commit that tort. The Court agrees. Because the defamation claim fails as currently pled, TMTG's claim of conspiracy must also fail for lack of an underlying wrong. *See, e.g.*, *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 n.6 (S.D. Fla. 2021) ("There being no defamation – the gist of the defamation conspiracy – there can be no conspiracy claim.").

## Conclusion

For the reasons set forth above, the amended complaint fails to allege a claim for defamation or a claim for conspiracy. Given the nature of the deficiencies discussed above, and considering the significant obstacles posed for plaintiffs by current defamation law, stating a claim for relief presents significant challenges. However, in

---

F.2d 711, 714-15, 717 (11th Cir. 1985)); *see also, e.g., Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995) (holding that a statement of opinion is actionable only if "it implies the allegation of undisclosed defamatory facts as the basis for the opinion") (quoting Restatement (Second) of Torts § 566). Although a speaker may be liable where an opinion is based on stated facts that are false, as noted above, the Court has ruled the challenged factual assertions regarding the finder's fee were substantially true.

an abundance of caution, the Court will dismiss the amended complaint without prejudice and allow TMTG another opportunity to amend.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendant WP Company LLC's Motion to Dismiss with Supporting Memorandum of Law" (Doc. 49) is **GRANTED.**

2. The amended complaint (Doc. 48) is hereby **DISMISSED WITHOUT PREJDUICE**, with leave to amend.

3. Plaintiff shall have up to and including January 13, 2025, to file a second amended complaint.  Failure to file a second amended complaint will result in this Order becoming a final judgment.  *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 719-20 (11th Cir. 2020).

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 23d day of December, 2024.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE