# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

      Plaintiff,

v.                                     Case No.: 8:23-cv-1535-TPB-AAS

WP COMPANY, LLC,
d/b/a The Washington Post

      Defendant.

_____/

## SECOND AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

       Plaintiff, TMTG Sub Inc. f/k/a Trump Media & Technology Group Corp.

("**Plaintiff**" or "**TMTG**"), files this Second Amended Complaint and Demand

for Jury Trial against Defendant, WP Company, LLC d/b/a The Washington

Post ("**Defendant**" or "**WaPo**"). This Amended Complaint concerns an article

published by Defendant related to a contemplated merger between TMTG and

Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.

("**DWAC**") and the defamatory statements contained therein as well as

Defendant's intentional conspiracy to harm Plaintiff's finances and reputation.

Plaintiff seeks (a) compensatory and punitive damages in excess of

$3,780,000,000.00 as determined by a Jury; (b) prejudgment interest on the

principal sum in accordance with applicable statutory rates; and (c) costs

arising from Defendant's defamation and conspiracy and reasonably incurred in prosecuting claims herein.

## INTRODUCTION

1.     TMTG is a Sarasota-based media and technology company that operates a flagship social media platform called "Truth Social."

2.     On May 13, 2023, WaPo, acting in concert with a former employee of TMTG, who had been terminated for cause, published an egregious hit piece falsely accusing TMTG of securities fraud and other wrongdoing, which was then amplified by WaPo on social media. WaPo's false statements of criminality and nefarious business transactions exposed TMTG to public ridicule, contempt, and distrust in the public sphere, and injured TMTG's business and reputation.

3.     WaPo and the false story's primary author, Drew Harwell ("**Harwell**"), have been on a years-long crusade against TMTG characterized by the constant portrayal of the company as verging on financial collapse and the unquestioning promotion of allegations by disgruntled former employees with obvious axes to grind.

4.     WaPo's defamatory and malicious statements addressed in this action created an existential threat to TMTG and caused enormous loss and hardship. TMTG brings this case to recover compensatory and special damages

caused to its business and good will, and punitive damages for WaPo's gross misconduct.

## PARTIES AND JURISDICTION[1]

5.    TMTG is a Delaware corporation headquartered in Sarasota, Florida.

6.    WaPo is a Delaware limited liability company, whose sole member is Nash Holdings, LLC, a Delaware limited liability company, whose ultimate owner was at the time of the commencement of this action was a citizen of the State of Washington. The *Washington Post* has more than 2,500,000 digital subscribers in the United States, including Florida. Defendant's Twitter/X page has more than 20,000,000 followers, including in Florida. WaPo has agents and offices in Florida. It transacts substantial business in Florida, including the sale of newspapers, advertising, and online subscription services to residents of Sarasota, and the operation of an active website accessible in Florida, www.washingtonpost.com. The article at issue in this action targeted a Florida business and was accessed and read by thousands of Floridians. To the best of Plaintiff's knowledge, WaPo's ultimate owner owns multiple properties in Florida and publicly announced in November 2023 his intent to reside in Florida.

---

[1] TMTG does not waive its contention that WaPo is subject to jurisdiction of Florida State Courts.

7.    Venue is proper in this Court, where the false and defamatory statements were published and where TMTG suffered substantial damages.

## STATEMENT OF MATERIAL FACTS

8.    On March 15, 2023, The Guardian published an online article entitled "Federal investigators examined Trump Media for possible money laundering, sources say." [https://www.theguardian.com/us-news/2023/mar/15/trump-media-investigated-possible-money-laundering (the "Guardian Article")]. The Guardian Article contained false statements and defamatory implications.

9.    The source of the Guardian's false and defamatory charges was a former employee of TMTG, Will Wilkerson ("**Wilkerson**"), who was previously terminated by TMTG for cause in connection with the unauthorized disclosure of TMTG's confidential information in violation of his employment agreement, non-disclosure agreement, and TMTG's external communications policy. Beginning in 2022, separate and apart from any purported disclosures he may have made to the government, Wilkerson began to concoct and publicly shop false stories about TMTG to numerous media outlets.

