## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

     Plaintiff,

vs.

WP COMPANY LLC d/b/a The Washington Post,

     Defendant.

Case No: 8:23-cv-01535-TPB-AAS

_____/

### DEFENDANT WP COMPANY LLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT WITH <u>SUPPORTING MEMORANDUM OF LAW</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant WP Company LLC d/b/a The Washington Post ("The Post") moves to dismiss the Second Amended Complaint (Doc. No. 70, "Second Am. Compl.") with prejudice. For the reasons given in the memorandum below, Plaintiff Trump Media & Technology Group Corp. ("TMTG") fails to state a claim for defamation or conspiracy.

### INTRODUCTION

The Court has already dismissed Plaintiff's claims twice before. First Op. (Doc. No. 46) at 20-21; Second Op. (Doc. No. 68) at 19. In its most recent decision dismissing the First Amended Complaint, the Court "in an abundance of caution" gave TMTG an opportunity to replead its claims a third time, but emphasized that TMTG would have "significant challenges" if it attempted to do so, because of both

the "deficiencies" with TMTG's claims, and also "the significant obstacles posed for plaintiffs by current defamation law." Second Op. at 18-19.

TMTG has now for a third time "fail[ed] to allege a claim for defamation or a claim for conspiracy." *Id.* at 18. This is because the limited changes TMTG has made in its Second Amended Complaint make actual malice allegations that are no more plausible than the ones the Court has already rejected as legally insufficient. TMTG's Second Amended Complaint has abandoned any claim regarding any statement in the Article, Ex. A, except for two of the original three "Finder's Fee Statements."

In response to the Court's instruction that "in any further amended pleading, TMTG may allege the nonexistence of the fee agreement, if it can do so in good faith," Second Op. at 15 n.6, TMTG has added versions of the terse denial that "nor did TMTG ever agree to pay such a fee," Second Am. Compl. ¶¶ 23 n.2, 28, 36, 42(a) & n.3. Although The Post for this reason, accepting the allegation as true, has not renewed its substantial truth ground for dismissal, this new denial fails to move the needle for actual malice purposes. This is so because the denial makes no new allegation that plausibly addresses *The Post's* subjective understanding of the finder's fee, and so does not plausibly allege that The Post "actually entertained serious doubts as to the veracity" of the Finder's Fee Statements, "or was highly aware" that those statements were "probably false." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

As before, the Second Amended Complaint, which incorporates the Article,

reflects that The Post relied on documentary sources for the reporting at issue provided by a TMTG co-founder and his attorneys: a finder's fee invoice and an agreement for payment that were among the "internal documents a company whistleblower has shared with federal investigators." Ex. A at 1. Thus, as the Court previously explained:

> Even if the documents reviewed by the Post contained no specific confirmation that payment had been made, that would not necessarily show the Post knew the fee had not, in fact, been paid or had a high degree of awareness it had probably not been paid. Accordingly, the amended complaint fails to state a claim for relief based on the first Finder's Fee Statement.

Second Op. at 16. So too here, as the Second Amended Complaint's new allegations denying the existence of the finder's fee agreement do not dispute that The Post's reporting was informed by these documentary sources provided by a knowledgeable executive at the company and his attorneys.

TMTG thus has failed, for a third time, to state a claim for defamation, despite considerable guidance from the Court. And, because TMTG's defamation claim fails, its conspiracy claim must once again "fail for lack of an underlying wrong," among other reasons. *Id.* at 18. After three strikes the case should therefore be dismissed with prejudice.

## BACKGROUND

### A.    TMTG

Trump Media & Technology Group operates the social media platform "Truth Social." Second Am. Compl. ¶ 1. In October 2021, TMTG announced that

it would merge with Digital World Acquisition Corp. ("DWAC"), a special-purpose acquisition company ("SPAC") already publicly traded on the stock market. Ex. A at 2. Although mergers with SPACs are generally completed within months of announcement, TMTG's merger with DWAC was delayed for more than two years, in part due to an inquiry by the Financial Industry Regulatory Authority and to investigations by the Securities and Exchange Commission ("SEC") and the Department of Justice. *Id.* at 8. The merger was ultimately approved in early 2024, during the pendency of this lawsuit. *See* Second Op. at 2 n.2.

