UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

    Plaintiff,

v.                                  Case No. 8:23-cv-1535-TPB-AAS

WP COMPANY LLC,

    Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION
TO DISMISS SECOND AMENDED COMPLAINT**

This matter is before the Court on "Defendant WP Company LLC's Motion to Dismiss the Second Amended Complaint with Supporting Memorandum of Law," filed on April 22, 2024. (Doc. 74). Plaintiff filed a response in opposition on February 17, 2025. (Doc. 75). Defendant filed a reply on April 8, 2025. (Doc. 79). Upon review of the motion, response, reply, court file, and record, the Court finds as follows:

**Background**[1]

This lawsuit for defamation by Plaintiff Trump Media & Technology Group Corp. ("TMTG") against Defendant WP Company LLC (the "Post") arises from an article titled "Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social,"

---

[1] The Court accepts as true the facts alleged in Plaintiff's amended complaint for purposes of ruling on the pending motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). The Court is not required to accept as true any legal conclusions couched as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

published by the Post on May 13, 2023, and circulated on Twitter (now known as "X") by Post personnel. The Court's prior orders dismissing the previous iterations of the complaint discuss the subject matter of the article, the statements challenged by TMTG as defamatory, and the legal principles governing defamation claims. That discussion is incorporated by reference.

The second amended complaint narrows TMTG's defamation claim to two statements from the Post's article relating to a purported finder's fee paid to Entoro Securities to secure an $8 million loan. Those statements are:

1. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust"; and

2. "The recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"

(Doc. 70, ¶ 14). TMTG alleges these statements were false and were made with actual malice, that is, with knowledge they were false or with reckless disregard as to whether they were false. The Post has once again moved to dismiss TMTG's case for failure to plead actual malice.

## Analysis

*Defamation*

The Post's article purported to be based on sources that included internal documents shared with the Post by former TMTG officer Will Wilkerson. The article did not point to any witness statement or written confirmation that TMTG made the finder's fee payment, but it did refer to an invoice from Entoro and a referral fee agreement calling for the payment. The existence of such an agreement would tend to negate actual malice on the part of the Post in stating that the fee was paid. Absent

specific evidence to the contrary, the Post might reasonably have believed that TMTG paid the fee because it had agreed to do so. The Court's prior dismissal orders emphasized that TMTG had not challenged the truth of the article's statements regarding the fee agreement, but gave TMTG leave to amend to allege that no agreement existed if it could do so in good faith.

TMTG's second amended complaint now squarely alleges that no fee agreement existed and that the Post's statements in the article about such a document were therefore false. *See* (Doc. 70, ¶¶ 23 n.2, 28, 36, 42a). TMTG further alleges, "[s]imply put, [the Post] reviewed the internal documents from Wilkerson but would not have seen any documents showing a finder's fee had been paid or agreed to be paid because no such documents existed, and this gave [the Post] knowledge that such documents did not exist. [The Post's] Statements to the contrary were knowingly false or, at the very least, evinced a reckless disregard for the truth." (*Id.* ¶ 42a).

The new allegations undermine the Post's argument that actual malice has not been alleged. They substantially undercut the basis the Post might have had for concluding that TMTG actually paid the fee. Equally important, they plausibly allege that the Post's reference to the fee agreement was knowingly false. This, in turn, casts doubt on the Post's subjective state of mind and whether the Post in fact believed the fee had been paid as it stated in the article.

The Post's arguments in its motion to dismiss that TMTG still fails to plead facts showing actual malice seem to ignore the significance of TMTG's new allegations. In fact, there is a strange disconnect between the Post's motion and TMTG's latest complaint. As just one example, the Post argues that TMTG does not dispute that the

Post's reporting was informed by "documentary sources provided by a knowledgeable executive at the company and his attorneys."  But, of course, TMTG alleges that one of the alleged "documentary sources," the fee agreement described and quoted in the article, *did not even exist*.  As pleaded, TMTG's allegations sufficiently state the existence of actual malice and plead a viable claim for defamation.

