# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

      Plaintiff,

v.

WP COMPANY, LLC,
d/b/a The Washington Post,

      Defendant.

Case No. 8:23-cv-1535-TPB-AAS

## PLAINTIFF'S MOTION TO OVERRULE CERTAIN OF DEFENDANT'S PRIVILEGE DESIGNATIONS <u>AND TO COMPEL PRODUCTION OF DOCUMENTS</u>

Plaintiff, TRUMP MEDIA & TECHNOLOGY GROUP CORP. ("Plaintiff" or "TMTG"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 37(a)(3) of the Federal Rules of Civil Procedure, hereby files this Motion to Overrule Certain of Defendant's Privilege Designations and to Compel Production of Documents ("Motion"). In support, Plaintiff states as follows:

## INTRODUCTION AND SUMMARY OF MOTION

Despite exhausting every possible avenue, TMTG has been unable to obtain any documentation, testimony, or other evidence related to The Post's editorial judgment and decision not to issue a clarification, correction, or editor's note

regarding the false and defamatory statements (the "Statements").[1] TMTG has served all 25 interrogatories it is allotted under Fed. R. Civ. P. 33 and has served 144 document requests on The Post, most of which have been objected to or overly narrowly construed by The Post. Moroever, The Post has represented that it has completed its production and that it has no further documents responsive to TMTG's written discovery requests.

In its Redaction Log ("Redaction Log") and Revised Supplemental Privilege Log ("Supplemental Log"), The Post has asserted several objections and withheld documents on the grounds of the attorney-client privilege and work-product protection. However, upon closer examination, The Post's Redaction and Supplemental Logs are withholding documents that are either not privileged or, even if they are privileged, are nonetheless subject to disclosure.

Those documents concern The Post's evaluation of, and its response to, TMTG's Retraction Demand to take down, clarify, or correct the Statements that are at issue. As articulated in this Motion, The Post had ample opportunity and a legitimate evidentiary basis to issue a clarification, correction, or editor's note to the

---

[1] Defined as the false and defamatory statements alleged in paragraph 14(a)-(b) of the Second Amended Complaint. *See* D.E. 70, ¶ 14.

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Article.[2] However, it refused to do so and instead doubled down on the Statements. When TMTG inquired as to why The Post made this decision—as TMTG must establish actual malice—The Post's witnesses[3] either could not recall or outright refused to answer questions on the basis that doing so would reveal attorney-client communications or work-product information. For four reasons, the Court should grant this Motion, overrule The Post's privilege objections, and compel The Post to produce the documents identified in this Motion.

*First*, the evidence demonstrates that The Post had a legitimate evidentiary basis to issue a clarification, correction, or editor's note to the Article. All of The Post's witnesses have testified that they have never seen any document that shows TMTG paid a finder's fee, that any third-party received a finder's fee from TMTG, or that there was any signed agreement between TMTG and a third-party to pay a finder's fee. ██████████████████████████████████

████████████████████████████████████████

---

[2] Defined as "Trust linked to porn-friendly bank could gain stake in Trump's Truth Social," which is identified in paragraph 13 of the Second Amended Complaint. *See id*., ¶ 13.

[3] The witnesses that TMTG refers to include Drew Harwell (author of the Article), Mark Seibel (the former technology policy editor at The Post and the line editor for the Article), Lori Montgomery (The Post's business editor that was involved in the editorial process of the Article), Cameron Barr, (The Post's former senior managing editor that was involved in the editorial process of the Article), and Sally Buzbee (The Post's former executive editor that was involved in the editorial process of the Article). This is an exhaustive list of the individuals that had significant involvement in the drafting, publishing, and editing of the Article, as well as evaluating and responding to TMTG's Retraction Demand.

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

████████████████████████████████████████

███████████████████

*Second*, three of the editors who evaluated the Article and TMTG's Retraction Demand testified that The Post's editorial process does not end at the time of publication. Indeed, these editors—Mr. Seibel, Ms. Montgomery, and Ms. Buzbee—collectively testified that after receiving a retraction demand, The Post routinely reviews its work, the documents that it contends substantiates the article, and if it discovers that a clarification, correction, or editor's note is needed, it should issue one because, in The Post's own words ██████████████████████████

████████

*Third*, evidence of The Post's editorial judgment and specifically its decision not to issue a clarification, correction, or editor's note to the Article is directly related to TMTG's burden to establish actual malice. Well-established defamation law has given public-figure plaintiffs like TMTG leeway to obtain information about the media's editorial process and judgment—even when the press claims such documents are privileged.

*Finally*, TMTG has exhausted its discovery devices and confirmed that it cannot obtain these documents from any other source. The Post has confirmed that it has no further documents to produce. TMTG has exhausted all interrogatories

available under Fed. R. Civ. P. 33. The Post's Supplemental Log has identified all the individuals who evaluated and responded to TMTG's Retraction Demand, and TMTG has deposed each of them. These witnesses either did not recall the answer to TMTG's questions or refused to answer them pursuant to their attorney's instructions.

## ARGUMENT

### I. Documents demonstrating The Post's editorial judgment are not privileged.

The Post's Redaction Log and Supplemental Privilege Log identify over 175 documents that are claimed to be protected by the attorney-client privilege and/or work product doctrine. *See* The Washington Post's Redaction Log and Supplemental Privilege Log, true and correct copies of which are attached as **Exhibit A**.[4] These documents are dated May 11, 2023, through May 17, 2023. Because the Article at issue was published on May 13, 2023, the dates of these documents indicate that they presumably reflect The Post's editorial judgment related to the Article and, of course, the Statements.

---

[4] Exhibits A and C through J have all been designated, pursuant to the Stipulated Confidentiality Order, either confidential or highly confidential attorneys' eyes only. In the interest of efficiency, Plaintiff will be filing under separate cover all Exhibits A through J and will redact in this Motion any information within those documents that is directly quoted herein.

BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

In this Motion, TMTG objects to the Post's privilege assertions in connection with the Retraction Demand (the "Challenged Documents"), as more particularly described:

- ███████████████████████████████████████████████

  *See* Exhibit A (Supplemental Log), ¶ 135.

- ███████████████████████████████████████████████

  *See id.*, ¶¶ 136-147, 151-162, and 260-271.

- ███████████████████████████████████████████████

  *See id.* Exhibit A, ¶¶ 148-149.

- ███████████████████████████████████████████████

  *See id.*, ¶¶ 167-168.

- ███████████████████████████████████████████████

  *See id.*, ¶¶ 163-164.

- ███████████████████████████████████████████████

  *See id.*, ¶¶ 165-166, 169-170, 172, 218-219, 245, 254, 255, and 257.

- ███████████████████████████████████████████████

  *See id.*, ¶¶ 177, 186, and 196.

BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

- ███████████████████████████████████████████████████████
  ███████████████████ *See id.*, ¶ 205.

- ███████████████████████████████████████████████████████
  ███████████████████████████████████████████████ *See*
  Exhibit A (Redaction Log), POST_23-cv-1535_0010516-10519; POST_23-
  cv-1535_0010663-10666; POST_23-cv-1535_0010717-10719.

As explained in detail below, these Challenged Documents demonstrate The
Post's editorial judgment in refusing to comply with Plaintiff's Retraction Demand
and its editorial decision to not issue a clarification, correction, or editor's note to
the Article—despite The Post having admitted that it had no factual basis for the
false and defamatory statements in the Complaint and being on notice that the
primary source for the Article lacked any personal knowledge about the false and
defamatory statements.

## A. The Post's policies and standards reflect that a correction to the Article should have been made.

The Post's Policies and Standards boast that the publisher is a paragon of
journalistic ethics. A true and correct copy of the Post's Policies and Standards is
attached as **Exhibit B**. In relevant part, they state:

> "Fairness results from a few simple practices: No story is fair if it omits
> facts of major importance or significance. Fairness includes
> completeness."
>
> …

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

"No story is fair if it consciously or unconsciously misleads or even deceives the reader. Fairness includes honesty – leveling with the reader."

…

"When we run a correction, clarification, or editor's note, our goal is to tell readers, as clearly and quickly as possible, what was wrong and what is correct. Anyone should be able to understand how and why a mistake has been corrected."

"A correction that calls into question the entire substance of an article, raises a significant ethical matter or addresses whether an article did not meet our standards, may require an editor's note and be followed by an explanation of what is at issue."

…

"As a matter of editorial policy, we do not grant take-down requests, which should be vetted at the highest level. If the subject claims that the story is inaccurate, we should be prepared to investigate and, if necessary, publish a correction. And there may be situations in which fairness demands an update or follow-up coverage – for example, if we reported that a person was charged with a crime but did not report that the charges were later dismissed for lack of evidence."

Exhibit B.

Collectively, these excerpts demonstrate that The Post's Policies and Standards ensure that all stories published by The Post are complete and are fairly and accurately portrayed. *See id*. The Post also holds itself to the standard that if a retraction demand is received, the Post "should be prepared to investigate and, if necessary, publish a correction." *See id*. The Post abides by the policy that a

correction, clarification, or editor's note is required to tell readers "what was wrong and what is correct." *See id*. Here, however, the evidence shows that The Post should have issued a clarification, correction, or editor's note to the Article.

On May 14, 2023, Plaintiff sent its retraction demand to The Post, demanding that The Post retract the article and identifying several false and defamatory statements, including those in paragraphs 14(a)-(b) of Plaintiff's Second Amended Complaint. A true and correct copy of Plaintiff's Retraction Demand is attached as **Exhibit C**. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ A true and correct copy of Mr. Harwell's email to Mr. Seibel is attached as **Exhibit D**.

However, all of The Post's fact witnesses who had significant involvement in the Article have testified that they have not seen any document showing (a) that Plaintiff paid the finder's fee in question; (b) that any third party received the finder's fee in question; or (c) a signed agreement between Plaintiff and any third party for Plaintiff to pay the finder's fee in question to a brokerage associated with Patrick Orlando. Notably, Mr. Harwell testified that The Post "did not see any documentation to verify that [Entoro or Patrick Orlando or anyone else] had received

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

the finder's fee," and to this day has not seen any such document. *See* 229:12-230:1 of Drew Harwell's Deposition Transcript, which is attached as **Exhibit E**. He further admitted that he did not believe that any third party had actually received a finder's fee from Plaintiff and did not "honestly know" whether Plaintiff ever even made such a payment. *See id.*, 230:2-8.

 Lori Montgomery, The Post's business editor, who was involved in the editorial process of the Article, testified that she had not seen any documentation that Plaintiff paid the finder's fee or that it signed an agreement with any third party to do so. *See* 113:15-114:7 of Lori Montgomery's Deposition Transcript, which is attached as **Exhibit G**. The only support for the false and defamatory statements she testified that she was aware of was an invoice and an unsigned version of an alleged agreement to pay a finder's fee. *See id.*, 114:17-20.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████  And Sally Buzbee, The Post's former executive

editor who was involved in the editorial process of the Article, testified that she did

not recall seeing any document showing that Plaintiff paid the finder's fee. *See*

96:20-97:3 of Sally Buzbee's Deposition Transcript, which is **Exhibit I**.

Worse, just one day before submitting its response to Plaintiff's Retraction

Demand, ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  A true

and correct copy of the May 16, 2023, email from Phil Brewster to Drew Harwell is

attached as **Exhibit J**. Despite receiving this email from Mr. Brewster, and the

testimony from each of the foregoing witnesses, The Post nevertheless responded to

Plaintiff's Retraction Demand ████████████████████████████████

████████████████████████████████████████████  A

true and correct copy of The Post's response to Plaintiff's Retraction Demand is

attached as **Exhibit K**.

Given that The Post lacked any evidentiary basis for the false and defamatory statements in the Article that are alleged in the Complaint, The Post's decision not to issue a clarification, correction, or editor's note to the Article is a product of its editorial judgment.

### B. The Post's editors collectively testified that The Post's editorial process does not end at the time of publication.

Three of the editors involved with the Article testified that The Post's editorial process does not end at the time of publication. Rather, that process extends to evaluating a retraction demand and deciding how to respond. Indeed, Ms. Buzbee testified that "In a situation whether The Post received any request to see if a correction or a retraction was asked for, it was The Post's policy to look into that, to look into the facts, and to determine if a correction or a retraction was required by the facts of the story." *See* Exhibit I, 84:20-85:8. Ms. Montgomery testified that "as a reporter [for The Post], you would definitely go back and analyze your own processes and check your notes." *See* Exhibit G, 38:5-15. She elaborated that "it doesn't matter how someone asks for a correction … you're going to go back through all your notes and try to analyze in your mind, is it true, regardless of what that person – what information that person provides you. **Because, obviously, the main thing you want to do is get it right**." *See id.*, 39:10-40:5 (emphasis added). Mr. Seibel testified that he was "certain that [Mr. Harwell] did go back and read his

story after being told it had inaccuracies and he was looking for them." *See* Exhibit

F, 147:19-148:12.

To date, The Post has not published any clarification, correction, or editor's

note to the Article. The Post's refusal to do so underscores The Post's actual malice

because it was reckless in its regard for the truth of the statements at the time of

publication (not having any documentation to support the false and defamatory

statements) or entertained serious doubts about the statements and published them

anyway ███████████████████████████████████████████

████████████████████████████████████

### C. The actual malice standard imposes a higher burden on The Post to justify withholding these documents from Plaintiff.

TMTG should be entitled to discover why The Post declined to issue a

clarification, correction, or editor's note to the Article. In *Herbert v. Lando*, 441 U.S.

153 (1979), the Supreme Court of the United States emphasized that the rules of

evidence apply equally to the press and that the press' editorial process is

discoverable:

> Courts have traditionally admitted any direct or indirect evidence
> relevant to the state of mind of the defendant and necessary to defeat a
> conditional privilege or enhance damages. The rules are applicable to
> the press and to other defendants alike, and it is evident that the courts
> across the country have long been accepting evidence going to the
> editorial processes of the media without encountering constitutional
> objections.

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

…

> In sum, contrary to the views of the Court of Appeals, according an
> absolute privilege to the editorial process of a media defendant in a libel
> case is not required, authorized, or presaged by our prior cases, and
> would substantially enhance the burden of proving actual malice,
> contrary to the expectations of *New York Times, Butts*, and similar
> cases.

*Lando*, 441 U.S. at 165 & 169.

To allay any invasion of what the First Amendment was designed to protect,

the *Lando* Court balanced these interests against the herculean burden that public-

figure defamation plaintiffs bear to establish their claims—actual malice:

> Of course, if inquiry into editorial conclusions threatens the suppression
> not only of information known or strongly suspected to be unreliable
> but also of truthful information, the issue would be quite different. ***But
> as we have said, our cases necessarily contemplate examination of the
> editorial process to prove the necessary awareness of probable
> falsehood, and if indirect proof of this element does not stifle truthful
> publication and is consistent with the First Amendment, as
> respondents seem to concede, we do not understand how direct
> inquiry with respect to the ultimate issue would be substantially more
> suspect***.

> …

> Accordingly, we find it difficult to believe that error-avoiding
> procedures will be terminated or stifled simply because there is liability
> for culpable error and because the editorial process will itself be
> examined in the tiny percentage of instances in which error is claimed
> and litigation ensues. ***Nor is there sound reason to believe that
> editorial exchanges and the editorial process are so subject to
> distortion and to such recurring misunderstanding that they should***

*be immune from examination in order to avoid erroneous judgments in defamation suits*.

…

This is not to say that the editorial discussions or exchanges have no constitutional protection from casual inquiry. *There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false*.

*Id*., 441 U.S. at 172 & 174 (emphasis added).

Indeed, other Courts around the country have adopted a similar analysis when evaluating whether to order disclosure of the press' confidential informants—which raises even greater First Amendment concerns than the press' editorial processes. In this vein, defamation law has given leeway to public-figure plaintiffs to assist their burden to establish actual malice:

Proof of actual malice under *Sullivan* invariably depends on knowing the identity of the reporter's source, since a libel plaintiff needs to demonstrate that the reporter's source was unreliable or that the reporter failed to take sufficient steps to verify his or her story. *Without such information, however, inquiring into the reliability of these sources would be a futile exercise: reporters could volunteer information buttressing their defense, and then plead the privilege to prevent the disclosure of any detrimental facts*. Ultimately, juries would be forced to decide the question of malice based on the allegations of a plaintiff claiming libel and a defendant whose defense of reliable sources would

be untested—a scenario which spells little hope of success for the plaintiff.

*Desai v. Hersh*, 954 F.2d 1408, 1412 (7th Cir. 1992).

It would be exceedingly difficult for appellee to introduce evidence beyond his own testimony to prove that he did not, at any time of day or night over an indefinite period of several weeks, remove boxfuls of documents from the UMW offices. Even if he did prove that the statements were false, *Sullivan* also requires a showing of malice or reckless disregard of the truth. That further step might be achieved by proof that appellant in fact had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those particular sources was reckless. Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any of such circumstances. Although it might be possible to submit the question of malice to the jury simply on the basis of the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof. Consequently, we find that the identity of appellant's sources is critical to appellee's claim.

*Carey v. Hume*, 492 F.2d 631, 636–37 (D.C. Cir. 1974).

When the identity of the confidential source helps a public-figure defamation plaintiff establish actual malice, Courts have authorized disclosure—even after balancing First Amendment concerns. *See Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 & 726–27 (5th Cir. 1980) ("Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances. … Like the defendants in Carey and Garland, Transamerican's only source for the allegedly libelous comments is the informant. The only way that

Miller can establish malice and prove his case is to show that Transamerican knew the story was false or that it was reckless to rely on the informant. In order to do that, he must know the informant's identity. We affirm the district court's order compelling disclosure of the informant's identity.").

Here, The Post had ample opportunity to issue a clarification, correction, or editor's note, but chose not to. *See supra* Exhibit E, 229:12-230:8; *see also* Exhibit F, 36:9-37:15; *see also* Exhibit G, 113:15-114:7, 114:17-20; *see also* Exhibit H, 111:13-112:18; *see also* Exhibit I, 96:20-97:3; *see also* Exhibit J. Despite the fact that all of The Post's individuals who had substantial involvement with the Article confirmed that they lacked an evidentiary basis for the Statements, ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ *Compare*

Exhibit J; *with* Exhibit K.

Logically, the facts explaining why The Post chose not to issue a clarification, correction, or editor's note would help the Court and the jury evaluate whether The Post acted with actual malice. Admittedly, a confidential source is entitled to *greater* protection than a publisher's editorial process. Thus, the Court should afford lesser deference to The Post's contentions that the documents discussing this decision are

privileged. *See supra* Exhibit A. Moreover, The Post's witnesses either refused to answer any questions regarding these documents or the May 16, 2023, meeting during which TMTG's Retraction Demand was discussed, or purportedly could not recall any information relating to the Retraction Demand. *See* Exhibit F, 187:24-188:13; *see also* Exhibit G, 100:5-105:10; *see also* Exhibit I, 66:21-70:9.

 An attorney's instruction to collect documents does not confer a privilege on those documents. As one District Court explained:

> Plaintiff's assertion of the attorney-client privilege is pointless in this situation. That privilege applies only to communications between a client and his attorney. ***It does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation***. Plaintiff similarly misapprehends the work product rule. That rule gives absolute protection to an attorney's mental impressions, conclusions, opinions, and legal theories. Fed.R.Civ.P. 26(b)(3). But it does not, as plaintiff suggests, shield from discovery all 'documents reviewed or prepared' by an attorney in anticipation of litigation. ***An attorney may not bring a document within the scope of***

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

> ___the work product rule simply by reviewing it if it was not originally
> prepared in anticipation of litigation___. Here, it is logical to assume that
> most, if not all, of the documents which plaintiff's attorneys may have
> reviewed in their investigation of HSM were not prepared in
> anticipation of this litigation. ___Documents of this nature cannot be
> classified as an attorney's work product___.

*Brown v. Hart, Schaffner & Marx*, 96 F.R.D. 64, 68 (N.D. Ill. 1982) (citing *FTC v. Shaffner,* 626 F.2d 32, 37 (7th Cir.1980)) (emphasis added).

This maxim applies even if a document simultaneously contains factual and legal theories. *See Bogosian v. Gulf Oil Corp.,* 738 F.2d 587, 595–96 (3d Cir. 1984) ("Of course, where the same document contains both facts and legal theories of the attorney, the adversary party is entitled to discovery of the facts. It would represent a retreat from the philosophy underlying the Federal Rules of Civil Procedure if a party could shield facts from disclosure by the expedient of combining them or interlacing them with core work product."). "Consistent with that premise, courts have consistently held that raw factual information obtained by counsel in preparation for litigation is not protected as work product merely because it was an attorney who unearthed it." *A.R. by an through Root v. Dudek*, 151 F. Supp. 3d 1309, 1314 (S.D. Fla. 2015).

As this District has previously explained, "Documents prepared for dissemination to third parties are not protected from discovery by either the attorney-client or the work product privilege. Nor are the details, including drafts of the

BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

document to be published, protected." *In re Seroquel Products Liab. Litig.,* No. 606MD1769-ORL-22DAB, 2008 WL 1995058, at *3 (M.D. Fla. May 7, 2008). Even if documents anticipate that legal advice "would later be sought concerning the issues discussed," that does not confer a privilege on those documents. *See Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989) ("Other documents withheld by the plaintiffs are not within the scope of the attorney-client privilege because they were not communications between a lawyer and client concerning legal advice. For example, some documents consist of notes of meetings of Intact personnel where various issues were discussed. Although no attorney was present at these meetings, it was evident that legal advice would later be sought concerning the issues discussed. But discussions that anticipate a privileged communication are not themselves privileged. To hold otherwise would expand the attorney-client privilege without limit, since countless communications within an organization could be considered preparatory to seeking legal advice. Accordingly, documents no. 5, 9, and 25 shall be produced. Likewise, the mere presence of an attorney at a meeting does not render the notes of the discussion privileged unless they reflect communications made to obtain his advice. Documents no. 37 and 46 are of this type and must be produced.").

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Because these documents will help the Court and the jury evaluate whether
The Post acted with actual malice, they will also help establish TMTG's punitive
damages claim. *See Straw v. Chase Revel, Inc.,* 813 F.2d 356, 362 & 363 (11th Cir.
1987) ("Thus, the appellant falls within the protection afforded by *Gertz,* and Straw
must show actual malice to obtain punitive damages. … Only actual malice will
support an award of punitive damages.").

Given the testimony of The Post's witnesses and the dearth of documents that
have been produced on this critical issue, there is a substantial gap as to why The
Post's editorial process concluded that a clarification, correction, or editor's note
was not necessary in response to TMTG's Retraction Demand. Given that these
documents reflect The Post's editorial process in connection with TMTG's
Retraction Demand, that TMTG has deposed all of the witnesses involved in this
process, and that no other source has been identified as having these documents,
TMTG has exhausted its resources and options to obtain this discovery.

The Post has not made any representation that it does not intend to use these
documents at trial. *See Lawton-Davis v. State Farm Mut. Auto. Ins. Co.,* 2015 WL
12839765, at *2 (M.D. Fla. Dec. 21, 2015) ("Defendant represents it does not intend
to use the surveillance footage at trial except for purposes of impeachment. 'Rule 26
does not require pre-trial disclosure of evidence that may be offered at trial solely

for impeachment.'") (quoting *Alphonso v. Esfeller Oil Field Const., Inc*., 380 Fed.Appx. 808, 810 (11th Cir. 2010)). If The Post intends to use any of the documents challenged in this Motion at trial, even if exclusively for impeachment, those documents must be produced. *See Local Access, LLC v. Peerless Network, Inc.,* 2018 WL 2938393, at *7 (M.D. Fla. June 12, 2018) (collecting cases: "To the extent Peerless is claiming that impeachment evidence is never discoverable, it is wrong."); *see also Norwood v. Ideal Collection Services, Inc*., 2008 WL 11333229, at *2 (S.D. Fla. Sept. 19, 2008) ("the attorney client privilege and the work product objections probably do not apply to any exhibits that Defendant intends to use at trial ...").

### D. The Court should conduct an *in- camera* review.

Alternatively, TMTG respectfully requests that the Court conduct an *in camera* review of the Challenged Documents. TMTG has provided a sufficient factual basis—grounded in facial deficiencies of The Post's Supplemental Log and the testimony of The Post's witnesses establishing that "legal review" functioned as a routine editorial checkpoint rather than a privileged legal consultation—to support a good faith belief that The Post has withheld non-privileged material (or severable non-privileged portions). *See* Exhibit F, 60:6-8. Under these circumstances, in camera review is warranted to resolve the privilege dispute efficiently and without

prejudicing either party. *Cf. Willoughby v. Gov't Employees Ins. Co.,* 2024 WL 3183860, at *5 (M.D. Fla. June 26, 2024) (cited only to explain the applicable standard: "A Court should only conduct an *in camera* review after the movant provides a sufficient factual basis to support a good faith belief that *in camera* review will reveal improperly withheld material.") (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

## CONCLUSION

WHEREFORE, TMTG respectfully requests that the Court enter an order overruling The Post's privilege assertions as to the Challenged Documents and compel The Post to produce these documents within seven calendar days, award TMTG its attorney's fees and costs, or, alternatively, order an *in camera* review of the Challenged Documents, and award any other further relief the Court deems proper.

## CERTIFICATION PURSUANT TO RULE 37 AND LOCAL RULE 3.01(g)

Pursuant to Rule 37 and M.D. Fla. R. 3.01(g), the parties have met and conferred in good faith about their positions regarding the issues raised in this Motion, through multiple written correspondences exchanged on February 25, 2026, through February 27, 2026. The parties have been unable to reach an agreement.

BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Dated: February 28, 2026       Respectfully submitted,

**BRITO, PLLC**
*Counsel for Plaintiff*
2121 Ponce de Leon Boulevard
Suite 650
Miami, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ *Alejandro Brito*
    **ALEJANDRO BRITO**
    Florida Bar No. 098442
    Primary: abrito@britopllc.com
    Secondary: apiriou@britopllc.com
    **JALAINE GARCIA**
    Florida Bar No. 58632
    Primary: jgarcia@britopllc.com
    **IAN MICHAEL CORP**
    Florida Bar No. 1010943
    Primary: icorp@britopllc.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

on February 28, 2026 through the Court's CM/ECF electronic filing system upon:

Carol J. Locicero, Esq.
Linda Riedemann Norbut, Esq.
Thomas & LoCicero, PL
601 South Blvd
Tampa, FL 33606-2629
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

Thomas G. Hentoff, Esq.
Nicholas G. Gamse, Esq.
Williams & Connolly
680 Maine Avenue S.W.
Washington, DC 20024
thentoff@wc.com
ngamse@wc.com
*Counsel for Defendant*

By: /s/ *Alejandro Brito*

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071