# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

      Plaintiff,

v.

WP COMPANY, LLC,
d/b/a The Washington Post,

      Defendant.

Case No. 8:23-cv-1535-TPB-AAS

## PLAINTIFF'S MOTION TO OVERRULE CERTAIN OF DEFENDANT'S PRIVILEGE DESIGNATIONS AND TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff, TRUMP MEDIA & TECHNOLOGY GROUP CORP. ("Plaintiff" or "TMTG"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 37(a)(3) of the Federal Rules of Civil Procedure, hereby files this Motion to Overrule Certain of Defendant's Privilege Designations and to Compel Production of Documents ("Motion"). In support, Plaintiff states as follows:

### INTRODUCTION

Defendant, WP Company, LLC d/b/a The Washington Post ("The Post"), has withheld and redacted a substantial number of documents—many of which concern The Post's pre-publication editorial process and judgment—based on categorical

and conclusory assertions set forth in The Post's Redaction Log and Revised Supplemental Privilege Log (the "Supplemental Log," and together with the Redaction Log, the "Privilege Logs"). The Privilege Logs are fundamentally deficient. They do not provide enough information for TMTG—or the Court—to evaluate whether any privilege applies, whether non-privileged material can be segregated and produced, or whether any protection has been waived.

As detailed below, the Privilege Logs sweep in materials that are not protected at all (including routine editorial communications labeled "privileged" simply because counsel was copied or was part of a standard workflow), and they fail to justify withholding or redacting attachments and internal materials.

The withheld and redacted materials are highly relevant to TMTG's claims and to The Post's defenses because they bear directly on The Post's editorial decision-making and state of mind in publishing several articles about TMTG, including the Article.[1] The record reflects that The Post knew or had reason to doubt the truth of the defamatory statements at issue[2] (the "Statements"). All of The Post's

---

[1] Defined as "Trust linked to porn-friendly bank could gain stake in Trump's Truth Social," which is identified in paragraph 13 of the Second Amended Complaint. *See id*., ¶ 13.

[2] Defined as the false and defamatory statements alleged in paragraph 14(a)-(b) of the Second Amended Complaint. *See* D.E. 70, ¶ 14.

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

key witnesses[3] have testified that they have never seen any document that shows TMTG paid a finder's fee, that any third-party received a finder's fee from TMTG, or that there was any signed agreement between TMTG and a third-party to pay a finder's fee. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

TMTG has exhausted the discovery tools available to obtain this information from alternative sources. The Post has represented that it has no further non-privileged documents to produce. TMTG has served the interrogatories available under Fed. R. Civ. P. 33, and The Post's Privilege Logs identify the individuals involved in reviewing and approving the Article (and related articles concerning Plaintiff). TMTG deposed each of those individuals. Yet they either did not recall the reasons "legal" was consulted or refused to answer on instruction of counsel. The challenged materials remain in The Post's exclusive possession.

---

[3] The witnesses that TMTG refers to include Drew Harwell (author of the Article), Mark Seibel (the former technology policy editor at The Post and the line editor for the Article), Lori Montgomery (The Post's business editor that was involved in the editorial process of the Article), Cameron Barr, (The Post's former senior managing editor that was involved in the editorial process of the Article), and Sally Buzbee (The Post's former executive editor that was involved in the editorial process of the Article). This is an exhaustive list of the individuals that had significant involvement in the drafting, publishing, and editing of the Article, as well as evaluating and responding to TMTG's Retraction Demand.

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

**ARGUMENT**

**I.    Materials reflecting The Post's editorial judgment are not privileged**.

The Post's Privilege Logs identify over 220 documents withheld and/or redacted on the basis of the attorney-client privilege, work product doctrine, and/or subject to a reporter's privilege. *See* The Post's Redaction Log and Supplemental Privilege Log, true and correct copies of which are attached as **Exhibit A**.[4] The documents at issue are dated October 13, 2022 through May 12, 2023, a period during which The Post published three (3) salacious articles about TMTG, including the Article at issue in this action. As logged, these materials relate to the preparation and publication of those articles and thus presumably reflect The Post's editorial decision-making.

TMTG challenges The Post's privilege assertions for the documents and redactions concerning the pre-publication process for those articles (the "Challenged Documents"), which fall into the following categories:

- Emails deemed privileged merely because in-house counsel is copied. *See* Exhibit A (Supplemental Log), ¶¶ 1-6, 8-10, 13-15, 17, 21-35, 36, 38, 40-41, 43, 46, 47-55, 61, 76, 91-110, 114, 115[5], 116-120, 122, 125.

---

[4] Exhibits A and C through J have all been designated, pursuant to the Stipulated Confidentiality Order, either confidential or highly confidential attorneys' eyes only. In the interest of efficiency, Plaintiff will be filing under separate cover all Exhibits A through J and will be redacting in this Motion any information within those documents that is directly quoted herein.

[5] Entry No. 115 does not even indicate who the email is from.

4

- Emails that do not include counsel on the face of the communication, withheld on the theory that they "reflect[] [the] request for legal advice from Post in-house counsel regarding publication of news article." *See id.,* ¶¶ 7, 11, 12, 16, 19, 56, 57, 58, 59, 60, 112, and 123.

- Attachments withheld based only on the conclusory label "Confidential document reflecting legal advice." *See id.,* ¶¶ 18, 20, 37, 39, and 9.

- Attachments described as "Confidential document [or materials] provided to Post in-house counsel for the purpose of obtaining legal advice regarding publication of [a] news article." *See id.,* §§ 42, 44, 45, 62, and 77.

As explained in detail below, the Challenged Documents demonstrate The Post's editorial decision to publish several news articles concerning Plaintiff—despite The Post admitting that it had no factual basis for the Statements and being on notice that the primary source for the Article lacked any personal knowledge about the Statements.

### A. The Post's policies and witness testimony confirm that "legal review" operated as a routine editorial checkpoint—not a privileged legal consultation.

The Post's published Policies and Standards hold out The Post as committed to completeness and fairness. A true and correct copy of the Post's Policies and Standards is attached as **Exhibit B**. In relevant part, they state:

"Fairness results from a few simple practices: No story is fair if it omits facts of major importance or significance. Fairness includes completeness."

…

"No story is fair if it consciously or unconsciously misleads or even deceives the reader. Fairness includes honesty – leveling with the reader."

Exhibit B.

The evidence shows that The Post did not adhere to these principles in publishing the Statements. Moreover, the deposition testimony establishes that "legal review" was embedded in The Post's ordinary editorial workflow—not a discrete request for confidential, individualized legal advice. Mark Seibel testified

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ *Id.* at 60:6-8. Lori Montgomery similarly testified that stories of a certain length or investigative complexity were routed to legal as part of an editorial process she described as "somewhat investigative." *See* 70:14-19 of Lori Montgomery's Deposition Transcript, which is attached as **Exhibit D**. Critically, she further testified that The Post had no specific policy governing when legal review was required (*see id.* at 72:8-11), undermining any claim that this review reflected a formal legal risk protocol or confidential attorney-client consultation. Taken together, their testimony demonstrates that the "legal review" reflected in the

Privilege Logs functioned as an editorial step, not a privileged attorney-client consultation whose primary purpose was to seek or provide legal advice.

Consistent with that record, every key Post witness involved in the Article has testified that they have not seen documentation showing that TMTG paid a finder's fee, that any third party received such a fee from TMTG, or that there was a signed agreement obligating TMTG to pay such a fee. Mr. Harwell testified that The Post "did not see any documentation to verify that [Entoro or Patrick Orlando or anyone else] had received the finder's fee." *See* 229:12-230:1 of Drew Harwell's Deposition Transcript, which is attached as **Exhibit E**. He further testified that he did not believe any third party actually received a finder's fee from TMTG and that he did not "honestly know" whether TMTG ever made such a payment. *See id.*, 230:2-8.



Mr. Seibel testified that ███████████████████████████ ███████████████████████████████████████ ███████████   *See* Exhibit C, 36:9-37:15. Mr. Seibel also admitted ██████████ ██████████████████████████████   *See id.*, 35:4-11. Lori Montgomery, The Post's business editor, who was involved in the editorial process of the Article, testified that she had not seen any documentation that Plaintiff paid the finder's fee or that it signed an agreement with any third party to do so. *See* Exhibit D, 113:15-114:7. The only support she was aware of for the false and

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

defamatory statements was an invoice for the payment and an unsigned version of an alleged agreement to pay a finder's fee. *See id.*, 114:17-20.

Cameron Barr, The Post's former senior managing editor, █████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *See* 111:13-112:18 of Cameron Barr's Deposition Transcript, a true and correct copy of which is attached as **Exhibit F**. And Sally Buzbee, The Post's former executive editor that was involved in the editorial process of the Article, testified that from what she recalled relating to the reporting of the Article, she did not recall seeing any document showing that Plaintiff paid the finder's fee. *See* 96:20-97:3 of Sally Buzbee's Deposition Transcript, which is **Exhibit G**.

Worse, just one day before The Post responded to Plaintiff's Retraction Demand, Mr. Harwell received correspondence from Phil Brewster, an attorney for Will Wilkerson—the primary source of the Article—█████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████ A true and correct copy of the May 16, 2023, email from Phil Brewster to Drew Harwell is attached as **Exhibit H**. Yet The Post responded to the Retraction Demand by doubling down, █████████ ███████████████████████████████████████████████████████████████

███████████ A true and correct copy of The Post's response to Plaintiff's

Retraction Demand is attached as **Exhibit I**.

The absence of documentary support, coupled with notice that the primary

source lacked personal knowledge, makes The Post's editorial decision-making

central to the issues in this case—and undermines any attempt to cloak routine

editorial communications in privilege labels

### B. Discovery into the editorial process is appropriate in a public-figure defamation case and is necessary to prove actual malice.

In *Herbert v. Lando*, 441 U.S. 153 (1979), the Supreme Court of the United

States emphasized that the rules of evidence apply equally to the press and that the

press' editorial process is discoverable:

> Courts have traditionally admitted any direct or indirect evidence
> relevant to the state of mind of the defendant and necessary to defeat a
> conditional privilege or enhance damages. The rules are applicable to
> the press and to other defendants alike, and it is evident that the courts
> across the country have long been accepting evidence going to the
> editorial processes of the media without encountering constitutional
> objections.
>
> …
>
> In sum, contrary to the views of the Court of Appeals, according an
> absolute privilege to the editorial process of a media defendant in a libel
> case is not required, authorized, or presaged by our prior cases, and
> would substantially enhance the burden of proving actual malice,
> contrary to the expectations of *New York Times, Butts*, and similar
> cases.

*Lando*, 441 U.S. at 165 & 169.

To allay any invasion of what the First Amendment was designed to protect,

the *Lando* Court balanced these interests against the herculean burden that public-

figure defamation plaintiffs bear to establish their claims—actual malice:

> Of course, if inquiry into editorial conclusions threatens the suppression
> not only of information known or strongly suspected to be unreliable
> but also of truthful information, the issue would be quite different. ***But
> as we have said, our cases necessarily contemplate examination of the
> editorial process to prove the necessary awareness of probable
> falsehood, and if indirect proof of this element does not stifle truthful
> publication and is consistent with the First Amendment, as
> respondents seem to concede, we do not understand how direct
> inquiry with respect to the ultimate issue would be substantially more
> suspect***.
>
> …
>
> Accordingly, we find it difficult to believe that error-avoiding
> procedures will be terminated or stifled simply because there is liability
> for culpable error and because the editorial process will itself be
> examined in the tiny percentage of instances in which error is claimed
> and litigation ensues. ***Nor is there sound reason to believe that
> editorial exchanges and the editorial process are so subject to
> distortion and to such recurring misunderstanding that they should
> be immune from examination in order to avoid erroneous judgments
> in defamation suits***.
>
> …
>
> This is not to say that the editorial discussions or exchanges have no
> constitutional protection from casual inquiry. ***There is no law that
> subjects the editorial process to private or official examination merely
> to satisfy curiosity or to serve some general end such as the public
> interest; and if there were, it would not survive constitutional scrutiny***

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

> *as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false.*

*Id.*, 441 U.S. at 172 & 174 (emphasis added).

Indeed, other Courts around the country have similarly recognized that, in cases requiring proof of actual malice, discovery into the publisher's sources and internal decision-making is often critical—particularly where a defendant asserts defenses that would otherwise go untested. In this vein, defamation law has given leeway to public-figure plaintiffs to assist their burden to establish actual malice:

> Proof of actual malice under *Sullivan* invariably depends on knowing the identity of the reporter's source, since a libel plaintiff needs to demonstrate that the reporter's source was unreliable or that the reporter failed to take sufficient steps to verify his or her story. ***Without such information, however, inquiring into the reliability of these sources would be a futile exercise: reporters could volunteer information buttressing their defense, and then plead the privilege to prevent the disclosure of any detrimental facts***. Ultimately, juries would be forced to decide the question of malice based on the allegations of a plaintiff claiming libel and a defendant whose defense of reliable sources would be untested—a scenario which spells little hope of success for the plaintiff.

*Desai v. Hersh*, 954 F.2d 1408, 1412 (7th Cir. 1992).

> It would be exceedingly difficult for appellee to introduce evidence beyond his own testimony to prove that he did not, at any time of day or night over an indefinite period of several weeks, remove boxfuls of documents from the UMW offices. Even if he did prove that the statements were false, *Sullivan* also requires a showing of malice or reckless disregard of the truth. That further step might be achieved by

11

proof that appellant in fact had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those particular sources was reckless. Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any of such circumstances. Although it might be possible to submit the question of malice to the jury simply on the basis of the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof. Consequently, we find that the identity of appellant's sources is critical to appellee's claim.

*Carey v. Hume*, 492 F.2d 631, 636–37 (D.C. Cir. 1974).

When the identity of the confidential source helps a public-figure defamation plaintiff establish actual malice, Courts have authorized disclosure—even after balancing First Amendment concerns. *See Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 & 726–27 (5th Cir. 1980)  ("Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances. … Like the defendants in Carey and Garland, Transamerican's only source for the allegedly libelous comments is the informant. The only way that Miller can establish malice and prove his case is to show that Transamerican knew the story was false or that it was reckless to rely on the informant. In order to do that, he must know the informant's identity. We affirm the district court's order compelling disclosure of the informant's identity.").

Here, the facts explaining why The Post chose to publish the Statements are directly relevant to actual malice. These are not requests for "causal inquiry" into

newsroom operations; they arise from a specific claim of injury based on allegedly

knowingly or recklessly false publication. *Lando,* 441 U.S. at 174.

### C. Attorney-client privilege and work product do not apply to routine editorial communications, and the Privilege Logs fail to carry The Post's burden.

As this District has recognized, "Documents prepared for dissemination to

third parties are not protected from discovery by either the attorney-client or the

work product privilege. Nor are the details, including drafts of the document to be

published, protected." *In re Seroquel Products Liab. Litig.,* No. 606MD1769-ORL-

22DAB, 2008 WL 1995058, at *3 (M.D. Fla. May 7, 2008). Discussions that merely

anticipate that legal advice may later be sought are not privileged. *See Duttle v.

Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989).

Nor does copying counsel transform an otherwise non-privileged

communication into privileged advice: "A communication is not privileged simply

because a lawyer is copied. Rather, the proponent of the attorney-client privilege

must show that the communication was confidential and that the primary purpose of

the communication was to relay, request, or transmit legal advice." *Simmons v. USI

Insurance Services LLC,* 2023 WL 6958659, at *2 (M.D. Fla. Oct. 20, 2023).

"'[B]usiness advice, unrelated to legal advice, is not protected by the privilege even

though conveyed by an attorney to the client,' because the purpose and intent is not

to communicate legal advice." *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Medical Center,* 2012 WL 5415108, at *3 (M.D. Fla. Nov. 6, 2012).

The Privilege Logs here do not supply the particulars necessary to show that the primary purpose of the challenged communications was to seek or provide legal advice, rather than to conduct routine editorial review. The same is true of the attachments: "simply funneling non-privileged information through an attorney does not automatically encase the document in the privilege." *Halifax Hosp. Medical Center,* 2012 WL 5415108, at *3; *see also Townhouse Restaurant of Oviedo, Inc. v. NuCO2, LLC,* 2020 WL 4923732, at * 6 (S.D. Fla. June 24, 2020) (documents "do not become privileged just by being attached to a privileged email communication."); *see also Burrow v. Forjas Taurus, S.A.,* 334 F.Supp.3d 1222, 1237 (S.D. Fla. 2018) (compelling production where defendants failed to carry their burden in showing how the attorney-client privilege applied to documents relating to an internal investigation that were turned over to defendants' attorneys).

To the extent any materials contain a mix of facts and attorney mental impressions, the facts remain discoverable and must be produced where segregable. *See Bogosian v. Gulf Oil Corp.,* 738 F.2d 587, 595–96 (3d Cir. 1984) ("Of course, where the same document contains both facts and legal theories of the attorney, the adversary party is entitled to discovery of the facts. It would represent a retreat from

the philosophy underlying the Federal Rules of Civil Procedure if a party could shield facts from disclosure by the expedient of combining them or interlacing them with core work product."). "Consistent with that premise, courts have consistently held that raw factual information obtained by counsel in preparation for litigation is not protected as work product merely because it was an attorney who unearthed it." *A.R. by an through Root v. Dudek*, 151 F. Supp. 3d 1309, 1314 (S.D. Fla. 2015). The Privilege Logs' conclusory entries—especially for attachments where the author and creation date are not even identified—do not permit that segregability analysis and do not meet The Post's burden.

### D. The Post's Redaction Log is non-compliant.

The Post's Redaction Log remains deficient and non-compliant because it fails to provide message-by-message details sufficient to evaluate each asserted basis for the redaction. Over-generalized descriptions and categorical groupings do not permit the opposing party or the Court to assess whether a privilege applies. *See Las Brisas Condominium Homes Condo. Assoc.,* 2023 WL 2788873, *2 (M.D. Fla. Mar. 8, 2023) (over-generalized groupings do not permit identification of how a specific document or redaction is privileged; multiple redactions may require separate discussion "to discern the privilege asserted."); *Halifax Hosp. Medical Center,* 2023 WL 5415108 at *5 ("For the adversarial system to function properly, each message

needs to be identified and described in a manner that fairly permits the opposing side

to assess whether the claim of privilege is valid.") (citation omitted).

### E. The Post's reporter's privilege is deficient and unsupported.

TMTG also challenges The Post's invocation of reporter's privilege in the

Privilege Logs, including The Post's reservation of a purported "absolute" privilege

under D.C. Shield Law without clearly identifying the governing law and the factual

basis for applying it in this Florida action. A party asserting a privilege must identify

the specific legal basis for the privilege at the time it is asserted. Privilege claims are

not placeholders. They cannot be left deliberately ambiguous to preserve shifting or

alternative legal theories as the dispute develops. Reserving the right to later invoke

a different jurisdiction's reporter's privilege law—particularly one that may provide

broader protections than Florida law—frustrates the purpose of Rule 26(b)(5) and

prevents any meaningful evaluation, challenge, or judicial review of the claim.

This action is pending in Florida, and Mr. Harwell (the author of the Article)

resides in Florida (and did so at the time he wrote the article). Florida choice-of-law

rules apply and Florida does not recognize an absolute reporter's privilege. *See* Fla.

Stat. § 90.5015. If The Post intends to rely on the D.C. Shield Law or any other non-

Florida source of law, it must make that position explicit and provide the threshold

legal and factual basis for that choice-of-law argument ***now***. *See supra,* Middle District of Florida Discovery Handbook (2021) at § 6(B)(1).

Compounding the problem, the categories that claim to withhold or redact information based on an "Absolute Reporter's Privilege" contain no document-specific information justifying any such privilege. Instead, The Post uses conclusory labels—e.g., redactions "reflecting absolute reporter's privilege"—which would be insufficient even if Florida recognized such a privilege. As phrased, The Post's Categorial Privilege Log does not provide either TMTG or the Court with any reasonable opportunity to evaluate the veracity of The Post's assertion of an absolute privilege.

Further, The Post's justification for asserting a qualified reporter's privilege is impermissibly broad and conclusory. The Post sweeps in virtually any internal newsroom communications, without identifying the subject matter of the communications, the specific issues to which they relate, whether they concern published or unpublished information, whether they include confidential source information, or how disclosure would implicate any protected newsgathering interest.

The Post's intentional vagueness appears designed to prevent TMTG from demonstrating why disclosure is warranted—because a proper description will

reveal that the withheld materials are likely highly relevant to The Post's affirmative defenses, raising substantial truth, the lack of actual malice, the fair report privilege, and First Amendment protections. Indeed, Courts in this Circuit, D.C., and around the country have recognized that internal drafts, editorial deliberations, and publication decision-making can go "to the core" of state of mind and actual malice. *See Monarch Air Group, LLC v. Journalism Development Network, Inc.,* 2025 WL 445491, \*3-4 (S.D. Fla. Feb. 10, 2025) (overruling journalist's privilege objections and compelling production of drafts, comments, and internal communications because they were likely probative of the defendant's state of mind, directly relevant to actual malice, and supported a compelling interest in disclosure—especially where the defendant raised defenses such as substantial truth and relate First Amended protections); *see also Carey v. Hume,* 492 F.2d 631, 636–37 (D.C. Cir. 1974) ("Although it might be possible to submit the question of malice to the jury simply based on the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof. Consequently, we find that the identity of appellant's sources is critical to appellee's claim."); *see also Desai v. Hersh*, 954 F.2d 1408, 1412 (7th Cir. 1992) ("Proof of actual malice under *Sullivan* invariably depends on knowing the identity of the reporter's source, since a libel plaintiff needs to demonstrate that the reporter's source

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

was unreliable or that the reporter failed to take sufficient steps to verify his or her story. Without such information, however, inquiring into the reliability of these sources would be a futile exercise: reporters could volunteer information buttressing their defense, and then plead the privilege to prevent the disclosure of any detrimental facts. Ultimately, juries would be forced to decide the question of malice based on the allegations of a plaintiff claiming libel and a defendant whose defense of reliable sources would be untested—a scenario which spells little hope of success for the plaintiff.").

Accordingly, The Post's reporter's privilege assertions should be overruled. The Post has not timely or clearly identified the governing law for any purported "absolute" privilege, nor supplied the threshold factual and legal basis necessary to invoke non-Florida law in this Florida action. To the extent The Post relies on a qualified privilege, it has not carried its burden to show that the challenged materials implicate protected newsgathering interests, as opposed to routine internal drafts, edits, and publication decision-making that go to the core state of mind and actual malice.

**F. The Court should conduct an *in- camera* review**.

Alternatively, TMTG respectfully requests that the Court conduct an *in camera* review of the Challenged Documents. TMTG has provided a sufficient

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

factual basis—grounded in facial deficiencies of The Post's Supplemental Log and the testimony of The Post's witnesses establishing that "legal review" functioned as a routine editorial checkpoint rather than a privileged legal consultation—to support a good faith belief that The Post has withheld non-privileged material (or severable non-privileged portions). Under these circumstances, in camera review is warranted to resolve the privilege dispute efficiently and without prejudicing either party. *Cf. Willoughby v. Gov't Employees Ins. Co.,* 2024 WL 3183860, at *5 (M.D. Fla. June 26, 2024) (cited only to explain the applicable standard: "A Court should only conduct an *in camera* review after the movant provides a sufficient factual basis to support a good faith belief that *in camera* review will reveal improperly withheld material.") (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

## CONCLUSION

WHEREFORE, TMTG respectfully requests that the Court enter an order overruling The Post's privilege assertions as to the Challenged Documents and compel The Post to produce these documents within seven calendar days, award TMTG its attorney's fees and costs, or, alternatively, order an *in camera* review of the Challenged Documents, and award any other further relief the Court deems proper.

BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

## CERTIFICATION PURSUANT TO RULE 37 AND LOCAL RULE 3.01(g)

Pursuant to Rule 37 and M.D. Fla. R. 3.01(g), the parties have met and conferred in good faith about their positions regarding the issues raised in this Motion, through written correspondence exchanged on January 19, 2026, January 30, 2026, and February 26, 2026. The parties have been unable to reach an agreement.

Dated: February 28, 2026            Respectfully submitted,

**BRITO, PLLC**
*Counsel for Plaintiff*
2121 Ponce de Leon Boulevard
Suite 650
Miami, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ *Alejandro Brito*
     **ALEJANDRO BRITO**
     Florida Bar No. 098442
     Primary: abrito@britopllc.com
     Secondary: apiriou@britopllc.com
     **JALAINE GARCIA**
     Florida Bar No. 58632
     Primary: jgarcia@britopllc.com
     **IAN MICHAEL CORP**
     Florida Bar No. 1010943
     Primary: icorp@britopllc.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

on February 28, 2026 through the Court's CM/ECF electronic filing system upon:

Carol J. Locicero, Esq.
Linda Riedemann Norbut, Esq.
Thomas & LoCicero, PL
601 South Blvd
Tampa, FL 33606-2629
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

Thomas G. Hentoff, Esq.
Nicholas G. Gamse, Esq.
Williams & Connolly
680 Maine Avenue S.W.
Washington, DC 20024
thentoff@wc.com
ngamse@wc.com
*Counsel for Defendant*

By: /s/ *Alejandro Brito*

**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071