# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

     Plaintiff,

vs.

WP COMPANY LLC d/b/a The Washington Post,

     Defendant.

Case No: 8:23-cv-01535-TPB-AAS

_____/

## DEFENDANT WP COMPANY LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER REGARDING AS TO DEFENDANT'S AMENDED 30(B)(6) NOTICE

Defendant WP Company LLC d/b/a The Washington Post's ("The Post") timely issued a notice to depose the corporate representative of Plaintiff Trump Media & Technology Group Corp. ("TMTG"). The notice included narrow, relevant topics, several of which are topics this Court has ruled are proper topics of discovery in this matter. Ex. A (Def.'s Am. 30(b)(6) Notice). Even so, TMTG seeks a protective order to deny The Post this discovery. TMTG's motion for a protective order challenges the majority of The Post's topics, reiterating objections previously raised and rejected by this Court. None of TMTG's objections establish the good cause required to receive the protective order it seeks.

TMTG contends that The Post's topics are insufficiently particular or irrelevant, but The Post has limited its topics to discrete, relevant categories of materials, such as TMTG's monthly financial reviews and disclosures to the Board

of Directors about its value.  TMTG asserts that The Post improperly seeks to elicit expert opinions, but The Post merely asks TMTG's representative to testify to the bases for TMTG's damages claim.  TMTG resists offering testimony about other legal matters, but, as the Court has recognized, these matters present overlapping factual and legal issues to the case at bar.  And TMTG objects to various topics on other privilege, proportionality, and relevance grounds, but these objections too lack merit.

At bottom, The Post's requests are typical 30(b)(6) topics; TMTG's objections should be denied.

## BACKGROUND

TMTG's Rule 30(b)(6) protective-order motion addresses matters that have already been before this Court.  The Court previously granted The Post's motion to compel discovery on TMTG's valuations, its payment of finder's fees to obtain financing, other defamation litigation, investigations by the Department of Justice or the Securities and Exchange Commission, and *Digital World Acquisition Corp. v. Arc Global Investments II, LLC*, Case No. 2024 CA 001061 NC, filed in the Circuit Court of the Twelfth Judicial Circuit, Sarasota County, FL (the "*DWAC* Case").  *See* ECF Nos. 99, 112.  Given the documents produced, these topics are proper lines of inquiry for TMTG's 30(b)(6) witness.

The Post first served a 30(b)(6) notice on TMTG on December 12, 2025.  *See* Ex. B (Def.'s Dec. 12, 2025 Rule 30(b)(6) Notice).  The Post noticed the deposition for early January to ensure its experts had accurate and comprehensive

information about TMTG's damages claims and bases, which were the subject of several 30(b)(6) topics. For three weeks, TMTG's response amounted to a single December 19 email that informed The Post that TMTG was not available on January 9 and that it was working on alternative dates. Because The Post had received no substantive response nor alternate dates from TMTG, The Post accommodated TMTG's stated unavailability and re-noticed the deposition for January 12. *See* Ex. C (Dec. 29 Email from N. Gamse). On January 4, 2025, TMTG responded in writing with objections to The Post's topics. The Post immediately requested to confer about these objections. *See* Ex. D (Jan. 5 Email from I. Beaton). But TMTG refused to engage in negotiations that would facilitate any 30(b)(6) testimony—even targeted testimony specific to The Post's damages claims—before The Post's deadline for expert report disclosure.

After an eventual conferral on the 30(b)(6) topics, The Post served an amended 30(b)(6) notice on February 3, 2026. Ex. A. Contrary to TMTG's claims, *see* Mot. 2, The Post engaged in good faith to narrow and clarify its 30(b)(6) topics in response to TMTG's objections in its amended notice.[1] The Post compromised in a number of ways, including removing topics and narrowing several topics to

---

[1] TMTG's contention that The Post has not "engaged in good faith" despite TMTG's "repeated attempts to meet and confer" is not well taken. *Id.* at 2. As described above, The Post served the present 30(b)(6) notice following extensive correspondence in December and January and several conferrals between the parties. TMTG cites no correspondence to substantiate its claims that its "repeated" efforts to confer were rebuffed. *Id.* In fact, in a February 10 email—TMTG's first correspondence about The Post's amended notice—TMTG that stated only that it was "evaluating" The Post's revised notice, and it "anticipate[s] that [TMTG] will be filing a motion for a protective order." Ex. E (Feb. 10 Email from J. Garcia).

which TMTG objected.  For example, The Post removed its prior Topic 1, "The Article," in response to TMTG's overbreadth concerns.  *Compare* Ex. B, *with* Ex. A; *see also infra* pp. 8–9.[2]

## GOVERNING STANDARD

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  *See Bank of N.Y. Mellon v. Gouda*, 2025 WL 2709802, at *2 (M.D. Fla. June 9, 2025) (citation omitted).  And this approach extends to depositions of corporate representatives under Rule 30(b)(6).  *Id.*

A party's designated 30(b)(6) representative may decline to provide testimony regarding the designated topics only if the party obtains a protective order under Rule 26(c)(1).  *Id.*  Such a protective order requires a showing of "good cause," and, to carry this burden, the moving party "must make a specific demonstration of facts in support of the request, rather than conclusory or speculative statements about the need for a protective order and the harm which will be suffered without" the requested protective order.  *Id.* (citation omitted).

## ARGUMENT

TMTG fails to demonstrate the good cause required for the court's protective

---

[2] The Post's objections to TMTG's 30(b)(6) topics, despite TMTG's claims to the contrary, reflect no "tit-for-tat approach."  Mot. 2.  TMTG's claim suggests equivalency in the parties' notices where there is none—TMTG's notice, by contrast, requested The Post prepare its representative to testify to nearly double the number of topics.  *See* ECF No. 140 at 1 (noting that TMTG's notice contained 39 broad topics, narrowed from an earlier list of nearly 80).  Any comparison The Post has made with TMTG's notices was aimed at requesting that TMTG treat it in an evenhanded manner.

intervention because The Post's topics are reasonably particular, seek relevant information, present no undue burden, and are proportionate to the needs of the case. Topic 5, which seeks testimony related to TMTG's financial condition and performance, is tailored to specifically address TMTG's monthly financial reviews and forecasts over a two-year period. Topics 6 and 7 focus on valuations of TMTG presented to a handful of individuals and disclosures that those same individuals made about the value of their shares of TMTG stock before its merger with Digital World Acquisition Corporation ("DWAC"). Topic 9 concerns TMTG's negotiations to pay finder's fees, which this Court has already ruled would be a proper subject of fact testimony from a TMTG witness. Topics 12 and 13 properly seek testimony as to the damages claimed in this case and the numerical calculations used to prepare them. Finally, Topics 15, 16, 17, and 18 focus on issues that TMTG has implicated in this litigation: TMTG's other recent defamation claims, its damages allegations in the closely related *DWAC* Case, the causes of the delay to TMTG's merger with DWAC and disclosures, if any, of these causes, and government investigations into TMTG and DWAC. [3]

## I.      Topic 5 is sufficiently narrow, not unduly burdensome, seeks relevant information, and is proportionate to the needs of the case.

Topic 5 is sufficiently narrow, not unduly burdensome, seeks relevant information, and is proportionate to the needs of the case. This topic seeks

---

[3] TMTG does not object to The Post's Topics 1–4, 8, 10–11, 14, and 19–20.

testimony on TMTG's financial condition and performance as reflected by:

i.  TMTG's financial statements from February 2022-March 2024, including the company's monthly revenues, expenses, and profits.

ii.  The company's monthly financial reviews and forecasts from February 2022-March 2024.

iii.  The company's Truth Social usage metrics contained within its monthly financial reviews.

iv.  The company's principal methods of reporting its liquidity and solvency to its Chief Financial Officer, Chief Executive Officer, and/or Board of Directors from February 2022-March 2024.

TMTG's testimony regarding its financial and user-engagement data have clear relevance to the issues in this case, especially damages. In both the Second Amended Complaint and its Initial Disclosures, TMTG alleges billions of dollars in damages due to losses in its "implied equity value." Second Am. Compl. ¶ 41, ECF No. 70; Ex. F (Pl.'s Second Supp. Initial Disclosures) at 7. TMTG's value depends on the company's underlying performance and financial metrics, so TMTG's understanding and evaluation of these metrics over time sheds light on whether TMTG, in fact, suffered the damages TMTG asserts. As this Court has recognized, there can be little argument that the requested information is disproportionate to the billions of dollars in damages TMTG seeks. *See* Oct. 1, 2025 Hr'g Tr. 14:10–14 (noting need for TMTG "to give the defendant some understanding of why it is and how it is that plaintiff has reached such a large damages number and what's really behind that damages number," ordering production of related documents); *see also, e.g.*, *Onemata Corp. v. Rahman*, 2021 WL 8895156, at *2 (S.D. Fla. June 14, 2021) (determining 30(b)(6) topics were proportionate where the case involved a

"multi-million dollar business sale").  The Post's focus on the period of 2022 to 2024 also make sense because, during this period, TMTG remained engaged in a protracted process to complete its merger with DWAC.  *See* Mot 5 n.2.

Still, TMTG insists The Post's request for testimony on two years' worth of financial data asks for too much information.  *See* Mot. 5–6.  But The Post seeks testimony about a discrete set of materials and metrics that its CFO and his team appear to have prepared monthly.  It is not unduly burdensome for TMTG's corporate representative to testify about a set of regularly produced materials.  *See Buie v. District of Columbia*, 327 F.R.D. 1, 8 (D.D.C. 2018) ("[I]t is both proper and common for a 30(b)(6) witness to prepare for the deposition by reviewing the records of the organization on whose behalf he or she testifies.").  Indeed, The Post has lightened any burden by informing TMTG that this topic pertains to these specific materials.  *See Menuel v. Hertz Corp.*, 2009 WL 10665026, at *7–8 (N.D. Ga. Dec. 9, 2009) (rejecting objection to deposition topic on overbreadth grounds where plaintiff clarified the specific aspects of the policies and handbooks that were to be discussed).  The two-year timeframe of the topic—which TMTG did not raise as objectionable in its conferrals with The Post—also does not tip the balance; courts routinely approve requests with similar timeframes.  *See, e.g.*, *Sun State Ford v. Ford Motor Co.*, 2025 WL 2029737, at *3 (M.D. Fla. July 21, 2025) (rejecting overbreadth and relevance objections to topics that sought information

from 2022 onwards).[4]

TMTG also omits that The Post has made good-faith efforts to narrow Topic 5 to address the concerns TMTG has raised.  In its initial 30(b)(6) notice, The Post offered a broader version of this Topic, which it narrowed in response to TMTG's concerns.  Specifically, The Post limited the Topic to specific and clearly identified subtopics:

| Original Topic 5 | Amended Topic 5 |
|---|---|
| TMTG's financial condition and performance, **including** | TMTG's financial condition and performance **as reflected by**: |
| i. TMTG's financial statements from February 2022-March 2024, including the company's monthly revenues, expenses, and profits. | i. TMTG's financial statements from February 2022-March 2024, including the company's monthly revenues, expenses, and profits. |
| ii. The company's monthly financial reviews and forecasts from February 2022-March 2024. | ii. The company's monthly financial reviews and forecasts from February 2022-Marcsh 2024. |
| iii. The company's monthly Truth Social usage metrics **and forecasts from February 2022-March 2024.** | iii. The company's Truth Social usage metrics **contained within its monthly financial reviews**. |
| iv. **The company's financing from February 2022-March 2024.** | iv. **The company's principal methods of reporting its liquidity and solvency to its Chief Financial Officer, Chief Executive Officer, and/or Board of Directors from February 2022-March 2024.** |

As a fallback, TMTG argues The Post seeks irrelevant information because "TMTG's claimed damages—as calculated by TMTG's experts—cover a finite period from the date of publication until May 17, 2023."  Mot. 6.  TMTG's experts,

---

[4] The sole case cited by TMTG, *Stoneeagle Servs., Inc. v. Pay-Plus Sols., Inc.*, 2015 WL 12843846, at *2 (M.D. Fla. Apr. 29, 2015), is inapposite.  It addressed only whether a party should be sanctioned for inadequate preparation of its corporate designee on a topic related to the relevant product's royalties and fees.  *Id.*

however, do not dictate what evidence is relevant for damages purposes, and The Post may rely on a broader set of financial information, especially where TMTG's damages theory rests, at least in part, on delays in TMTG's merger which TMTG completed in March 2024.  *See* Mot. 5 n.2.[5]

## II.    Topics 6 and 7 are sufficiently narrow, present no undue burden, seek relevant information, and are proportionate to the needs of the case.

Topics 6 and 7 are reasonably particular, impose no undue burden, seek relevant information and are proportionate to the needs of the case.  Topic 6 concerns "[a]ll valuations of TMTG" that were "presented to TMTG's Board, its Chief Financial Officer, or its Chief Executive Officer," while Topic 7 seeks "[d]isclosures made by" those individuals "prior to the DWAC merger regarding the value of their shares of TMTG stock."  Ex. A.  These topics go directly to TMTG's claim that The Post's Article "destroyed at least $2.78 billion in implied equity value in TMTG."  Second Am. Compl. ¶ 41.  Given the size of this claim, further discovery into TMTG's finances is proportionate to the needs of the case. *See supra* p. 6–7.

Contrary to TMTG's assertions, these topics do not require searches "across countless custodians and documents."  *See* Mot. 7.  Rather, the custodians of these documents are identified as TMTG's board members, CFO, and CEO.  *See Spearman v. Broker Sols., Inc.*, 2022 WL 1715965, at *10 (N.D. Ga. Jan. 10, 2022)

---

[5] Nevertheless, if the Court deems this timeframe too broad, The Post proposes a narrowing of the timeframe for the period of January 2023 through December 2023.

(rejecting objection to topic where narrowed to apply to a set number of employees).  Nor must TMTG hunt for the relevant documents because TMTG has already identified all valuations in response to The Post's interrogatories.  *See* Ex. G (Def.'s First Set of Interrogs.) at 11.[6]

The authority TMTC cites for overbreadth and undue burden are inapposite. In those cases, courts struck down sweeping requests for "all" communications on unbounded, vague topics or where the plaintiff failed to explain the relevance of a particular topic.[7]  By contrast, The Post seeks one category of information (valuation) that was provided to a small group of identified individuals and similarly targets communications from a small, finite group of individuals about TMTG's stock value in Topics 6 and 7, respectively.

### III.   Topic 9 seeks relevant information proportionate to the needs of the case.

In Topic 9, The Post seeks to elicit testimony about "[a]ll instances in which TMTG offered a commission, broker's free, or finder's fee in exchange for, or in connection with, financing."  Such testimony is relevant and proportionate to the needs of the case because this topic relates to The Post's substantial-truth defense as to the finder's fee reported on in the Article.  Further, TMTG's custom and

---

[6] Of course, to the extent TMTG is aware of valuations not identified in its interrogatory responses, that information is squarely relevant to The Post's defense to TMTG's damages claim.

[7] For example, in *West v. Verizon Services Corporation*, the plaintiff's improper topic sought "all" communications about a program, with no further specification as to the topics of those communications.  2010 WL 11482532, at *4 (M.D. Fla. July 12, 2010).  In *Hickman v. Johnson*, the court rejected a plaintiff's topic addressing five years' worth of police-misconduct complaints plaintiff failed to explain the relevance.  2019 WL 13545894, at *4 (M.D. Fla. Mar. 26, 2019).

practice in offering or entering into agreements in connection with other finder's fees is relevant to establishing whether TMTG had such an agreement with Entoro.

The Court has already spoken to the propriety of 30(b)(6) testimony on this subject. When The Post sought similar information through an interrogatory, *see* Ex. H (Pl.'s Supp. Resp. to Def.'s Second Set of Interrogs.) at 2, the Court not only overruled TMTG's objections (similar to those lodged here) but also determined that "TMTG's corporate representative may . . . be deposed about these agreements and transactions," ECF No. 112 at 3. Simply put, the Court has already rejected TMTG's argument that Topic 9 should be narrowed to "the single transaction and counterparty referenced in the Article." Mot. 10.

Any new concerns about overbreadth are overstated. In response to the Court's order compelling it to respond to The Post's Interrogatory, TMTG represented that it made "finder's fee" payments to two other counterparties: Crow Island Consulting, LLC and Bailey Deason Capital Investments, LLC in March 2024. *See* Ex. H at 2. The Post's request for testimony on these finder's fees, as well as any other finder's fees TMTG offered or exchanged for, is targeted and relevant.

## IV. Topics 12 and 13 appropriately seek TMTG's bases for its damages claims.

Contrary to TMTG's objections, Topics 12 and 13 seek testimony from TMTG's corporate representative that is relevant and proportionate to the issues in dispute, specifically TMTG's alleged claims to billions of dollars in damages. Topic 12 seeks the corporate representative's testimony on "TMTG's claimed injury

and/or damages" set forth in its Second Amended Complaint and Initial Disclosures. Ex. A at 3. It also requests the corporate representative be prepared to testify regarding the damages amount, calculation, and principal documentary basis "[f]or each category of damages claimed" by TMTG based on its Second Amended Complaint and Initial Disclosures. *Id.* Similarly, Topic 13 requests the corporate representative testify regarding "[t]he specific numerical calculations used to prepare TMTG's $2.78 billion compensatory damages demand" set forth in the Second Amended Complaint. *Id.*

Topic 12 and Topic 13 seek testimony that courts routinely permit parties to cover in 30(b)(6) depositions. *See, e.g., DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 2022 WL 2702378, at *13 (E.D.N.Y. Feb. 11, 2022) ("As a general matter, defendants have the right to question a 30(b)(6) witness on the basis for plaintiffs' damages claims and the cost of lost opportunities."); *see also Adventist Health Sys./Sunbelt Inc. v. Med. Savings Ins. Co.*, 2005 WL 8159879, at *3 (M.D. Fla. May 6, 2005) (reopening 30(b)(6) deposition where designated representative failed to "explain the factual support for [plaintiff's] damages claims"). In its Second Amended Complaint, TMTG seeks $2.78 billion in compensatory damages, alleging the Article "destroyed at least $2.78 billion of implied equity value in TMTG." Second Am. Compl. ¶ 41. In its Second Supplemental Initial Disclosures, TMTG discloses that it seeks $2.78 billion in compensatory damages—$1 billion in "reputational repair and mitigation costs" and $1.78 billion in "lost profits and future earning capacity." Ex. F (at 6–7 (capitalization altered). The Post should be

permitted to ask TMTG to provide testimony about the bases for its damages claims.  After all, TMTG nowhere disputes that such testimony would be irrelevant or disproportionate to issues in the case.  *See* Mot. 10–13.

Rather, TMTG objects to Topics 12 and 13 because it claims these topics seek to elicit effective expert testimony.  TMTG is mistaken.  Topics 12 and 13 require TMTG's representative to testify to the factual bases for TMTG's damages claims, not expert opinions.  Although expert opinions and factual testimony may overlap to some degree, TMTG may not avoid preparing its corporate representative to discuss its damages claims by pointing to its experts' analysis.  "Corporate witnesses under Rule 30(b)(6) are representatives of the organization and are charged with testifying on behalf of the organization about facts known or reasonably known," while experts "offer *opinion* based on facts provided."  *MP NexLevel, LLC v. Codale Elec. Supply, Inc.*, 2012 WL 2368138, at *2 (D. Utah June 21, 2012).  "Therefore, an expert witness is not suited to testify as to facts known to an organization and is not a substitute for the testimony of a Rule 30(b)(6) corporate representative."  *Id.*

For this reason, courts have regularly rejected the same argument TMTG advances here and required corporate representatives to testify to the facts and evidence underlying damages claims notwithstanding the existence of expert testimony.[8]   None of the cases TMTG cites suggests otherwise—none even

---

[8] *See, e.g.*, *Eco. Rts. Found. v. Hot Line Constr., Inc.*, 2022 WL 3574450, at *7 (C.D. Cal. July 27, 2022) (determining that, in a 30(b)(6) deposition, the plaintiff could question the witness regarding "the factual information" related to a topic even though other aspects of the topic were

addresses the overlap between a 30(b)(6) topic and expert testimony concerning damages.[1]  *See, e.g.*, *F.D.I.C. v. Brudnicki*, 2013 WL 5814494, at *3, 5 (N.D. Fla. Oct. 29, 2013) (requiring corporate representative to testify about factual information regarding the standards of care and noting defendants could question the 30(b)(6) witnesses about "how the FDIC calculates damages in this case").

In fact, Topics 12 and 13 rest on even stronger ground than other cases because, in its Complaint and Supplemental Initial Disclosures, TMTG's seeks damages that have no basis in its experts' report.  TMTG claims it seeks a total $2.78 billion in compensatory damages, yet its experts' opinions do not support this figure.  Even if TMTG now disavows these damages calculations and categories, The Post still is entitled to elicit testimony to that effect from TMTG's corporate representative.  *See CMI Roadbuilding, Inc. v. SpecSys, Inc.*, 2021 WL 9682172, at *2 (W.D. Okla. Jan. 18, 2021) (explaining 30(b)(6) witness could refer to expert's analysis if had no other basis for damages claims but, if not, would need to testify about any other bases).

TMTG's other grounds for its objections similarly lack merit.  Topic 12 does not ask the corporate representative to engage in "a document-indexing project."

---

within the scope of expert discovery); *Black Card LLC v. Visa USA Inc.*, 2019 WL 13180684, at *8 (D. Wyo. Dec. 2, 2019) (rejecting objection to topic regarding claimed damages because an expert witness's opinions are not a substitute for a corporate representative's testimony about the facts known to the corporation); *First Fin. Bank Nat'l Ass'n v. Williams*, 2021 WL 5085346, at *1–*2 (W.D. Ky. Nov. 2, 2021) (denying protective order as to topics concerning bases for plaintiff's claimed damages despite expert report); *see also MP NexLevel*, 2012 WL 2368138, at *3 ("Because MP NexLevel failed to provide a Rule 30(b)(6) witness prepared to discuss the facts underlying its allegations of damages, MP NexLevel is liable for sanctions under Rule 37(d).").

*See* Mot. 13.  Rather, The Post asks the corporate representative to be prepared to discuss the purported documentary bases, if any, for its damages claims.  TMTG also objects to Topic 13 because it pertains to the damages figure TMTG set forth in its Complaint.  *See* Mot. 13–14.  But The Post has every right to ask TMTG's 30(b)(6) witness to explain the bases for TMTG's allegations in the operative complaint.  *See Adventist Health Sys.*, 2005 WL 8159879, at *3 (M.D. Fla. May 6, 2005) (reopening 30(b)(6) deposition so witness could testify to basis for damages clam set forth in the operative complaint).  If TMTG now disclaims the operative complaint's damages allegations, that provides more reason for The Post to examine TMTG's corporate representative on Topic 13 as well as Topic 12.[9]

## V.    Topics 15, 16, 17 and 18 seek discoverable, non-privileged testimony that is relevant and proportionate to the needs of the case.

Topics 15, 16, 17, and 18 seek to elicit testimony from TMTG's corporate representative on TMTG's other recent defamation claims; TMTG's damages allegations in the *DWAC* Case; the causes of delay to TMTG's merger with DWAC and the disclosures, if any, of these causes; and government investigations into TMTG and DWAC, respectively.  All are appropriate topics for discovery in this case.

---

[9] TMTG's downplaying of the Second Amended Complaint's damages claim as merely an "early pleading demand drafted by counsel" misstates the record.  TMTG's October 10, 2025 Supplemental Initial Disclosures—served in direct response to an order from this Court that required further information on its damages disclosures—expressly reiterated this $2.78 billion figure.  *See* ECF No. 99 at 1–2.  Furthermore, TMTG needed to have a good-faith factual basis for this damages number.  *See* Fed. R. Civ. P. 11.

The Post seeks testimony about TMTG's other claims because its damages theories have substantial overlap with the damages it has alleged in those cases. As for Topic 16, the Court has ordered production of all documents from the *DWAC* Case in this matter because of the similar claims in both cases—the conduct at issue there too caused a delay of the TMTG-DWAC merger, reputational harm, and other similar damages during the same time period. *See* ECF No. 112 at 2. Similarly, the two lawsuits identified in Topic 15—defamation lawsuits filed by TMTG in the same time period—are relevant and proportionate because, in those cases too, TMTG claims additional billions of dollars in overlapping reputational harm based on other articles about TMTG published within weeks or months of the Article at issue here.

With respect to Topics 17 and 18, TMTG has made its merger with DWAC and the regulatory scrutiny of this merger key issues in this case. The Second Amended Complaint alleges the Challenged Statements, by "damag[ing] TMTG's business, brand, and good will," threatened and "further delay[ed] the SEC's review of the proposed merger with DWAC." Second Am. Comp. ¶ 40. These issues have not fallen away. Again, TMTG's experts discuss TMTG's merger and the purported costs associated with the merger's delays at length in their report. What is more, the Court has already determined that TMTG's merger and government investigations into TMTG and DWAC are relevant and proportionate to the issues here as demonstrated by its orders that compelled TMTG to produce documents and testimony on these very topics. *See* ECF Nos. 99, 112, 128.

Faced with these topics' clear relevance and proportionality, TMTG makes baseless objections.

First, TMTG argues that Topics 15, 16, 17, and 18 are overbroad and insufficiently particular. *See* Mot. 14–16, 20–21.  TMTG insists these topics have no clear limits or bounds, but The Post clearly set forth and provided specific examples of the information it expects TMTG's representative to cover.  From these topics, it is reasonably clear what TMTG's corporate representative should be prepared to discuss: (1) its defamation claims since 2021, including in the identified cases, (2) the damages claims in the *DWAC* case, (3) the causes and disclosure of causes for delays in TMTG's merger with DWAC, and (4) Department of Justice or Securities and Exchange Commission investigations into DWAC or TMTG and the communications with those agencies during those investigations. *See U.S. Equal Emp. Opportunity Comm'n v. Qualtool, Inc.*, 2022 WL 16695172, at *5 (M.D. Fla. Nov. 3, 2022) (explaining the purpose of the reasonable particularity requirement is to help the corporation prepare its representative to answer questions at the deposition).

Second, TMTG insists these topics seek information that is disproportionate to the needs of the case. *See* Mot. 17–18, 21.  Not so.  As noted above, this Court has already determined that document discovery into the areas covered by these topics is relevant and proportionate to the needs of the case. *See supra* pp. 15–16. Thus, The Post's efforts to seek TMTG's testimony regarding its defamation claims against The Guardian and other publications, and the *DWAC* Case, are consistent

with the existing scope of discovery, not "fishing expeditions." Mot. 16. Further, TMTG has invoked its delays in its merger with DWAC and The Guardian's reporting in its experts' report to support its multi-billion-dollar damages claims. Though these topics may sweep broadly, TMTG's failure to address the importance of these issues to the case dooms its objections. *See Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2016 WL 562916, at *3 (N.D. Ala. Jan. 13, 2016) (rejecting proportionality objections to 30(b)(6) topics where defendant "fail[ed] to demonstrate how such a burden deviates from the proportionality required by Rule 26(b)(1) or the general corporate obligation created by Rule 30(b)(6)").

Third, contrary to TMTG's claims, Topics 15, 16, 17, and 18 do not seek to elicit expert testimony insofar as they probe issues of damages and causation. *See* Mot. 19–20, 21–22. Just as The Post may ask TMTG's corporate representative to explain TMTG's bases for its damages claims, The Post may do the same for its damages claims in other cases where, as here, those claims are relevant. *See supra* p. 16. TMTG's arguments as to causation fail for similar reasons: The Post may use a 30(b)(6) deposition to probe the factual bases for TMTG's claims about the causes of its damages and delays in the TMTG-DWAC merger. *See Veroblue Farms USA Inc. v. Wulf*, 2022 WL 1644442, at *8 (N.D. Tex. May 23, 2022) (permitting party to ask 30(b)(6) witness about the facts related to causes of claimed damages); *Tapia v. TA Operating, LLC*, 2022 WL 1604673, at *4 (D.N.M. May 20, 2022) (permitting party to ask 30(b)(6) witness about "all factors" that

contributed to causes of claimed injuries and losses).[10]

Fourth, the risk that Topics 15, 16, and 18 require TMTG to divulge privileged information is, at the very best, remote. TMTG seeks to foreclose any questioning on Topics 15 and 16 because, in preparing for this topic, TMTG would need to consider "legal judgment and litigation strategy, including what counsel believed was material, what theories were advanced, and how claims were framed." Mot. at 18–19. But "[a] corporation is not entitled to refuse to provide a Rule 30(b)(6) representative on the basis of privilege or work product protections merely because its counsel prepared the representative." *F.D.I.C. v. Hutchins*, 2013 WL 12109446, at \*6 (N.D. Ga. Oct. 25, 2013) (rejecting privilege objection to deposition topic). And TMTG's argument, which boils down to a claim that its preparation relied on legal advice and judgment, fares no better. Besides, regardless of the preparation, The Post may elicit testimony about the factual support for TMTG's claims in the *DWAC* Case and other litigation without asking TMTG to reveal its attorneys' advice or work product. *See United States v. Taneja*, 2023 WL 3563604, at \*3–4 (M.D. Fla. Feb. 2, 2023) (denying protective order on privilege grounds where the notice sought factual bases for claims, "not opinion work product"). Despite TMTG's suggestion to the contrary, Topic 18, which seeks information about

---

[10] What is more, Topics 17 and 18 seeks purely factual information. With respect to Topic 17, what caused delays in TMTG's merger with DWAC and what causes were disclosed, are factual questions within TMTG's ken, not inquiries demanding "technical and expert judgment." Mot. at 21. For Topic 18, TMTG has no basis to refuse to answer factual questions about governmental investigations merely because The Post may use that information to challenge its claims about causation. *See id.* at 20.

government investigations and communications with the government, raises no risk of unearthing privileged information: information voluntarily shared with third parties, such as government agencies, is not privileged. *See, e.g.*, *Arthrex, Inc. v. Parcus Med., LLCi,* 2012 WL 13098036, at*2 (M.D. Fla. Sept. 19, 2012) (determining email sent to third parties was not privileged).

In any event, even if Topics 15, 16, and 18 could elicit privileged information, that risk does not entitle TMTG to block The Post from raising these topics. Rather, courts recognize that parties should address privilege concerns through objections during 30(b)(6) depositions, not pre-deposition protective orders. *See, e.g.*, *Woznicki v. Raydon Corp.*, 2019 WL 5703085, at *5 (M.D. Fla. Oct. 25, 2019). Even TMTG's cited authority does not suggest otherwise. *See S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011).[11]

## CONCLUSION

For the foregoing reasons, the Court should deny TMTG's Motion for a Protective Order.

---

[11] In *Kramer*, the court held that the SEC could not "assert a blanket claim of privilege in response to a Rule 30(b)(6) notice" as that would "create[] an unworkable circumstance in which a defendant loses a primary means of discovery without a meaningful review of his opponent's claim of privilege." *Id.* TMTG's reliance on *In re Bilzerian*, 258 B.R. 846 (Bankr. M.D. Fla. 2001), is also misplaced. There, the court granted a protective order after the SEC represented that "a deposition of a person with knowledge from the [Commission] would necessarily require counsel for the [Commission] to appear and be deposed since that is the only person with knowledge of the matters set forth in the Motion." *Id.* at 847. Here, TMTG makes no similar claim that deposing TMTG on these topics "necessarily require[s] the taking of the deposition of [TMTG's] lead counsel or someone with knowledge gained exclusively from" that counsel. *Id.* at 849.

Dated:        March 2, 2026             Respectfully submitted,

THOMAS & LoCICERO PL              WILLIAMS & CONNOLLY LLP


*/s/ Carol J. LoCicero*              */s/ Thomas G. Hentoff*
Carol Jean LoCicero (FBN 603030)     Thomas G. Hentoff (*pro hac vice*)
Linda R. Norbut (FBN 1011401)        Nicholas G. Gamse (*pro hac vice*)
601 South Boulevard                  Isabelle J. Beaton (*pro hac vice*)
Tampa, FL  33606                     680 Maine Avenue, S.W.
Telephone: (813) 984-3060            Washington, DC  20024
Facsimile: (813) 984-3070            Telephone: (202) 434-5000
clocicero@tlolawfirm.com             Facsimile: (202) 480-8371
lnorbut@tlolawfirm.com               thentoff@wc.com
                                     ngamse@wc.com
*Counsel for Defendant*               ibeaton@wc.com

                                     *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, I electronically filed a true and correct copy of the foregoing motion with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the email address of all counsel of record.

<u>/s/ Carol J. LoCicero</u>
Carol J. LoCicero
Counsel for Defendant