UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

    Plaintiff,

v.                                     Case No. 8:23-cv-01535-TPB-AAS

WP COMPANY LLC d/b/a The
Washington Post,

    Defendant.
_____/

## ORDER

Plaintiff Trump Media & Technology Group (TMTG) moves for a protective order with respect to Topics 5, 6, 7, 9, 12, 13, 15, 16, 17, and 18 identified in Defendant WP Company LLC d/b/a The Washington Post's (The Post) Amended Notice of Taking Rule 30(b)(6) Deposition. (Doc. 141). The Post opposes the motion. (Doc. 151).

The court may, for good cause, issue an order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c); *see In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987) (providing that the district court may issue a protective order if "good cause" is shown). The party seeking a protective order has the burden to demonstrate good cause. *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*,

231 F.R.D. 426, 429–30 (M.D. Fla. 2005). "'Good cause' is a well-established legal phrase. Although difficult to define in absolute terms, it generally signifies a sound basis or legitimate need to take judicial action." *Alexander*, 820 F.2d at 356. Establishing good cause requires a "particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Ekokotu v. Fed. Exp. Corp.*, 408 F. App'x 331, 336 (11th Cir. 2011) (internal quotations omitted).

    **A.    Topic 5**

This topic seeks testimony on TMTG's financial condition and performance. (*See* Doc. 141-1, p. 2). Specifically,

> i. TMTG's financial statements from February 2022-March 2024, including the company's monthly revenues, expenses, and profits.
>
> ii. The company's monthly financial reviews and forecasts from February 2022-March 2024.
>
> iii. The company's Truth Social usage metrics contained within its monthly financial reviews.
>
> iv. The company's principal methods of reporting its liquidity and solvency to its Chief Financial Officer, Chief Executive Officer, and/or Board of Directors from February 2022-March 2024.

(*Id.*).

TMTG's testimony regarding its financial and user-engagement data is relevant and proportional to the issue of damages here. TMTG's second

amended complaint alleges "at least $2.78 billion" in damages due to losses in its "implied equity value." (Doc. 70, ¶ 41). TMTG's value depends on the company's underlying performance and financial metrics, so TMTG's understanding and evaluation of these metrics is necessary to determine whether TMTG suffered the damages it asserts. *See Onemata Corp. v. Rahman*, No. 20-62002-CIV-DIMITROULEAS/SNOW, 2021 WL 8895156, at *2 (S.D. Fla. June 14, 2021) (determining 30(b)(6) topics were proportionate where the case involved a "multi-million dollar business sale").

The requested period from 2022 through 2024 is not overbroad. *See Sun State Ford v. Ford Motor Co.*, No: 6:23-cv-1728-PGB-LHP, 2025 WL 2029737, at *3 (M.D. Fla. July 21, 2025) (rejecting overbreadth and relevance objections to topics that sought information from 2022 onwards). Indeed, this was the period TMTG engaged in a protracted process to complete its merger with DWAC. In addition, The Post requests testimony regarding a discrete set of materials and metrics that TMTG's Chief Financial Officer and his team appear to have prepared monthly. *See Menuel v. Hertz Corp.*, No. 1:07-CV-3031-JTC-RGV, 2009 WL 10665026, at *7–8 (N.D. Ga. Dec. 9, 2009) (rejecting an objection to a deposition topic on overbreadth grounds where plaintiff clarified the specific aspects of the policies and handbooks that were to be discussed). Requesting testimony about these somewhat standard monthly

reports and reviews is not overbroad or unduly burdensome. Thus, TMTG has not established the good cause necessary for a protective order as to Topic 5.

### B. Topics 6 and 7

Topic 6 concerns "[a]ll valuations of TMTG" that were "presented to TMTG's Board, its Chief Financial Officer, or its Chief Executive Officer," while Topic 7 seeks "[d]isclosures made by" those individuals "prior to the DWAC merger regarding the value of their shares of TMTG stock." (*See* Doc. 141-1, p. 2). The custodians of these documents are specifically identified as TMTG's board members, Chief Financial Officer, and Chief Executive Officer. (*Id.*). *See Spearman v. Broker Sols., Inc.*, No. 1:20-CV-04981-CAP, 2022 WL 1715965, at *10 (N.D. Ga. Jan. 10, 2022) (rejecting an objection to a topic that was narrowed to apply to a set number of employees). Topics 6 and 7 request the valuations provided to a small group of identified individuals and communications from a small, finite group of individuals about TMTG's stock value. These topics go directly to TMTG's claim that The Post's Article "destroyed at least $2.78 billion in implied equity value in TMTG." (Doc. 70, ¶ 41). Thus, TMTG has not established the good cause necessary for a protective order as to Topics 6 and 7.

### C. Topic 9

Topic 9 seeks testimony about "[a]ll instances in which TMTG offered a

commission, broker's free, or finder's fee in exchange for, or in connection with, financing." (*See* Doc. 141-1, p. 3). This topic relates to The Post's substantial-truth defense as to the finder's fee reported in the Article. In addition, TMTG's custom and practice in offering or entering into agreements in connection with other finder's fees is relevant to establishing whether TMTG had such an agreement with Entoro. Further, in response to The Post's Interrogatory No. 14, TMTG represented that it made "finder's fee" payments to two other counterparties: Crow Island Consulting, LLC and Bailey Deason Capital Investments, LLC in March 2024. (*See* Doc. 151-8, p. 2). The Post's request for testimony on these finder's fees, as well as any other finder's fees TMTG offered or exchanged for, is relevant and proportionate to the needs of this case. Thus, TMTG has not established the good cause necessary for a protective order as to Topic 9.

### D.    Topics 12 and 13

Topic 12 seeks testimony on "TMTG's claimed injury and/or damages" outlined in its second amended complaint and initial disclosures. (*See* Doc. 141-1, p. 3). It also requests that the corporate representative be prepared to testify regarding the damages amount, calculation, and principal documentary basis "[f]or each category of damages claimed" by TMTG based on its second amended complaint and initial disclosures. (*Id.*). Similarly, Topic 13 requests

5

the corporate representative testify regarding "[t]he specific numerical calculations used to prepare TMTG's $2.78 billion compensatory damages demand" outlined in the second amended complaint. (*Id.*).

In its second amended complaint, TMTG claims $2.78 billion in compensatory damages, alleging the Article "destroyed at least $2.78 billion of implied equity value in TMTG." (Doc. 70, ¶ 41). In TMTG's second amended initial disclosures, TMTG discloses that it claims $2.78 billion in compensatory damages—$1 billion in reputational repair and mitigation costs and $1.78 billion in lost profits and future earning capacity. (Doc. 151-6, pp. 6–7). TMTG's response to an order from this court requiring further information on its damages disclosures reiterated the $2.78 billion damages figure. (*See* Doc. 99, pp. 1–2).

The Post is permitted to ask TMTG's corporate representative to testify about the basis for its damages claims.[1] *See Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, No. 6:03-cv-1121-Orl-19KRS, 2005 WL 8159879, at *3 (M.D. Fla. May 6, 2005) (reopening a 30(b)(6) deposition where designated representative failed to "explain the factual support for [plaintiff's] damages claims"); *F.D.I.C. v. Brudnicki*, No. 5:12–cv–00398–RS–GRJ, 2013 WL

---

[1] If TMTG now disclaims the operative complaint's damages allegations, that too provides reason for The Post to examine TMTG's corporate representative on these topics.

6

5814494, at *3, 5 (N.D. Fla. Oct. 29, 2013) (requiring corporate representative to testify about factual information regarding the standards of care and noting defendants could question the 30(b)(6) witnesses about "how the FDIC calculates damages in this case"). Thus, TMTG has not established the good cause necessary for a protective order as to Topics 12 and 13.

### E.   Topics 15, 16, 17, and 18

Topics 15, 16, 17, and 18 seek testimony on TMTG's other recent defamation claims; TMTG's damages allegations in the DWAC Case; the causes of delay to TMTG's merger with DWAC and the disclosures, if any, of these causes; and any government investigations into TMTG and DWAC, respectively. (*See* Doc. 141-1, pp. 3–4).

As for Topic 16, the court has already ordered production of all documents from the DWAC Case because of the similar claims in both cases—the conduct at issue there, too, caused a delay of the TMTG-DWAC merger, reputational harm, and similar damages during the same period. (*See* Doc. 112, p. 2). In the two lawsuits identified in Topic 15—defamation lawsuits filed by TMTG in the same period—TMTG claims similar damages and overlapping reputational harm based on other articles about TMTG published within weeks or months of the Article at issue here. For the reasons the court ordered production of documents related to the DWAC Case, the testimony regarding

7

the lawsuits identified in Topic 15 is relevant and proportionate to the claims here.

Topics 17 and 18 seek testimony about: (1) the causes of the delay of the merger between TMTG and DWAC that TMTG disclosed, and the dates and manners in which it disclosed them, and (2) any investigation by the Securities and Exchange Commission (SEC) or Department of Justice (DOJ) into TMTG or its merger with DWAC, including the dates and subjects of each investigation and the company's communications with the SEC and DOJ about the investigation. (*See* Doc. 141-1, p. 4). TMTG's second amended complaint alleges the challenged statements in the Article damaged TMTG's business, brand, and goodwill and "further delay[ed] the SEC's review of the proposed merger with DWAC." (Doc. 70, ¶ 40). TMTG's experts discuss the merger and the purported costs associated with its delays in their report. In addition, the court has already determined that TMTG's merger and government investigations into TMTG and DWAC are relevant and proportionate to the issues here, as explained in its orders compelling TMTG to produce documents and testimony on these topics. (*See* Docs. 99, 112, 128).

Topics 15, 16, 17, and 18 appropriately narrow the issues for which TMTG's corporate representative should be prepared to testify. Specifically, (1) TMTG's defamation claims since 2021, including in the identified cases, (2) the

8

damages claims in the DWAC case, (3) the causes and disclosure of causes for delays in TMTG's merger with DWAC, and (4) DOJ or SEC investigations into DWAC or TMTG and the communications with those agencies during those investigations. *See U.S. Equal Emp. Opportunity Comm'n v. Qualtool, Inc.*, No: 5:21-cv-229-ACC-PRL, 2022 WL 16695172, at *5 (M.D. Fla. Nov. 3, 2022) (explaining that the purpose of the reasonable particularity requirement is to help the corporation prepare its representative to answer questions at the deposition). As for the risk of exposing privileged information, "[a] corporation is not entitled to refuse to provide a Rule 30(b)(6) representative based on privilege or work product protections merely because its counsel prepared the representative." *F.D.I.C. v. Hutchins*, No. 1:11-CV-1622-AT, 2013 WL 12109446, at *6 (N.D. Ga. Oct. 25, 2013) (rejecting a privilege objection to deposition topic). The Post may elicit testimony about the factual support for TMTG's claims in the DWAC Case and other litigation without asking TMTG to reveal its attorneys' advice or work product. *See United States v. Taneja*, No. 8:21-cv-102-SCB-MRM, 2023 WL 3563604, at *3–4 (M.D. Fla. Feb. 2, 2023) (denying a protective order on privilege grounds where the notice sought factual bases for claims, "not opinion work product").

In addition, information voluntarily shared with third parties, such as government agencies, is not privileged. *See, e.g.*, *Arthrex, Inc. v. Parcus Med.*,

9

*LLC*, No. 2:10-cv-151-FtM-99DNF, 2012 WL 13098036, at *2 (M.D. Fla. Sept. 19, 2012) (determining an email sent to third parties was not privileged). Even if these topics could elicit privileged information, the attorney-client and work-product privileges may not be generally raised to prevent testifying. *See Johnson v. Gross*, 611 F. App'x 544, 547 (11th Cir. 2015) (blanket privilege assertions are generally unacceptable). Instead, the privilege should be asserted when specific questions are asked during the deposition. *See id.* The parties should address privilege concerns through objections to the deposition, not pre-deposition protective orders. *See, e.g.*, *Woznicki v. Raydon Corp.*, No. 6:18-cv-2090-Orl-78GJK, 2019 WL 5703085, at *5 (M.D. Fla. Oct. 25, 2019). Thus, TMTG has not established the good cause necessary for a protective order as to Topics 15, 16, 17, and 18.

Accordingly, for the reasons stated, TMTG's motion for protective order (Doc. 141) is **DENIED**.

**ENTERED** in Tampa, Florida, on March 5, 2026.

*/s/ Amanda Arnold Sansone*
AMANDA ARNOLD SANSONE
United States Magistrate Judge