# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

vs.

                                              Case No: 8:23-cv-01535-TPB-AAS

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

_____/

# DEFENDANT WP CO. LLC d/b/a THE WASHINGTON POST'S
# MOTION FOR SUMMARY JUDGMENT
# <u>AND INCORPORATED MEMORANDUM OF LAW</u>

Pursuant to Federal Rule of Civil Procedure 56, Defendant WP Company LLC d/b/a The Washington Post ("The Post") respectfully moves for summary judgment on both counts of the Complaint filed by Plaintiff Trump Media & Technology Group Corp. ("TMTG"): Count I (defamation) and Count II (conspiracy). As explained below, no genuine issue of material fact exists, and The Post is entitled to judgment as a matter of law.

## **MEMORANDUM OF LAW**

On May 13, 2023, The Post reported that TMTG, a company founded by then-former-President Donald Trump, had received $8 million in loans from an obscure financial entity, ES Family Trust. The Post's article (the "Article") was part of its continuing business coverage regarding TMTG's efforts to launch and fund a social media platform and followed two Post articles reporting on information disclosed by TMTG-co-founder-turned-whistleblower Will Wilkerson. The Article also reported that, based on internal TMTG documents Wilkerson provided, TMTG had agreed to pay and paid a $240,000 finder's fee to Entoro Securities, a brokerage associated with the CEO of TMTG's prospective merger partner, Digital World Acquisition Corp. ("DWAC"). According to the Article, neither the $8 million loan—which entitled ES Family Trust to company shares after the merger— nor the finder's fee were disclosed to the Securities and Exchange Commission ("SEC") or DWAC's shareholders.[1]

---

[1] After filing this lawsuit, TMTG merged with and became a subsidiary of DWAC in March 2024. It transferred to DWAC the name in the case caption above—Trump Media and Technology Group

1

TMTG sued The Post for defamation, claiming the Article contained nine false and defamatory statements about TMTG.  After three rounds of motions to dismiss, TMTG's claim was narrowed to just two statements, both involving the finder's fee.  The operative Complaint claims that the Article's statements that (1) TMTG "paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust" and that (2) Entoro, a "brokerage associated with Patrick Orlando," was the "recipient of that fee," are false and defamatory because "TMTG never paid or agreed to pay a $240,000 'finder's fee.'"  Second Am. Compl. (Doc. No. 70) ¶¶ 14, 28 ("Compl.").  In a passage that TMTG did not include in the Complaint, the Article also reported that "[i]n January 2022, Trump Media agreed to pay a cash referral fee—equal to 3 percent of the $8 million loans, or $240,000 —to a Houston-based brokerage firm called Entoro Securities, according to a referral fee agreement and an Entoro invoice provided by Wilkerson."  Harwell Ex. 1 at 5.[2]

TMTG is a public figure and therefore must prove on summary judgment that a reasonable jury could find by clear and convincing evidence that The Post published the finder's fee statements with actual malice.  In other words, TMTG

---

Corp.  Plaintiff assumed a new name, TMTG Sub Inc.  Although Plaintiff has not yet sought leave to update the case caption, TMTG Sub Inc., not the current Trump Media and Technology Group Corp. (former DWAC), is the legal entity suing The Post.  *See* Declaration of Thomas G. Hentoff, Ex. A at 4.

[2] "[Witness name] Ex. [number]" refers to exhibits to witness declarations.  All citations to exhibit pages refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

must show—well beyond a preponderance of the evidence—that at the time of publication The Post knew the finder's fee statements were false or entertained serious doubts as to their truth.  TMTG cannot satisfy that heavy burden.

Washington Post reporter Drew Harwell thoroughly investigated the Article before publication.  He interviewed Will Wilkerson—an on-the-record source—who knew first-hand about TMTG's financial dealings.  Harwell also interviewed Wilkerson's attorneys, who were giving information to government investigators on his behalf.  He also reviewed internal TMTG documents and other documents Wilkerson attached to his SEC whistleblower complaint.  And he contacted several sources to help him interpret the information he had collected.

As to the $240,000 referral fee specifically, Harwell's telephone and in-person interviews of Wilkerson with his attorneys covered the topic, as did numerous documents that Wilkerson's attorneys sent him.  In all, they told Harwell repeatedly—both orally and in writing—that TMTG had agreed to Entoro's finder's fee and paid it.  Harwell reviewed an invoice Entoro had sent TMTG for the fee and, later, an unsigned "Referral Fee Agreement," which Wilkerson's attorneys had located in his trove of whistleblower documents and which set out the terms for the fee.  Harwell repeatedly spoke to Wilkerson's attorneys and asked them to review a summary of the facts for accuracy before publication.  He contacted TMTG, Entoro, and others eight days before publication to inform them of the article's contents (including the agreement to pay the finder's fee) and to offer an opportunity for them to comment.  He followed up with TMTG when he

did not hear back.  Given this investigation, Harwell and his editor, Mark Seibel, had confidence in the Article's accuracy at the time of publication.

A reporter need not engage in such a thorough investigation to dispel allegations of actual malice.  What matters is whether there is clear and convincing evidence that the reporter actually knew, at the time of publication, that the statements were false or in fact entertained serious doubts as to the truth of those statements.  And in this case, there is no evidence, much less clear and convincing evidence, that Harwell or his editors knew the finder's fee statements were false.  Instead, Harwell's investigation rebuts any argument that the finder's fee statements were made with actual malice.  This Court should thus grant The Post summary judgment on TMTG's defamation claim and TMTG's conspiracy claim based on its defamation claim.

## BACKGROUND

### I.    Factual Background

Drew Harwell, an award-winning journalist, has authored more than 1,000 articles during his 12 years with The Washington Post.  Drew Harwell Decl. ¶ 8, 11.  Covering The Post's business and technology beats, Harwell has reported on the dealings of the world's leading technology corporations and the government agencies that regulate them.  *Id.* ¶¶ 5, 8-9.  Harwell is known as a "hard-working, thorough, and talented reporter who strives for accuracy and fairness."  Lori Montgomery Decl. ¶ 9; Mark Seibel Decl. ¶¶ 11, 22.

In 2021, news circulated that then-former President Trump would launch a

social media platform, Truth Social.  Harwell Decl. ¶ 12.  Harwell and his editor, Mark Seibel, decided to cover the venture.  *Id*.  The story was a good fit for Harwell's beat—a blend of business, technology, and politics—and it was newsworthy, given the former President's involvement in the business venture.  *Id*. ¶¶ 8-9, 12.

Over the next year, as Harwell simultaneously reported on other breaking technology stories, he also covered TMTG's development.  *Id*. ¶¶ 11, 13, 29.  Several of Harwell's articles on TMTG detailed how Truth Social's glitchy rollout had led to TMTG's uncertain financial footing.  Harwell Exs. 2-3.  But, Harwell reported, TMTG's anticipated merger with DWAC, a "special purpose acquisition company" ("SPAC"), offered a lifeline.  Harwell Ex. 3 at 5.[3]  Once the merger went through, TMTG would gain access to more than $1 billion from DWAC's investors.  *Id*.  But there was a snag.  DWAC was under investigation by the Department of Justice ("DOJ") and the SEC, indefinitely freezing the merger.  Harwell Ex. 4 at 3.

More details regarding the SEC's investigation into DWAC emerged in a Miami Herald article Harwell read in October 2022.  Harwell Decl. ¶ 14.  According to the article, Will Wilkerson—a co-founder of TMTG—had informed the SEC that DWAC violated securities laws by engaging in pre-merger communications with TMTG and failing to disclose those communications to shareholders.  *Id*.

Harwell decided to reach out to Wilkerson through the whistleblower's

---

[3] A SPAC is a publicly traded corporation formed solely to merge with a privately held business so it can go public.  *Shevland v. Orlando*, 629 F. Supp. 3d 1252, 1254 n.2 (S.D. Fla. 2022).

attorneys, and he spoke to the attorneys on the phone in early October.  *Id.* ¶¶ 15-16.   In those calls, Wilkerson's attorneys provided details about Wilkerson's whistleblower complaint and noted Wilkerson had other concerns about TMTG's and DWAC's financial dealings.  *Id.* ¶ 16; Harwell Ex. 7 at 2-6.  On October 10, 2022, the attorneys mentioned on a call that TMTG had received an $8 million loan from an entity called ES Family Trust.  Harwell Ex. 7 at 5.  The attorneys also told Harwell that TMTG had paid a "quarte[r] []of a million" to a "[s]ecurity firm in Houston," "[E]ntoro Securities."  *Id.* at 6; Harwell Decl. ¶ 61a.

Harwell interviewed Wilkerson in a phone call the next day.  Harwell Decl.¶ 18; Harwell Ex. 7 at 6-14.  Wilkerson, he learned, had served as TMTG's senior vice president of operations until he was recently suspended for his comments to the Miami Herald.  Harwell Decl. ¶ 23.  That first interview covered Wilkerson's time inside TMTG, including the story of TMTG's genesis and TMTG's precarious financial situation.  *Id.* ¶ 18; Harwell Ex. 7 at 6-14.  Regarding TMTG's finances, Wilkerson explained TMTG knew little about the ES Family Trust loan's origin, and TMTG's executives worried whether the funds were legitimate.  Harwell Decl. ¶ 19.  Wilkerson said the loan was not disclosed to the SEC or to DWAC shareholders.  *Id.*  Wilkerson and his attorneys also told Harwell that DWAC CEO Orlando secured that loan, and TMTG agreed to pay a $240,000 referral fee to a brokerage he was associated with called Entoro Securities.  *Id.* ¶ 21.  Harwell wrote in his notes, "3% beneficiary.  Could be split between Entoro Securities.  He helped secure this funding and then gets a finders fee."  Harwell Ex. 7 at 14.

Harwell requested substantiating documents, and Wilkerson's attorneys obliged. Harwell Decl. ¶¶ 17, 19-20, 22. Harwell received, among other things, the promissory note for the $8 million loan, records showing two wire transfers paying a total of $8 million to TMTG, and an invoice on Entoro letterhead reflecting that TMTG had a $240,000 "balance due" for a "Referral Fee Agreement: 3% of $8,000,000." *Id.*; Harwell Exs. 9-13.

Harwell drafted an article that focused on Wilkerson's experience as a co-founder of TMTG and the allegations in Wilkerson's whistleblower complaint. Harwell Decl. ¶ 25. The article briefly touched on the $8 million loan from ES Family Trust, noting that two of TMTG's co-founders were "unnerved" by the large loan from an "unknown group." *Id.*; Harwell Ex. 14 at 6.

Harwell planned to explore ES Family Trust's loan in follow-up articles. Harwell Decl. ¶ 29. But other tech stories dominated his time over the next few months. *Id.* Nevertheless, he stayed in touch with Wilkerson's attorneys. *Id.* In January 2023, Wilkerson's attorney, Philip Brewster, forwarded Harwell an email that he had sent to Senator Elizabeth Warren's office about ES Family Trust's investment in TMTG. *Id.* ¶ 30; Harwell Ex. 15 at 2-3. In that email, Brewster emphasized that the deal raised red flags "for possible illicit finance connections." Harwell Ex. 15 at 3. Brewster also noted Orlando's role in arranging the transaction and stated that "TMTG paid a $240,000 referral fee to Entoro for the $8 MM ES Family Trust investment" and attached Entoro's invoice. *Id.* at 2.

In March 2023, the Guardian reported that TMTG was under investigation

for possible violations of money laundering laws in connection with the loan wired in part from Paxum Bank. Harwell Ex. 16. The Guardian reported that prosecutors appeared interested in the payments because Paxum Bank had ties to the adult industry, putting it at "higher risk of engaging in money laundering and other illicit financing." *Id.* at 4. The article stated that it relied in part on statements by former TMTG executive and "co-founder turned whistleblower Will Wilkerson." *Id.* at 3.

Following the Guardian article, Harwell revisited his reporting on TMTG. Harwell Decl. ¶ 33. On April 20, 2023, Harwell interviewed Wilkerson and his attorneys in person. *Id.* ¶ 34. He made an audio recording of the interview. *Id.* Wilkerson answered questions, as did his attorneys, speaking in his presence and on his behalf. *Id.* During that interview, Wilkerson again referenced Entoro's finder's fee and noted that Orlando engaged in "self-dealing . . . because through Entoro Securities, he was trying to get $240,000 . . . out of that $8 million." *Id.* ¶ 36. Wilkerson's attorneys later mentioned reporting the potential conflict-of-interest regarding the finder's fee to the SEC, explaining the SEC investigator found it "very interesting" and said:

> "[Y]ou guys should file a TCR [*i.e.*, a whistleblower tip] on this. When we were particularly talking about Orlando, his payments that he got for the ES Family Trust, it was all the material that we had packaged up and given to him."

*See id.* ¶ 37.[4]

---

[4] In an SEC whistleblower filing weeks before Harwell contacted Wilkerson's attorneys, Brewster told federal investigators that TMTG had made the payment: "a commission from the ES Family Trust . . . was paid to Entoro Securities (invoice attached) by TMTG." Hentoff Ex. B at 13.

8

Soon after the interview, Wilkerson's attorneys emailed Harwell an unsigned agreement between Entoro and TMTG for a referral fee to be paid to Entoro, which they had located in Wilkerson's whistleblower documents. *Id.* ¶ 39; Harwell Ex. 21. According to the agreement, the payment was "equal to 3% of the gross proceeds or equivalent" of transactions by investors listed in Schedule B of the agreement. Harwell Ex. 21 at 3. Schedule B identified the investors as "Anton Postolnikov and affiliated entities." *Id.* at 7.

Harwell had enough material to fill two separate articles. Harwell Decl. ¶ 40. So, he decided to focus one article on Wilkerson's post-TMTG life and the other on the circumstances surrounding the $8 million loan. *Id.*

Harwell checked with Wilkerson's attorneys regularly as he drafted the loan article to ensure he was accurately reporting their information. *Id.* ¶ 48. While those conversations largely focused on details regarding the loan, Harwell also confirmed what he had learned regarding Entoro's finder's fee. Harwell Exs. 23-24. Brewster, according to Harwell's notes, confirmed that "TMTG agreed to pay 3% for certain investors," that the "[a]greement calls for TMTG to pay [E]ntoro a cash referral fee," and that the "cash referral fee equal to 3% of the gross proceeds or equivalent to transactions for investors on schedule b." Harwell Decl. ¶ 59a; Harwell Ex. 23 at 3. And Harwell noted during another call with Brewster: "Trump Media is paying the brokerage firm, where Orlando is licensed at," and Entoro was "[a]rranging for this money and taking a fee on it." Harwell Decl. ¶ 61c; Harwell Ex. 24 at 4. He also noted, "Trump Media agreed to pay a cash referral fee, equal

9

to 3 percent of the loan, to Entoro Securities, according to a referral fee agreement provided by Wilkerson." Harwell Decl. ¶ 59b; Harwell Ex. 24 at 4.

On May 5, Harwell summarized the Article's contents in an email and asked Wilkerson's attorneys to review and confirm the information. Harwell Decl. ¶ 48. He noted the Article would "cit[e] a Jan. 2022 referral fee agreement and an invoice that shows TMTG agreeing to pay a cash referral fee—equal to 3 percent of the $8 million loan, or $240,000—to Entoro Securities." Harwell Ex. 25 at 2. Wilkerson's attorneys raised no concerns about this report. *Id.*

Also on May 5, eight days before publishing the Article, Harwell sought comment by reaching out to TMTG spokeswoman Shannon Devine, TMTG CFO Phillip Juhan, and TMTG's email address for press relations. Harwell Decl. ¶ 51. That email listed more than 30 bullet points addressing topics that might be covered in the lengthy Article. *Id.* It did not include every point that would be made in the Article; the goal was to provide an overview of the key topics the Article would probably cover, in order to give TMTG a robust opportunity to engage on the substance of these matters, whether to dispute, explain, or comment on them. *Id.* As relevant here, that "no surprises" email highlighted that the Article would report on the referral fee and agreement. *Id.* Although the summary did not specifically mention payment, it did highlight "Entoro's referral fee":

- "We're citing a Jan. 2022 referral fee agreement and an invoice that shows TMTG agreeing to pay a cash referral fee—equal to 3 percent of $8 million loan, or $240,000—to Entoro Securities, and which names 'Anton Postolnikov and affiliated entities' as 'Introduced Parties' who participated in the deal."

10

- "We're noting Orlando is a registered broker at Entoro, according to a database [brokercheck.finra.org] run by the Financial Industry Regulatory Authority, and that Orlando's LinkedIn profile says he has been a managing director there since 2020."

- "We're noting that the deal allowed Orlando to help coordinate a major loan into a company that his SPAC had not yet merged with and to have another one of his companies be rewarded for it, which Wilkerson's attorneys argue is a conflict of interest."

- "We're noting that DWAC did not tell investors about the $8 million in loans or Entoro's referral fee in its disclosure filings submitted to the SEC, which an expert told us could cause 'big problems,' given that the money and concerns over its origins could affect the value of its shares."

Harwell Ex. 28 at 3. Days passed with no response from TMTG. Harwell Decl. ¶ 52. So Harwell tried again. *Id.* He still received no response. *Id.* The afternoon before publishing the Article, he tried a third time, forwarding his emails to TMTG to its CEO Devin Nunes. *Id.* He still received no response. *Id.* Harwell also reached out to others mentioned in the Article but received no substantive pushback. *Id.* ¶ 53.

The Post published Harwell's article online on May 13, 2023. Harwell Ex. 1. Only Harwell and Seibel substantively wrote and edited the Article. Harwell Decl. ¶ 64; Seibel Decl. ¶ 19.[5] The Article, "Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social," reported that TMTG had agreed to and received

---

[5] Two non-employee freelancers received a byline for work they did on parts of the Article not challenged here. Harwell Decl. ¶¶ 43-44, 54. Business Editor Lori Montgomery reviewed the Article before publication and made a suggestion about further reporting on an issue unrelated to the challenged statements. *Id.* ¶ 64; Montgomery Decl. ¶¶ 9, 13. Senior Managing Editor Cameron Barr and Executive Editor Sally Buzbee may have read the Article before publication but could not recall. Hentoff Ex. C at 7-8; Hentoff Ex. D at 10-11. The Post's content management system reflected no substantive edits from any employee other than Harwell and Seibel. Harwell Decl. ¶ 64.

$8 million from an obscure financial entity called ES Family Trust.  Harwell Ex. 1 at 2-3.  ES Family Trust has ties to Paxum Bank, which promotes itself as a "trusted payment service for the adult industry."  *Id.* at 7.  The Article cited "internal documents [Wilkerson] has shared with federal investigators" and The Post, including an unsigned convertible promissory note from the trust offering TMTG money "in exchange for agreeing to 'automatically' convert the loan principal into 'shares of Company Stock' once the merger with [DWAC] occurred."  *Id.* at 2, 5.[6]

The Article also reported the finder's fee, saying:

> The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust - or that the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO.

Harwell Ex. 1 at 2-3.  And later, it explained:

> In January 2022, Trump Media agreed to pay a cash referral fee – equal to 3 percent of the $8 million loans, or $240,000 - to a Houston-based brokerage firm called Entoro Securities, according to a referral fee agreement and an Entoro invoice provided by Wilkerson.

*Id.* at 5.  The Article stated that "the financial tangle" with the loan and fee could possibly explain why the SEC had yet to approve the DWAC-TMTG merger, citing NYU law professor Michael Ohlrogge, a leading expert on SPACs.  *Id.* at 3.

The Article explained that TMTG, its executives, and TMTG's outside auditors (among others) had not responded to requests for comment.  *Id.*  But the

---

[6] The Article stated that Wilkerson recalled a former TMTG employee declining to sign the promissory note because TMTG "hadn't undertaken enough due diligence on where the money had come from," but "[t]he money was sent anyway," as confirmed by two wire transfer records totaling $8 million sent to TMTG from Paxum Bank and ES Family Trust.  Harwell Ex. 1 at 5.

Article noted that TMTG's CEO Nunes had sued for defamation over the Guardian's related report that federal prosecutors were investigating whether TMTG's loans violated money-laundering statutes. *Id.* at 9. The Article noted that Nunes alleged the Guardian's "entire story is fabricated." *Id.*

The next day, TMTG's general counsel emailed a retraction demand to The Post. Harwell Decl. ¶ 75. The letter warned that unless The Post "completely retract[ed] all versions of this story" and "publish[ed] a mutually agreeable apology," TMTG would "take swift legal action." Harwell Ex. 29 at 3. The notice identified multiple allegedly "false and defamatory assertions and implications" in the Article, including that TMTG "paid a $240,000 'finder's fee' to a third party for helping to arrange an $8 million loan from ES Family Trust" and that the "recipient of the finder's fee was a brokerage associated with former (DWAC) CEO Patrick Orlando." *Id.* at 2. The demand did not say that The Post falsely reported that TMTG had agreed to pay the finder's fee. *Id.* at 2-3. And TMTG did not attach any documentation showing these statements were false. *Id.*

Harwell emailed the letter to Seibel, telling him he had "documentation to back all of [the reporting] up." Harwell Decl. ¶ 78. He also emailed Brewster to get his reaction. *Id.* ¶ 80. Brewster replied: "Our initial reaction is straightforward. We standby the story." Harwell Ex. 31 at 2. Harwell followed up to ask about Wilkerson's proof that the finder's fee was paid. Harwell Decl. ¶ 81. A day later, Brewster said for the first time that Wilkerson did not know "whether payment was issued for the fee earned by Entoro Securities and placed on the balance sheet of

13

TMTG as a liability." Harwell Ex. 32 at 2. Wilkerson had been instructed to "place the Entoro invoice into TMGT's [sic] Quick Book accounting system as a vendor expense," but "withhold issuing payment"—a common practice for the cash-strapped company, according to Brewster. *Id.* But Brewster emphasized TMTG's agreement to pay the fee: to Wilkerson's knowledge, "no one challenged the validity of the Entoro invoice or whether it was earned, due and payable, including Juhan, and it was entered as a vendor expense" in TMTG's accounting system. *Id.*

On May 17, 2023, after discussions with Post counsel and other top editors, Business Editor Lori Montgomery sent a letter responding to TMTG's demand. Montgomery Decl. ¶¶ 19-20; Harwell Ex. 33. She explained that The Post believed TMTG's demand for a retraction of the entire Article was unwarranted given that its statements were supported by sources, which Montgomery itemized for the statements that TMTG challenged. Harwell Ex. 33 at 2. Regarding the finder's fee, The Post cited the "Entoro referral fee agreement and invoice confirm[ing] the $240,000 referral fee, billed to TMTG." *Id.* But The Post did not refuse to issue any correction. Instead, it ended its letter: "As to your assertion that the article omits 'material information' from DWAC's registration statement and other documents, we would be happy to consider your concerns if you would provide us with more specifics." *Id.* TMTG did not respond. Montgomery Decl. ¶ 22.

## II.   Procedural Background

Three days later, TMTG sued. The original complaint, filed in Florida circuit court, alleged (1) defamation as to nine statements in the Article and in related

social media posts; and that (2) The Post conspired with Wilkerson and his counsel to defame TMTG.  *See* Compl. (Doc. No. 1-2) ¶¶ 12, 29.  Among the statements that TMTG alleged were false was The Post's report of ES Family Trust's $8 million promissory note loan giving it an undisclosed stake in TMTG.  *Id.* ¶ 12.  As for the finder's fee, TMTG's original complaint challenged only "The Post's assertion that the fee was actually *paid*"—it did not challenge the "veracity" of the finder's fee agreement in The Post's possession.  First Op. (Doc. No. 46) at 9.

The Post removed the case to federal court.  Doc. No. 1.  On March 8, 2024, this Court granted The Post's motion to dismiss the Complaint without prejudice.  First Op. (Doc. No. 46) at 20-21.  In doing so, the Court ruled that TMTG was a public figure required to plead actual malice.  *See id.* at 7.  On the finder's fee statements, the Court held that TMTG did not sufficiently allege actual malice.  *Id.* at 11.  This Court instructed TMTG to address in its amended complaint the "impact of the fee agreement and the invoice, if any, on whether The Post entertained serious doubts regarding its statement that the fee was paid."  *Id.*

TMTG's Amended Complaint narrowed its defamation claim to six statements.  Second Op. (Doc. No. 68) at 15.  The Court again dismissed the Complaint without prejudice.  *Id.* at 7.  Regarding the finder's fee statements, the Court found The Post's statements substantially true.  *Id.*  TMTG did "not deny there was an agreement to pay the fee to an affiliate of Orlando."  *Id.*  And, because a "conflict of interest would have existed whether TMTG merely undertook an undisclosed obligation to pay the fee to Orlando's company, or actually paid the

15

fee," the "defamatory sting" of the fee agreement and fee payment statements "would be the same." *Id.*

TMTG had also failed to allege actual malice.  Because The Post had a fee agreement and an invoice, the Court explained that The Post could "reasonably have assumed that TMTG fulfilled the obligation evidenced by the agreement and the invoice by paying the fee," unless The Post had a "document that affirmatively showed the fee had not been paid" or "Wilkerson told The Post the fee had not been paid." *Id.* at 16.  The Court gave TMTG one last chance to amend and noted that in a future pleading, TMTG could "allege the nonexistence of the fee agreement, if it can do so in good faith." *Id.* at 15 n.6, 18-19.[7]

TMTG's Second Amended Complaint included a new allegation:  TMTG did not agree to pay a finder's fee.  Second Am. Compl. (Doc. No. 70) ¶¶ 23 n.2, 28, 36, 42(a) & n.3 ("Compl.").  Reviewing the new allegations, the Court held TMTG had finally "nudg[ed] its claims across the line from conceivable to plausible," Third Op. (Doc. No. 83) at 6 (citation omitted), while emphasizing that TMTG's claims would not necessarily "prevail or even make it to a jury," *id.* at 5.

The Court, however, noted that TMTG had "change[d] horses somewhat" in briefing alleging now that the "fee agreement described and quoted in the article" *did* exist but "was actually an undated and unsigned draft fee agreement." *Id.* at 4. The Court decided, though, that based on the Complaint's allegations—which

---

[7] Regarding the Article's statements that TMTG agreed to accept an $8 million loan from ES Family Trust in exchange for company stock, the Court held that TMTG's Amended Complaint failed plausibly to "plead either falsity or actual malice " Second Op. at 8-13.

never mentioned a draft or unsigned agreement—TMTG had sufficiently alleged actual malice. *Id.* The Court said that even if TMTG "pleaded the existence of an unsigned draft agreement," the Article's failure to disclose the agreement was unsigned "cut[] in favor of actual malice." *Id.* at 4-5. But the Court was "not inclined" to "sort this out" on the pleadings; it would "review the documents and consider the testimony of the witnesses at the summary judgment stage." *Id.* at 4.

## SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am. N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).[8]

Under Florida law, for defamation claims concerning public figures, plaintiffs must prove: (1) publication; (2) falsity; (3) "knowledge or reckless disregard as to the falsity" of the statements; (4) actual damages; and (5) defamatory content. *Dershowitz v. CNN, Inc.*, 153 F.4th 1189, 1192 (11th Cir. 2025).[9] Insufficient evidence as to even one element requires grant of summary judgment for the defendant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[8] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted.

[9] Because the actual malice standard "derive[s] from the First Amendment," it is considered a matter of federal law. *Berisha v. Lawson*, 973 F.3d 1304, 1314 n.6 (11th Cir. 2020). Florida has also implemented the same actual malice standard "as a matter of state law." *Dershowitz*, 153 F.4th at 1193 (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

"When determining if a genuine factual issue as to actual malice exists," courts must "bear in mind the actual quantum and quality of proof necessary to support liability" for actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Summary judgment tests whether "the record could support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence." *Dershowitz*, 153 F.4th at 1192 (citation omitted).

The "Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits" to preserve free speech and give reporters "the breathing room they need to pursue the truth." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.) (reversing denial of summary judgment on actual malice). Courts in this Circuit thus routinely enter summary judgment for the defendant on actual malice grounds. *E.g.*, *Dershowitz*, 153 F.4th at 1193-95 (affirming grant of summary judgment on actual malice).[10]

## ARGUMENT

### I.    There Is No Genuine Issue of Material Fact as to Actual Malice

TMTG cannot prove its defamation claim. As a "prominent social media company founded by and named for a former President of the United States," TMTG is a public figure. First Op. at 6-8. As such, it cannot, consistent with the

---

[10] Other cases include: *Phelps v. Ramsay*, 2024 WL 3289612, at *7-9 (11th Cir. July 3, 2024) (per curiam) (same); *Grayson v. No Labels, Inc.*, 2022 WL 12144181, at *2-3 (11th Cir. Oct. 21, 2022) (per curiam) (same); *Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016) (per curiam) (same); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1197-98 (11th Cir. 1999) (same); *Meisler v. Gannett Co.*, 12 F.3d 1026, 1029-30 (11th Cir. 1994) (per curiam) (same); *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1498-99 (11th Cir. 1988) (same).

"constitutional guarantees" of free speech and free press, prevail on a defamation claim against The Post without showing that The Post made false and defamatory statements about TMTG with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Setting aside whether or not the finder's fee statements were substantially true, TMTG cannot come anywhere close to showing by clear and convincing evidence that it has satisfied the famously "daunting" standard of actual malice. *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).[11]

### A.    The Law of Actual Malice

To prove actual malice, TMTG must shoulder a heavy burden of proof. It must offer sufficient evidence that The Post "published a defamatory statement either with actual knowledge of its falsity or with a high degree of awareness of its probable falsity." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020). "[A]ctual malice requires material falsity," which means the statements at issue must not only include "minor inaccuracies" but also must produce a "different effect on the mind of the reader from that which the pleaded truth would have produced." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 246-47 (2014). Further, because The Post is an organization, TMTG must show that Harwell and his editors—*i.e.*, the individuals who had the "primary roles" in writing, editing, and publishing the Article—knew that the finder's fee statements were false or in

---

[11] The Post is moving for summary judgment only on lack of actual malice. But if this case proceeds to trial, The Post expects to show, based on witness testimony and documentary evidence, that TMTG agreed to pay Entoro $240,000—a 3% finder's fee. That agreement renders the challenged statements substantially true. Second Op. at 15.

fact entertained serious doubts as to the truth of those statements. *Flotech, Inc. v. E. I. Du Pont de Nemours & Co.*, 814 F.2d 775, 781 (1st Cir. 1987) (citing *N.Y. Times*, 376 U.S. at 287). That standard is, by design, extremely difficult to satisfy.

To start, TMTG must prove actual malice with "clear and convincing" evidence, even at summary judgment. *Dershowitz*, 153 F.4th at 1192. It is not enough to show that it was more likely than not that Harwell and Seibel doubted the truth of the Article's statements (though TMTG cannot even prove that). Clear and convincing evidence goes "well beyond a preponderance of the evidence." *Berisha*, 973 F.3d at 1312. Indeed, some evidence that raises the possibility of actual malice is not clear and convincing evidence. *Long v. Arcell*, 618 F.2d 1145, 1148-49 (5th Cir. 1980) (affirming judgment notwithstanding the verdict because actual malice was proven only by a preponderance of the evidence).[12]

The clear and convincing evidence standard is "so high" that the Eleventh Circuit has never reversed a grant of summary judgment on actual malice in cases against media defendants, even though the court of appeals reviews the evidence *de novo* and draws all reasonable inferences in favor of the plaintiff. *Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *24 (S.D. Fla. Sept. 20, 2023) (collecting cases).

Actual malice is assessed subjectively. What matters is whether defendants "*in fact* entertained serious doubts as to the truth" at the time of publication, *Berisha*, 973 F.3d at 1312, not whether they "should have known of the falsity of

---

[12] Fifth Circuit decisions issued by September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

the statement," *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026 (5th Cir. 1975). The Court considers only what defendants actually knew based on "the information that was available to and considered by [them] prior to publication." *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1508 (D.C. Cir. 1996); *Silvester v. Am. Broad. Co.*, 650 F. Supp. 766, 779 (S.D. Fla. 1986) (actual malice assessed at the time of publication), *aff'd*, 839 F.2d 1491 (11th Cir. 1988).

### B.    The Post Believed the Statements Were Accurate

No reasonable jury could find that there is clear and convincing evidence in the record that Harwell and his editors knew that the finder's fee statements were false or that they subjectively, in fact, entertained serious doubts as to their truth. That evidence simply does not exist because at the time of publication, Harwell was convinced the Article was accurate, and his editors did not doubt him.

For good reason. Harwell pieced together the Article from his interviews, emails, and texts with Wilkerson and his attorneys, Wilkerson's whistleblower complaint, consultation with a SPAC expert, and internal TMTG documents. Harwell Decl. ¶¶ 47-50. And despite seeking evidence that might contradict what he had uncovered, not a single person or a piece of evidence suggested that TMTG had not agreed to pay Entoro's finder's fee or that it had not paid it.

Still, even if there were some comment that Harwell should have followed up on or a question that he should have asked, that would not prove subjective knowledge of falsity by clear and convincing evidence. Again, the question is *did he know* at the time of publication, not should he have. *See* Second Op. at 16.

21

There is no evidence—much less evidence "well beyond a preponderance of the evidence," *Berisha*, 973 F.3d at 1312—that shows at the time of publication, Harwell and his editors knew that the finder's fee statements were false. The evidence points to one conclusion: Harwell and his editors had a "sincere . . . belief in the truth of their accusations." *Dershowitz*, 153 F.4th at 1190.

### 1. Harwell's Investigation Rebuts Actual Malice Allegations

A plaintiff cannot meet the demanding standard of actual malice by showing merely that an article's inaccurate statements were the product of insufficient investigation or failure to verify sources' information. *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968). However, a journalist's "long and thorough investigation" and effort to fact-check his article affirmatively dispels a suggestion of actual malice. *Talley v. Time, Inc.*, 923 F.3d 878, 898 (10th Cir. 2019).

Harwell was told repeatedly—by sources knowledgeable of TMTG's financial affairs—that TMTG and Entoro had agreed to a finder's fee for the $8 million loan. Those statements were corroborated. And he verified his information with his sources and TMTG before publication. Consider the information he gathered about the finder's fee agreement:

- During Harwell's first interview with Wilkerson and his attorneys, Wilkerson told Harwell about the finder's fee agreement. *See supra* at 6.

- Harwell requested and received from Wilkerson's attorneys substantiating documents related to the ES Family Trust loan. *See supra* at 7. This included an invoice from Entoro seeking a $240,000 "BALANCE DUE" for "Referral Fee Agreement: 3% of $8,000,000." *Id.* Harwell learned Wilkerson's attorneys had sent Senator Warren's office this invoice. *Id.*

- During Harwell's in-person interview with Wilkerson and his attorneys on April 20, 2023, as captured in the audio recording, Wilkerson noted

22

"Orlando's self-dealing" "because through Entoro Securities, he was trying to get $240,000 right out of that $8 million." *See supra* at 8.

- Wilkerson's attorneys emailed Harwell an unsigned agreement between Entoro and TMTG for a 3% referral fee, which they had located in Wilkerson's whistleblower documents. *See supra* at 9. That fee agreement included details that confirmed its legitimacy. Seibel, for instance, noted that the agreement mentioned that Entoro had introduced TMTG to Anton Postolnikov, who was associated with Paxum Bank, the entity that wired $2 million of the loan to TMTG. Seibel Decl. ¶ 22.

- During a phone call with Brewster on April 25, 2023, Brewster told Harwell (according to Harwell's notes) that "TMTG agreed to pay 3% for certain investors," "Agreement calls for TMTG to pay [E]ntoro [sic] a cash referral fee," and "cash referral fee equal to 3% of the gross proceeds or equivalent to transactions for investors on schedule b." *See supra* at 9.

- During a phone conversation with Brewster on May 4, 2023, Harwell's notes reflect Brewster told him, "Trump Media agreed to pay a cash referral fee, equal to 3 percent of the loan, to Entoro Securities, according to a referral fee agreement provided by Wilkerson." *See supra* at 9-10.

- On May 5, 2023, Harwell emailed Wilkerson's attorneys a summary of the Article, including that TMTG agreed to pay the referral fee. *See supra* at 10. Wilkerson's attorneys did not push back on those statements. *Id.*

- On May 5, 2023, Harwell sent a "no-surprises" email to TMTG with bullet points previewing the Article's content. *See supra* at 10-11. Harwell followed up twice but received no response. *Id.*

Likewise, Harwell was told multiple times that TMTG had paid the referral fee:

- On October 10, 2022, during a call with Wilkerson's attorneys, Harwell wrote in his notes that they had told him, "Security firm in Houston. Trump Media pa[i]d quarte[]r of a million to this trust, [E]ntoro Securities." *See supra* at 6.

- In January 2023, Wilkerson's attorney, Brewster, forwarded Harwell an email he had sent to Senator Warren's office, which said, "TMTG paid a $240,000 referral fee to Entoro for the $8 MM ES Family Trust investment," and attached Entoro's invoice. *Supra* at 7.

- At the April 20 interview, Wilkerson's attorneys—in Wilkerson's presence— told Harwell about reporting the finder's fee (particularly "payments that [Orlando] got for the ES Family Trust") to the SEC. *See supra* at 8.

- During a phone call with Brewster on May 4, 2023, Harwell's notes reflect Brewster told him, "Trump Media is paying the brokerage firm, where Orlando is licensed at" and "[a]rranging for this money and taking a fee on it." *Supra* at 9.

- And although the "no surprises" email did not specifically mention the

23

payment, it did highlight that The Post would be reporting on "Entoro's referral fee." *See supra* at 10-11.

This is not a situation where a reporter deliberately ignored sources who might contradict his story, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989), or never tried to verify the statements of known unreliable sources, *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157-58 (1967), or relied "wholly on an unverified anonymous" tip, *St. Amant*, 390 U.S. at 732. The finder's fee statements were substantiated by documents. *See Berisha*, 973 F.3d at 1313 (no actual malice where information was "corroborated" by several sources). Harwell confirmed his information with his sources. *Talley*, 923 F.3d at 898 (no actual malice where reporters verified information by "re-interviewing their sources and fact-checking the final piece"). And he provided TMTG repeated opportunities to dispute his reporting. *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (request for comment "tends to undercut any inference of actual malice").

The evidence is thus entirely consistent with Harwell's unrebutted testimony that he believed his reporting was accurate at the time the Article was published. Harwell Decl. ¶ 58; *see Dershowitz*, 153 F.4th at 1193 (affirming grant of summary judgment where journalists testified they believed their statements were accurate).

Harwell's editor Seibel meanwhile trusted his reporter. As Seibel supervised Harwell's investigation and article drafts, he saw no red flags in terms of the investigation Harwell conducted. Seibel Decl. ¶ 22. Seibel actually thought this particular Article was well corroborated, as Harwell had strong substantiating documents including a fee agreement that (1) referenced the name of the principal

24

of the bank that provided the loans that were the subject of the article, and (2) appeared to be from Entoro, the brokerage firm that also sent TMTG an invoice for the fee outlined in the fee agreement. *Id.* Seibel had known Harwell for years and knew him "to be truthful and accurate in his reporting," leaving "no reason to doubt the veracity of any of the statements in the subject article." *See Mile Marker, Inc. v. Petersen Publ'g, LLC*, 811 So. 2d 841, 847 (Fla. Dist. Ct. App. 2002); Seibel Decl. ¶¶ 11, 22.

### 2. Harwell Did Not Doubt the Accuracy of the Statements

TMTG cannot produce clear and convincing evidence that Harwell or his editors "in fact entertained serious doubts as to the truth of [The Post's] publication" of the finder's fee statements. *Berisha*, 973 F.3d at 1312.

a.  TMTG alleges that Harwell acted with actual malice by relying on Wilkerson, a purportedly biased source. Compl. ¶ 42b. However, as this Court has already recognized, as a matter of law, "[r]eliance on a potentially biased source does not by itself establish actual malice." Second Op. at 10; *Berisha*, 973 F.3d at 1312-13 (collecting cases). And, as a factual matter, there is no proof—much less clear and convincing evidence—in the record that Harwell or his editors harbored doubts about the accuracy of Wilkerson's and his attorney's statements. In fact, Harwell and his editors had ample reason to trust Wilkerson and his attorneys.

First, Wilkerson, an on-the-record source, had been a TMTG "insider positioned to provide accurate information and supporting documents to the Post." Second Op. at 10. Wilkerson was TMTG's executive vice president of

operations which, he told Harwell, meant he was "essentially a company treasurer." Harwell Decl. ¶ 35. So, when Wilkerson (a high-level TMTG executive with "access to [TMTG's] bank account") and his attorneys told Harwell that TMTG had received a $8 million loan from ES Family Trust and had agreed to pay a 3% finder's fee for arranging that loan, Harwell found that believable. *Id.* ¶¶ 23, 35.

Second, Wilkerson's information was corroborated. *See Berisha*, 973 F.3d at 1313. Harwell was able to "verif[y] other aspects of [his source's] information," including Wilkerson's allegations regarding the ES Family Trust loan. *See St. Amant*, 390 U.S. at 733. Wilkerson's accurate report on the loan gave Harwell greater confidence in Wilkerson's other allegations. Harwell Decl. ¶ 62. Indeed, Harwell published two articles previously based on information Wilkerson and his attorneys had relayed to him, without any substantive challenge to their accuracy. *Id.*; *see Vandenburg*, 507 F.2d at 1028 (no actual malice where reporter "testified that he had found [source's] information on previous stories reliable").

Third, Wilkerson and his attorneys offered a consistent account to The Post *and* federal investigators, which, in Harwell's mind, buttressed their general credibility. *See* Harwell Decl. ¶ 62; *Sheridan Square Press*, 91 F.3d at 1513 ("giv[ing] weight" when assessing actual malice "to the fact that a source told [federal] investigators the same story that he told the defendant, under circumstances where lying could have serious consequences"). While Harwell was reporting on TMTG, he reviewed Wilkerson's whistleblower complaint and saw that Wilkerson's account to the SEC was consistent with facts he had described to

26

Harwell.  Harwell Decl. ¶ 62.  The whistleblower complaint also referenced some of the same documentary substantiation Wilkerson and his attorneys had provided to Harwell.  *Id.* ¶ 17.  Wilkerson's attorneys had also told Senator Warren's office that TMTG had paid the finder's fee to Entoro and attached the same Entoro invoice Wilkerson's attorneys had provided to Harwell.  *Id.* ¶ 30.

Further, The Post let readers know about Wilkerson's potential reasons for being adverse to TMTG.  By TMTG's own admission, by referencing past articles, The Post informed readers that "Wilkerson was 'fired' from his job," had "accused TMTG of violating the securities law," was perceived as a "threat[] to TMTG's future," and lost stock options. Compl. ¶ 42b.  That disclosure alone "undermine[s] claims showing that the report was issued with actual malice." *Berisha*, 973 F.3d at 1313; *Silvester*, 839 F.2d at 1498 (no actual malice where broadcast disclosed the reporter's source "was not an unimpeachable source").

b.  There is also no clear and convincing evidence that Harwell subjectively doubted the truth of the Article's finder's fee statements simply because the referral fee agreement he reviewed was unsigned.  To Harwell, the existence of a referral fee agreement document (signed or unsigned) corroborated Wilkerson and his attorneys' statements that TMTG had reached an agreement with Entoro. Harwell Decl. ¶ 60.  Indeed, the agreement—which Wilkerson's attorneys located after providing the other information to Harwell—set out terms consistent with what Wilkerson and his attorneys had previously described to Harwell.  *Id.*  Thus, none of Harwell's emails or notes or any other evidence suggest that Harwell

27

actually doubted the existence of the agreement simply because he reviewed an unsigned version. And, because actual malice is assessed subjectively, it is immaterial whether or not the lack of signatures *should have* caused Harwell to doubt the existence of the agreement. *See Long*, 618 F.2d at 1147.

At the motion to dismiss stage, when considering whether TMTG's complaint "plausibly allege[d]" actual malice, this Court held that The Post's "reliance on an unsigned draft agreement" might support an inference of actual malice because The Post gave "more careful treatment" to explaining in the Article that the promissory note was unsigned. Third Op. at 5. The Court, however, noted that it would need to "review the documents and consider the testimony of the witnesses at the summary judgment stage of these proceedings" to determine whether the finder's fee statements were made with actual malice. *Id.* at 4.

Now, on summary judgment, no evidence suggests that The Post acted in bad faith when it disclosed that the promissory note—not the agreement—was unsigned. The Article disclosed that the promissory note was not signed *because that was a significant detail.* Harwell Decl. ¶ 67. The Article explained that TMTG executives were "unnerved" by the $8 million loan, the terms of which required TMTG to turn over a "sizable stake" of the company to an unknown source. Harwell Ex. 1 at 2-3. The Article reported that a TMTG executive refused to sign the agreement because of due diligence concerns. *Id.* at 3. By contrast, there was no obvious reason for the Article to note the referral fee agreement was unsigned.

The fact that TMTG received the loan even when the promissory note was

unsigned, though, reinforced Harwell's belief that TMTG had agreed to the unsigned referral agreement. *See* Harwell Decl. ¶ 60. Harwell knew that TMTG had given up a "sizable stake" of its stock for $8 million even though that contract was unsigned. *Id.*; Harwell Ex. 1 at 2. Given that precedent, Harwell had no doubt TMTG would agree to a $240,000 payment through an unsigned document.

c. TMTG alleges The Post "harbored extreme bias, ill-will, and desire to inflict harm on TMTG." Compl. ¶ 42(f). That is not true. Harwell Decl. ¶ 88; Seibel Decl. ¶ 39. But, regardless, "[s]peakers' feelings about their subjects are irrelevant" for actual malice purposes. *Dershowitz*, 153 F.4th at 1193. "All that matters are the speakers' subjective beliefs about the truth of their own statements." *Id.*

### 3. Response to Retraction Demand Does Not Prove Actual Malice

TMTG will argue that The Post acted with actual malice because it did not correct its statement that TMTG paid Entoro a finder's fee after TMTG demanded a retraction. But a newspaper's decision not to correct an article—even if a plaintiff offers conclusive proof of its falsity after publication—"does not prove actual malice." *Hunt*, 720 F.2d at 643 n.19; *see also N.Y. Times Co. v. Connor*, 365 F.2d 567, 577 (5th Cir. 1966) ("failure to retract did not constitute evidence of malice"); *Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) (per curiam) ("refusal to correct a publication falls short" of actual malice); *Reed v. Chamblee*, 2023 WL 6292578, at *24 (M.D. Fla. Sept. 27, 2023) (same). That is because "post-publication conduct" is "not probative of [a defendant's] state of mind at the time of publication," *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021); *see also*

29

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (awareness of facts *after* publication does not prove actual malice); *Long*, 618 F.2d at 1147 (actual malice assessed at the time of publication).

Indeed, The Post's communications in response to TMTG's retraction demand *support* that at the time of publication, it steadfastly believed in the accuracy of its reporting. After receiving the retraction demand, Harwell emailed Seibel that he had "documentation to back all of [the reporting] up." Harwell Decl. ¶ 78. Wilkerson's attorneys stood by the Article too. *Id.* ¶ 80.

Brewster responded to Harwell's follow-up *after* the Article was published, clarifying Wilkerson did not know whether the fee was paid. *Id.* ¶ 82. Even then, Brewster explained that evidence supported TMTG's intent to pay. *Id.* Regardless, an email sent after the Article was published "does not help [TMTG] establish actual malice at the time of publication." *Pippen*, 734 F.3d at 614. And The Post did not refuse a correction; it asked TMTG to provide "more specifics" about why the statements were false. *See supra* at 14. TMTG ignored that request. *Id.*

## II.     There Is No Genuine Issue of Material Fact as to Conspiracy

Because no reasonable jury could find that there is clear and convincing evidence in the record to support its defamation claim, "TMTG's claim of conspiracy must also fail for lack of an underlying wrong." Second Op. at 18; *see also Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 n.6 (S.D. Fla. 2021).

## CONCLUSION

This Court should grant summary judgment in The Post's favor.

Dated: April 24, 2026

THOMAS & LoCICERO PL

/s/ *Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Counsel for Defendant*

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/s/ *Thomas G. Hentoff*
Thomas G. Hentoff (*pro hac vice*)
Nicholas G. Gamse (*pro hac vice*)
Claire R. Cahill (*pro hac vice*)
Samuel M. Lazerwitz (*pro hac vice*)
Isabelle Jensen Beaton (*pro hac vice*)
Catherine A. Reid (*pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
thentoff@wc.com
ngamse@wc.com
ccahill@wc.com
slazerwitz@wc.com
ibeaton@wc.com
creid@wc.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2026, I electronically filed a true and correct copy of the foregoing motion with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the email address of all counsel of record.

/s/ *Thomas G. Hentoff*
Thomas G. Hentoff (*pro hac vice*)
*Counsel for Defendant*

31