**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

v.

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

Case No: 8:23-cv-01535-TPB-AAS

———————————————————————————/

**DECLARATION OF DREW HARWELL IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Drew Harwell, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am a technology reporter for The Washington Post ("The Post"). This declaration is based on my personal knowledge and on documents kept by The Post in the ordinary course of business that I have reviewed.  I was also deposed in this case.  If called as a witness, I could and would testify competently to these facts under oath.

2.    On Saturday, May 13, 2023, The Post published an article titled "Trust linked to porn-friendly bank could gain stake in Trump's Truth Social" (the "Article"), which is attached as Exhibit 1.  I was the principal author of the Article and solely responsible for the statements at issue in this case.  Freelance reporters Matei Rosca and Matt Bernardini received bylines for their contributions to portions of the Article that are not challenged in this case.

3.    The Article contained the following two statements that are the

subject of Trump Media & Technology Group Corp's ("TMTG" or "Trump Media") lawsuit:

    a. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust."

    b. "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"

4. It is my understanding that TMTG alleges that it is false that TMTG agreed to pay a finder's fee and that TMTG paid the finder's fee.

**PROFESSIONAL BACKGROUND**

5. I am a technology reporter for The Post, where I cover the ways in which technology is reshaping modern life. This includes reporting on artificial intelligence, tech companies and the government agencies that regulate them, social media, and emerging technologies.

6. I graduated from the University of Florida in 2009 with a Bachelor of Science in Journalism.

7. I have been employed full time as a journalist since 2009, when I started as a reporter at the Tampa Bay Times, where I covered a variety of localities in the Tampa area before joining the business staff to cover real estate.

8. I joined The Post in 2014, first covering business general assignment before moving to the technology beat. Over the course of my 12 years reporting there, I have authored more than 1,000 articles.

9.      My reporting has run the gamut from breaking news coverage to feature stories and investigative articles.  I have reported on a variety of topics, such as the online proliferation of fake images generated by artificial intelligence tools, online influencers and the burgeoning economy they are creating, violent propaganda in armed conflicts, the U.S. government's efforts to ban TikTok, and Elon Musk's acquisition of Twitter.

10.     Whenever I am reporting, my primary objective is to get the story right: that means accurate and fair.  To ensure accuracy, I conduct broad research and consult numerous different kinds of sources to obtain information.  It is my regular practice to document conversations with sources either by taking notes or by recording interviews.  I request substantiating documents from sources.  And I routinely reach out to the subjects of my stories before publication to provide an overview of the content that may be included.  In reporting the Article, I acted consistently with my standard practice.

11.     My journalism has been recognized with a number of awards. I was a member of an international reporting team that won a George Polk Award (2021) for "The Pegasus Project," which exposed how spyware sold to governments by a private security firm was used to hack cellphones belonging to journalists, human rights activists, and others.  In 2024, I received an honorable mention in the Gerald Loeb Awards for my feature on influencers making millions of dollars through the online platform OnlyFans.  The SABEW Best in Business Awards have also recognized my work.  In 2023 I received an honorable mention for a compilation

of my reporting on Truth Social, and in 2024, I received an honorable mention for my feature on a woman who had streamed every hour of her life for three years. I was also a finalist for the Livingston Award (2022) based upon my range of work.

**REPORTING ON TMTG**

12.     I began covering TMTG in 2021, when then-former President Donald Trump announced the launch of the company.  Editor Mark Seibel and I decided that TMTG was a newsworthy topic because it was the former president's company and was created in response to his deplatforming, or removal, from other social media sites in the wake of the January 6, 2021 attack on the U.S. Capitol, a major news event that The Post covered extensively.

13.     My reporting on TMTG has focused on a variety of developments, including the beta launch of the Truth Social website, *see* Ex. 2;  Truth Social's technical challenges, such as a long waiting list for the app that prevented hundreds of thousands of users from joining the platform during its first weeks online, *see* Ex. 3; TMTG's struggle to merge with Digital World Acquisition Corp. ("DWAC"), a special-purpose acquisition company ("SPAC"), *see* Ex. 4;[1] the Security and Exchange Commission's ("SEC") later approval of that merger, *see* Ex. 5; and the surge in TMTG's stock on its first day of trading, *see* Ex 6.

14.     As part of this coverage, I reviewed other news organizations'

---

[1]  A SPAC is "a type of blank check company" with no underlying business of its own that can be used as a vehicle for "transitioning a company from a private company to a publicly traded company."  *SPACs*, Investor.gov, https://tinyurl.com/4zwvczj4 (last visited Apr. 24, 2026). Typically, the SPAC will complete its own initial public offering (IPO) and will then either acquire or merge with the private company so that it, too, becomes public. *Id.*

reporting on TMTG.  On October 7, 2022, I read an article in the *Miami Herald* that featured Will Wilkerson, a TMTG senior vice president of operations who had become a whistleblower. In the article, Wilkerson detailed his experience inside the company, which he co-founded.  According to the article, Wilkerson had submitted a whistleblower complaint—a "tips, complaints, and referrals" form ("TCR")—to the SEC to allege that DWAC violated securities laws by engaging in pre-merger communications with TMTG and failing to disclose those communications to shareholders.  The article further stated that Wilkerson provided internal TMTG documents to the SEC, federal prosecutors, and Federal Bureau of Investigation ("FBI") investigators to substantiate his allegations.  Aside from Wilkerson, the article also featured his attorneys, Phillip Brewster, Patrick Mincey, and Stephen Bell.

15.     After reading the article, I emailed Wilkerson's attorneys to indicate my interest in speaking with them about Wilkerson's experience at TMTG.

16.     Over the next few days, I spoke with them on the phone multiple times.  My purpose was to gather more information about Wilkerson and the documents he had provided to federal officials to corroborate his allegations about TMTG.  Wilkerson's attorneys informed me that they had also provided this information to federal prosecutors in the Southern District of New York.  I took contemporaneous notes of these conversations, which are attached as Exhibit 7.  It was my practice to type notes on an electronic scratch pad while I was on the phone.  Then, at the end of the conversation, I would copy my notes and paste them

into a Word document that I created for a particular story.  I organize the Word documents by theme, and within each theme, my conversations with sources are listed chronologically.  I followed this practice for my reporting on TMTG.

17.    Upon my request, Wilkerson's attorneys provided me with a link to a folder containing Wilkerson's whistleblower complaint and hundreds of emails, spreadsheets, photos, and other documents from Wilkerson's time at TMTG.  Ex. 8 (October 7, 2022 Email from S. Bell to D. Harwell).  This was a subset of Wilkerson's trove of 150,000 documents.  Wilkerson's attorneys informed me that they had turned these documents over to both the SEC and to the federal prosecutors in New York.

18.    My first interview of Wilkerson was by phone on October 11, 2022.  His attorneys were present on the call.   Wilkerson and his attorneys discussed a number of topics relating to his time inside TMTG.  My contemporaneous notes are reflected in Exhibit 7.

19.    One topic that Wilkerson and his attorneys highlighted was an unusual $8 million in loans that TMTG received from an entity called ES Family Trust. This transaction was unusual because, according to Wilkerson, TMTG knew very little about the trust or the origin of the money.  Company insiders were concerned whether the funds were even legitimate.  Moreover, the loans were not disclosed to the SEC or to DWAC shareholders.  The day before I spoke to Wilkerson for the first time, his attorneys sent me the substantiating documents related to this transaction that they had provided to the government.   The

attorneys' email transmitting these documents is attached as Exhibit 9.

20.    The convertible promissory note associated with the loans contained only the name of the trustee, Angel Pacheco, with no address or contact information for ES Family Trust. *See* Ex. 10 (convertible promissory note). This convertible promissory note specified that in exchange for its investment, ES Family Trust would receive stock ownership in TMTG once it merged with a SPAC and became a public company. The note featured only the signature of TMTG co-founder Wes Moss. Signature lines for TMTG co-founder Andy Litinsky and for ES Family Trust's Pacheco were left blank. The loans were transmitted to TMTG via two wire payments. The first came on December 23, 2021, from Paxum Bank, a Dominica-based company known for facilitating cross-border financial transactions in the adult entertainment industry. *See* Ex. 11 (Paxum Bank wire). The second transfer was sent by ES Family Trust on February 17, 2022. *See* Ex. 12 (ES Family Trust wire).

21.    Another unusual aspect of the transaction that Wilkerson and his attorneys pointed out was that DWAC's CEO Patrick Orlando secured the funding from ES Family Trust, and in exchange, TMTG paid a $240,000 referral fee to a brokerage associated with him called Entoro Securities.

22.    When Brewster sent me the documents substantiating the $8 million ES Family Trust loans, he also sent me an invoice for the referral fee. *See* Ex. 13 (Entoro invoice). The invoice stated that it was for "Referral Fee Agreement: 3% of $8,000,000," and the amount was $240,000. The invoice was on Entoro

letterhead and was billed to TMTG.

23.    As is my practice with any source, I assessed Wilkerson's credibility during our interview.  At the time I first spoke to him, Wilkerson had been suspended by TMTG for his disclosures to the Miami Herald.  He was fired on October 13, 2022 for speaking to the Herald and to The Post.  However, as a co-founder, Wilkerson had been with TMTG since its inception and served as a senior vice president of operations, so he was positioned to know about the day-to-day operations of the company.  Wilkerson seemed to be a true believer in Truth Social and the need for a social media platform that did not censor conservative viewpoints.  He said that he cared about the business and thought it had a great chance for success, if not for some of the managerial and financial decisions the leadership had made.  Because of his belief in the company and the level of detail and substantiating documents that he provided, I determined that Wilkerson was a credible source who was speaking out to protect shareholders.

24.    At no point was I engaged in a conspiracy of any kind with Wilkerson or his attorneys to defame TMTG.  Rather, Wilkerson and his attorneys became sources for my reporting on TMTG, and my relationship with them was typical of the relationships that I develop with any other sources.

25.    I decided to focus my initial article on Wilkerson's experience as a co-founder of TMTG, including his interactions with President Trump; co-founder Andy Litinsky's ouster from the board; the company's struggle to find a merger partner; and the allegations in Wilkerson's whistleblower complaint.  For this

initial article, I also decided to include some of the information that Wilkerson and his attorneys provided about the $8 million ES Family Trust loans.  I noted that company insiders were wary of this influx of money because it came from an unknown group, and Orlando refused to identify the source of the money.  Citing financial documents that Wilkerson and his attorneys provided, I reported that the money had been routed from a bank in the Caribbean island of Dominica through a cryptocurrency company.  I did not include information about the referral fee, which I felt was outside the focus of the first article.

26.    Before publishing the information that Wilkerson provided, I reached out to the subjects of my proposed article to request comment.  My practice is to provide subjects an overview of information that may be included in an article before publication so that they have notice and a fair opportunity to comment directly on the substance and to provide information that will help me find the truth.  At The Post, we refer to these communications as "no surprises" emails.  If a subject provides me with information before publication in response to a no-surprises email, I will review it.  If that information reveals that any facts in my draft article are not accurate, I will do additional reporting to correct those facts or will remove them before publication.  My goal as a journalist is to tell the truth.

27.    Three days before publication, on October 12, 2022, I sent a no-surprises email to a TMTG email account for press relations.  After receiving no response, I reached out again two days before publication.  On October 13, 2022, in response to my second email, spokeswoman Shannon Devine responded on

behalf of TMTG, and I incorporated this response into a draft of the article.

28.     On October 15, 2022, The Post published my article based on these interviews, "Co-founder of Trump's media company details Truth Social's bitter infighting," attached as Exhibit 14. This article described the impetus for creating TMTG and Wilkerson's experience working on its launch. It then highlighted some of the key documents that Wilkerson submitted to federal investigators and included a link to Wilkerson's whistleblower complaint to the SEC. The main thrust of the article was Wilkerson's allegation that DWAC engaged in pre-merger communications with TMTG that were not disclosed to shareholders. These pre-merger communications, Wilkerson alleged, violated securities laws. Based on this conduct, the SEC later charged DWAC with making material misrepresentations to investors. DWAC agreed to pay an $18 million penalty fee to settle the charges. Press Release, SEC, SEC Charges Digital World SPAC for Material Misrepresentations to Investors (July 20, 2023), https://tinyurl.com/86zdj3vp. The October 15, 2022 article also briefly touched on the $8 million loans from ES Family Trust, noting that two of TMTG's co-founders were "unnerved" by the loans from an "unknown group." Ex. 14.

29.     I believed that I had follow-up reporting to do on the information that I had learned from Wilkerson and his attorneys, and from the whistleblower documents that they had given me, including on the $8 million ES Family Trust transaction and the $240,000 referral fee, but over the next couple of months, my focus shifted to reporting on Congress's efforts to ban the social media platform

TikTok. Although I was busy pursuing articles on that topic and others, I stayed in touch with Wilkerson's attorneys, who periodically provided updates on Wilkerson's whistleblower submissions.

30. In January 2023, Brewster forwarded to me an email, attached as Exhibit 15, that he had sent to Senator Elizabeth Warren's office about the $8 million ES Family Trust investment in TMTG. He attached the Entoro invoice, along with other documents related to the ES Family Trust loans. In the email to Senator Warren's staff, Brewster emphasized that the deal raised red flags "for possible illicit finance connections," particularly because one of Paxum Bank's owners, Anton Postolnikov, appeared to have ties to the Russian government. Paxum Bank transmitted the first wire payment to TMTG on the trust's behalf. Brewster also noted Orlando's role in arranging the transaction and said that "TMTG paid a $240,000 referral fee to Entoro for the $8 MM ES Family Trust investment."

31. In February 2023, Brewster and I texted again about developments in TMTG's merger with DWAC. I told Brewster that I had been too busy with my other reporting to further investigate the ES Family Trust financing but hoped to return to the story at a later point. I also expressed my interest in writing a follow-up profile of Wilkerson.

32. In March 2023, The Guardian published two articles about the ES Family Trust loan, attached as Exhibits 16 and 17. The Guardian reported that federal prosecutors in the Southern District of New York investigated TMTG for

11

money-laundering violations in connection with the loan.  The Guardian also reported on the referral fee, stating that Orlando sourced the ES Family Trust loans and charged a $240,000 finder's fee.

33.     Given these developments and my previous interest in following up on Wilkerson's story, I decided to schedule an in-person interview with Wilkerson and his attorneys.

34.     On April 20, 2023, I spent more than four hours interviewing Wilkerson and his attorneys in North Carolina, where Wilkerson lives. With their permission, I created audio recordings of the interview I conducted that day. I first spent time with just Wilkerson at the Starbucks where he had been working since his termination from TMTG.  Then, Wilkerson's attorneys joined us for the rest of the interview.  Wilkerson was present for the entirety of the interview.  Wilkerson and all three of his attorneys spoke during the interview.  It was my understanding that Wilkerson's attorneys were speaking on his behalf.

35.     During this wide-ranging discussion, we talked about Wilkerson's life after being terminated from TMTG, his motivation for speaking out, and the information that he provided to federal investigators regarding the $8 million ES Family Trust loans.  Wilkerson explained that his knowledge of TMTG's financing stemmed from his role as executive vice president of operations, which meant that he was essentially a company treasurer.  Wilkerson said that he and Phillip Juhan, TMTG's chief financial officer, were the only two people who had access to TMTG's bank account.

12

36. In addition to discussing the internal company issues relating to the $8 million ES Family Trust investment itself, Wilkerson and his attorneys also discussed the referral fee. Wilkerson noted that one "component" of the story was "Orlando's self-dealing . . . because through Entoro Securities, he was trying to get $240,000 . . . out of that $8 million." Ex. 18 (April 20, 2023 Interview Recording, Part 3) at 23:33-23:41.

37. Similarly, while Wilkerson was present, Brewster said that the SEC attorney they spoke to "told us to file a whistleblower complaint. Because we started to talk about Orlando, the payment, ES Family Trust. We provided all of it to him . . . He was like this is all very interesting. Can you guys make sure—you guys should file a TCR [an SEC "tips, complaints, and referrals" form] on this. When we were particularly talking about Orlando, his payments that he got for ES Family Trust, it was all the material that we had packaged up and given to him." Ex. 19 (April 20, 2023 Interview Recording, Part 4), at 30:13-31:21.

38. During the interview, Wilkerson's attorneys told me that they would send me additional documents related to the ES Family Trust transaction that they had not yet discovered when we spoke in October 2022. They emphasized that because of the enormity of Wilkerson's trove of records, they were continually uncovering documents that shed light on the loans.

39. Several days later, Wilkerson's attorneys followed up on our conversation by emailing me an unsigned agreement between Entoro and TMTG for a referral fee to be paid to Entoro. That email is attached as Exhibit 20, and the

13

referral fee agreement is Exhibit 21. According to the agreement, the payment was "equal to 3% of the gross proceeds or equivalent" of transactions by investors listed in Schedule B of the agreement. Schedule B identified the investors as "Anton Postolnikov and affiliated entities." Although this information was initially transmitted "off the record," Wilkerson's attorneys later approved its publication. Combined with the $240,000 invoice that they had previously sent to me, this draft agreement further corroborated Wilkerson's and his attorneys' statements about the referral fee.

40.    Between my interviews with Wilkerson and his attorneys and the documents that they provided, I decided that there was too much information to fit into one cohesive article. I decided to write two separate articles. The first would focus on Wilkerson's post-TMTG life, while the second would delve further into the $8 million loans.

41.    Before The Post published the first of these two articles, the Wilkerson profile, I sent a no-surprises email to TMTG on April 27, 2023. TMTG spokesperson Devine responded the next day with a statement that I included in the eventual article.

42.    The Wilkerson profile, "He blew the whistle on Trump's Truth Social. Now he works at Starbucks," was published on April 29, 2023. It is attached as Exhibit 22. The article reported that Wilkerson had struggled to find a job and faced online backlash after speaking out publicly about his experience at TMTG. It provided updates on the status of TMTG's merger with DWAC—which was still

14

stalled—and on a lawsuit that TMTG CEO Devin Nunes filed against the Guardian
for its March reports on the $8 million ES Family Trust loans. The article also
reported that Wilkerson said that he had documents to back up the Guardian's
reports. Among these documents was an email showing that TMTG's chief
financial officer did not have contact information for anyone at ES Family Trust
more than a month after the money was transferred. The article also reported that
DWAC fired Orlando shortly after the Guardian published its articles.

### THE ES FAMILY TRUST ARTICLE

43. After publication of the profile, Brewster gave me the names of two
freelance reporters, Matei Rosca and Matt Bernardini, who were also working on
an article about the ES Family Trust loans. According to Brewster, the freelancers
had uncovered additional information about Paxum Bank and its owner,
Postolnikov.

44. I reached out to Rosca and Bernardini, who provided a draft of their
article. Their draft focused on Postolnikov's Russian connections and his previous
business ventures with Paxum Bank's then-CEO Andrei Octav Moise. The draft
stated that Postolnikov had been under criminal investigation for fraud and tax
evasion in Russia. Since moving to the United States, Postolnikov had donated to
a political action committee supporting Florida Governor Ron DeSantis.

45. I discussed this draft with my editor Mark Seibel, and we decided that
I would draft my own article that focused less on Postolnikov's background and
more on the ES Family Trust loans as a potential reason for the delay in the SEC

15

approving the DWAC-TMTG merger.  We gave the freelance reporters bylines because the Post decided to use the information that they contributed about Moise and about Postolnikov's political donations to Governor DeSantis.  This is information that I also verified before publication.  In addition, the freelance reporters assisted in sending out no-surprises emails to some of the individuals and entities named in the article.  I was included on these emails.

46.     I understand that one sentence of the freelancer reporters' draft said that "Entoro signed a referral agreement with Trump Media which stated that they would get 3% of any investment made by one of their referrals."  This was not a focus of their draft article and involved a topic on which I had separately done my own independent reporting.  I understand that TMTG has focused on that sentence because it said there was a "signed" agreement.  Because I had already done my own reporting on the referral fee and did not intend to use that portion of their draft, I skimmed this section.  I do not recall noticing the statement about a signed agreement at the time, and it did not influence my reporting or story drafting on the referral fee agreement.

47.     My draft was the culmination of hours of interviews, research, and analysis.  To draft the Article, I reviewed a variety of materials, including internal TMTG documents that Wilkerson and his attorneys provided to me; their email correspondence with staff for Senator Warren; SEC filings; federal court filings; the corporate database PitchBook; and various news articles that are linked in the Article.

48.     I drew upon my interviews and other communications with Wilkerson and his attorneys and emailed and spoke with them several more times to ensure that the information I planned to report was accurate. I took notes of phone calls with Brewster on April 25, 2023, Ex. 23 and on May 4, 2023, Ex. 24.  On May 5, 2023, I emailed Wilkerson's attorneys a list of information that I planned to include in the Article and asked them to "read through and help ensure that we're getting everything right."  Ex. 25 (May 5, 2023 Email from D. Harwell to P. Brewster, et al.).  I included in that list that we were "citing a Jan. 2022 referral fee agreement and an invoice that shows TMTG agreeing to pay a cash referral fee — equal to 3 percent of the $8 million loan, or $240,000 — to Entoro Securities, and which names 'Anton Postolnikov and affiliated entities' as 'Introduced Parties' who participated in the deal."  On May 7, 2023, Wilkerson's attorneys responded and did not raise any concerns regarding the statement about the referral fee. Ex. 26 (May 7, 2023 Email from P. Brewster to D. Harwell).

49.     I conducted additional interviews as well.  I reached out to NYU Law Professor Michael Ohlrogge, a SPAC expert I had consulted for my prior reporting on the DWAC-TMTG merger.  At my deposition, I did not recall which documents I had provided to Professor Ohlrogge, but I have reviewed an email that I sent to him that included the Entoro invoice, the referral fee agreement, and the convertible promissory note as attachments.  Ex. 27 (May 5, 2023 Email from D. Harwell to M. Ohlrogge).  In my email, I noted that "Trump Media agreed to pay a cash referral fee," according to the referral fee agreement and invoice.  *Id.*

17

Professor Ohlrogge expressed his opinion that the $8 million loans and the stake that ES Family Trust would assume in TMTG in the event of a merger was material information that the SEC could insist that DWAC disclose to shareholders. Professor Ohlrogge said that the SEC could insist that DWAC disclose the referral fee arrangement too. He explained that Orlando, as DWAC's CEO, owed fiduciary duties to the DWAC shareholders. As such, it raised conflict of interest issues for Orlando to benefit from a transaction through his role at Entoro while draining money from TMTG, which was to merge with DWAC. According to Ohlrogge, concerns about the source of the $8 million and the referral fee could impact the value of DWAC shares.

50.     I also interviewed Carlisle Jno Baptiste, managing editor of Nature Isle News, which had published an article about Paxum Bank; and Tom Sas, a DWAC investor. Before publication, I sent no-surprises emails to both and corresponded with them about content in the Article unrelated to the at-issue statements.

51.     Eight days before publishing the Article, on May 5, 2023, I began reaching out to TMTG for comment. I first sent a no-surprises email to TMTG's email account for press relations, spokeswoman Devine, and TMTG Chief Financial Officer Phillip Juhan with a list of more than 30 bullet points of information that may appear in the Article. This list did not include every single point that would be made in the Article. Rather, I aimed to provide an overview of the key topics the Article would probably cover, in order to give TMTG a robust

18

opportunity to engage on the substance of these matters, whether to dispute, explain, or comment on them.  In my email, attached as Exhibit 28, I included the following points, which addressed the referral fee and agreement.  Although they did not specifically mention the payment, they did highlight "Entoro's referral fee":

    a. "We're citing a Jan. 2022 referral fee agreement and an invoice that shows TMTG agreeing to pay a cash referral fee—equal to 3 percent of $8 million loan, or $240,000—to Entoro Securities, and which names 'Anton Postolnikov and affiliated entities' as 'Introduced Parties' who participated in the deal."

    b. "We're noting Orlando is a registered broker at Entoro, according to a database [brokercheck.finra.org] run by the Financial Industry Regulatory Authority, and that Orlando's LinkedIn profile says he has been a managing director there since 2020."

    c. "We're noting that the deal allowed Orlando to help coordinate a major loan into a company that his SPAC had not yet merged with and to have another one of his companies be rewarded for it, which Wilkerson's attorneys argue is a conflict of interest."

    d. "We're noting that DWAC did not tell investors about the $8 million in loans or Entoro's referral fee in its disclosure filings submitted to the SEC, which an expert told us could cause 'big problems,' given that the money and concerns over its origins could affect the value of its shares."

52.     After five days of receiving no response, on May 10, 2023, I replied to the email thread to reiterate my request for comment from any of the recipients of the no-surprises email to TMTG.  Because I had still not received a response the day before publication, on May 12, I forwarded my prior emails to TMTG CEO Nunes.  No one from TMTG responded. *See* Ex. 28.

53.     I also sent no-surprises emails to a wide variety of individuals and entities who were either mentioned in the Article or that I believed might have information relevant to it:

a. On May 5, 2023, I sent no-surprises emails to the SEC; Steven Cheung, a representative of the Donald J. Trump for President 2024 campaign; Patrick Orlando; Eric Swider, a TMTG board member who had replaced Orlando as DWAC's CEO; TMTG co-founder Wes Moss; James Row, managing partner, and Morgan Sills, former director of Entoro Capital LLC; Alexander Monje, former legal counsel for Orlando's firm Benessere Investment Group; FINRA's Media Relations Department; and TMTG's auditing firm BF Borgers.  The SEC and FINRA responded, both declining to comment, and Cheung responded and asked if I had reached out to TMTG.  I sent follow-up emails to Cheung on May 8, 2023, to BF Borgers and Monje on May 10, 2023, and to Orlando on May 12, 2023.  I received no responses.

b. I requested comment from United States Representative Dan Meuser on May 8, 9, 10, and 11, 2023 and from United States Representative

20

Bryan Steil on May 9, 10, and 11, 2023. I received no responses.

c. On May 9, 2023, I sent a no-surprises email to a representative for Governor DeSantis, and I followed up on May 11, 2023. I received no response.

d. On May 10, 2023, I sent no-surprises emails to TMTG co-founder Litinsky, and to the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). FinCEN responded and declined comment.

e. On May 12, 2023, because no one from TMTG had responded, I sent requests for comment to Donald Trump, Jr., a TMTG board member; and John Haley, a partner at Nelson Mullins who had worked for TMTG. I received no responses.

54. Freelance reporters Bernardini and Rosca assisted with seeking comment from some of the subjects of the Article who were not involved in the agreement to pay or payment of the referral fee. On May 5, 2023, Bernardini sent no-surprises emails to Paxum Bank and Anton Postolnikov on behalf of The Post. On May 6, 2023, Rosca sent a no-surprises email to an account for ES Family Trust. I was CC'ed on these emails, to which we received no response. Rosca also messaged Angel Pacheco, trustee for ES Family Trust, via Signal, Whatsapp, and LinkedIn. He received no response. Bernardini spoke with Moise, and his comments were included in the Article.

55. I also tried calling a number for Paxum Bank several times but always

21

received a dial tone.  On May 12, 2023, my call went through, and the person who answered declined comment.

56.    Because TMTG did not respond to my requests for comment, I included in the Article the statement that TMTG had provided for the Wilkerson profile, which said that The Post's reporting was based on "discredited hit pieces, defamatory allegations and false statistics." Ex. 22.

57.    Throughout the reporting process, I complied with The Post's policies and standards by remaining objective, diligently seeking comment, and striving for completeness and accuracy.

58.    At the time of publication, it was my belief that TMTG had not only agreed to pay but had also actually paid a referral fee to Entoro, the Orlando-affiliated brokerage, in exchange for Orlando arranging the ES Family Trust financing.

59.    My belief that TMTG had agreed to pay the fee was based on both statements by Wilkerson and his attorneys and on documents that they provided. First, as to the statements, my contemporaneous notes reflect that on multiple occasions, Wilkerson's attorneys said that TMTG had agreed to pay the referral fee:

    a. April 25, 2023 call with Brewster: "TMTG agreed to pay 3% for certain investors...agreement calls for TMTG to pay [E]ntoro a cash referral fee." Ex. 23 at 3.

    b. May 4, 2023 call with Brewster: "Trump Media agreed to pay a cash referral fee, equal to 3 percent of the loan, to Entoro Securities,

according to a referral fee agreement provided by Wilkerson." Ex. 24 at 4.

Second, as to the documents, Wilkerson and his attorneys provided the Entoro invoice, Ex. 13, and referral fee agreement, Ex. 21.

60.     The fact that the referral fee agreement was unsigned did not impact my belief that TMTG had agreed to pay the fee.  Wilkerson and his attorneys had told me, and had told government officials, numerous times that TMTG had agreed to a referral fee, and Wilkerson's attorneys had earlier sent me as documentary corroboration the invoice that Entoro had sent TMTG.  I believed that Entoro would not have sent an invoice if there had not been an agreement to pay.  In addition, I knew that Wilkerson's attorneys had been searching through a cache of more than 150,000 whistleblower documents, so I believed there could be later versions of the agreement or that this was a digital version of a final agreement that Wilkerson's lawyers did not have access to.  In addition, my reporting showed me in connection with this very transaction that TMTG had agreed to a promissory note agreement with ES Family Trust even though the promissory note agreement had been signed by only one of three named parties.  Finally, I specifically included my reporting on the agreement to a referral fee as part of the no-surprises emails that I sent to three people and an email address affiliated with TMTG.  The lack of a negative response further supported my belief in the report's accuracy.

61.     My belief that TMTG had paid the fee was similarly based on my conversations with Wilkerson and his attorneys and substantiating documents.  As

reflected in my recording of the April 20, 2023 interview, Wilkerson's attorneys, while Wilkerson was present and they were speaking on his behalf, said that they told the SEC "about Orlando, his payments that he got for the ES Family Trust." Because his attorneys were deeply involved in the whistleblower action and acting as Wilkerson's representatives, and Wilkerson did not contradict their statements, I had no reason to doubt the accuracy of their statements about the payment. It was also consistent with my contemporaneous notes of previous statements by Wilkerson and his attorneys on this topic:

<ol type="a">
<li>October 10, 2022 call with Wilkerson's attorneys: "Security firm in Houston. Trump Media pa[i]d quarte[r of] a million to this trust, [E]ntoro Securities." Ex. 7 at 6.</li>
<li>October 11, 2022 call with Wilkerson: "3% beneficiary. Could be split between Entoro Securities. [H]e helped secure this funding and then gets a finders fee." Ex. 7 at 14.</li>
<li>May 4, 2023 call with Brewster: "Trump Media is paying the brokerage firm, where Orlando is licensed at...Arranging this money and taking a fee on it." Ex. 24 at 4.</li>
</ol>

Brewster's email to Senator Warren's office, which stated that the fee was paid, Ex. 15, confirmed that he made this same representation to governmental officials conducting an investigation into TMTG's financing. My belief that TMTG paid the fee was also bolstered by documentary evidence: the invoice and referral fee agreement.

24

62.     I relied on my sources—Wilkerson and his attorneys—who repeatedly told me and government officials that TMTG had paid the referral fee.  By this point, I had already written two articles that relied in part on information that Wilkerson and his attorneys provided, and there had been no substantive challenges to the accuracy of those articles.  Moreover, the statements that Wilkerson and his attorneys made for those articles were consistent with the facts and documents that they provided to the SEC in connection with Wilkerson's whistleblower complaint. Wilkerson's and his attorneys' statements were further corroborated by the other financing documents related to the ES Family Trust loan that the attorneys provided.  The Paxum Bank and ES Family Trust wires proved that TMTG received the $8 million loans.  Because the referral fee agreement was tied to that loan, which had been paid, it stood to reason that Wilkerson and his attorneys were correct that the referral fee was paid as well.   My no-surprises emails did not explicitly state that we would report that the referral fee was paid— only that TMTG agreed to pay it.  The mention of the agreement was not meant to exclude the fact of payment.  These no-surprises emails are non-exhaustive lists of information that may be included in an article.

63.     I completed a rough draft of the Article and entered it into The Post's content-management system on May 5, 2023.

64.     As I continued to gather comments from the subjects of the Article, I worked with my editor, Seibel, to edit the draft.  We were in regular communication about my reporting.  From May 5, 2023 to May 13, 2023, Seibel and I took turns

editing the draft in the Post's content management system.  All the while, we communicated via Slack and email about these edits and about any further reporting that needed to be done.  For example, Seibel suggested that I reach out to members of Congress who had complained about the SEC's delay in approving the DWAC-TMTG merger to see if they were aware of the ES Family Trust loans. According to my review of The Post's content management system, Seibel and I were the only individuals who made substantive edits to the draft.  However, Business Editor Lori Montgomery also reviewed it on May 11, 2023.  After reading the draft, Montgomery suggested that I reach out to one of The Post's international reporters to see if she could assist in tracking down more details about Paxum Bank and Postolnikov for future reporting.

65.    It is my understanding that Seibel sent the draft Article to Post in-house counsel for pre-publication review.  Seibel sent me their comments on May 12, and I implemented their suggested edits as appropriate.

66.    On Saturday, May 13, 2023, The Post published the Article online. The main focus of the Article was that DWAC had accepted an $8 million loan from an "obscure financial entity" linked to "a Caribbean-island bank" that services the adult entertainment industry. Ex. 1.  The Article identified the bank as porn-linked to highlight the mysterious nature of the funds.  Adding to that mystery was the fact that the Paxum Bank's director, Angel Pacheco, was listed as the trustee for the obscure financial entity, ES Family Trust.  The Article also reported that ES Family Trust would gain a large stake in TMTG if the merger between DWAC and

26

TMTG was approved.  Moreover, according to SEC filings, neither the loan nor the role that ES Family Trust would assume in TMTG were disclosed to the SEC or to DWAC shareholders.

67.    The Article noted that the convertible promissory note that would give ES Family Trust a major stake in the company was signed by only one co-founder of TMTG and was not signed by Pacheco.  The lack of signatures was significant as to this agreement because ES Family Trust nevertheless wired loans totaling $8 million.

68.    The Article included the following statements about the finder's fee that are at issue in this case: 1) "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust;" and 2) "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO."  Ex. 1.

69.    In addition, the Article reported that "[i]n January 2022, Trump Media agreed to pay a cash referral fee — equal to 3 percent of the $8 million loans, or $240,000 — to a Houston-based brokerage firm called Entoro Securities, according to a referral fee agreement and an Entoro invoice provided by Wilkerson." *Id.*  The Article linked Orlando to Entoro through a Finra database, which listed him as a registered broker there.  In addition, Orlando's LinkedIn profile said that he had been a managing director at Entoro since 2020.

70.    The Article did not state that TMTG had an affirmative obligation to

disclose the $8 million loan and the referral fee. Nor did it claim that TMTG caused DWAC to improperly fail to disclose the funding. It observed that neither company had disclosed this information to shareholders or the SEC.

71.    Specifically as to DWAC, the Article stated that "Digital World did not tell investors about the $8 million in loans or Entoro's referral fee in its filings submitted to the SEC, a review of public documents shows." *Id.* It then noted Professor Ohlrogge's opinion that "the SEC could insist the loans should have been disclosed to investors, given that the concerns over its origins and Orlando's finder's fee could affect the value of the shares." *Id.*

72.    The Article also included the following quotes from Professor Ohlrogge about DWAC and Orlando's nondisclosures:

　　　a.    "This is definitely something that could cause problems," he said. "At a minimum, if the SEC knew about this loan, it would insist that it be disclosed to [Digital World] shareholders . . . And the company didn't even do that." *Id.*

　　　b.    "The right way for him to have done this is to say: 'I know this transaction looks potentially bad and may be enriching me at the expense of [Digital World] shareholders, but I really think it's ultimately in their best interest,'" Ohlrogge said. "That's the right way to do it. And he didn't do anything of the sort." *Id.*

73.    After publication, I circulated the link to the Article to the various subjects that I had reached out to for comment. Even if a subject did not respond

28

to my pre-publication outreach, my practice is to send the link in case an individual wishes to provide information or suggest a correction after publication.

74. As was my regular practice, I also posted on social media about the Article. I tweeted a link to the Article. In a second post on the same thread, I noted that I had interviewed an investor who spent his life savings on DWAC stock that had dropped in value from $175 a share to $13 a share. The purpose of this tweet was to provide information about the contents of the Article and risks inherent in investments, albeit in a more casual manner of speaking than the Article itself used.

**TMTG'S RETRACTION DEMAND**

75. The next day, Sunday, May 14, 2023, TMTG General Counsel Scott Glabe emailed a retraction demand, Ex. 29 (Retraction Demand), to Post executive editor Sally Buzbee and to me at 2:30 PM EDT. The demand letter alleged that the Article contained "false and defamatory assertions and implications," including:

    a. "Trump Media paid a $240,000 'finder's fee' to a third party for helping to arrange an $8 million loan from ES Family Trust."

    b. "The recipient of the finder's fee was a brokerage associated with former Digital World Acquisition Corp. (DWAC) CEO Patrick Orlando."

    c. "TMTG improperly failed to disclose, or caused DWAC to improperly fail to disclose, the payment of the finder's fee to the SEC, DWAC shareholders, and the investing public."

29

76. The letter also asserted that the Article "knowingly or recklessly omit[ted] material information contained in DWAC's publicly available registration statement" and in "documents provided to [The Post] by Mr. Wilkerson." *Id.*

77. Notably, the demand letter did not allege anywhere that it was false that TMTG had agreed to pay the finder's fee to an entity associated with Orlando. Indeed, a separate passage in the Article said exactly that, but the Demand Letter did not challenge it: "[i]n January 2022, Trump Media agreed to pay a cash referral fee— equal to 3 percent of the $8 million loans, or $240,000 — to a Houston-based brokerage firm called Entoro Securities, according to a referral fee agreement and an Entoro invoice provided by Wilkerson." Ex. 1.

78. After receiving the demand letter, I forwarded it to Seibel and informed him that I had "documentation to back all of [the reporting] up." Ex. 30 (May 14, 2023 Email from D. Harwell to M. Seibel).

79. Later that evening, Seibel instructed me to gather the documentation substantiating my reporting.

80. I also forwarded the demand letter to Wilkerson's attorneys for their reaction. After reviewing the letter, Brewster responded that they stood by the story. Ex. 31 (May 14, 2023 Email from P. Brewster to D. Harwell).

81. I reached back out to Wilkerson's attorneys with a few follow-up questions regarding the allegations in the demand letter. Specifically, I asked about Wilkerson's proof that the referral-fee payment was made.

82. The next day, Brewster responded with a fuller explanation of Wilkerson's recollection about the payment. Ex. 32 (May 16, 2023 Email from P. Brewster to D. Harwell). According to Brewster, Wilkerson did not know "whether payment was issued for the fee earned by Entoro Securities and placed on the balance sheet of TMTG as a liability." *Id.* Rather, TMTG's CFO Phillip Juhan instructed Wilkerson "to place the Entoro invoice into [the company's] Quick Book accounting system as a vendor expense" and "to withhold issuing payment until Juhan instructed him to do so." *Id.* However, Brewster further explained that "[d]elayed payment by TMTG to vendors was common[]place," and "during [Wilkerson's] tenure at the company, no one challenged the validity of the Entoro invoice or whether it was earned, due and payable, including Juhan, and it was entered as a vendor expense" in the company's accounting system. *Id.*

83. This was the first time—after publication—that I heard from Wilkerson or his attorneys that Wilkerson did not know definitively whether or not the payment had gone out. As shown above, Wilkerson's attorneys told me, and government officials, that the payment had been made multiple times, including once in an audio-recorded interview in April 2023 in Wilkerson's presence. I note that the email provided further support for our report that TMTG had agreed to pay the referral fee, that it stated that the invoice had been put in QuickBooks for payment and marked as a liability, and that TMTG at the time was slow-paying invoices that it agreed it owed.

84. I understand that The Post's senior editors and in-house counsel, as

well as Seibel, discussed a response to the demand letter and indeed provided a response. I did not participate in those discussions and relied on their judgment regarding how to respond.

85. On May 17, 2023, editor Montgomery emailed The Post's response to the demand letter to TMTG. Ex. 33 (Post Response to Retraction Demand). I was CC'ed on the email. Although I was not involved in drafting the response, it is my understanding that The Post requested additional specifics from TMTG regarding its allegations that statements in the Article were false.

86. TMTG did not respond to the request, and instead filed this lawsuit on May 20, 2023, just three days after The Post sent the response to the demand letter.

87. After receiving the post-publication email from Wilkerson's lawyer on May 16, 2023, I no longer felt I knew with certainty whether the payment was actually made. I understand that TMTG filed a lawsuit rather than provide more specific information on the issue, and that the issue of payment has been a subject of much discovery in this lawsuit. At the time of publication, however, I had no doubts as to the accuracy of my reporting on TMTG's payment of the finder's fee.

88. My reporting was never motivated by animus towards or a desire to inflict harm upon TMTG, its CEO Devin Nunes, or President Trump. To the extent that the Second Amended Complaint claims that my social media posts displayed bias, I note that my manner of speaking on social media is more casual than the language that I use in my articles. But I was never motivated by animus or bias

against TMTG, its CEO Devin Nunes, or President Trump in drafting these posts.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed this 24th day of April 2026 in Tampa, FL.

By: _____

Drew Harwell