**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

v.

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

    Case No: 8:23-cv-01535-TPB-AAS

_____/

**DECLARATION OF LORI MONTGOMERY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Lori Montgomery, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I was a journalist at The Washington Post ("The Post") for 25 years. Most recently, I was The Post's politics and government editor, and before that, the business editor. This declaration is based on my personal knowledge and on documents kept by The Post in the ordinary course of business that I have reviewed. I was also deposed in this case. If called as a witness, I could and would testify competently to these facts under oath.

2.     On Saturday, May 13, 2023, The Post published an article titled "Trust linked to porn-friendly bank could gain stake in Trump's Truth Social" (the "Article"). Harwell Ex. 1. Drew Harwell was the principal author, and freelance reporters Matei Rosca and Matt Bernardini contributed to portions of the Article not at issue in this case. Mark Seibel edited the Article.

3.     The Article contained the following two statements that are the

subject of Trump Media & Technology Group Corp's ("TMTG" or "Trump Media") lawsuit:

  a. "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust."

  b. "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"

4. It is my understanding that TMTG alleges that it is false that TMTG agreed to pay a finder's fee and that TMTG paid the finder's fee.

5. I read the Article before publication and was part of the editorial and legal team that reviewed and responded to TMTG's retraction demand.

**PROFESSIONAL BACKGROUND**

6. I was The Post's business editor from 2021 to 2025 and then was politics and government editor from 2025 until my retirement at the end of last year.

7. I joined The Post as a state government reporter in February 2000. Over the next 15 years, I covered politics in Maryland and the District of Columbia, then focused on national economic policy. In 2015, I took on my first editing role, becoming a national assignment editor. The next year, I was promoted to deputy national editor, a role that I held until I was promoted to business editor in 2021.

8. While at The Post, I led a project in 2015 cataloguing fatal police shootings in the United States that won a George Polk Award and a Pulitzer Prize.

2

I also helped lead a Pulitzer-Prize-winning project in 2019 that revealed the tangible effects of climate change.

9. I was The Post's business editor in May 2023, when the Article was published. In that role, I oversaw several areas of coverage, including technology, the national economy, and economic policy. Mark Seibel, the technology policy editor, was one of my direct reports. Seibel, in turn, oversaw a team of technology reporters, including Drew Harwell. I had the opportunity to observe Harwell's work over a long period of time and believe that he is a hard-working, thorough, and talented reporter who strives for accuracy and fairness.

10. As business editor, I was primarily responsible for guiding the overall direction of our coverage, rather than editing individual stories. Editors would keep me apprised of their work, and I would often review stories at a high level when a draft was complete, offering any suggested edits. If a story was particularly lengthy or complex, I would also read closely for clarity. As department head, I would then attend meetings twice a day to pitch the business team's stories to the newsroom as a whole.

11. I do not have an independent recollection of reviewing the Article before publication. But it would have been consistent with my normal practice to do so, and I have seen Slack messages showing that I read the Article at least two days before publication. One of my messages complimented the Article and gave a suggestion for further reporting about a part of the Article that was unrelated to the challenged statements. I do not recall making any edits to the Article, and it is

my understanding that The Post's content management system does not reflect any edits by me.

**ES FAMILY TRUST ARTICLE**

12.    By the spring of 2023, I was aware that Harwell had been reporting on TMTG since then-former President Donald Trump announced that he would launch a social media platform.

13.    I do not specifically remember how or when I first became aware of the Article at issue.  But according to my Slack messages, after I read a draft of the Article, I reached out on May 11, 2023 to The Post's international editor to see if one of his reporters would be able to assist with gathering information about Paxum Bank and Anton Postolnikov.  The editor gave me the name of a reporter who might be able to help, and I sent her name to Harwell and Seibel.

14.    I do not have any specific recollection of reading the Article before publication aside from what is reflected in my Slack messages.  I have no memory of seeing anything in the Article that struck me as inaccurate or questionable.  If I had, I would have said as much to Seibel, as that was part of my job responsibilities.  In particular, I have no recollection of reading or reacting to the Article's statements about the referral fee agreement or payment.

15.    The Article was published on May 13, 2023.  As was my practice with articles written by the reporters in my department, I tweeted a link to the Article.  My only intent in doing so was to highlight Harwell's reporting, which I believed readers would find interesting and newsworthy.

4

**TMTG'S RETRACTION DEMAND**

16.    The next day, Sunday, May 14, 2023, Post executive editor Sally Buzbee sent me and Post in-house counsel a retraction demand that TMTG General Counsel Scott Glabe had emailed to her and to Harwell earlier that day. Harwell Ex. 29 (Retraction Demand).  The demand letter alleged that the Article contained "false and defamatory assertions and implications," including:

a. "Trump Media paid a $240,000 'finder's fee' to a third party for helping to arrange an $8 million loan from ES Family Trust."

b. "The recipient of the finder's fee was a brokerage associated with former Digital World Acquisition Corp. (DWAC) CEO Patrick Orlando."

c. "TMTG improperly failed to disclose, or caused DWAC to improperly fail to disclose, the payment of the finder's fee to the SEC, DWAC shareholders, and the investing public."

17.    The demand letter also asserted that the Article "knowingly or recklessly omit[ted] material information contained in DWAC's publicly available registration statement" and in "documents provided to [The Post] by Mr. Wilkerson." *Id.*

18.    I remember finding the demand letter unclear.  TMTG demanded a retraction and an apology, yet its letter failed to specify what exactly was false about the statements it challenged.  For example, for the first assertion above, I could not tell if TMTG was alleging that the amount of the fee was incorrect, if it was not

5

technically called a "finder's fee," if ES Family Trust was not the entity that issued the financing, or if the fee was paid, just for a different reason than for arranging the loans. The retraction demand simply asserted that a sentence containing all of these elements was "false and defamatory."

19.     On May 16, 2023, I met with Seibel, Buzbee, Managing Editor Cameron Barr, and Post in-house lawyers Jay Kennedy and James McLaughlin to discuss TMTG's retraction demand and The Post's response. We then collaboratively drafted a response to TMTG's demand letter. Harwell Ex. 33 (Post Response to Retraction Demand). I signed and sent the response to TMTG.

20.     In the response, we explained the substantiation for The Post's reporting on the referral fee. We noted the existence of the referral fee agreement and invoice, a database linking DWAC's CEO to Entoro, and the failure to disclose either the referral fee or the ES Family Trust loans to the SEC and investors. We then invited TMTG to provide additional information so that The Post could further consider its concerns and potentially publish a correction.

21.     The reason we needed additional information to consider a correction is because every correction at The Post is specifically constructed to accomplish two goals: to tell readers what we got wrong, and then, to tell them what is true. To draft a correction, then, we must know what is true. Post-publication, it became clear that we simply did not have enough information to determine whether a correction to the statement that a finder's fee had been paid was warranted (or, for that matter, if that was precisely what TMTG was disputing). "Correcting" the

Article at that point without more information could have resulted in publishing inaccurate information, and therefore, a series of corrections as more information came to light. That is why my response to TMTG invited the company to provide "specifics."

22.    TMTG did not respond with the additional information that we invited it to provide. It filed this lawsuit on May 20, 2023, three days after I sent The Post's response to the retraction demand. The Post's response was not published or made public before TMTG included information about it in its complaint.

23.    In reporting and editing the Article, Harwell and Seibel complied with Post policies and standards. I also complied with Post policies and standards in my pre-publication review of the Article and consideration of the retraction demand.

24.    I never intended to inflict harm on TMTG or harbored bias against it, TMTG CEO Devin Nunes, or President Trump. In my journalism career, I have always strived to produce objective, accurate reporting.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed this 24th day of April 2026 in Washington, D.C.

By: _____
Lori Montgomery

7