**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

v.

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

_____/

Case No: 8:23-cv-01535-TPB-AAS

**DECLARATION OF MARK SEIBEL IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Mark Seibel, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I was previously the technology policy editor for The Washington Post ("The Post"). This declaration is based on my personal knowledge and on documents kept by The Post in the ordinary course of business that I have reviewed. If called as a witness, I could and would testify competently to these facts under oath. I was also deposed in this matter.

2.    On Saturday, May 13, 2023, The Post published an article titled "Trust linked to porn-friendly bank could gain stake in Trump's Truth Social" (the "Article"). Harwell Ex. 1. I edited the Article. Drew Harwell was the primary author, and freelance reporters Matei Rosca and Matt Bernardini contributed to aspects of the Article that are not at issue in this case.

3.    The Article contained the following two statements that are the subject of Trump Media & Technology Group Corp's ("TMTG" or "Trump Media") lawsuit:

a.    "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust."

b.    "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO"

4.    It is my understanding that TMTG alleges that these statements are false because it neither agreed to pay nor paid a $240,000 finder's fee.

5.    In addition to editing the Article, I was involved in The Post's evaluation of and response to TMTG's retraction demand.

**PROFESSIONAL BACKGROUND**

6.    I served as The Post's technology policy editor from February 2019 until my retirement at the end of May 2024.

7.    I graduated from Southern Methodist University in 1974 with a Bachelor of Fine Arts in Journalism.  By the time I joined The Post, I had worked in journalism for more than four decades.  I was national security editor at BuzzFeed News; chief of correspondents for McClatchy Newspapers; managing editor of McClatchyDC.com; managing international editor at Knight Ridder; and foreign editor and managing editor for news at the Miami Herald.  I also worked at the Dallas Morning News, the Dallas Times Herald, the Los Angeles Times, and

the San Jose Mercury.

8.      While at the Miami Herald, I directed teams that won Pulitzer Prizes for coverage of the Iran-Contra affair (1987); Hurricane Andrew (1997); and Elian Gonzales, the child at the center of an international custody battle whom federal agents seized in Miami and returned to Cuba (2001).

9.      During my time at The Post, I supervised a team of reporters who covered technology issues.  My role as an editor was to ensure that these reporters pursued stories of interest and stayed on top of developments in their areas of coverage.  Aside from advising my reporters on which stories to pursue, I also provided guidance on their reporting, such as suggesting potential sources to contact to develop a particular story.

10.      Once a draft article was ready, I would then work collaboratively with the reporter to edit the draft and prepare it for publication.  As part of this editing process, it was my practice to discuss with the reporter what documentation existed to substantiate factual contentions in the draft.  I followed this regular practice for the Article.

11.      During the entirety of my time at The Post, reporter Drew Harwell was under my purview.  I found Harwell to be a very exacting reporter, accurate and thorough.  Sources also praised Harwell for providing notice of the information that he was considering including in an article before publication.

**TMTG COVERAGE**

12.      Harwell began reporting on TMTG in 2021, when President Donald

3

Trump announced his new social media venture. Harwell and I agreed on the newsworthiness of this development in the wake of other social media companies suspending President Trump's accounts. His return to the internet was a key moment in his political trajectory.

13.    In October 2022, I edited Harwell's first article about Will Wilkerson, the TMTG senior vice president of operations and co-founder who filed a whistleblower complaint about the company with the Securities and Exchange Commission ("SEC"). Harwell Ex. 14 ("Co-founder of Trump's media company details Truth Social's bitter infighting"). This article provided an overview of some of the allegations in Wilkerson's whistleblower submission, such as that Digital World Acquisition Corp. ("DWAC"), TMTG's planned merger partner, had violated securities laws by engaging in pre-merger communications with TMTG. The article also noted a mysterious $8 million investment in TMTG from an unknown entity called ES Family Trust.

14.    Over the next several months, the technology team's focus shifted to other breaking news developments and enterprise reporting. Among other stories, Harwell covered the U.S. government's efforts to ban TikTok and Elon Musk's transformation of Twitter. I edited his articles on those topics.

15.    In March 2023, The Guardian published two articles about the $8 million ES Family Trust loans. Harwell Ex. 16, 17. The Guardian reported that federal prosecutors had investigated whether TMTG violated money laundering laws by accepting the loans, which appeared to have Russian ties. Shortly after

4

publication, DWAC fired CEO Orlando.    Harwell and I discussed these developments and decided that there was further reporting for him to do on the DWAC/TMTG developments.

16.    The next month, Harwell traveled to North Carolina to interview Wilkerson and his attorneys in person for a follow-up story.  When he returned, he drafted two articles about Wilkerson and TMTG.  The first was a profile of Wilkerson and his life working as a barista after TMTG fired him for speaking with the press.  Harwell Ex. 22 ("He blew the whistle on Trump's Truth Social. Now he works at Starbucks.").  The second was a deeper dive into the $8 million ES Family Trust loans, which is the Article at issue in this case.  I edited both.

**THE ES FAMILY TRUST ARTICLE**

17.    On May 3, 2023, Harwell told me that he had connected with two freelance reporters who were also working on a story about ES Family Trust. According to Wilkerson's attorneys, they had uncovered more information about the trust's ties to Russia.  They offered to share a draft of their article for The Post's consideration.

18.    I reviewed the draft and determined that most of it was not relevant to The Post's reporting on TMTG.  Because I had never worked with these freelance reporters before, I told Harwell that if we wanted to use any of their information, he would need to independently confirm it.  He agreed to conduct his own newsgathering.  We decided to give Rosca and Bernardini bylines because they contributed reporting.  The aspects of the Article they contributed to are not at

5

issue.

19.    On May 5, 2023, Harwell sent me a draft of the Article.  Harwell and I were the only individuals who substantively edited the Article.  From May 5, 2023 to May 12, 2023, we communicated via Slack and email about edits to the draft. One of my edits was to suggest moving DWAC's failure to disclose the ES Family Trust transaction to the SEC up higher in the Article.  I also suggested that the headline include information about the links to the porn industry of Paxum Bank, the entity that sent the first wire payment to TMTG from ES Family Trust.   A director of Paxum Bank,  Angel Pacheco, was also the trustee of ES Family Trust. I felt that this detail highlighted the mysterious nature of the funds that TMTG had received.  Harwell and I both edited the statements at issue in this case.

20.    During this time, I also asked Harwell about substantiation for the Article.  Harwell provided documents to support his reporting and answered any questions that I had about statements in the Article.  Where needed, I suggested additional reporting for Harwell to do, such as reaching out to BF Borgers, TMTG's auditor, and to lawmakers to see if they would comment on the loans as a potential reason for the delay in the DWAC-TMTG merger.

21.    My communications with Harwell while working on the Article occasionally expressed sarcasm or references to questionable statements that TMTG had made about its reach or audience.  But these attempts at humor did not reflect bias or desire to harm TMTG and did not color the reporting or editing of the Article.  At all times, consistent with my more than 40 years in journalism, I

worked to make sure that the story was fair and accurate.

22.    I had full confidence in Harwell's reporting.  By May 2023, we had worked together for more than four years.  Harwell had shown himself to be an accurate, detail-oriented journalist.  For this article, he had strong substantiating documents from Wilkerson and his attorneys: an unsigned referral fee agreement and an invoice for the $240,000 referral fee, both from the brokerage firm Entoro. The agreement indicated that Entoro earned the fee by connecting TMTG with Anton Postolnikov, a principal of Paxum Bank, which transmitted the first wire payment to TMTG.  These details strengthened my belief that these were legitimate documents reflecting the transaction.  Harwell also had sources—Wilkerson and his attorneys—who had proven reliable over the course of several stories. Wilkerson was a co-founder of TMTG and had been senior vice president of operations, so even if he was not the person responsible for cutting checks on behalf of TMTG, I was confident that he was positioned to know about company financial matters.

23.    On Thursday, May 11, 2023, I sent a draft of the Article to Post in-house counsel for review.  They reviewed it and provided feedback the next day, and I sent The Post's in-house counsel's comments to Harwell, who implemented their suggestions as appropriate.

24.    Business editor Lori Montgomery also read the Article before publication and suggested that Harwell and I connect with an international reporter to track down information for future stories about ES Family Trust.

25.    Harwell followed Post policies and standards in reporting the Article. I also followed these policies and standards in editing the Article.

26.    The Post published the Article on Saturday, May 13, 2023. The Article included the following statements about the referral fee that are at issue in this case: 1) "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust;" and 2) "the recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO."  Harwell Ex. 1 (Article).

27.    At the time of publication, I had no doubts as to the veracity of these statements.  Based on the statements that Wilkerson and his attorneys made to Harwell in multiple interviews about the referral fee agreement and the payment, and the substantiation of referral fee documents they provided to Harwell, I believed that TMTG had both agreed to and actually paid a referral fee.

28.    As to the agreement, the fact that the referral fee agreement was unsigned did not make me doubt that an agreement had been reached.  Among other reasons, the electronic copy that Wilkerson's attorneys located to send to Harwell may not have been the final version; unsigned agreements may memorialize oral agreements, and agreements that do not bear signatures are often honored.  For example, ES Family Trust did not sign the convertible promissory note, yet it nevertheless wired the money to TMTG.  In addition, the fact that Entoro also sent TMTG an invoice for the $240,000 amount showed me that an

8

agreement had been reached, since typically an invoice is only sent for an agreed payment. Finally, in his no-surprises emails to TMTG and its executives, Harwell had specifically noted that The Post was citing to a referral fee agreement and invoice that showed TMTG agreeing to pay the fee. No one affiliated with TMTG responded to Harwell's emails to say that there was no such agreement.

29. As to the payment, I had no reason to doubt Harwell's related reporting that the payment had been made, and I did not question it. I also did not specifically query Harwell about whether a payment had been made. Based on Harwell's conversations with Professor Ohlrogge and on my own understanding of SEC regulations, the referral fee agreement itself created a potential conflict of interest because of Orlando's overlapping roles with DWAC and Entoro. In my mind, then, an agreement to pay was the most important aspect of the referral fee. Because TMTG had incurred an obligation through the agreement, I believed that the company would fulfill that obligation, so I had no reason to doubt that it had been paid.

**TMTG'S RETRACTION DEMAND**

30. On Sunday, May 14, 2023, Post in-house counsel forwarded me a retraction demand received from TMTG that day. Harwell Ex. 29 (Retraction Demand). The demand letter alleged that the Article contained "false and defamatory assertions and implications," including:

    a. "Trump Media paid a $240,000 'finder's fee' to a third party for helping to arrange an $8 million loan from ES Family Trust."

9

b. "The recipient of the finder's fee was a brokerage associated with former Digital World Acquisition Corp. (DWAC) CEO Patrick Orlando."

c. "TMTG improperly failed to disclose, or caused DWAC to improperly fail to disclose, the payment of the finder's fee to the SEC, DWAC shareholders, and the investing public."

31.    My initial impression of the demand letter was that it was opaque as to what exactly was alleged to be false about the statements.  TMTG provided little detail to support its assertions.  I tried my best to discern the meaning of the letter, including by rereading DWAC's lengthy registration statement.

32.    Harwell also forwarded the letter to me and said that he had documentation to back up his reporting.  Harwell Ex. 30 (May 14, 2023 Email from D. Harwell to M. Seibel).  I instructed Harwell to assemble this documentation.

33.    I was aware that Harwell reached out to Wilkerson's attorneys about the retraction demand to get their reaction.  Harwell forwarded me their initial reaction, which was that Wilkerson stood by the story.

34.    During my deposition, I was shown an email that one of Wilkerson's attorneys, Phil Brewster, sent to Harwell on May 16, 2023, after The Post received the retraction demand.  Harwell Ex. 32 (May 16, 2023 Email from P. Brewster to D. Harwell).  In that email, Brewster wrote that Wilkerson did not specifically know "whether payment was issued for the fee."  He said that TMTG's chief financial officer had instructed Wilkerson to place the invoice into the company's accounting

10

system, marking it as a liability, but not to issue payment until instructed to do so. This was consistent, Brewster explained, with the company's practice at the time of slow paying vendors to manage its cash on hand. Brewster noted that "no one challenged the validity of the Entoro invoice or whether it was earned, due, and payable" during Wilkerson's time at TMTG.

35.    I do not recall whether I saw this email at the time. But reading it now, the email provides further support that TMTG agreed to pay the referral fee. TMTG's CFO told Wilkerson to enter the invoice as a vendor expense, and no one challenged the validity of the invoice at that time. Wilkerson entered the invoice into the company's queue for payment but left the company before the payment could be issued. The email also provides support that Wilkerson was in a position to know that TMTG agreed to pay the referral fee.

36.    On May 16, 2023, I met with Executive Editor Sally Buzbee, Managing Editor Cameron Barr, Business Editor Montgomery, and Post in-house lawyers Jay Kennedy and James McLaughlin to discuss TMTG's retraction demand and The Post's response. We then collaboratively drafted a response to TMTG's letter.

37.    On May 17, 2023, Montgomery emailed The Post's response to TMTG. Harwell. Ex. 33 (Post Response to Retraction Demand). The letter explained The Post's basis for reporting that there was a referral fee and that neither the fee nor the ES Family Trust loans were disclosed to the SEC. The letter stated that The Post "would be happy to consider [TMTG]s' concerns" if TMTG "would provide us with more specifics."

11

38.     TMTG did not respond and instead filed this lawsuit on May 20, 2023, just three days after The Post sent its letter responding to the retraction demand.

39.     I had no bias against President Trump, TMTG CEO Devin Nunes, or TMTG. In my work as an editor, I simply aimed to help reporters produce accurate, fair articles on newsworthy topics. I bore no ill will.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed this 23rd day of April 2026 in Dallas, TX.

By: _____

Mark Seibel

12