# EXHIBIT T

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:23-cv-1535-TPB-AAS

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

          Plaintiff,

     vs.

WP COMPANY, LLC,
d/b/a THE WASHINGTON POST,

          Defendant.
_____/

VIDEOTAPED DEPOSITION OF DREW HARWELL

Friday, January 9th, 2026
9:41 a.m. - 5:52 p.m.

Thomas & LoCicero
601 South Boulevard
Tampa, Florida 33606-2629

-----------------------------------------------

REPORTED BY:
Susan Potts, RMR, CRR, CSR-IL
Job Number:  7043098

Drew Harwell
January 09, 2026

APPEARANCES:


    BRITO, PLLC, by:
    ALEJANDRO BRITO, ESQ.
    JALAINE GARCIA, ESQ.
    2121 Ponce de Leon Boulevard, Suite 650
    Miami, Florida 33134
    Phone:  305-614-4071
    E-Mail:  abrito@britopllc.com
             jgarcia@britopllc.com

        appeared on behalf of the Plaintiff;


    WILLIAMS & CONNOLLY, by:
    THOMAS G. HENTOFF, ESQ.
    CAT REID, ESQ.
    680 Maine Avenue S.W.
    Washington, D.C. 20024
    Phone:  202-434-5000
    E-Mail:  thentoff@wc.com
             creid@wc.com

-and-

    THOMAS & LOCICERO, by:
    LINDA RIEDEMANN NORBUT, ESQ.
    601 South Boulevard
    Tampa, Florida 33606-2629
    Phone:  813-984-3060
    E-Mail:  lnorbut@tlolawfirm.com

-and-

    THE WASHINGTON POST, by:
    JAMES A. McLAUGHLIN, ESQ.
    1301 K Street, N.W.
    Washington, D.C. 20024
    Phone:  202-334-7988
    E-Mail:  james.mclaughlin@washpost.com

        appeared on behalf of the Defendant.


ALSO PRESENT:

    Nathan Neal, Videographer
    Jack Langer

Drew Harwell
January 09, 2026

                        INDEX

              WITNESS:  DREW HARWELL

     EXAMINATION                              PAGE

     By Mr. Brito                              8


     Errata Sheet                            271

     Certificate of Reporter                 273

     Certificate of Oath                     274

Drew Harwell
January 09, 2026

EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 1 | The Washington Post's policies and standards | 46 |
| Exhibit 2 | October 15, 2022, article | 127 |
| Exhibit 3 | E-mails between Drew Harwell and Shayna Jacobs | 143 |
| Exhibit 4 | E-mail between Drew Harwell and Mark Seibel that originated with an e-mail from Phillip Brewster to Drew Harwell dated March 22nd, 2023 | 160 |
| Exhibit 5 | April 20, 2023, e-mail from Stephen Bell to Drew Harwell | 163 |
| Exhibit 6 | April 27, 2023, e-mail from Drew Harwell to Marlene Rodriguez | 166 |
| Exhibit 7 | April 29, 2023, article | 167 |
| Exhibit 8 | E-mails between Drew Harwell and Mr. Swider | 176 |
| Exhibit 9 | E-mails between Drew Harwell and Michael Ohlrogge | 192 |
| Exhibit 10 | Trust Linked to Porn-Friendly Bank Could Gain a Stake in Trump's Truth Social article | 211 |
| Exhibit 11 | E-mails between Drew Harwell and Matthew Bernardini and Matthew Bernardini and Matei Rosca | 219 |
| Exhibit 12 | May 14, 2023, e-mails between Scott Glade on and Sally Buzbee | 225 |

EXHIBITS

MARKED              DESCRIPTION                          PAGE

Exhibit 13     May 12th e-mail from Drew         244
               Harwell to Donald Trump Jr.

Exhibit 14     May 12th, 2013, e-mail from       248
               Drew Harwell to John Haley

Exhibit 15     May 13, 2023, e-mail from         250
               Drew Harwell to Eric Swider

Exhibit 16     May 12th e-mail between           252
               Drew Harwell and Devin Nunes

Exhibit 17     May 16, 2023, e-mail from         258
               Phil Brewster to Drew Harwell

Drew Harwell
January 09, 2026

The videotaped deposition of DREW HARWELL was taken pursuant to Notice by counsel for the Plaintiff on January 9th, 2026, commencing at 9:41 a.m. at Thomas & LoCicero, 601 South Boulevard, Tampa, Florida 33606-2629. Said deposition was reported by Susan Potts, RMR, CRR, CSR-IL, Notary Public, State of Florida at Large.

- - - - - - - - - - -

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  Today is January 9th, 2026, and the time is 9:41 a.m.  Audio and video recording will continue to take place until all parties agree to go off the record. Please note that the microphones are sensitive and may pick up whispering and private conversations.

This is the video recorded proceeding of Drew Harwell taken in the matter of Trump Media Technology versus WP Company, LLC, filed in the United States District Court in the Middle District of Florida.

This proceeding is being held at the offices of Thomas and LoCicero located at 601 South Boulevard, Tampa, Florida.  My name

Drew Harwell
January 09, 2026

is Nathan Neal, and I'm your videographer.  I'm not related to any party in this action nor am I financially interested in the outcome.  The court reporter is Sue Potts, both in association with U.S. Legal Support.

Will counsel present please announce their appearances for the record?

MR. BRITO:  Good morning.  Alejandro Brito on behalf of the plaintiff.

MS. GARCIA:  Good morning.  Jalaine Garcia on behalf of the plaintiff.

MR. HENTOFF:  Good morning.  Thomas Hentoff representing the Washington Post and the witness.  And with me is Jim McLaughlin of the Washington Post and my colleague Cat Reid and our co-counsel Linda Norbut.

THE VIDEOGRAPHER:  Madam Court Reporter, would you please swear in the witness?

THE COURT REPORTER:  Can you raise your right hand to be sworn, sir?

Do you solemnly swear or affirm the testimony you're about to give shall be the truth, the whole truth, and nothing but the truth?

Drew Harwell
January 09, 2026

THE WITNESS:  Yes.

DREW HARWELL,

a witness, having been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. BRITO:

Q.   Good morning, sir.

A.   Good morning.

Q.   Could you please state your full name for the record?

A.   My name is Drew Harwell.

Q.   Mr. Harwell, have you ever sat for a deposition before?

A.   I have not.

Q.   I'm going to go over a few ground rules just to facilitate the exchange of information today.  I'm going to be asking you a series of questions.  I'm going to try to do so as clearly as I can.

If you have a difficult time understanding my question, just let me know, and I will be happy to restate or rephrase my question.  If you don't ask me to rephrase or restate my question and you provide me with a

Drew Harwell
January 09, 2026

MR. HENTOFF:  Let's talk about lunch off the record.

But, actually, I want to stay on the record just for one second.  So I just want to say on the record that the witness will review the transcript.

THE VIDEOGRAPHER:  Hearing no objection, we are going off the record.  The time is 12:39 p.m.

(A recess was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 1:58 p.m.

MR. BRITO:  Mr. Wilkerson (sic), I'm going to show you what we'll mark as Exhibit 2.

(Deposition Exhibit No. 2

marked for identification.)

BY MR. BRITO:

Q.   Are you able to identify Exhibit 2 for the record?

A.   I am able to identify this.

Q.   Just make sure to keep your voice up, please.

A.   Yes, I can identify this.

Q.   What is it?

A.   This is the first story I did involving

Drew Harwell
January 09, 2026

Will Wilkerson.

Q.   And that's dated October 15, 2022?

A.   It is.

Q.   Is that the original date of publication?

A.   Yes, I believe so.

Q.   Now, if you take a look at the second page of the document -- and it's got -- it bears the number 12 at the bottom right-hand corner.

A.   Yes.

Q.   At the very top, it references an e-mail, and it says one of hundreds previously unreported company messages, documents, photos, and audio recordings that Wilkerson has provided to the SEC in connection with his whistleblower submission.

Do you see that?

A.   I do see that.

Q.   What's the e-mail that you're referencing there?

A.   In the previous paragraph I note an e-mail in which Andy Litinsky complained that now President Trump was retaliating against me by threatening to blow up the company if his

Drew Harwell
January 09, 2026

demands are not met.

Q.   The hundreds of previously unrecorded messages, documents, photos, and audio recordings, had you been provided those as of the date of this article?

A.   Yes.  I was provided many of those messages, if not all of them before this article.

Q.   Do you know whether or not you were provided some as opposed to all because you were provided some after the article or sitting here today do you believe you were provided all of this information prior to writing the article?

A.    There were hundreds of messages that Will Wilkerson and his attorneys provided to the SEC.  I was given a large number of them, but I'm not for certain -- I'm not certain that I got all of the messages they sent to the SEC.

Q.   The article lists you as the sole author, correct?

A.   Yes, I'm the sole author of this story.

Q.   Did anyone assist you in writing this story?

A.   No, no one assisted me in writing this

Drew Harwell
January 09, 2026

story.

Q.    There's no contributors, as far as you know?

A.    No, I don't see any contributors listed on this story.

Q.    Since the time that you originally published -- the Washington Post published Exhibit 2, have there been any updates or changes to the article?

A.    I'm not aware of any changes made to this article since it was published.

Q.    The article references communications that you had with Mr. Wilkerson's attorneys, does it not?

A.    I believe it does.  I'm looking at the story for confirmation of that, but yes, I've spoken with the attorneys before the story.

Q.    In relation to October 15th, 2022, when do you believe you had your first conversation with Mr. Wilkerson?

A.    It was within days of this story publishing.  I can't remember the specific date, but yeah, it was a couple -- within a couple days of this being published.

Q.    Okay.  And Mr. Wilkerson was fired nine

Drew Harwell
January 09, 2026

days prior to this article being disseminated, correct?

A.    I see in the story Wilkerson who was fired from his job Thursday after he spoke to The Post.  I'm not sure on which day this is, October 15th, but I would assume it was -- I kind of remember this being a Saturday, but I'm not entirely certain, so I think it would have been less than nine days.

Q.    Okay.  He was suspended on October 6th.

A.    Okay.

Q.    Is that correct?

A.    I don't recall specifically when he was suspended.  I just know from his recollection that he was fired from his job that Thursday.

Q.    Okay.  If you look at the bottom of page 2, it references --

A.    Yes, yes, yeah.  Wilkerson said he was still working for the company on October 6th, and then he received a letter that night suspending him.  Yes, that's right.

Q.    So October 6th when he was suspended, that was before you had ever spoken to him; is that correct?

A.    It says, "Wilkerson said he was still

Drew Harwell
January 09, 2026

working for the company on October 6th when his complaint was first reported by the Miami Herald.  A Trump Media attorney sent Wilkerson a letter that night suspending him."

So he was suspended the night of his complaint being reported by the Herald.  I spoke with him after that Herald story was published.

Q.   So in a chronological sense, the suspension occurred before you ever spoke to Mr. Wilkerson?

A.   Yes, that's right.  The suspension occurred before I spoke with him.

Q.   Would you describe Exhibit 2 as being a piece that was sympathetic to Mr. Wilkerson?

A.   I would say this was a story that recounted his story.  I was -- I would not describe it as sympathetic or critical.  It was just a recounting of his experience within the -- within the -- within the organization.

Q.   Was there a photo shoot that took place as part of this story, this article that was printed?

A.   I don't see photos here, but I recall there were photos taken of him at some point

Drew Harwell
January 09, 2026

and his attorneys.

Q.   In North Carolina?

A.   Yes, I believe they were in North Carolina, but I'm not entirely certain.

Q.   Whose idea was it to have the photo shoot?

A.   I don't recall.  Often with these stories, an editor will decide, but I don't remember specifically who made that decision.

Q.   Who typically would have made such a recommendation and then who would have made the determination?

A.   Per our practice, the editors would decide that a story merited photos or would be better illustrated with photos.  This happens with many of our stories.

They'll talk with a photo editor who will help arrange for either a Post photographer to go out and meet with the subject or arrange for a freelance photo journalist to meet with them.

Q.   In this instance do you know who was involved in that process?

A.   I don't specifically know.  I would assume Mark Seibel as my editor would help

Drew Harwell
January 09, 2026

facilitate that process, but I'm not sure who else he might have spoken to.

Q.    Who edited this story?

A.    Mark Seibel edited this story.

Q.    Anyone else?

A.    He was my main point of contact.  I'm not sure who else he might have shared it with.

Q.    Who ultimately approved the publication?

A.    I don't know who ultimately approved it, but I know that he edited it and, you know, shared it with the rest of the organization as a story to be published, but I'm not sure what conversations he had.

Q.    Is it fair to state that the information that's contained in this article comes -- that the information that was contained in this article came from Mr. Wilkerson or his attorneys?

A.    Much of the information came from Mr. Wilkerson and his attorneys and the documents.  Some of the information came from you'll see SEC filings, past public statements, other documentary evidence, past stories.  But a good amount of the information came from

Drew Harwell
January 09, 2026

Mr. Wilkerson, his attorneys, and his documents.

Q.   When in relation to this story did you receive all the records that are reflected at the top of page 2 of the article?

A.   I'm sorry.  Say that again.

Q.   At the top of page 2 of the article, it talks about hundreds of company messages, documents, photos, and audio recordings.

A.   Right.

Q.   When in relation to October 15th did you receive that information?

A.   Oh, I received the documents, messages, photos within -- within days of speaking -- of this story, I mean, I would assume within a week or two of publishing this story.

Q.   It couldn't have been two weeks because --

A.   Yeah.  It would have been after October 6th when that Herald story came out and before October 15th.  So within nine days of this story.

Q.   It would be less than nine days presumably because if we do the full math, the ninth day is the first time you communicated

Drew Harwell
January 09, 2026

with his lawyers and after that is when you communicated with Mr. Wilkerson, correct?

A.   Right.  So within nine days, less than nine days, I had the documents.

Q.   And when in relation to your conversation with Mr. Wilkerson's lawyers for the first time when you reached out to them seeking to get information about Mr. Wilkerson so that you could contact him did you receive these documents?

A.   I can't recall specifically when I received the documents.  I would assume within a couple days of speaking with him and his attorneys.

Q.   And did you receive it from the attorneys or from Mr. Wilkerson or both?

A.   The documents came from the attorneys.

Q.   Only?

A.   Yes.

Q.   Was that before or after you spoke to Mr. Wilkerson?

A.   I think I -- my recollection is that I spoke with Mr. Wilkerson and his attorneys and then they shared specific pieces of documentary evidence after that.

Drew Harwell
January 09, 2026

Q.   Okay.  So the chronology is you speak to the lawyers, then you speak to Mr. Wilkerson, and then you speak to them again collectively and then you get the documents?

A.   I initially reached out to his attorneys after the Herald story was published. We set up a time for us all to speak.  After that the documents were shared with me.  And then after a review period and further reporting, the story was published.

Q.   So when you spoke to Mr. Wilkerson, the lawyers were present?

A.   Yes, I believe so.

Q.   You never spoke to him one on one other than when you had the face-to-face meeting?

A.   That's right.

Q.   And in the face-to-face meeting, were the lawyers there?

A.   They were not present.  It was just me and Mr. Wilkerson together interviewing each other.  The lawyers were somewhere else.

Q.   Where did that take place?

A.   I met with him at the grocery store he was working at.  We -- I asked him to show me around the store, walk me through his typical

Drew Harwell

January 09, 2026

day, introduced me to some of his coworkers at the Starbucks.

We walked around talking.  We sat at the cafe, the Starbucks and had an interview, spoke for a certain amount of time.  Then afterward he and I and his attorneys did a further interview together.

Q.    On that same day?

A.    On that same day.

Q.    Where was that interview?

A.    I can't remember the name of it, but it was somewhere that served food.

Q.    The hundreds of documents that you reference in the article, are you still in possession of everything that was supplied to you today?

A.    Yes, I believe I am.

Q.    Were there any facts or contentions that you raised in this article that you sought to get corroboration from another witness?

A.    I shared the facts we would be including in the story with Trump Media TMTG and sought their response to some of Mr. Wilkerson's contentions, some of what we reviewed in the documents before publication.

Drew Harwell
January 09, 2026

Q.   Did you get a response?

A.   Trump Media -- TMTG responded.

Q.   How so?

A.   Reading from the story, they sent me a statement that "Now President Trump had hired Devin Nunes as CEO to create a culture of compliance and build a world class team to lead Truth Social" and certain other elements in that paragraph.  I'm happy to read them if you want.

Q.   Sure.

A.   "The company said it was already a success having launched on the Apple and Google app stores."

(Reporter instruction.)

THE WITNESS:  Sure.  This is a paraphrase of their response, but they said, "The company said it was already a success having launched on the Apple and Google app stores, executed multiple feature updates, and attracted millions of users."

Full quote, Ignoring these achievements, the Washington Post sent us an inquiry rife with knowingly false and defamatory statements and other concocted

Drew Harwell
January 09, 2026

psychodramas, end quote.  The statement did not

directly address any of Wilkerson's claims.

Q.   Other than President Trump, Trump

Media, and the Trump organization, did you seek

to get corroboration or confirmation regarding

any of the statements made in this article?

A.   I contacted the SEC, the Southern

District of New York.  I believe I -- yes, I

sent to the Trump organization, TMTG, President

Trump.  I sent requests to Wes Moss, Andy

Litinsky.

Q.   Did the SEC respond?

A.   They declined to comment.

Q.   Did the Southern District of New York

U.S. attorney's office respond?

A.   They declined to comment.

Q.   Did Mr. Litinsky respond?

A.   He did not respond.

Q.   Did Mr. Moss respond?

A.   Mr. Moss did not respond.

Q.   Anyone that you reached out for

corroboration or confirmation of the statements

made in this article?

A.   I interviewed or requested insight and

expertise from three financial experts who are

Drew Harwell
January 09, 2026

quoted in the story.

Q.   Did you provide them with any of the documentation that you had been supplied?

A.   I don't believe I sent them any documents.  I think I shared some of the reporting we were considering including in the story and asked for their response and insight.

Q.   So they were giving opinions as opposed to corroborating factual information; is that fair?

A.   They were given -- yes.  They were reflecting their insight as experts in this -- in this kind of matter.

Q.   Opinions based upon your representation of events, correct?

A.   They were offering their opinion on the specific issue of whether a SPAC leadership knowing its target merger partner and not disclosing it before its initial public offering document was a violation of SEC's rules.

Q.   But without any corroboration of that actually occurring, correct?

They weren't provided with corroboration of that actually occurring?

Drew Harwell
January 09, 2026

A.   No.  They were offering their insight into that scenario.

Q.   In other words, providing you their opinion without any factual basis directly tying your scenario to any particular person or entity?

MR. HENTOFF:  Objection to the form of the question.

THE WITNESS:  They were providing me their insight on this scenario.

BY MR. BRITO:

Q.   But without any factual information being supplied to them?

MR. HENTOFF:  Objection to the form of the question.

BY MR. BRITO:

Q.   They were provided with hypotheticals, were they not?

If this occurred, would this -- what would be the consequence in sum or substance?

A.   I walked them through the specific scenario of whether a SPAC's leadership knowing its target merger partner and not disclosing it before the IPO document would violate SEC rules.  They provided their insight as to

Drew Harwell
January 09, 2026

whether that scenario would be -- as to how
that scenario would play out.

Q.   And that was just based on your
question to them, no documents, correct?

A.   That was based on my conversations with
them, that's right.

Q.   Did you record your conversations with
these three experts?

A.   I don't recall if I did.  I did take
notes from our conversation.

Q.   And are those contained in your notes
that you produced in this case?

A.   Any notes from those conversations
would be in my notes.

MR. BRITO:  I'll hand to you what we'll
mark as Exhibit 3.

(Deposition Exhibit No. 3

marked for identification.)

BY MR. BRITO:

Q.   Take a look at Exhibit 3 and let me
know when you're ready to answer some questions
in relation to it.

A.   Sure.  Okay.  I've read this.

Q.   Okay.  So Exhibit 3 is a series of
e-mails between you and Shayna, S-h-a-y-n-a,

Drew Harwell
January 09, 2026

Jacobs.

Do you see that?

A.    I do see that.

Q.    Who's Shayna Jacobs?

A.    She was one of my colleagues at The Post.

Q.    What position did she have in March of 2023?

A.    At the time she was reporting on federal courts and would have been reporting on Southern District of New York matters.

Q.    Your e-mail at the bottom of Exhibit 3 says, "Sorry to bother, but I'm told SDNY confirmed on background to The Guardian that they had a money laundering investigation into Trump's media company underway as reported here."

Do you see that?

A.    I do see that.

Q.    Who told you that SDNY confirmed?

A.    I believe Wilkerson's attorneys offered that to me.  I was never able to confirm it with the SDNY myself.

Q.    Did you question as to the veracity of that statement that SDNY was confirming an

Drew Harwell
January 09, 2026

investigation?

A.   I did not.  I mean, how I proceeded was to ask Shayna whether she could help me confirm this on background and whether we could confirm it with SDNY on the record.  I wanted to know more before we proceeded with that kind of information.

Q.   You had not obtained that kind of confirmation from SDNY, correct?

A.   No, I had not obtained confirmation from SDNY.

Q.   In actuality, SDNY was not willing to comment, correct?

A.   SDNY did not comment to me on the record, no.

Q.   In your experience, it's not atypical for SDNY or any other federal prosecutor's office not to comment on any investigations, correct?

A.   I'm sorry.  Say that one more time.

Q.   Based on your experience as a reporter, it is not atypical for the Southern District of New York U.S. attorney's office or any other U.S. attorney's office to not comment on investigations, correct?

Drew Harwell

January 09, 2026

A.    I think it's very typical for them not to comment on investigations, yes.

Q.    So the fact that you were being told that they had confirmed information regarding an investigation, did that create any suspicion in your mind or doubt in your mind as to the veracity of that statement?

A.    It did not create any doubt in my mind because by that point Mr. Wilkerson's attorneys had said they were cooperating with the SDNY investigators.

They had shared with me that they had shared a good amount of information with both SDNY and SEC.  And so it seemed reasonable to me to -- that they had had conversations that they would not confirm to me as a reporter.

Q.    But you're stating here, "I'm told SDNY confirmed on background to The Guardian."

So you were being told by Mr. Wilkerson's lawyers that the U.S. attorney's office for the Southern District of New York was confirming to of all people The Guardian about an investigation that was being conducted.

That's what you're writing here,

Drew Harwell
January 09, 2026

correct?

A.   That's right.  I don't know --

Q.   There's no question.  I just want to know if that's what this says.

A.   That is -- what it says is "I'm told SDNY confirmed on background to The Guardian."

Q.   Okay.  That they had a money laundering investigation into TMTG.

That's Trump's media company; that's what you're referring to, right?

A.   That's right.  Trump's media company TMTG.

Q.   Okay.  So you are told this and you actually write this to Shayna Jacobs and Devlin Barrett, and you're testifying today under oath that you had no concerns about the veracity of that statement; am I getting that correct?

A.   My interest -- my interest in this statement was to find out more, to do more reporting, to understand.  I don't know The Guardian's sources.

Q.   That's not my question, sir.

A.   I didn't have concern with the veracity of this statement because we were working to confirm or find more information about it.

Drew Harwell
January 09, 2026

Q.   Right.  You were working to confirm information about it.

One of -- one of the efforts that you made was to speak directly to the SDNY, was it not?

A.   That's right.  I did contact the SDNY.

Q.   And they were unwilling to comment, correct?

A.   They were unwilling to comment to me about this, that's right.

Q.   What made The Guardian any different from the Washington Post such that you would believe that the SDNY would actually confirm to The Guardian the background of a money laundering investigation, but they wouldn't comment to the Washington Post?

A.   Different reporters at different organizations have different sources.  Some people have close sources in organizations that will confirm information on background that they wouldn't confirm to me because I don't have that kind of relationship.

So it did not seem impossible to me that The Guardian would have sources or information that I did not have from my vantage

Drew Harwell
January 09, 2026

point at the Washington Post.

Q.    But you had no independent corroboration of the SDNY's position, correct?

A.    I did not have any independent confirmation of the SDNY's position.  I was operating off of what I said here.

Q.    At no time since you've been a reporter has the SDNY ever confirmed an investigation to you about anything or any person; is that fair?

A.    The SDNY has not confirmed any investigation here.

Q.    I'm not just talking about here.

I'm talking about in your experience as a journalist, they've never confirmed any investigation to you, have they?

A.    I can't recall any investigation that the SDNY has confirmed to me.

Q.    So then Shayna writes back to you.  And if we look at the end of the first line, she asks the same questions that I'm asking you.  Have the lawyers confirmed on background that they have been dealing with SDNY?

Do you see that?

A.    That's right.

Q.    And then you respond that same day, you

Drew Harwell
January 09, 2026

put, "Just off the phone with one of the

lawyers.  He told me SDNY never tells them

they're investigating something."

        Right?

    A.    That's right.  That's what I said.

    Q.    Did that give you any concern as to the

veracity of the statement that you were

originally told when you wrote this e-mail on

March 15 at 9:37 as to what you were told by

Mr. Wilkerson's attorneys?

        MR. HENTOFF:  Objection.  That's an

incomplete recitation of even just the sentence

in that e-mail.

        MR. BRITO:  Let's -- I'm going to need

the objections to only be legal in nature.  And

please refrain from trying to help the witness

in answering my questions by coaching him with

improper speaking objections.  Let's limit it

to legal objections, please.

        MR. HENTOFF:  We're two-and-a-half

hours into this, and you know all of my

objections have been proper.

        MR. BRITO:  That one wasn't.

        MR. HENTOFF:  I object to that on the

ground that it mistakes the record, and that's

Drew Harwell

January 09, 2026

a proper objection.

MR. BRITO:  That's not what you said the first time.

BY MR. BRITO:

Q.  Do you understand my question, sir?

A.  Can you rephrase it?

Q.  Sure.  In your e-mail at 2:14 p.m., you wrote that you spoke to the lawyers again and that "He told me SDNY never tells them they're investigating something," right?

A.  I said, "He told me SDNY never tells them that they're investigating something but that they have plenty of correspondence with the SDNY folks and that they're the kinds of e-mails and requests you'd exchange with a fact witness."

Q.  Okay.  "SDNY never tells them they're investigating something," right; you wrote that, did you not?

A.  I did as part of this longer sentence and longer paragraph.

Q.  That's fine.  We can talk about the plenty of correspondence and the kinds of e-mails, but that's not -- that's not what is really driving this.

Drew Harwell
January 09, 2026

I'm asking you about the fact that you made a definitive statement that SDNY never tells them they're investigating something, which based on your own experience you find to be correct and consistent with your own experience, right?

MR. HENTOFF:  Objection.  Mischaracterizes the document.

THE WITNESS:  What I'm saying here is he told me SDNY never tells them they're investigating something.

BY MR. BRITO:

Q.   And that's consistent with your own experience, was it not?

MR. HENTOFF:  I believe you interrupted the witness while he was speaking.

THE WITNESS:  My perspective as a journalist is going to be different.  This perspective of a journalist from a different organization that may have different relationships with members of that office, it may be different from the conversations that the attorneys for somebody who has material information related to something they could or could not be investigating.

Drew Harwell
January 09, 2026

So, you know, I was not privy to the conversations that SDNY was having with anyone else, but I'm relaying here in this message that from my call with one of the attorneys SDNY had never told them they were investigating something, but there had -- they had plenty of correspondence with those folks, a lot of e-mails and requests you'd exchange with a fact witness.

BY MR. BRITO:

Q.   Who's the "he" in your sentence, the third sentence?

A.   The "he told me"?

Q.   Uh-huh.

A.   I can't remember specifically which attorney it was.

Q.   Give me the universe of attorneys that you think it was.

A.   I would expect it was likely Phillip Brewster, but there were other -- two other attorneys I spoke with who represented Mr. Wilkerson.

Q.   Which were?

A.   Stephen Bell.  And I can't recall the third name.

Drew Harwell

January 09, 2026

MR. BRITO:  I'm going to hand to you what we'll mark as Exhibit 9.

(Deposition Exhibit No. 9

marked for identification.)

BY MR. BRITO:

Q.   And Exhibit 9 is a series of e-mails between you and Michael Ohlrogge, O-h-l-r-o-g-g-e.  I don't know if I'm mispronouncing the last name or not.

But who is -- I'm just going to call him Michael for purposes of this e-mail.  Who is Michael?

A.   Michael is a professor at the -- at New York University.

Q.   What does he teach?

A.   He teaches finance.

Q.   Is he -- does he teach at the New York University undergrad business school?

A.   I'm not sure what his curriculum is now.

Q.   And how did you come across Michael?

A.   He is a professor who has been cited in other reporting by financial journals and other journalists as an expert to financial issues.

Q.   Who brought you his name or who pointed

Drew Harwell
January 09, 2026

him out to you?

A.   I can't specifically recall.  I think I may have seen him in the Wall Street Journal or something like that.  He's just somebody I've seen while doing my own reporting.

Q.   And you reached out to him?

A.   I did reach out to him.

Q.   He's actually a law professor, is he not?

A.   He's an expert in finance, and he's a law professor at NYU.

Q.   We have communications between you and him from April 26th, 2023, to May 8, 2023, in front of us, correct?

A.   The first e-mail in this packet is April 26th of 2023.

Q.   Now, what I want you to take a look at is your e-mail to him on the third page of this document.  The e-mail is dated May 5th, 2023, at 9:35 a.m., and the document on the bottom right-hand corner says 7544.

A.   Okay.

Q.   In the e-mail you write to him, you say, hey, Michael, there's another point from the files I'm hoping to spotlight.  It may not

Drew Harwell
January 09, 2026

be in your wheelhouse but would appreciate your

guidance or a reference to someone who might.

Do you see that?

A.    I do see that.

Q.    And you start talking about a

convertible promissory note, right?

A.    I do start talking about a convertible

promissory note.

Q.    And then if we scroll to the bottom,

you write, "In January 2022 Trump Media agreed

to pay a cash referral fee equal to 3 percent

of the $8 million loan or $240,000 to a

Houston-based brokerage firm called Entoro

Securities according to a referral fee

agreement and an Entoro invoice provided by

Wilkerson."

Do you see that?

A.    I do see that paragraph.

Q.    Did you provide a copy of the referral

fee agreement to Michael at any point in time?

A.    I don't remember sending him either

document.

Q.    Either of the two?

A.    I don't recall sending him the

documents.

Drew Harwell
January 09, 2026

Q.   Is there a reason why?

A.   No.  Except for the fact that we were talking about a number of different documents, and I figured -- I just didn't have the thought to send him all these documents.

Q.   You then write, "The referral fee agreement names, quote, Anton Postolnikov, P-o-s-t-o-l-n-i-k-o-v, and affiliated entities, closed quote, as, quote, introduced parties, closed quote, who participated in the deal."

Did I read that correctly?

A.   Yes, that's what that says.

Q.   Sitting here today, have you ever seen a signed referral fee agreement that reflects what you are representing to Michael as of May 5th, 2023?

A.   I have seen a referral fee agreement document.  It was not signed.

Q.   To the present, you've not seen such a signed document?

A.   I have not seen a signed referral fee agreement document.

Q.   Have you seen one that's partially signed?

A.   I have not seen a partially signed

Drew Harwell
January 09, 2026

referral fee agreement document.

Q.   Have you seen one that's electronically signed?

A.   I've seen one referral fee agreement document, and it had no signature.

Q.   Did you ever tell Michael that this document that you were referring to was unsigned?

A.   No, I did not relay that it was unsigned.

Q.   By virtue of the fact that it was unsigned, did that impact your understanding as to whether or not it was binding on anyone?

A.   No, it didn't affect my thinking on whether it was binding.

Q.   You thought it was binding even if no one had signed it?

MR. HENTOFF:  Objection to the form of the question.

THE WITNESS:  I was told by Mr. Wilkerson that money had been paid and was shown this document that relayed -- related to the $240,000 referral fee agreement.  So my understanding was that it was an agreement that had already been binding and had already been

ERRATA SHEET    **Please see attached**

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE

IN RE:  Trump Media & Technology
Group Corp. vs. WP Company, LLC
DEPOSITION OF:  Drew Harwell
January 9th, 2026
{Job Number 7043098}

PAGE      LINE      CORRECTION AND REASON THEREFORE

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____          2/19/2026

DREW HARWELL                              DATE

**Errata Sheet for the Deposition of Drew Harwell**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 36 | 23 | "either" should be "each" | Transcription error |
| 68 | 17 | "report" should be "afford" | Transcription error |
| 78 | 19 | "Laurie" should be "Lori" | Spelling error |
| 91 | 6 | "unpublished" should be "unpublish" | Transcription error |
| 140 | 21 | "anyone" should be "anyone else" | Transcription error |
| 161 | 7 | "Viss" should be "Biss" | Spelling error |
| 161 | 11 | "Viss, V-i-s-s" should be "Biss, B-i-s-s" | Spelling error |
| 161 | 15 | "Viss" should be "Biss" | Spelling error |
| 161 | 24 | "Viss" should be "Biss" | Spelling error |
| 180 | 4 | "we" should be "you" | Transcription error |
| 188 | 17 | "answer" should be "question" | Transcription error |
| 204 | 22 | "our" should be "a" | Transcription error |
| 208 | 18 | "attach" should be "attached" | Transcription error |
| 216 | 12 | "on draft" should be "on a draft" | Transcription error |
| 239 | 23 | "Sass" should be "Sas" | Spelling error |
| 262 | 4 | "Laurie" should be "Lori" | Spelling error |
| 262 | 21 | "with the source" should be "the source" | Transcription error |
| 267 | 20 | "for the reporting" should be "further reporting" | Transcription error |