## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

v.

                                   Case No: 8:23-cv-01535-TPB-AAS

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

                                           /

## DEFENDANT WP CO. LLC d/b/a THE WASHINGTON POST'S
## REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

TMTG's brief misstates the actual malice standard. The actual malice inquiry is not an exercise in Monday-morning quarterbacking, asking whether a publisher "could have learned" particular facts with "minimal pre-publication inquiry." Opp. 22, 24. Instead, actual malice—even when proven through purposeful avoidance of the truth—is about a publisher's subjective mental state at publication, asking whether the publisher knew or "actually had a high degree of awareness" the statements were false, but published them anyway. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989).[1]

No matter how TMTG contorts the record, it cannot meet that standard. There is no evidence, much less *clear and convincing evidence*, that Drew Harwell or Mark Seibel "had a high degree of awareness" before publication that the statements at issue were false. To the contrary, the undisputed record shows Harwell had on-the-record sources supporting that TMTG agreed to pay a finder's fee to Entoro and did pay the fee, and that The Post believed its sources.

## ARGUMENT

### I.   There Is No Genuine Issue of Material Fact as to Actual Malice

TMTG cannot prove actual malice because it presents no evidence of Harwell's or Seibel's state of mind at publication.[2] *See Dershowitz v. CNN, Inc.*, 153 F.4th 1189, 1193-95 (11th Cir. 2025) (affirming grant of summary judgment);

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted.

[2] Although TMTG (at 3-12) lists 12 purported "disputed" facts, this brief explains why those facts are either not disputed or not material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (explaining only "genuine" disputes of "material fact" preclude summary judgment).

1

*Berisha v. Lawson*, 973 F.3d 1304, 1312-16 (11th Cir. 2020) (same); *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 116 (D.C. Cir. 2017) (reversing denial of summary judgment and emphasizing that "[s]ummary proceedings" advance the "protective purpose of the First Amendment" by preventing "long and expensive litigation.").

There is no direct evidence that before publication Harwell or Seibel seriously doubted that TMTG had agreed to or had paid Entoro's referral fee.  No one told Harwell the fee had not been agreed to or paid; no document Harwell reviewed contradicted an agreement or payment.  And Harwell and Seibel never expressed any doubt that TMTG had agreed to and paid the referral fee.

Nor does TMTG's circumstantial evidence show actual malice.  Although TMTG tries to prove actual malice through purposeful avoidance of the truth, TMTG misstates the law and the record.  TMTG fails to offer clear and convincing evidence that The Post made a "deliberate decision" not to confirm the truth of its statements in the face of serious doubt.  *Harte-Hanks*, 491 U.S. at 692.

### A.    TMTG Misstates the Law of Purposeful Avoidance

TMTG (at 24) asserts that "[p]urposeful avoidance asks what the publisher could have learned through available pre-publication verification."  That definition downgrades actual malice to negligence and ignores the Supreme Court's repeated instruction that "failure to investigate before publishing, even when a reasonably prudent person would have done so," is not actual malice.  *Harte-Hanks*, 491 U.S. at 688.  A plaintiff seeking to prove actual malice through purposeful avoidance

still must prove the defendant's subjective mental state, specifically "intent to avoid the truth." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

Purposeful avoidance asks whether—based on what was actually known to the publisher before publication—the falsity of the statement was so "obvious" that the lack of direct evidence of knowledge of falsity is explained by the defendant deliberately avoiding the truth. *See Harte-Hanks*, 491 U.S. at 688, 692. The cases TMTG (at 13, 22) relies on illustrate this standard. In *Harte-Hanks*, a newspaper interviewed "six witnesses [who] had consistently and categorically denied" the source's allegations, and nothing corroborated the source's account. 491 U.S. at 682-83. Despite this, the reporters ignored known key sources that might disprove the source's story, including tape recordings already in the newspaper's possession. *Id.* at 691-93. That inaction was "a *deliberate* decision" not to try to "confirm the probable falsity of [the] charges." *Id.* at 692 (emphasis added).

Similarly, in *Hunt v. Liberty Lobby*, the publisher's notes and testimony proved the publisher "had reason to, *and in fact did*, question" the information's veracity before publication. 720 F.2d 631, 645 (11th Cir. 1983). Yet, the publisher "did not follow up on his doubts" before publication—a fact that was particularly egregious given the "inherent improbability" of the allegations (that the CIA was covering up its role in the Kennedy assassination). *Id.* at 645-46.[3]

---

[3] In the other cases TMTG cites (at 13-15, 17-18), unlike this case, there was direct evidence the journalists doubted their sources. *See Rebozo v. Wash. Post Co.*, 637 F.2d 375, 382 (5th Cir. 1981) (internal memo "expressed uncertainty"); *Amin v. NBCUniversal Media, LLC*, 2024 WL 3188768, at *4 (N.D. Ga. June 26, 2024) (texts and emails revealed reporters "actually doubted" source).

Thus, to prove actual malice through purposeful avoidance, TMTG still must offer circumstantial evidence that Harwell and Seibel actually had serious doubts.

**B.      TMTG's Evidence Falls Far Short of Purposeful Avoidance**

"The instant case is precisely the opposite of [*Harte-Hanks*]." *Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1243 (11th Cir. 1999).  As to the agreement to pay the referral fee, TMTG's brief never explicitly argues that The Post reported the agreement with actual malice.  *See* Opp. 18 ("The Post did not publish an 'agreement to pay.'  It published 'paid.'").  And TMTG could not prove purposeful avoidance anyway.  Will Wilkerson's attorneys repeatedly told Harwell that TMTG agreed to pay the fee, Harwell Decl. ¶ 59, and substantiated their statements with an invoice and a draft referral fee agreement, Harwell Exs. 13, 21.  There were no obvious reasons to doubt Wilkerson and his attorneys.  *See infra* pp. 7-8.

The Post did the *opposite* of avoiding the truth.  It sought to verify the agreement.  Eight days before publication, Harwell emailed TMTG saying, "We're citing a Jan. 2022 referral fee agreement and an invoice that shows TMTG agreeing to pay a cash referral fee—equal to 3 percent of $8 million loan, or $240,000—to Entoro Securities."  Harwell Decl. ¶ 51.  Harwell also followed up twice.  *Id.* ¶ 52.

As to the fee's payment, TMTG also cannot establish actual malice for two independent reasons.  For one, Harwell's and Seibel's lack of actual malice as to the agreement is enough to show that they lacked actual malice in reporting the payment.  Saying that TMTG not only agreed to but "paid a $240,000 finder's fee" was at most a "minor inaccurac[y]."  *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S.

237, 247 (2014); Mot. 19.  The Supreme Court has "required more than mere falsity to establish actual malice:  The falsity must be material," meaning the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Air Wis.*, 571 U.S. at 247.  As this Court already held, the "defamatory 'sting'" of the statement that TMTG paid the fee would have the "same" "effect on the mind of a reader" as agreement to the fee— both the agreement and the payment implicate the same potential conflict of interest.  Second Op. at 15.  So TMTG cannot prove that The Post acted with actual malice regarding a statement that is not materially false.  In any event, TMTG cannot show purposeful avoidance regarding the payment statement.

### 1. There is no evidence that The Post was on notice that the payment statement was inaccurate

The Post only had evidence *supporting* that TMTG paid the finder's fee. TMTG has not genuinely disputed that Wilkerson's attorneys told Harwell multiple times—including in a recorded interview in Wilkerson's presence while speaking on his behalf—that TMTG paid the fee.  Harwell Decl. ¶¶ 36-37, 61; Opp. Ex. C 121:19-122:7.  It is immaterial that later Wilkerson did not recall Harwell asking about the fee or said he would not have told Harwell something untrue.  Opp. 4-5.[4]

There is undisputed evidence that Wilkerson's attorneys also told others that TMTG paid the fee.  Mot. 26-27.  In an audio-recorded interview, Wilkerson's

---

[4] TMTG cites testimony from Will Wilkerson, Patrick Orlando, Phillip Juhan, James Row, and Post corporate designee Scott Vance. *See, e.g.*, Opp. 7-9, 21-22.  None of this testimony addressed whether Harwell or Seibel "in fact entertained serious doubts" at the time of publication. *See Berisha*, 973 F.3d at 1312.

attorneys told Harwell that they reported the "payments that [Orlando] got for ES Family Trust" to the SEC.  Harwell Decl. ¶ 37.  And Wilkerson's attorney also forwarded Harwell an email he had sent to Senator Warren's office which said, "TMTG paid a $240,000 referral fee to Entoro."  *Id.* ¶ 30.  Although TMTG (at 6) claims that the Warren email could not "provide independent corroboration" of payment, it does not dispute that Harwell found his sources' account more believable because they offered a consistent account to others.  Mot. 26; Opp. 17. Though TMTG (at 17) asserts that Harwell's belief in his sources is irrelevant, actual malice is *entirely* about what Harwell believed.[5]

TMTG (at 14-15) argues that Harwell needed proof beyond his sources, like a payment record.  But a publisher is not required to "establish through an independent source that [a source's] allegations are true."  *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1509 (D.C. Cir. 1996).  That would convert a state-of-mind inquiry into assessing "whether the publisher satisfied an objective standard of care."  *Id.*  Demanding such proof would also paralyze reporting about financial matters, since the media will rarely have a raw payment record for any transaction.

TMTG (at 14-15) suggests Harwell and Seibel admitted to publishing a statement they "did not know to be true."  But that testimony addressed whether *today* Harwell and Seibel know whether TMTG paid the fee.  Opp. Ex. M 31:15-22;

---

[5] TMTG (at 20) complains that The Post cited Wilkerson's supplemental whistleblower complaint even though Harwell did not review it before publication.  The Post (at 8 n.4) offered the document to show that there is no genuine dispute that Wilkerson's attorneys told Harwell that TMTG paid the fee, as Harwell's notes say.  Opp. 4.  The email is proof that Wilkerson's attorneys were telling people (including federal authorities) that TMTG paid—not just agreed to—the fee.

Opp. Ex. B 230:6-231:9.  Before publication, they believed that TMTG paid the fee.[6]

TMTG (at 18-19) also tries to prove actual malice by highlighting that, before publication, Seibel acknowledged that Wilkerson's allegation regarding the "SEC nondisclosure" was a "bigger deal."  TMTG implies that it would have been *reasonable* for Seibel to make an extra effort to verify payment.  But that is not the standard for actual malice.  Seibel knew that Wilkerson's attorneys had told Harwell that TMTG had paid the fee, and The Post was "not required to continue [its] investigation" to try to disprove its sources.  *Levan*, 190 F.3d at 1243.

### 2.  There is no evidence that information known to Harwell and Seibel before publication was implausible or contradictory

TMTG (at 9) claims that Harwell and Seibel knew Wilkerson was not a "credible" source because TMTG terminated him.  TMTG's insinuation that Wilkerson gave The Post unreliable information as a disgruntled former employee makes no sense:  Wilkerson was still a TMTG employee when he disclosed similar information to the SEC and the Miami Herald; TMTG terminated him for those disclosures.  This Court has also already held that "[t]he fact that Wilkerson . . . was to some unspecified extent hostile to TMTG does not, without more, support an inference that he gave vent to that hostility by fabricating facts regarding the loan."  Second Op. at 10.  TMTG has not put forward *any* evidence that Wilkerson fabricated facts out of malice or that Harwell knew Wilkerson or his attorneys to be inherently unreliable—which is what matters for actual malice.  *See Woods v.*

---

[6] The Post has since published a correction noting that pre-trial discovery showed that the finder's fee was not paid.  *Correction*, Wash. Post (May 22, 2026), https://tinyurl.com/ypkfwvf6.

*Evansville Press Co.*, 791 F.2d 480, 488 (7th Cir. 1986) ("Reliance on a single source . . . does not constitute actual malice."). And TMTG provides no substantive rebuttal to why Harwell did in fact credit Wilkerson and his attorneys. Mot. 25-27.

Nor has TMTG genuinely disputed that Harwell and Seibel viewed various documents as corroborating Wilkerson's information. Mot. 22-28.

**Promissory Note:** TMTG (at 8-9) does not dispute that the promissory note corroborated both Wilkerson's credibility and the fact that TMTG's financial dealings did not always depend on signed documents. Harwell Decl. ¶¶ 60, 62.[7]

**Entoro Invoice:** TMTG (at 6, 8-9) suggests Harwell's reliance on the invoice was unreasonable because the invoice reflected a "BALANCE DUE," not a balance paid. But Harwell "reasonably . . . believed that TMTG paid the fee because it had agreed to do so," Third Op. at 3; Harwell Decl. ¶¶ 60-61, and the invoice corroborated what Wilkerson and his attorneys said about the agreement.

**Referral Fee Agreement:** TMTG (at 16) faults Harwell for reporting a "completed payment" based on an "unsigned, undated" referral fee agreement. As The Post explained, Harwell believed that the unsigned agreement helped corroborate Wilkerson and his attorneys' statements that TMTG had agreed to and paid a fee to Entoro. Mot. 27-28. The unsigned agreement did not "contradict[] information" known to Harwell. *Hunt*, 720 F.2d at 645. TMTG offers no evidence disputing Harwell's and Seibel's belief that the agreement corroborated payment.[8]

---

[7] TMTG (at 9, 16) argues only that the promissory note did not confirm the fact of payment. But Harwell saw the note as corroborating his source's account, not payment specifically. Mot. 27-29.

[8] The Post also explained in detail why the Article reported that the promissory note—not the

### 3. The Post's repeated efforts to verify its information with TMTG further dispel speculation of purposeful avoidance

TMTG (at 15) contends that The Post did not meaningfully try to verify that TMTG paid the referral fee because its "no surprises" email did not reference "payment."  But TMTG does not dispute that four paragraphs of the email addressed the referral fee issue, including explicitly mentioning that the Article would report "Entoro's referral fee." *See* Mot. 10-11; Harwell Ex. 28.[9]

There is no evidence that The Post intentionally did not refer to "payment." Nor does TMTG dispute Harwell's reason for not mentioning "payment" or explain why Harwell, after trying to verify that TMTG *agreed* to pay the fee, would deliberately not verify that TMTG *paid* the fee.  Mot. 10; Harwell Decl. ¶ 51.  The Eleventh Circuit recently has held that a similar alleged fact-checking omission was not evidence of actual malice.  *Moore v. Cecil*, --- F.4th ---, 2026 WL 1109336, at *15 (11th Cir. Apr. 24, 2026).  Here, The Post's other efforts to "verify the accuracy of its statements" in the Article "militates against a finding of actual malice." *Id.*

### 4. No other evidence shows purposeful avoidance of the truth

TMTG (at 24) concedes that The Post's post-publication conduct and retraction response are not themselves evidence of actual malice.  Still, TMTG (at 24) claims The Post's retraction response "reveal[s] an evidentiary gap that existed

---

agreement—was unsigned.  Mot. 28.  TMTG does not dispute The Post's explanation, beyond restating that the Article described only the promissory note as unsigned.  Opp. 21.

[9] In any event, The Post had no legal obligation at all to "contact [TMTG] for comment before publication." *Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016) (per curiam).

all along." But the fact that The Post could not definitively say after publication that payment had *not* occurred does not mean it "necessarily lacked enough information" before publication to believe that payment *had* occurred. Opp. 19.

The other alleged "flaws" in The Post's investigation do not amount to actual malice. TMTG (at 11-12, 19) accuses The Post of violating its Policies and Standards. It did not. Regardless, TMTG "must prove more than an extreme departure from professional standards" for actual malice. *Harte-Hanks*, 491 U.S. at 665. TMTG (at 15) miscites Harwell's testimony discussing his efforts to verify information with the SEC and SDNY for *different* articles. *See* Opp. Ex. B 127:25-153:9. And Harwell did not tell Professor Ohlrogge that the referral fee agreement was unsigned because Harwell attached the agreement. Opp. 7; Harwell Ex. 27.

At bottom, TMTG argues only that Harwell and Seibel could have asked more precise questions about proof of payment. That is not actual malice. But even if there were "some evidence" of actual malice, there is insufficient evidence to support finding actual malice "*by clear and convincing evidence.*" *Cannon v. Peck*, 36 F.4th 547, 573 (4th Cir. 2022); *see Kahl*, 856 F.3d at 116 (actual malice is "significantly more onerous" than the preponderance of the evidence standard).

## II.    There is No Genuine Issue of Material Fact as to Conspiracy

TMTG's conspiracy claim falls with its defamation claim. Mot. 30 (citing *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 n.6 (S.D. Fla. 2021)).

### CONCLUSION

This Court should grant summary judgment in The Post's favor.

10

Dated: May 29, 2026

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Counsel for Defendant*

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

*/s/ Thomas G. Hentoff*
Thomas G. Hentoff (*pro hac vice*)
Nicholas G. Gamse (*pro hac vice*)
Claire R. Cahill (*pro hac vice*)
Samuel M. Lazerwitz (*pro hac vice*)
Isabelle Jensen Beaton (*pro hac vice*)
Catherine A. Reid (*pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
thentoff@wc.com
ngamse@wc.com
ccahill@wc.com
slazerwitz@wc.com
ibeaton@wc.com
creid@wc.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed a true and correct copy of the foregoing motion with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the email address of all counsel of record.

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero
Counsel for Defendant

11