10.    By May 2023, Wilkerson had devised another fake news story to discredit and harm TMTG.

11.   By May 2023, it was well-known that WaPo and Harwell eagerly published false and injurious stories about TMTG, its CEO, Devin Nunes ("**Nunes**"), and former President Donald Trump. *See* Exhibit A.

12.   Wilkerson contacted WaPo with a salacious story about a porn-friendly bank and its alleged dealings with TMTG allegedly amounting to securities fraud and other potential crimes or misdeeds. Through a series of meetings and conversations with Wilkerson and his lawyers, WaPo undertook with Wilkerson to publish agreed false and defamatory statements to intentionally injure TMTG.

13.   On May 13, 2023, WaPo published an online article with the clickbait headline, "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***." [https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions (the "**WaPo Article**")]. This sensational brand of "reporting" was in line with WaPo and Harwell's global campaign to publish salacious headlines and stories to increase media traffic and defame TMTG and others related to TMTG.

14.   The WaPo Article and follow-on social media republications contain the following false statements of fact of or concerning TMTG:

    a. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust"; and

    b. "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO" (referred to collectively as the "**Statements**").

15.    WaPo was not content with publication of the Statements set forth above to its subscribers and republished such Statements to its X (formerly Twitter) followers.

16.    Harwell republished the WaPo Article to his 48,000 followers, which included correspondents at CNN, New York Times, NBC News, The Atlantic, Huffington Post, the Daily Beast, Business Insider, and the Guardian.    [http://twitter.com/drewharwell/status/1657351704419917825 (New: The Truth Social saga just keeps getting weirder. Our latest includes a porn-friendly bank on a Caribbean island and an $8 million mystery loan").

17.    In order to further spread the smear and increase damage to TMTG, WaPo engaged agents from both within and outside the company to broadly republish the defamatory statements. For example, Harwell and Washington Post "cyber reporter" Joseph Menn ("**Menn**") "boosted" (republished) the WaPo Article on the Mastodon social media network.

[https://mastodon.social/@JosephMenn@infosec.exchange/110363703525631648 ("Wild tale about mysterious backin for Truth Social")].

18.    WaPo business editor Lori Montgomery ("**Montgomery**"), the author of WaPo's May 17, 2023 response to TMTG's retraction demand (*see infra*), joined the fray by retweeting the WaPo Article to her followers.

19.    Co-author of the WaPo Article, freelance journalist Matt Bernardini ("**Bernardini**"), also retweeted the WaPo Article to his followers. [https://twitter.com/MattBernardini7/status/1657346969365364737?s=20].

20.    The second co-author of the WaPo Article, Matei Rosca ("**Rosca**"), tweeted the WaPo Article to his followers [https://twitter.com/mateirosca/status/1657350755848683520?s=20], retweeted Harwell, *and* republished the WaPo Articled on his website. [https://reporter.london/]. Rosca lead readers to believe that the WaPo Article was "just scratching the surface," and that there were additional undisclosed facts and wrongdoing by TMTG. [https://twitter.com/mateirosca/status/1657396995709890561/s=20 (@MattBernardini7 @mateirosca @drewharwell the Washington Post ES Trust/Trump Media story is just the surface right? Great work")].

21.    WaPo's and its confederates' frenzy and repeated, concerted harassment evidence a knowing, deliberate, organized, and systemic effort to

promote the false and defamatory Statements worldwide in order to inflict the greatest possible injury on TMTG and its business status and opportunities.

22.    The clickbait headline of the WaPo Article – "***Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social***" – was intended to grab the immediate attention of common-minded readers by falsely insinuating that TMTG was involved in shady business dealings. [*See* https://twitter.com/ericgarland/status/1657772179793256450 ("'Yo WaPo, you buried the lede here, even calling it a loan from a porn-friendly bank.' It's PAXUM BANK, one that's almost surely tied to Russian Mafiya $$$ from sex trafficking of cam girls in Romania and around the world. Its owner just resigned yesterday.")].

23.    The Statements immediately conveyed a defamatory, intentional, and inescapable meaning to readers; the gist of which is that TMTG committed securities fraud or aided, abetted, and participated in improper acts to conceal material facts[2] from the SEC and shareholders of DWAC.

24.    The WaPo Article imputed to TMTG crimes, dishonesty, want of integrity, and corporate malfeasance guiding readers to conclude that TMTG

---

[2] The WaPo Article represents that TMTG's failure to disclose payment of the "$240,000 finder's fee" was a material omission and, therefore, securities fraud. WaPo states, "Orlando's finder's fee could affect the value of the shares." To be clear, WaPo's Statements are baseless because no finder's fee was paid to anyone, nor did TMTG ever agree to pay such a fee.

and its executives could go to jail because of the non-disclosures, suffer humiliation, and/or fail in its business endeavors. [*see*, *e.g.*, https://twitter.com/dave_winx/status/1657723934677008390 ("The beautiful thing about this is that it could potentially lead to charges against Devon [sic] Nunes"); https://twitter.com//KeyLargo2/status/1657502055047614472 ("Someone, please put this corrupt mf'er in jail!")]. Readers of the WaPo Article concluded that TMTG operated underhandedly and openly disregarded the rule of law. *See*, *e.g.*, https://www.washingtonpost.com/technology/2023/05/13/trump-truth-social-loan-questions/?commentID=99e03c41-0803-41cc-8340-fbd718941d86].

25.    To prop up the WaPo Article's central thesis – namely, that TMTG engaged in or was a party to securities fraud – WaPo included in the Article the story of an "investor," Tom Sas, a purported Trump supporter, who was "injured" after he spent $561,000 on DWAC stock, "his life savings," because of TMTG's non-disclosures. On May 13, 2023, WaPo tweeted the Article and highlighted Sas's misfortune, insinuating that TMTG's concealment of material facts caused DWAC's stock price to plummet to $13 per share. In his quote tweet, Harwell ridiculed Sas and other investors similarly situated. [https://twitter.com/drwharwell/status/1657366474032381952 ("No matter how your day is going, at least you didn't spend your life savings on Truth Social-related stock, paying $175 for share that now sell for $13")]. WaPo

readers similarly commented and mocked Sas as a "sucker" and that Sas was a victim of a stock "scam" or "grift."

26.    As was naturally and foreseeably intended by WaPo and Wilkerson, the WaPo Article and its defamatory Statements were republished thousands of times, including by prominent anti-TMTG Twitter users.

27.    The Statements are materially false.

28.    TMTG never paid or agreed to pay a $240,000 "finder's fee" to anyone who purportedly assisted to arrange an $8 million loan from ES Family Trust as accused in the Statements. Neither Orlando nor any brokerage associated with Orlando received any finder's fee. Accordingly, TMTG did not improperly fail to disclose (or cause DWAC to fail to disclose) payment of a finder's fee to the SEC, DWAC shareholders, and/or the investing public because one did not exist, and there was no agreement for one.

29.    Comparing the truth of these facts to the Statements, individually and in their accumulated totality, the WaPo Article was plainly, materially false, defamatory, and specifically intended to disrupt, disparage, injure, condemn, and besmirch TMTG's business reputation and its financial standing.

30.    Fla. Stat. § 770.01 provides that a plaintiff in a civil action against a publication for libel or slander "shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or

broadcast and the statements therein which he or she alleges to be false and defamatory."

31.    On May 14, 2023, TMTG served written notice on WaPo pursuant to Fla. Stat. § 770.01 and requested retraction of the WaPo Article.

32.    On May 17, 2023, a response written by Montgomery admitted that payment of the "$240,000 finder's fee" was "information" that was "material to investors," but WaPo refused to recognize that no finder's fee had ever been paid, that TMTG did not fail or refuse to disclose anything to the SEC or shareholders, and that its Statements were materially false. WaPo continues to refuse to retract its defamatory Statements.

33.    WaPo's Statements were not published in good faith. The falsity of the Statements is not due to an honest mistake of the facts. There are no reasonable or verifiable grounds for believing the Statements are true. Publication of the Statements and republication of the Guardian Article were part of a concerted effort to damage TMTG and damage is business.

## CAUSES OF ACTION

### COUNT I
### Defamation Arising from the Statements

34.    TMTG realleges and incorporates herein paragraphs 1 through 33 above.

35.     WaPo made and published to third parties, including WaPo's subscribers, advertisers, viewers, and followers in Sarasota County and world-wide, the false Statements. WaPo also republished the false and defamatory statements contained in the Guardian Article.

36.     The Statements are entirely false. As discussed, TMTG never paid or agreed to pay a $240,000 "finder's fee" to anyone who purportedly assisted to arrange an $8 million loan from ES Family Trust as accused in the Statements.

37.     By publishing the false Statements on the Internet and by tweeting the same, WaPo knew or should have known that the false Statements would be republished over and over again by third parties to TMTG's detriment and injury. Such republication was the natural and intended consequence of WaPo's actions and presumptively authorized and encouraged by WaPo as part of its regular course of business. In addition to the original publication, WaPo is liable for the republication of the Statements by its agents and third parties.

38.     The Statements constitute defamation *per se*. The Statements accuse TMTG of infamous crimes, including securities fraud, misconduct, incompetence, dishonesty, and/or deception in its trade and business.

39.    The Statements subject TMTG to distrust by the public, potential investors, and regulating agencies, and thus are inherently injurious to TMTG's business.

40.    The Statements damaged TMTG's business, brand, and good will, causing potential investors and/or users of Truth Social to refrain from joining the platform, jeopardizing and further delaying the SEC's review of the proposed merger with DWAC, and causing loss of future earning capacity.

41.    Publication of the WaPo Article destroyed at least $2.78 billion of implied equity value in TMTG.

42.    WaPo acted with actual malice and reckless disregard for the truth of the Statements as follows:

a. In the WaPo Article, WaPo asserts that "internal documents" supplied by Wilkerson showed that former DWAC CEO Patrick Orlando, or a brokerage associated with him, was paid a finder's fee for the loan. This was false: No such finder's fee was ever paid, nor did TMTG ever agree to pay such a fee. Therefore, no "internal document" showed or could have shown that TMTG paid or agreed to pay a finder's fee.[3] Wilkerson, who had full access to

_____

[3] The fact that a third party sent TMTG an invoice is not evidence of an agreement to pay a fee, much less of an actual payment. While TMTG respectfully submits it does not bear the burden of proving a negative at this stage of the litigation, it is prepared to marshal evidence affirmatively showing that no fee was paid.

TMTG's books and records, knew that TMTG had not paid a finder's fee or even agreed to do so, which would have necessitated accounting for the fee as a liability. Because Wilkerson was WaPo's sole source for its claims, WaPo knew or had a high degree of awareness that the fee had not been paid. WaPo has admitted that Harwell reviewed the internal documents from Wilkerson. Simply put, WaPo reviewed the internal documents from Wilkerson but would not have seen any documents showing a finder's fee had been paid or agreed to be paid because no such documents existed, and this gave WaPo knowledge that such documents did not exist. WaPo's Statements to the contrary were knowingly false or, at the very least, evinced a reckless disregard for the truth. In spite of knowing the allegations were fake or at least having no evidence to substantiate the finder's fee, WaPo accused TMTG of hiding the fictitious payment to an Orlando-associated entity from the SEC and shareholders. If true, TMTG's fraudulent and deceptive concealment of material facts from the SEC and shareholders would have been, at the least, a colossal lack of good business judgment–especially given the then-ongoing SEC enforcement investigations that focused on the conduct of Orlando. Given this context, the alleged failure to disclose a finder's fee payment could have been grounds for the SEC to further delay or deny effectiveness of DWAC's registration statement pertaining to its then-pending merger with TMTG.

b.    WaPo knew Wilkerson had been "ousted" from TMTG, i.e.,
terminated for cause after making unauthorized disclosures of TMTG's
confidential information to press outlets including WaPo, which published
sympathetic profiles of Wilkerson (complete with photo shoots) in October 2022
and April 2023.[4] WaPo knew there was bad blood between TMTG and
Wilkerson, including because, *according to WaPo's own reporting*, Wilkerson
was "fired" from his job, (falsely) accused TMTG of violating the securities law,
became a "threat[] to TMTG's future," and lost "stock options that might have
one day made him a millionaire"—along with his self-image as an
"unstoppable" Avenger, which he exchanged for a $16/hour job as a Starbucks
barista. The Miami Herald further publicized Wilkerson's bad blood with
TMTG months before the WaPo Article.[5] The Miami Herald published the
following: (1) "He [Wilkerson] argues the [Truth Social] site has quickly become
more about promoting Trump than giving voice to a range of conservatives and

---

[4] Drew Harwell, "Co-founder of Trump's media company details Truth Social's
bitter infighting", WASHINGTON POST (Oct. 15, 2022), https://archive.is/T3Qe8;
Drew Harwell, "He blew the whistle on Trump's Truth Social. Now he works
at    Starbucks.",    WASHINGTON    POST    (Apr.    29,    2023),
https://archive.is/Peun0#selection-327.0-327.71.

[5] Jay Weaver, "*Behind the scenes of how Trump's Truth Social was born, and
how    it    could    fall    apart*", MIAMI    HERALD    (Oct.    7,    2022),
https://www.miamiherald.com/news/politics-
government/article266503321.html.

others . . .”; (2) “One way or another, this company is going to go bankrupt”; (3) “Wilkerson . . . said he decided to speak out about Truth Social because he believes it has not fulfilled its original mission to be a ‘Big Tent’ for conservatives and other political voices in social media — that, instead, it has turned into an ‘echo chamber’ for Trump and his personality since it was launched online in February with former Republican Rep. Devin Nunes as Trump Media’s CEO.”; (4) “‘Unfortunately, it’s [the Truth Social platform] fed into the ultra MAGA followers and QAnon conspiracy theorists,’ he told the Herald. ‘That was never the original intention of the site. . . . it’s really a shame it’s gone in this direction.’”; (5) “. . . Wilkerson said that despite his excitement about Truth Social’s future, he became deeply concerned about the arrival of Nunes as Trump Media’s new CEO in January and the ideological direction of the social media platform, especially when he started hiring what he viewed as Nunes’ ‘cronies.’ He said Nunes . . . recast Truth Social as Trump’s ‘bully pulpit,’ a direction he had feared at the outset.”; and (6) “‘It was all downhill after Devin Nunes took over,’ Wilkerson said. ‘You don’t get to be a multibillion-dollar company with one message, a repeating echo chamber around one person, Donald Trump.’” Despite all of this, WaPo published the false Statements anyway.

       c.    The Statements were intentionally extreme and outrageous. WaPo knew that publication of the Statements would cause a media frenzy.

WaPo deliberately and recklessly conveyed a false narrative about TMTG in order to sensationalize the news and injure TMTG's business reputation and financial standing. WaPo published the Statements with the intent to inflict injury on TMTG.

       f.    WaPo harbored extreme bias, ill-will, and desire to inflict harm on TMTG through publishing knowing falsehoods. WaPo and Harwell have a long and well-documented history of antipathy toward TMTG, Nunes, and former President Trump, and publication of the Statements evidences the same. For example, Harwell began ridiculing Nunes' leadership of TMTG even before Nunes assumed his position at the company—when Nunes first announced he would leave Congress to lead TMTG, Harwell posted sarcastically on Twitter, "Big move for esteemed social network, streaming media & cloud computing expert Devin Nunes."[6] Furthermore, after former President Trump was banned from Twitter, Harwell characterized Trump's social media posts as violent, hateful, and dangerous, co-authoring a WaPo story asserting that "President Trump will leave the White House on Wednesday as a man shorn of a key instrument of his power — his Twitter account — amid a broad reckoning over whether even the world's leading politicians have a right to incite violence and spread hate speech on social

---

[6]    Drew    Harwell    (@drewharwell),    X    (Dec.    6,    2021), https://x.com/drewharwell/status/1468008362579271686.

media.[7] Going beyond publicly denigrating the company, as Truth Social was undergoing beta testing in 2021, Harwell bragged that he'd repeatedly registered fake accounts on the incipient platform.[8]

43.    As a direct result of WaPo's defamation, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damages, and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000 or such greater amount as determined by the Jury.

## COUNT II
## Conspiracy

44.    TMTG realleges and incorporates herein paragraphs 1 through 43 above.

45.    Beginning in October 2022 and continuing through present, WaPo, outside third parties (including the WaPo Article's freelance co-authors), Wilkerson and his lawyers combined, associated, agreed, or acted in concert

---

[7] Craig Timberg and Drew Harwell, "E*xiled from social media mainstream, Trump and his followers will find life different at the extreme corners of the Web*," WASHINGTON POST (Jan. 19, 2021), https://archive.is/YGbga#selection-427.1-427.119.

[8]    Drew    Harwell    (@drewharwell),    X    (Oct.    20,    2021), https://x.com/drewharwell/status/1451020106067288065;    Drew    Harwell (@drewharwell),    X    (Oct.    21,    2021), https://x.com/drewharwell/status/1451256225417646085 .

together for the express purpose and illegal objective of injuring TMTG and intentionally interfering with and destroying its business and reputation.

46.    In furtherance of the conspiracy and preconceived plan, WaPo worked together with others to write, publish, and republish false and defamatory Statements about TMTG to harm its business.

47.    Wilkerson supplied leaked documents to WaPo, and the parties jointly crafted a fraudulent narrative about securities fraud.

48.    The WaPo Article and its publication were overt acts in furtherance of the conspiracy.

49.    WaPo and its co-conspirators acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming TMTG.

50.    WaPo's actions constitute a conspiracy at common law.

51.    As a direct result of WaPo's willful misconduct, TMTG suffered damages, including, but not limited to, loss and injury to its business, brand and good will, lost future earning capacity, damage, and injury to reputation (past and future), costs, and other out-of-pocket expenses in the sum of $2,780,000,000 or such greater amount as determined by the Jury.

TMTG alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession. TMTG believes that

substantial additional evidentiary support, which is in the exclusive possession of WaPo and others, exists for the allegations and claims set forth above.

TMTG reserves the right to amend this Second Amended Complaint upon discovery of additional evidence of WaPo's wrongdoing.

## JURY DEMAND

TMTG demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, TMTG demands judgment against WaPo, as follows:

a. Compensatory damages in the amount of $2,780,000,000.00 or such greater amount as is determined by the Jury;

b. Punitive damages in the amount of $1,000,000,000.00 or the maximum amount allowed by law;

c. Prejudgment interest from May 13, 2023, until the date Judgment is entered at the maximum rate allowed by law;

d. Prejudgment interest at the maximum rate allowed by Florida law; and

e. Such other relief this Court deems just and proper.


Dated: January 13, 2025                     Respectfully submitted,

                                            */s/  Stephen B. French*

Stephen B. French
Fla. Bar No. 0078761
Jesse R. Binnall, *pro hac vice*
Jared J. Roberts
Fla. Bar No. 1036550
Shawn Flynn
Fla. Bar No. 104091
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
stephen@binnall.com
jesse@binnall.com
shawn@binnall.com
jared@binnall.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on January 13, 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


*/s/  Stephen B. French*
Stephen B. French
Fla. Bar No. 0078761

*Attorney for Plaintiff*