### B.    The Article

On May 13, 2023, The Post published an article by lead reporter Drew Harwell titled, "Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social." Second Am. Compl. ¶ 13; Ex. A. The Article concerned TMTG's receipt of an $8-million loan from ES Family Trust—an "obscure financial entity" with ties to Caribbean-based Paxum Bank, which "bills itself as a top payment service for adult entertainment sites"—in exchange for TMTG stock. Ex. A at 1.

Among other things, the Article reported that, in connection with the loan, TMTG had agreed to pay and did pay a $240,000 finder's fee to Entoro Securities, a brokerage firm managed by DWAC's then-CEO Patrick Orlando. *See id.* at 1-2, 4. The Post attributed its reporting on the finder's fee to "a referral fee agreement and an Entoro invoice" provided to The Post—and to federal investigators—by Will Wilkerson, a "whistleblower who . . . was the company's executive vice president of operations," and his attorneys. *Id.* at 1-2, 4. The Article quoted directly from the

referral fee agreement, stating that it "names '[Paxum Bank owner] Anton Postolnikov and affiliated entities' as 'Introduced Parties' who participated in the deal." *Id.* at 4.

The Article's other reporting relied on additional "internal documents [Wilkerson] has shared with federal investigators," such as a copy of a convertible promissory note setting forth the terms for the eventual stock transfer, two wire transfer documents showing payment of the loan to TMTG, and internal company emails discussing the loan. *Id.* at 1, 4-5. Additionally, the Article included on-the-record statements from Wilkerson regarding the loan, *see id.* at 4, and it disclosed other sources like the former chief executive officer of Paxum Bank, a legal expert on SPACs, and a DWAC investor, *see, e.g.*, *id.* at 2-3, 6, 9. The Article also noted that The Post had sought but did not receive comment from multiple TMTG representatives, board members, and executives, as well as DWAC and its former chief executives. *See, e.g.*, *id.* at 2-5, 8. In the absence of any comment from TMTG and DWAC, the Article published a previously received statement from TMTG that described The Post's reporting as "based on 'discredited hit pieces, defamatory allegations and false statistics'" without "disput[ing] any specific claims." *Id.* at 2.

### C.    The Retraction Demand and The Post's Response

On May 14, 2023, TMTG sent a retraction demand to The Post. Ex. B.[1] The letter identified multiple allegedly "false and defamatory assertions and

---

[1] The Court may consider TMTG's retraction demand, and The Post's subsequent response, as incorporated by reference. *See* Second Am. Compl. ¶¶ 18, 31, 32; *Reed v. Chamblee*, 2023 WL 6292578, at *10 n.10 (M.D. Fla. Sept. 27, 2023).

implications" in the Article, including that TMTG paid a $240,000 finder's fee to a "brokerage associated with former [DWAC] CEO Patrick Orlando." *Id.* at 1.

On May 17, 2023, The Post issued a response that itemized the disclosed sources for the statements at issue. Ex. C. With respect to the reporting on the finder's fee, The Post cited the "Entoro referral fee agreement and invoice confirm[ing] the $240,000 referral fee, billed to TMTG," and noted that the "agreement also names Paxum Bank's Anton Postolnikov." *Id.* at 1. The Post explained that a retraction of this and other reporting in the Article was thus unwarranted, but invited TMTG to provide "more specifics" regarding the purported inaccuracies. *Id.*

TMTG did not respond.

### D.    Procedural History

TMTG brought this action in the Twelfth Judicial Circuit Court in Sarasota County, Florida, on May 20, 2023, alleging that (1) nine statements in the Article and in related social media posts were false and defamatory; and (2) The Post conspired with Wilkerson and his counsel to defame TMTG. *See* Compl. (Doc. No. 1-2) ¶¶ 12, 29. The Post removed the case to federal court. (Doc. No. 1).

On July 17, 2023, The Post moved to dismiss the Complaint for failure to state a claim. On March 8, 2024, this Court dismissed the Complaint without prejudice. First Op. at 20-21. In doing so, the Court ruled that TMTG was a public figure, and therefore required to plead actual malice. *See id.* at 7.

TMTG filed an Amended Complaint on April 8, 2024, (Doc. No. 48, "First

Am. Compl."), narrowing the scope of its defamation claim to six statements. On December 23, 2024, the Court again ordered dismissal without prejudice on the basis that TMTG had "failed to allege facts showing" that any of these statements "were both materially false and made with actual malice." Second Op. at 7. Although the Court emphasized TMTG would face "significant challenges" if it were to seek to amend yet again, the Court allowed TMTG leave to do so "in an abundance of caution," while underscoring that its Order would otherwise become a final judgment. *Id.* at 18-19.

TMTG filed a Second Amended Complaint on January 13, 2025. TMTG now challenges only two statements, which the Court previously addressed as the "Finder's Fee Statements." Second Op. at 14.[2] These remaining statements are:

> (1) "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust"; and
>
> (2) "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO."

Second Am. Compl. ¶ 14.

The Second Amended Complaint includes the following new allegation regarding the finder's fee agreement:

> • that TMTG "never paid or agreed to pay a $240,000 'finder's fee' to anyone who purportedly assisted to arrange an $8 million loan from ES Family Trust as accused in the Statements."

*Id.* ¶ 36; *see also id.* ¶¶ 28, 42(a) (similar).

---

[2] The changes in the Second Amended Complaint can be seen in attached exhibit showing a redline of the First Amended and Second Amended Complaints. Ex. D.

The only other substantive additions to the Second Amended Complaint are the following new allegations regarding Wilkerson's and The Post's supposed bias, which mirror prior allegations to this effect:

- that Wilkerson's termination from TMTG was "in connection with the unauthorized disclosure of TMTG's confidential information in violation of his employment agreement, non-disclosure agreement, and TMTG's external communications policy," *id.* ¶ 9, and that The Post knew from its prior reporting that this firing caused Wilkerson to lose "stock options that might have one day made him a millionaire," *id.* ¶ 42(b); and

- that Drew Harwell, who reported the Article, had a "history of antipathy" toward TMTG, as demonstrated by his (1) posting "sarcastically" about TMTG's decision to make former Congressman Devin Nunes the company's chief executive; (2) describing President Donald Trump's social media posts as "violent, hateful, and dangerous" in an article about Twitter's decision to ban the President from the platform; and (3) "bragg[ing]" that he was able to create fake TMTG user accounts during the company's beta testing period, *id.* ¶ 42(f).

The Second Amended Complaint also removes allegations related to multiple statements no longer at issue. For example, TMTG has abandoned its prior claim that a third "Finder's Fee Statement"—that "Orlando's finder's fee could affect the value of the shares," First Am. Compl. ¶ 14—was defamatory. TMTG also excludes its prior admission that Wilkerson "was TMTG's point of contact for wire transfers" and "had access to TMTG's books, records, and bank accounts." *Id.* ¶ 51(a).

In addition, TMTG no longer alleges that The Post published a "scandalous story about securities fraud, adult entertainment, and shady business deals," *Id.* ¶ 55. This is consistent with the Court's observation that "TMTG does not

challenge the accuracy of the bulk" of the Article, including the Article's reporting that TMTG "borrowed $8 million from an entity or entities with connections to the adult film industry, that the loan deal involved a pledge of stock in the company to be formed by the merger, and that some TMTG executives were concerned about the lack of information regarding the lender."  Second Op. at 5.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint's factual allegations must be sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" will suffice.  *Id.* at 555.

"To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits."  *Kahl v. BNA*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.).  Thus, "courts routinely dismiss defamation claims at the motion to dismiss stage."  *Marder v. TEGNA Inc.*, 2020 WL 3496447, at *3 (S.D. Fla. June 29, 2020) (citing cases); *Michel*, 816 F.3d at 702 (affirming dismissal); *Reed*, 2023 WL 6292578, at *26 (dismissing defamation claims with prejudice).

## ARGUMENT

## I.    THE AMENDED COMPLAINT FAILS TO STATE A DEFAMATION CLAIM.

To succeed on a claim of defamation, a public figure like TMTG must "allege actual malice by setting forth facts sufficient to give rise to a reasonable inference

that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." Second Op. at 8 (internal quotation marks omitted) (citing *Michel*, 816 F.3d 686, 702). This standard of fault "is a subjective one," and poses a "significant obstacle[]" for a public-figure plaintiff. *Id.* at 8, 18.

Here, TMTG's defamation claim should be dismissed for failure plausibly to allege actual malice, because the Second Amended Complaint's allegations largely "are identical to or substantially similar to those" that preceded them, and, as before, TMTG has not alleged that The Post published any statement with at least reckless disregard for whether it was true or false. *Id.* at 5. First, to the extent TMTG makes new allegations, it fails to plead that The Post "actually entertained serious doubts as to the veracity" of the Finder's Fee Statements, "or was highly aware" that those statements were "probably false." *Michel*, 816 F.3d at 703. Second, TMTG continues to ignore, and continues not to contest, the face of the Article showing The Post's reliance on multiple sources and considerable attempts to contact TMTG affiliates for comments, which undercut any inference of actual malice and support dismissal of TMTG's defamation claim.

## A.    TMTG's New Allegations Fail To Plead Actual Malice.

None of TMTG's new allegations—concerning the fee agreement's nonexistence, alleged bias harbored by source Will Wilkerson, or alleged bias harbored by The Post itself—address the deficiencies identified in the Court's two previous Orders or otherwise "support a reasonable inference the Post acted with

10

actual malice." Second Op. at 11.  That is because the allegations are immaterial to the question of whether The Post at least entertained serious doubts regarding its disclosed sources or its understanding of those sources.

### 1.    New Allegations that a Fee Agreement Did Not Exist

TMTG now alleges that it never entered an agreement to pay a referral fee. Second Am. Compl. ¶ 42(a).  But this new allegation is immaterial for actual malice purposes because it does not address The Post's subjective understanding of whether TMTG had entered into such an agreement.

Despite the Court's guidance, TMTG for the third time has "fail[ed] to address the impact" of the sources The Post expressly relied upon for the Finder's Fee Statements, i.e., the "referral fee agreement and Entoro invoice."  Second Op. at 16; Ex. A at 4.  In both of its prior opinions, the Court directed TMTG "to address the impact of the fee agreement and the invoice on whether the Post acted with actual malice in stating that the fee was paid."  Second Op. at 16; *see also* First Op. at 11.  But even now, TMTG disregards this instruction by failing to include any allegation regarding The Post's disclosed reliance on a fee agreement from Wilkerson and acknowledging the invoice only as a "third-party" invoice.  Second Am. Compl. ¶ 42(a) n.3.

TMTG does not allege that the referral fee agreement and invoice that The Post relied upon and quoted from were not authentic, let alone plausibly allege that The Post subjectively had serious reasons to doubt them.[3]  TMTG also has

---

[3] Without disputing the existence of the invoice, TMTG alleges that the "fact that a third party sent

"offer[ed] no explanation" why The Post "could not reasonably have assumed that TMTG fulfilled the obligation evidenced by the agreement and the invoice by paying the fee," despite the Court previously noting this deficiency.  Second Op. at 16.  And TMTG has not made any allegation that The Post, at minimum, entertained serious doubts about that assumption, regardless of whether that conclusion was "ultimately incorrect."  *Jacoby v. CNN, Inc.*, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021) (per curiam) (affirming dismissal on actual malice grounds where plaintiff had not alleged "any facts demonstrating that Defendants held serious doubts about the truth of [their] sources or even about whether the sources actually supported the position that Defendants utilized them for," even if Defendants were allegedly wrong in their conclusions).

Nor could TMTG do so, because The Post received these documents from a company "insider positioned to provide accurate information," Second Op. at 10, and his lawyers, and knew they had also been provided to federal investigators, Ex. A at 1.  Because TMTG has not plausibly alleged that The Post had reason to doubt the nature of these documents or otherwise "doubt [their] veracity," the Court should once more dismiss TMTG's defamation claim on this basis.  First Op. at 8 (citing *Michel*, 816 F.3d at 703); *see also* Second Op. at 16.

Having failed to address the fundamental and undisputed point that The

---

TMTG an invoice is not evidence of an agreement to pay a fee, much less of an actual payment." Second Am. Compl. ¶ 42(a) n.3.  But as the Court previously explained, this contention has no bearing on whether The Post *subjectively believed* that "the fee had not, in fact, been paid or had a high degree of awareness it had probably not been paid."  Second Op. at 16; *see also Michel*, 816 F.3d at 702 ("[T]he beliefs or actions of a reasonable person are irrelevant").

Post relied upon its disclosed sources, TMTG advances the theory that because The Post reviewed internal TMTG documents, and allegedly no internal TMTG "documents showing a finder's fee had been paid or agreed to be paid . . . existed," it logically follows that The Post possessed "knowledge that such documents did not exist." Second Am. Compl. ¶ 42(a). But as explained above, these "conclusory statements and lackluster allegations" without such a supporting allegation "are rebutted by the Article[] [it]sel[f]," and The Post's express reliance on a referral agreement and invoice. *Jacoby v. CNN, Inc.*, 537 F. Supp. 3d 1303, 1311-12 (M.D. Fla. 2021), *aff'd per curiam*, 2021 WL 5858569; *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). Moreover, TMTG does not go so far as to "allege the existence of any document that affirmatively showed" to The Post that "the fee had not been paid" or that an agreement did not exist, as the Court directed, Second Op. at 16, much less that The Post ever had subjective awareness of such a document (it didn't).[4]

TMTG "submits it does not bear the burden of proving a negative at this stage of the litigation." Second Am. Compl. ¶ 42(a) n.3. But this misunderstands both the 12(b)(6) pleading standard and the actual malice standard. To survive on

---

[4] Indeed, TMTG's stated basis for alleging the lack of an agreement to pay a finder's fee does not challenge the documents The Post relied on, but instead contends that an agreement "would have necessitated accounting for the fee as a liability," which the Second Complaint suggests TMTG did not do. Second Am. Compl. ¶ 42(a). But there is no allegation that The Post had any knowledge of supposed internal TMTG accounting processes.

a 12(b)(6) motion, a plaintiff "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (citation omitted) (further noting that the "plausibility pleading standard applies to the actual malice standard in defamation proceedings"). TMTG's allegations do not "[]cross the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, because they require the inference that The Post should have disbelieved an agreement and invoice provided by a knowledgeable whistleblower, in favor of a "negative" that TMTG admits it cannot establish on the pleadings, after multiple amendments.

### 2.    Additional Allegations Regarding Wilkerson's Supposed "Bad Blood" with TMTG

TMTG's actual malice allegations are particularly deficient because, as before, they do not and cannot explain how The Post acted with actual malice when it relied on a knowledgeable whistleblower, and his counsel, who provided the documentary sources to both The Post and to federal investigators. *See* Ex A. at 1. As the Court explained, Wilkerson, as TMTG's senior vice president of operations turned whistleblower, was "an insider positioned to provide accurate information and supporting documents to the Post." Second Op. at 10.[5]

TMTG essentially repeats its prior insufficient allegations that "bad blood"

---

[5] Even TMTG has admitted that Wilkerson had insider knowledge of the company's financial transactions. *See* First Am. Compl. ¶ 51(a) (alleging that "records leaked" to The Post "reflected that Wilkerson was TMTG's point of contact for wire transfers," and that The Post "knew" that Wilkerson also "had access to TMTG's books, records, and bank accounts").

existed between the company and Wilkerson, the "source for [The Post's] claims." Second Am. Compl. ¶ 42(b). For example, TMTG alleges that The Post was aware from its prior reporting that "Wilkerson was 'fired' from his job" for sharing TMTG documents with news organizations like The Post and "lost 'stock options that might have one day made him a millionaire.'" *Id.* But as the Court previously concluded, the "fact that Wilkerson . . . was to some unspecified extent hostile to TMTG does not, without more, support an inference that he gave vent to that hostility by fabricating facts regarding the loan" and did so in an obvious manner in his communications with The Post. Second Op. at 10. And as with its prior complaints, TMTG has not alleged (and cannot allege) that "Wilkerson told the Post the fee had not been paid." *Id.* at 16.

Even if TMTG's new allegations supported a plausible inference that The Post was aware Wilkerson was hostile toward TMTG, these alleged facts would be legally insufficient, as "[r]eliance on a potentially biased source does not by itself establish actual malice." Second Op. at 10; *see also Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (holding that facts that might undermine a source's credibility "do not show that a publisher necessarily acted with malice by relying on the source"). For even "reliance on tainted or troubled sources"—which The Post does not concede that Wilkerson was—"does not alone establish actual malice." *Harvey v. CNN, Inc.*, 48 F.4th 257, 274 (4th Cir. 2022) (citation omitted) (affirming dismissal).

### 3.    Additional Allegations Regarding Drew Harwell's Supposed Bias Toward TMTG

TMTG supplements its prior allegations that The Post was biased against TMTG and its CEO Devin Nunes by directing the Court to three snippets of 2021 commentary by the Article's lead author, Drew Harwell.[6]  The Court previously rejected similar allegations based upon a "series of negative headlines" as "insufficient to support an inference of malice," and these new allegations fare no better.  Second Op. at 11; *see also* First Op. at 10 n.2. (rejecting generally allegations that The Post "harbored extreme bias, ill-will and desire to inflict harm on TMTG through knowing falsehoods" as insufficient to plausibly plead actual malice); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 n.8 (11th Cir. 2021) ("[T]he actual malice standard is not about whether the speaker had evil intent or a motive arising from ill will; it is about whether the speaker subjectively doubts the truth of the publication.") (affirming dismissal).

At most, TMTG's allegations, based on a smattering of commentary published more than a year before the Article, indicate that Harwell at points in time had published some arguably critical commentary of TMTG and its leadership, not that Harwell harbored a vendetta of the sort that would prompt him to publish reporting that he seriously doubted or knew to be false.  The

---

[6] Specifically, TMTG now alleges that Harwell, (1) "posted sarcastically on Twitter" about the selection of former Congressman Devin Nunes as TMTG's chief executive officer; (2) "characterized [President Donald] Trump's social media posts as violent, hateful, and dangerous" in an article regarding Twitter's suspension of the @realDonaldTrump account; and (3) "bragged" he had been able to register fake accounts on Truth Social during its internal testing. Second Am. Compl. ¶ 42(f).

allegations do not support a plausible inference that he or anyone else at The Post ever seriously doubted the veracity of the Finder's Fee Statements at the time of the Article's publication.[7]  Thus, the allegations regarding The Post's alleged bias and "intention to portray [TMTG] in a negative light" again fail to demonstrate that The Post "intended to inflict harm through knowing or reckless falsehood."  Second Op. at 10 (citation omitted); *see also Trump v. Cable News Network, Inc.*, 684 F. Supp. 3d 1269, 1275 (S.D. Fla. 2023) (cleaned up) (dismissing complaint where allegations that publisher "acted with political enmity" and sought to "undermine [a candidate's] political standing" failed to plead actual malice).

* * * * *

As with its first and second complaints, TMTG has failed to include any allegations that counter the "obvious alternative explanation," evident from the face of the Article, that The Post published the Finder's Fee Statements because it understood the documentary sources, provided by Wilkerson and his lawyers, to confirm that TMTG had agreed to pay and did pay a finder's fee in connection with the loan.  *Twombly*, 550 U.S. at 567.  As such, even the "'sum total' of proper inferences" from these new allegations regarding the agreement's nonexistence, Wilkerson's bias, and The Post's bias fails to plead a direct or "circumstantial case

---

[7] And the social media posts cited by TMTG, *see* Second Am. Compl. ¶ 42(f) & n.8 (containing hyperlinks), refute any implication that Harwell created fake Truth Social accounts during the site's internal testing for the purpose of impersonation.  Instead, Harwell helpfully warned the public that then-existing security lapses allowed anyone to create an account as someone else.  *Id.* (linking to https://x.com/drewharwell/status/1451020106067288065).

for actual malice." Second Op. at 10.

## B. TMTG Ignores Affirmative Statements in the Article Demonstrating an Absence of Actual Malice.

The Second Amended Complaint yet again fails to address the uncontested showing on the face of the Article that "undermin[es] any inference of actual malice." Second Op. at 10. As the Court has addressed, this includes that:

- the "article reflected the Post's reliance on sources apart from Wilkerson, including DWAC's public filings" and a legal expert on SPACs;

- The "Post had reached out to TMTG for comment before publication";

- "the article reported TMTG's criticism of a previous Post story as based on 'discredited hit pieces, defamatory allegations and false statistics,' even though TMTG did not respond; and

- the Finder's Fee Statements themselves were not "inherently improbable."

*Id.* at 10-11. All of this is "conduct [that] tends to undercut any inference of actual malice," *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018), and shows that The Post did not "purposefully avoid[] further investigation with the intent to avoid the truth," Second Op. at 11 (citing *Michel*, 816 F.3d at 703). To the contrary, The Post quite plainly went to great lengths in an effort to include TMTG's position. *See Michel*, 816 F.3d at 703 (emphasizing that where, as here, "the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice"). TMTG has not engaged, much less overcome, any of these issues in its Second Amended Complaint.

18

In all, this is not a case where The Post "relied exclusively" on a single "dubious" source to report an "explosive and inherently improbable" claim, and otherwise "ma[de] no effort to contact corroborating sources." *Coomer v. Byrne*, 2025 WL 90097, at \*7 (M.D. Fla. Jan. 14, 2025).  Instead, as this Court has recognized, the Article itself shows that The Post  "cited various sources"— including company documents provided to federal investigators and "statements expressly attributed to the whistleblower, former TMTG officer Will Wilkerson"— in the course of reporting a broader story about "TMTG borrow[ing] $8 million from an entity or entities with connections to the adult film industry" that is now largely unchallenged.  Second Op. at 2, 5.  This is all inconsistent with TMTG's claim that The Post acted with reckless disregard for the truth was respect to one detail in that story.  *See, e.g.*, *id.* at 10-11;  *Michel*, 816 F.3d at 703; *Lemelson*, 903 F.3d at 24.

## II.    THE COMPLAINT FAILS TO STATE A CONSPIRACY CLAIM.

TMTG effectively repeats the conspiracy claim raised in its prior complaints, and this claim is deficient for the same reasons as before.

First, because the Second Amended Complaint "fails to state a claim for the underlying tort of defamation, it necessarily fails to state a claim for conspiracy to commit that tort."  Second Op. at 18; *see also Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 n.6 (S.D. Fla. 2021) ("There being no defamation—the gist of the defamation conspiracy—there can be no conspiracy claim.").

Second, TMTG "cannot bring a civil conspiracy action based on defamation

while also bringing a defamation claim," because "[d]oing so violates Florida's single publication/single action rule," which provides that "a single publication gives rise to a single cause of action." *Cherdak v. Cottone*, 2023 WL 2044608, at *7 (M.D. Fla. Feb. 16, 2023) (citation omitted).

Third, TMTG does not state a conspiracy claim because its Second Amended Complaint once more adds only "generalized, conclusory allegations of an 'agreement'" to the "basic narrative" that The Post "published a defamatory article based on information provided by Wilkerson and other sources." First Op. at 19. Having failed to make any plausible allegation that The Post *agreed* with Wilkerson and his lawyers to defame TMTG, it has not pleaded a "key element" of conspiracy. *Samara v. Juice Plus+ Co.*, 2021 WL 8894301, at *3 (M.D. Fla. Mar. 1, 2021). Dismissal of the conspiracy claim is thus required.

## CONCLUSION

For the reasons stated, this lawsuit should be dismissed with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

Undersigned counsel has contacted Plaintiff's counsel by email with respect to the relief sought herein. Plaintiff's counsel opposes the relief requested.

Dated: January 27, 2025                     Respectfully submitted,


THOMAS & LoCICERO PL                        WILLIAMS & CONNOLLY LLP

*/s/ Carol Jean LoCicero*                    */s/ Thomas G. Hentoff*
Carol Jean LoCicero (FBN 603030)             Thomas G. Hentoff (*pro hac vice*)
Linda R. Norbut (FBN 1011401)                Nicholas G. Gamse (*pro hac vice*)
601 South Boulevard                          680 Maine Avenue, S.W.
Tampa, FL 33606                              Washington, DC 20024
Telephone: (813) 984-3060                    Telephone: (202) 434-5000
Facsimile: (813) 984-3070                    Facsimile: (202) 480-8371
clocicero@tlolawfirm.com                     thentoff@wc.com
lnorbut@tlolawfirm.com                       ngamse@wc.com

*Counsel for Defendant*                       *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on January 27, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/   *Thomas G. Hentoff*
Thomas G. Hentoff
*Counsel for Defendant*