TMTG's response to the Post's motion to dismiss, however, adds another wrinkle.  Having argued that the article's statements about a fee agreement are "fabrications," TMTG changes horses somewhat and says that the document referred to in the article was actually an undated and unsigned draft fee agreement.  The Post's reply triumphantly announces that TMTG has "finally" admitted the truth.  Assuming TMTG's "admission" is, in fact, the truth, it has taken three rounds of briefing to extract it from either side, neither of which it seems has been candid with the Court on this issue.

The Court concludes, however, that it makes no difference.  The second amended complaint says nothing about a "draft" or "unsigned" fee agreement.  A complaint's sufficiency is determined by its allegations, not by statements in a response brief.  *E.g., Amaya v. Vilsack*, No. 23-cv-22838-ALTMAN/Reid, 2024 WL 1285162, at *4 (S.D. Fla. Mar. 26, 2024).  The Court is not inclined to allow another round of pleading and then the inevitable follow-on round of motion practice to sort this out.  The Court will have to review the documents and consider the testimony of the witnesses at the summary judgment stage of these proceedings.

In addition, even if the Court were to pretend TMTG had pleaded the existence of an unsigned draft agreement, the Court would reject the Post's arguments for

dismissal. The Post argues that reliance on an unsigned draft agreement to conclude payment was made is unremarkable, and it points to the fact that the "note" documenting the $8 million loan was not completely signed either. But the article expressly stated that the note was not fully executed and described it as an "offer" of funds, unlike the Post's unqualified reference to the fee "agreement." Further, no one disputes the loan was made and receipt of the proceeds was shown by wire transfer documents. The Post's more careful treatment of the loan and its documentation cuts in favor of actual malice as to the finder's fee statement, not against it.

The Post next argues that the invoice from Entoro "corroborat[ed] the agreement's existence." Maybe so, but the Post has not filed any invoice with the Court. Perhaps that is because the actual document would undermine the Post's arguments. As noted, neither side has been particularly candid on this issue, and the Court is now unable to take either side's assertions at face value. The existence of some kind of invoice, without more, does not negate the inference of actual malice arising from the Post's unqualified (and therefore false) statement regarding the existence of an actual agreement to pay the fee.

Finally, the Post argues that it relied on Wilkerson, a knowledgeable source. But the article does not attribute to Wilkerson any specific statements regarding the agreement or the payment.

The Post's motion to dismiss TMTG's defamation claim in Count I of the second amended complaint is therefore denied. This is not to say that TMTG will ultimately prevail or even make it to a jury. The Court merely concludes that, notwithstanding the hurdles facing a public figure defamation plaintiff, TMTG's allegations sufficiently

"nudg[e]" its claims "across the line from conceivable to plausible." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### *Conspiracy*

The Post argues that TMTG's companion claim for conspiracy to commit defamation fails on several grounds, each of which the Court rejects. Because the Court has upheld TMTG's defamation claim, there is an underlying tort to support the conspiracy claim. The "single publication rule" prohibits a companion claim based on defamatory statements only when the defamation claim fails, which is not the case here. *See Block v. Matesic*, No. 21-61032-CIV-ALTMAN/Hunt, 2023 WL 3816693, at *6 & n.5 (S.D. Fla. June 5, 2023). Finally, TMTG's allegations identify the alleged conspirators, state that they "combined, associated, agreed, or acted in concert" to injure TMTG, that the Post performed an overt act in furtherance of the conspiracy by publishing the defamatory article, that Wilkerson supplied leaked documents to the Post, and that the parties jointly crafted a fraudulent narrative about securities fraud. TMTG's allegations are not conclusory and plausibly allege a claim for conspiracy, at least between the Post and Wilkerson. *See Primerica Fin. Services, Inc. v. Mitchell*, 48 F. Supp. 2d 1363, 1369 (S.D. Fla. 1999).

The Post's motion to dismiss the conspiracy claim in Count II of the second amended complaint is therefore denied.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendant WP Company LLC's Motion to Dismiss the Second Amended Complaint with Supporting Memorandum of Law" (Doc. 74) is **DENIED**.

2. Defendant is directed to file an answer to the second amended complaint on or before June 20, 2025.

3. The parties are directed to file a case management report within 7 days. *See* (Doc. 77). The case management report will propose a date for completion of discovery no later than December 31, 2025, and for the filing of dispositive and *Daubert* motions no later than January 31, 2026.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 6th day of June, 2025.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE