**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,

    Plaintiff,

v.

                                             Case No: 8:23-cv-01535-TPB-AAS

WP COMPANY LLC d/b/a The Washington Post,

    Defendant.

_____/


**DEFENDANT WP CO. LLC d/b/a THE WASHINGTON POST'S**
**MOTION FOR AN ADVERSE JURY INSTRUCTION UNDER RULE**
**37(b)(2)(A) AND FOR FEES AND EXPENSES**
**UNDER RULES 37(a)(5), 37(b)(2)(C), AND 37(c)(1)**

**INTRODUCTION**

Plaintiff Trump Media & Technology Group Corp. ("TMTG") violated multiple Court orders and failed to comply with its basic discovery obligations. It has forced The Post and the Court to expend significant resources to enforce TMTG's compliance. TMTG continues to violate Court orders by withholding documents, causing ongoing prejudice to The Post. The Court previously gave The Post leave to move for sanctions in connection with TMTG's non-compliance. With this motion, the Court should now order an adverse jury instruction based on the ongoing failure to produce key documents,[1] and order fees and expenses based on TMTG's repeated discovery violations and noncompliance with Court orders.

First, to date, TMTG has yet to comply with the Court's orders requiring production of documents from TMTG Chief Financial Officer and central witness Phillip Juhan's custodial file. The Court's October 24, 2025 and November 19, 2025 Orders (Doc. Nos. 112, 128) required TMTG to produce responsive documents from Mr. Juhan's custodial repositories, including his phone and computer. Since November 2025, The Post has repeatedly told TMTG that it had not received a single document from Mr. Juhan's custodial file. In February 2026, mere weeks before the close of fact discovery, TMTG confessed it failed to search and produce documents from Mr. Juhan's custodial file, blaming a vendor error. But even those results seemed incomplete. The Court, recognizing this, compelled

---

[1] Should the Court grant The Post's motion for summary judgment, Doc. No. 211, the request for an adverse jury instruction would be moot.

TMTG to produce a hit report.

TMTG's Court-ordered hit report proved that thousands of documents on Mr. Juhan's phone and computer hit on the parties' agreed-upon search terms but were not produced. Incredibly, when The Post brought this to TMTG's attention and asked to confer, TMTG declined to review and produce those documents. Thus, despite multiple Court orders compelling the production of Mr. Juhan's documents, TMTG has *still* not produced a single document from his phone nor produced any documents from his computer responsive to the agreed-on search terms (including, for example "Entoro"). TMTG's ongoing, unjustified failure warrants the imposition of an adverse jury instruction as to the nature of the improperly withheld evidence.

Second, more broadly, TMTG disregarded multiple other obligations to produce documents, respond to interrogatories, and provide disclosures that are required under the Federal Rules of Civil Procedure. This failure forced The Post to file two motions to compel and multiple status reports, which led to four court appearances to enforce TMTG's compliance. Following each hearing and motion, the Court issued orders largely granting The Post's motions and ordering TMTG to comply with its discovery obligations and prior Court orders. Thus, in addition to the adverse jury instruction to cure the ongoing prejudice The Post faces, TMTG's actions warrant payment of fees and costs to The Post for its efforts to enforce the Federal Rules and Court orders. Fed. R. Civ. P. 37(a)(5); 37(b)(2).

The Court granted The Post leave to seek sanctions several months ago, *see*

Nov. 19 Order at 3-4, and emphasized that the motion could be held "in abeyance" and "brought later if discovery continues to be an issue," Nov. 19 Tr. at 66:18-68:8.[2] As the Court is fully aware, The Post continued to have trouble obtaining discovery and enforcing compliance with the Court's Orders, and indeed sought further relief from the Court in that regard (which was largely granted).  Now that fact discovery has closed, The Post submits this motion pursuant to Rules 37(a)(5), 37(b)(2), and 37(c), seeking sanctions for the discovery costs it incurred and ongoing prejudice.

The Court should grant the motion.

## BACKGROUND

### I.  THE POST INCURRED EXPENSES BASED ON TMTG'S DELAYS AND VIOLATIONS OF COURT ORDERS

#### A.  The Post's August 7, 2025 Motion to Compel

On August 7, 2025, The Post filed its first motion to compel.  Def.'s Mot. to Compel (Doc. No. 93) ("Aug. 7 Mot.").  Despite a Court order requiring document production to commence in June 2025, TMTG had yet to produce a single document or commit to a date by which it would.  *Id.* at 11-12.  TMTG had also served deficient Initial Disclosures with insufficient information about its staggering $3.78 billion damages claim, *id.* at 6-10, improperly objected to production of relevant documents, *id.* at 12-15, and served deficient interrogatory

---

[2] The Court invited The Post to renew its motion for sanctions and stated it could include a specific amount of fees.  Nov. 19 Order at 3-4.  In light of the subsequent discovery issues, The Post files the present motion, which seeks an order granting sanctions and indicating which portion of The Post's total expenses described herein may be recoverable.  The Post will then confer with TMTG and, if the parties are unable to stipulate to an amount, The Post will make a supplemental submission as directed by the Court addressing specific expenses.  *See PETA, Inc. v. Dade City's Wild Things, Inc.*, 2018 WL 4760780, at *1 (M.D. Fla. Jan. 19, 2018).

responses, *id.* at 15-19.  The Post moved to compel on all these grounds.  *See id.*

The Court granted the motion to compel almost in its entirety:

1.  The Court ordered TMTG to amend its initial disclosures to "include more specific information for its damage computation" under Rule 26, Oct. 2, 2025 Order (Doc. No. 99) ("Oct. 2 Order") at 1-2, granting in large part The Post's motion to compel a more specific damages disclosure, Aug. 7 Mot. at 6-10.

2.  The Court ordered TMTG to begin producing documents responsive to The Post's RFPs, including RFP No. 26, Oct. 2 Order at 1-2, granting The Post's motions to compel document production, Aug. 7 Mot. at 11-13.

3.  The Court ordered TMTG to produce documents it produced in the DWAC Case, Oct. 2 Order at 2, granting in part The Post's motion, Aug. 7 Mot. at 13-14.[3]

4.  The Court ordered TMTG to respond fully to Interrogatory No. 3, which sought information about custodians and repositories, Oct. 2 Order at 2, granting in part The Post's motion to compel a complete response, Aug. 7 Mot. at 16-18.

5.  The Court ordered TMTG to respond fully to Interrogatory Nos. 4 and 5, which sought information about TMTG's damages, Oct. 2 Order at 3, granting in part The Post's motion to compel complete responses, Aug. 7 Mot. at 16-19.

The Court scheduled a follow-up hearing for October 24, 2025, and instructed the parties to file a notice identifying discovery issues.  Oct. 2 Order at 3.

**B.    The Post's October 24, 2025 Oral Motions to Compel**

At the October 24, 2025 hearing, the Court again ordered TMTG to fulfill its discovery obligations and granted The Post's three oral motions to compel, two of which were made to enforce compliance with the Court's October 2 Order:

1.  The Court ordered TMTG to provide the documents it intends to rely on for its damages claim and documents previously compelled, granting The Post's oral motion.  Oct. 24 Order  at 1-2. This Order required further compliance with the Court's October 2 Order related to TMTG's Rule 26(a) damages disclosure and TMTG's failure to produce documents.  *Id.* at 2; *see* Oct. 2 Order at 1-2.

---

[3] The motion refers to *Digital World Acquisition Corp. v. Arc Global Investments II, LLC*, Case No. 2024 CA 001061 NC, filed in the Circuit Court of the Twelfth Judicial Circuit, Sarasota County, Florida as the "DWAC Case" and the documents produced by TMTG in it as "DWAC Documents." The Court denied The Post's motion only insofar as it declined to compel TMTG to produce documents produced *to* TMTG in the DWAC Case in response to RFP No. 31.  The Court also did not address The Post's requests for fees under Rule 37(b), 37(a)(5), and 37(c)(1).

2. The Court ordered TMTG to provide further information about witness document repositories. Oct. 24 Order at 2. The Court based this order on TMTG's continued noncompliance concerning The Post's Interrogatory No. 3, which TMTG had still failed to sufficiently respond to, despite the Court's October 2 Order requiring a full response. *See* Oct. 2 Order at 2.

3. The Court ordered TMTG to provide all documents produced by TMTG in the DWAC Case, as required by its October 2 Order. Oct. 24 Order at 2.

4. The Court ordered TMTG to produce documents to provide information responsive to The Post's Interrogatory No. 14. *Id.* at 2.

The Court ordered an additional joint status update and scheduled a hearing for November 19, 2025. *Id.* at 3.

## C. The Post's November 19, 2025 Oral Motions to Compel

At the November 19, 2025 status hearing, the Court granted five more of The Post's motions to compel. This was the third Court order directing compliance with the Court's previous orders. Four of the items ordered by the Court directed TMTG to comply with the Court's previous orders:

1. The Court ordered TMTG to produce documents from Jacob Langer's file, granting The Post's oral motion. Nov. 19 Order at 1. This Order compelled compliance with the October 24 Order requiring document production. Oct 24. Order at 1-2.

2. The Court ordered TMTG to provide a "hit report"–an updated report of custodial repositories searched, date ranges, and search term hits, granting The Post's oral motion to compel. Nov. 19 Order at 1-2. This Order compelled further information for The Post to understand whether TMTG had complied with the Court's October 24 Order requiring complete document production. *See* Oct. 24 Order at 1-2.

3. The Court ordered TMTG to produce around 18,000 documents from the DWAC Case, which the Court had twice previously ordered produced, granting The Post's oral motion to compel. Nov. 19 Order at 2. Consistent with this Order, The Court denied TMTG's related motion for a protective order. *Id.* at 2.

4. The Court ordered TMTG to provide a complete and updated response to The Post's Interrogatory No. 3 and to verify that it had collected documents for each listed repository, granting The Post's oral motion to compel. *Id.* at 2. The Court had previously ordered this in its October 2 Order. Oct. 2 Order at 2.

5. The Court set a deadline of November 26, 2025 for TMTG to produce documents responsive to The Post's Second Set of RFPs, granting The Post's oral motion. Nov. 19 Order at 3.

5

The Post reiterated its request for sanctions, as it was The Post's third attempt to enforce TMTG's compliance with its discovery obligations and a further attempt to enforce compliance with the Court's orders. The Court invited The Post to request sanctions again, stating that "based on the ruling today, along with the other [previous] rulings, I will entertain the defendant['s]" sanctions motion. Nov. 19 Tr. 66:18-68:8. It noted the subsequent motion could be held "in abeyance" and "brought later if discovery continues to be an issue." *Id.*; *see* Nov. 19 Order at 3-4.

### D.    The Post's February 28, 2026 Motion to Compel

The Post filed another motion to compel on February 28, 2026, seeking relief for TMTG's failure to produce documents from Mr. Juhan's file and other discovery violations. *See* Def.'s Mot. to Compel (Doc. No. 145) ("Feb. 28 Mot."). The Court granted in part the motion to compel information about Mr. Juhan's document production and five other motions for relief.

#### 1.    The Court Ordered Further Information About Phillip Juhan's Document Production.

TMTG had been under a Court-ordered obligation to produce all documents from its custodians' files responsive to The Post's First and Second Sets of RFPs since November 2025. *See* Oct. 24 Order at 1-2; Nov. 19 Order at 3. Since then, The Post repeatedly expressed concern that TMTG had not searched the custodial files of its CFO, Mr. Juhan, a key TMTG fact witness, *see* Pl.'s Mot. for Summ. J. (Doc. No. 218-01) at 7-8, 19; Pl.'s Expert Report (Doc. No. 220-02) at 17-18 & n.24.[4]

---

[4] The history of The Post's repeated efforts to obtain the documents from Mr. Juhan's file is described in detail in The Post's February 28, 2026 Motion to Compel. Feb. 28 Mot. at 2-5, 8-10.

6

TMTG nonetheless represented to The Post and the Court that it had collected and searched his files.  Nov. 19 Tr. at 62:18-22.  On February 13, 2026, TMTG finally admitted it had neither searched nor produced documents from Mr. Juhan's custodial files.  Ex. 6 (I. Beaton Feb. 13. Email).  This violated the Court's October 24 and November 19 Orders.  Shortly after, TMTG claimed to cure the deficiency, but produced documents only from *email*, not his phone or computer.  TMTG's discovery responses and Mr. Juhan's deposition had confirmed his phone and computer contain responsive documents, *see* Joint Disc. Status Update (Doc. No. 119) at 18; Ex. 7 at 12; Ex. 3, yet TMTG produced no records from either repository.

In The Post's February 28 Motion, it moved to compel TMTG to search for and produce the relevant documents from Mr. Juhan's phone and computer.  Feb. 28 Mot. at 8-10.  In response, TMTG represented at the hearing that Mr. Juhan's "laptop and his phone" were imaged by its vendor in 2025 and "everything that is responsive has been turned over."  Mar. 31 Tr. at 71:18-72:9; 74:5-16.  The Post raised concerns with that representation.  In response, the Court ordered TMTG to produce a hit report of Mr. Juhan's phone and computer.  *Id.* at 84:19-25.  The Court and parties were aware that "prior orders already exist requiring the production" of any responsive records on these devices.  *Id.* at 85:7-12.  In response, counsel for The Post noted that it "appreciate[s] the prior orders are still valid and binding and if we need to come back" based on the results of the hit report, "we will do so."  *Id.* at 85:16-21; *see id.* at 85:22 (Court agreeing to that proposal).  The Court accordingly ordered TMTG to produce a hit report for Mr.

Juhan's computer and phone by April 7, 2026.  Mar. 31 Order (Doc. No. 193) at 2.

### 2. The Court Ordered TMTG to Comply with Other Obligations.

The Court ordered the following additional relief in its March 31 Order:[5]

1. The Court ordered that TMTG withdraw another witness, Eric Swider, or produce a hit report, Mar. 31 Order at 2, granting in part The Post's motion to compel, Feb. 28 Mot. at 10-11. This Order required TMTG to provide information to assist The Post in understanding whether TMTG had complied with its obligations under the October 24 and November 19 Orders requiring document production.

2. The Court ordered TMTG to produce its recent discovery disclosures and its witnesses' deposition transcripts from the DWAC Case, Mar. 31 Order at 2-3, granting in large part The Post's motions to compel, Feb. 28 Mot. at 11-15.

3. The Court ordered TMTG to produce any non-privileged documents that hit on search terms related to the broker Entoro and, if any documents were withheld, identify those privilege log entries, Mar. 31 Order at 4, granting The Post's motion to compel those documents, Feb. 28 Mot. at 16-17.

4. The Court ordered that TMTG must produce withheld communications with third parties, non-lawyers, and other non-privileged communications or amend its privilege log, Mar. 31 Order at 4-5, granting The Post's motion seeking production of improperly withheld documents, Feb. 28 Mot. at 19-22.

5. The Court ordered TMTG to supplement its privilege log with information substantiating its claim over numerous entries or produce documents, Mar. 31 Order at 5, granting The Post's motion to compel, Feb. 28 Mot. at 18-23.

## II. TMTG'S WITHHOLDING OF PHILLIP JUHAN'S DOCUMENTS AND ONGOING PREJUDICE

TMTG provided The Post with the Court-ordered hit report on April 7, 2026. The hit report showed Mr. Juhan's devices contained thousands of documents that included the parties' agreed-to search terms for the first and second RFPs but were never produced.   See Ex. 1; Ex. 2.  Indeed, Mr. Juhan's phone alone appeared to contain nearly two thousand documents with search term hits, including documents that hit on the critical string "Entoro OR Entaro OR Entero OR (James

---

[5] The Court denied as moot two of The Post's requests based on representations by TMTG's counsel at the hearing.  TMTG had not informed The Post it would make those representations.

w/3 Row)"–all of which the Court had ordered be produced under the Court's March 31, 2026 Order. Ex. 1; Mar. 31 Order at 4. Similarly, Mr. Juhan's computer hit report revealed thousands of hits on the search terms. Ex. 2. TMTG produced no records from this device apart from a small set of monthly financial reviews, *see* Mar. 31 Tr. at 146:21-151:3. In other words, the hit report served its intended purpose: it demonstrated that Mr. Juhan's phone and personal computer contained responsive documents that TMTG had not produced.

After receiving the hit report, The Post repeatedly asked TMTG to produce the responsive documents from Mr. Juhan's phone and computer ahead of his scheduled Rule 30(b)(6) deposition. Ex. 4 (N. Gamse Apr. 9 Email); Ex. 5 (N. Gamse Apr. 14 Email). Despite The Post's requests, TMTG declined to review the documents as requested. Even though TMTG had previously imaged and processed the documents, *see* March 31. Tr. at 72:1-9, TMTG claimed for the first time that the documents were not in TMTG's possession, Ex. 5 (J. Garcia Apr. 15 Email). TMTG also rebuffed The Post's requests to confer on the issue, prompting The Post to warn TMTG it would seek further relief from the Court if TMTG did not make itself available. Ex. 5 (N. Gamse Apr. 15 Email; I. Beaton Apr. 20 & Apr. 22 Emails). TMTG did not make itself available. *Id.* (J. Garcia Apr. 21 Email).

As of filing, The Post has not received documents from Mr. Juhan's phone nor documents responsive to the agreed-on search terms from his computer.

## LEGAL STANDARD

This Court has "broad discretion" to determine the "appropriate sanctions"

under Federal Rule of Civil Procedure 37.  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993).  "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to [ensure] the integrity of the discovery process."  *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982) (per curiam).  A court may impose such sanctions to deter future conduct, compensate the court and parties for expenses, compel discovery, deter future conduct, and penalize the guilty party.  *Ctr. for Individual Rts. v. Chevaldina*, 2022 WL 4462246, at *2 (11th Cir. Sept. 26, 2022) (per curiam).

Under Rule 37(a), a Court (1) must order the opposing party to pay the movant's fees where it grants the motion unless an exception applies; and (2) may "apportion the reasonable expenses" where it grants the motion in part.  Fed R. Civ. P. 37(a)(5)(A), (C); *see Chevaldina*, 2022 WL 4462246, at *3 (approving finding that expenses were "generally mandatory" after largely granting a motion to compel but denying in part).

Under Rule 37(b), when a party "fails to obey an order to provide or permit discovery," the court "must order" payment of "the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed R. Civ. P. 37(b)(2)(C); *see Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304 (11th Cir. 2020).  And, it may issue "further just orders" including (but not limited to):

1. directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; and
2. prohibiting the disobedient party from supporting or opposing designated claims

10

or defenses, or from introducing designated matters in evidence. Fed. R. Civ. P. 37(b)(2)(A).

Courts impose both monetary and non-monetary sanctions on parties for discovery violations even absent bad faith or willfulness. *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994). The court need only make a finding of bad faith when imposing the most severe sanctions— default or dismissal. *Id.* Courts can thus impose lesser sanctions, such as adverse jury instructions and prohibitions on presenting certain evidence, without a finding of bad faith or willfulness. *Id.*; *Higgs*, 969 F.3d at 1304.

## ARGUMENT

### I.     AN ADVERSE JURY INSTRUCTION BASED ON TMTG'S ONGOING WITHHOLDING OF DOCUMENTS IS WARRANTED

The Court should order an adverse jury instruction based on TMTG's failure to fulfill its Court-ordered obligation to produce responsive records from Mr. Juhan's custodial files. Rule 37 authorizes a court "to provide a jury with adverse instructions, instruct the jury that certain facts be taken as established, or prohibit the disobedient party from supporting or opposing certain claims or defenses" as sanctions for discovery noncompliance. *Tynes v. Fla. Dep't of Juv. Just.*, 2021 WL 7084642, at *2 (S.D. Fla. July 20, 2021).

Here, attorney's fees alone are insufficient to cure the prejudice to The Post and uphold "the integrity of the discovery process" given the extent of TMTG's shortcomings in producing Mr. Juhan's custodial records. *Aztec Steel*, 691 F.2d at 482. Despite multiple Court orders, TMTG failed to produce demonstrably

11

relevant documents from Mr. Juhan's phone or computer. As it stands—and even if fees are ordered—The Post is prejudiced by TMTG's failures, and TMTG benefits from its own noncompliance. The Court should order an adverse jury inference instruction about the content of the withheld documents to correct the imbalance.

**A.    The Court Ordered the Production of Phillip Juhan's Files.**

The Court's October 24 and November 19 Orders required TMTG to complete production of its documents responsive to The Post's First Set of RFPs by November 7, 2025, *see* Oct. 24 Order at 1-2, and The Post's Second Set of RFPs by November 26, 2025, *see* Nov. 19 Order at 3. There is no doubt that Mr. Juhan's custodial files, including his personal phone and computer, included information responsive to those RFPs and relevant to this case. *See* Ex. 7 at 12 (identifying Mr. Juhan's computer and phone); Nov. 19 Order at 2 (ordering TMTG to verify that it "collected the data repositories identified" in its response to Interrogatory No. 3.).

Despite those orders and The Post's repeated efforts to receive Mr. Juhan's full set of custodial documents, all signs indicate that TMTG has made no efforts to produce these documents. TMTG's hit reports show hundreds of hits on the agreed-upon search terms for Mr. Juhan's phone and computer, *see* Ex. 1, Ex. 2, but, to date, TMTG has not produced a single document from either Mr. Juhan's phone or computer that was collected in response to those search terms. Indeed, TMTG recently indicated that it had not begun review of these documents. Ex. 5 (J. Garcia Apr. 21 Email). Since then, TMTG has not only failed to confirm that it has done so but also has simply refused to confer with The Post on the issue despite

The Post's repeated requests.  *See* Ex. 5 (I. Beaton Apr. 20 & Apr. 22 Emails).

**B.    The Withheld Documents Likely Contain Core Evidence and Are Being Withheld Without Justification.**

TMTG's noncompliance with Court orders and improper withholding of documents require additional sanctions because the records TMTG is withholding are likely central to its claims and it has no justification for withholding them.

First, both Mr. Juhan's deposition and discovery from third parties established that the withheld documents from Mr. Juhan's phone and computer contain not only relevant information but also information that, in all likelihood, goes to the "heart of the claims" in this case.  *Freeman v. Giuliani*, 691 F. Supp. 3d 32, 58-59 (D.D.C. 2023) (prejudice greater when withheld discovery pertains to core of claims).  Mr. Juhan is a central figure in the core factual dispute over whether TMTG agreed to pay a finder's fee to Entoro.  He is one of four witnesses disclosed as allegedly having knowledge of falsity, and both parties relied heavily on his documents and testimony in their substantial truth summary judgment briefing.  *See* TMTG Mot. for Summ. J. at 7; Post Opp. to TMTG Mot. for Summ. J. (Doc. No. 235) at 17-18.  And there is specific evidence that Mr. Juhan's phone contains important information about the fee arrangement:  in the text messages produced by a third party, Will Wilkerson, Mr. Juhan describes Entoro—the party at the heart of the dispute as to the truth of the finder's fee statements—as the "broker of the ES note."  Ex. 3.  Mr. Juhan likely sent additional texts about the brokerage arrangement—it was no surprise that his phone hit report showed additional hits on the search string "Entoro" and dozens (if not hundreds) of hits

that pertain to Entoro or a commission to Patrick Orlando.  *See* Ex. 1.[6]  TMTG offers no explanation for its failure to produce the text with Mr. Wilkerson or any other relevant texts.  It is inconceivable that not one of the hundreds of documents that hit on the search strings related to the brokerage arrangement is responsive.

As for damages, Mr. Juhan is TMTG's CFO and responsible for financial reporting.  He testified that key financial documents are saved on his hard drive. *See* Juhan Mar. 3 Tr. (Doc. No. 235-06) at 145:4-146:1.  Mr. Juhan's computer hit report, unsurprisingly, showed hundreds of hits for the financial search strings.[7]

Second, TMTG's failure to search for and produce these documents—or even confer on these issues—is unjustified and flouts the Court's orders.  TMTG attributed the initial months' long delay to a mere vendor error.  Ex. 6 (I. Beaton Feb. 13. Email).  Now, TMTG appears to claim that the involvement of Mr. Juhan's personal counsel prevents review and production of his phone and computer.  Ex. 5 (J. Garcia Apr. 21 Email).  But that is not what TMTG told the Court.  TMTG represented to the Court that it had already imaged Mr. Juhan's phone and laptop in 2025, so it had the ability to search, review, and produce records whenever it saw fit.[8]  March 31. Tr. at 72:1-9 ("[Mr. Juhan's laptop and his phone] were imaged,

---

[6] For example, "((Pat* w/3 Orlando) OR "Entoro Securities") AND pay*)" has 347 hits, "("Trump Media" OR TMTG OR "Truth Social") AND ((broker* OR find*) w/5 (note* OR fee* OR financ*))" has 50 hits, and "(finder* w/3 fee*) OR (referral* w/3 fee*) OR (success w/3 fee*) OR (broker* w/3 fee*)" has 136 hits.  *Id.*

[7] For example, the string "("Trump Media" OR TMTG OR "Truth Social") AND (valuation OR "investor prospectus*" OR "private placement*")" hit on 1419 documents on his computer.  Ex. 2.

[8] To the extent TMTG argues it does not have possession of these documents, that violates the Court's November 19 Order requiring it to "verify that [it] collected the data from the repositories identified in . . . interrogatory no. 3."  Nov. 19 Order at 2.

yes. . . . Those folders were ingested into our vendor's system."). Further, counsel for TMTG emailed The Post a summary of the contents of some of these texts, indicating it *did* have possession. Ex. 4 (J. Garcia Apr. 8 Email). And Mr. Juhan testified that TMTG's lawyers have all the data from his phone. Juhan Nov. 3 Tr. at 26:3-11. TMTG's eleventh-hour about-face cannot mask its unjustified failure to review and produce relevant documents, which warrants sanctions more severe than fees. *See, e.g., Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 227, 231 (S.D.N.Y. 2003) (ordering default judgment and noting that "defendants' non-compliance and failure to make an adequate search has continued to the present in the face of continuing complaints from counsel" which "weighs heavily in favor of the most severe sanctions").

## C.    The Court Should Order an Adverse Jury Instruction.

Under Rule 37(c), the Court may order that the jury be instructed that they must, or may, treat a fact as true (a "mandatory" or "permissive" adverse-inference instruction). *See* Fed. R. Civ. P. 37(b)(2)(A)(i), (c)(1)(C) (court may order that "facts be taken as established for purposes of the action, as the prevailing party claims"); *Higgs*, 969 F.3d at 1306-07. An adverse jury instruction is warranted upon finding that a party withheld documents relevant to the claims and defenses in the case, *see, e.g., Freeman*, 691 F. Supp. 3d at 67-68, or where discovery violations make it so that a court cannot "ensure" a party has disclosed relevant documents on a key issue, *United States v. Advoc. Law Grps. of Fla., P.A.*, 2021 WL 11960209, at *4 (M.D. Fla. Dec. 27, 2021) (citation omitted). Although

15

prejudice is not required, it is a relevant consideration when shown. *See First Coast Energy, L.L.P. v. Mid-Continent Cas. Co.*, 2015 WL 5159140, at *5 (M.D. Fla. Sept. 2, 2015) (ordering default judgment as sanction).

As it stands, TMTG's non-compliance has tilted the evidentiary playing field in its favor. The Post has demonstrated that the documents at issue are highly likely to contain relevant information in several ways.

1. <u>Substantial Truth</u>: The documents may support The Post's argument that TMTG agreed to pay a finder's fee to Entoro and, thus, lend support to The Post's argument that the statements at issue are substantially true. In the only text messages from Mr. Juhan, which The Post obtained from a third party, Mr. Juhan acknowledged that Entoro was the "PO broker of the ES note." Ex. 3. Mr. Juhan testified that his message referred to Patrick Orlando's brokerage relationship with Entoro. As described above, the agreed-upon search strings related to this brokerage arrangement hit on hundreds of documents on Mr. Juhan's phone; it is implausible that none of those hits are responsive. *See supra* at 14 & n.3. His text messages to other individuals likely contain similar admissions about Entoro's status as the agreed-to broker. In addition, TMTG will likely call Mr. Juhan as a witness, and TMTG's withholding of potentially key documents prevents The Post from using them to undermine or impeach his testimony.

2. <u>Damages</u>: TMTG's failure to produce documents from Mr. Juhan's custodial files also harms the Post's ability to rebut TMTG's damages claim at trial. The Post's damages expert relied on financial documents produced by TMTG in his

report.  *See* Johnson Report (Doc. No. 220-08) at 9.  Mr. Juhan testified that he stores other copies of these documents—which may include drafts, add commentary, or otherwise provide The Post with information necessary to rebut the damages claim in this case—on his computer.  Juhan Mar. 3 Tr. 145:4-146:1.  As described above, there were hundreds of hits for terms related to valuations on Mr. Juhan's computer, and it is inconceivable that none of those documents would be responsive.  *See supra* at 14.  But to date, TMTG has not produced a single document in response to The Post's search strings from Mr. Juhan's computer.

TMTG's actions have already prejudiced The Post in other ways that will impact its ability to present its case at trial.  Incomplete or untimely production of discovery before a deposition prejudices the receiving party.  *See, e.g.*, *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1312 (D.C. Cir. 2021).  The Post has now deposed Mr. Juhan three times, and those depositions were used in summary judgment briefing[9] and may be used at trial substantively or for impeachment.  However, the usefulness of those depositions to The Post was affected—The Post could not question Mr. Juhan about potentially key documents.  In addition, The Post has had to devote significant resources to investigating the nonproduction of documents and litigating TMTG's compliance rather than preparing for trial.  *See Advoc. L. Groups of Fla.*, 2021 WL 11960209, at *4 (ordering adverse instruction and agreeing that the party was "prejudiced by [the] nondisclosure because it had

---

[9] The Post prepared its summary judgment briefs and expert reports without a full record, further prejudicing it.  *See id.* (opponent was prejudiced as it had "to file its summary judgment motions without an opportunity to review the documents that supported [the] claims and defenses.").

17

to divert a significant amount of time and resources towards uncovering the . . . misrepresentations and omissions" (citation omitted)); *First Coast Energy*, 2015 WL 5159140, at *5 (rejecting proposed "'no harm, no foul' approach" as it "elides the significant delay incurred in attempting to remedy the 'omissions'").

The fact that TMTG has produced Mr. Juhan's *emails* does not obviate the need for other responsive documents. *See, e.g.*, *Klayman* 6 F.4th at 1312 ("Klayman cannot avoid a finding of prejudice by pointing to the fact that he provided some discovery[.]"). TMTG's apparent decision not to produce relevant documents already collected and reviewed from his phone and computer is inconsistent with the Court's orders and discovery rules and therefore precisely the situation that necessitates evidentiary sanctions. *See, e.g.*, *Freeman,* 691 F. Supp. 3d at 67-68 (ordering adverse jury instruction as "Plaintiffs are not required to take Giuliani at his word . . . instead of being able to scrutinize documentary records of the same and make their own analysis").

This case is analogous to other cases where an adverse jury instruction was deemed appropriate. In *Freeman*, for example, the defendant withheld documents responsive to two RFPs, even when ordered to produce them by the court. The court held that "as a sanction for failing to comply with [the orders requiring production], the jury will be instructed that they *must*," when considering the issue to which the withheld discovery pertained, "infer that [he] is intentionally trying to hide relevant discovery." 691 F. Supp. 3d at 68. Here, too, the withheld documents are relevant, and a mandatory (or, at a minimum, permissive)

inference would properly instruct the jury on how to evaluate the withholding.

Courts order adverse jury instructions even when some or all of the withheld information was ultimately produced. For example, in *Advocate Law Groups of Florida*, the court ordered an adverse inference based on the party's failure to provide financial information (which the opposing party ultimately obtained from other sources) as there was "no method to guarantee that" the opposing party and court had full information after the producing party had failed to comply with prior discovery orders. 2021 WL 11960209, at *4. And the *First Coast Energy* court ordered partial default but noted that "an adverse jury instruction might be an appropriate lesser sanction" based on a party's "inadequate initial investigation followed by a disjointed effort to search for responsive documents only after the Court stepped in." 2015 WL 5159140, at *3, 6. The court rejected the argument that later production of the missing records cured the prejudice, noting that based on prior behavior, "neither [the party] nor the Court can have any confidence that [the producing party] has finally produced all requested documents." *Id*. at *5.

The Court should include an instruction for the jury that it must (or, at a minimum, may) infer that documents contained on Mr. Juhan's phone and computer that were not produced in this matter contain information that is harmful to TMTG, specifically, that they contain evidence that (1) TMTG agreed to pay a finder's fee to Entoro in connection with the ES Family Trust loan, and (2) TMTG did not suffer financial harm following publication of the Article.

19

### D.    Lesser Sanctions Will Not Cure Prejudice to The Post.

Monetary sanctions alone will not cure prejudice to The Post, and even if TMTG were to provide all of Mr. Juhan's custodial documents now, an adverse jury instruction would still be warranted.[10]  Fact discovery has closed, and the parties have concluded their depositions in advance of trial in August.  *See Higgs*, 969 F.3d at 1305 (approving permissive adverse inference jury instruction where opponent did not have a chance to depose the witness); *Gilmore v. Jones*, 2021 WL 5280970, at *8-9 (W.D. Va. Nov. 12, 2021) (imposing adverse jury instruction to "level the evidentiary playing field" after repeated discovery violations and compliance "only after Plaintiff moved to compel").

There is also no guarantee that any late-breaking production by TMTG would be fully responsive to the Court's Orders.  TMTG has a history of failing to produce all responsive documents even when purporting to do so at the final hour. *See supra* at 6-7.  Courts are inclined to grant an evidentiary sanction when discovery has closed, rather than reopening discovery.  *See First Coast Energy*, 2015 WL 5159140, at *6 (approving partial default in lieu of reopening discovery as that would "reward . . . bad behavior without remedying the prejudice it has caused," and "fees alone would not restore confidence that all discoverable information has been produced"); *Tynes*, 2021 WL 7084642, at *1 (adverse jury instruction warranted despite documents finally being produced, so long as

---

[10] If TMTG does produce documents after this motion is filed, it certainly should not be permitted to rely on them. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii); *Wyndham*, 2020 WL 3512121, at *3.

delayed documents were relevant).

Financial sanctions alone would also fail to deter similar conduct—particularly if, as here, a plaintiff is seeking billions of dollars in damages. Litigants should not be permitted to disregard discovery orders and obligations to confer only to produce documents at the final hour because they risk sanctions. Such tactics offend "the spirit of openness and fair play the discovery rules embrace." *Higgs*, 969 F.3d at 1305; *see Aztec Steel*, 691 F.2d at 482 ("Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to [ensure] the integrity of the discovery process."). TMTG's conduct has transformed discovery from a set of carefully defined procedures into a costly and time-consuming pursuit with "multiple rounds of judicial involvement" which has "squander[ed] … scarce judicial resources (and the resources of other litigants)." *Klayman*, 6 F.4th at 1312 (quotation omitted).

## II.    ATTORNEY'S FEES ARE WARRANTED UNDER RULE 37

TMTG's conduct during discovery in this case caused extensive delays and unnecessary expense and burden on the Court and the parties. TMTG only produced documents and provided certain updated disclosures and interrogatory responses in response to motions to compel. Rule 37 sanctions are designed to "penalize those whose conduct may be deemed to warrant such a sanction," and "deter those who might be tempted to such conduct in the absence of such a deterrent." *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir. 1985) (citation omitted). Under Rule 37, the Court should order TMTG to pay reasonable

21

expenses associated with each of The Post's motions to compel and status updates. *See O'Shea v. Leader, Bulso, & Nolan, PLC*, 2016 WL 4070145, at *2 (N.D. Ala. July 29, 2016) (ordering full fees associated with partial motion to compel grant based on "repeated disregard for the court's deadlines, which caused additional delay and expense for the Defendants and wasted the court's time and resources").

TMTG should be required to pay The Post's reasonable expenses associated with (A) its August 7, 2025 Motion to Compel, (B) its October and November oral motions to compel, and (C) its February 28, 2026 Motion to Compel.

## A.    Fees are Warranted Based on The Post's August 7, 2025 Motion to Compel.

The Post's August 7, 2025 Motion to Compel was granted almost entirely. With minor variation on the specific relief sought, the Court ordered the relief The Post requested for five of the six discovery items in the August 7 Motion, including commencement of document production, basic Rule 26(a) disclosures about TMTG's claimed damages,[11] and complete responses to key interrogatories. *See supra* at 3-4. For the sixth request—The Post's request for all documents from the DWAC Case—the Court granted The Post's request as to documents produced *by* TMTG and denied the request only for documents produced from other parties.[12]

TMTG should pay The Post's reasonable expenses for the August 7 Motion

---

[11] Fees are warranted for this aspect of The Post's Motion under Rule 37(c) as well.

[12] The Court did not indicate that it believed the request was improper, but rather, viewed the documents produced by TMTG as simpler given the possibility that documents produced to TMTG were "subject to different confidentiality orders" or agreements. Oct. 1 Tr. at 37:6-18.

under Rule 37(a)(5)(C), taking into account the one subpart the Court denied.[13]

### B.    Fees are Warranted Based on The Post's Motions at the October 24, 2025 and November 19, 2025 Hearings.

The Court granted The Post's October 2 oral motions to compel. *See* Oct. 24. Order. TMTG had an opportunity to respond to each of these in the Joint Status Update and at the hearing, yet it could neither justify nor explain any of these failures to comply with the Court's October 2nd Order. Thus, Rule 37(a)(5)(A) entitles The Post to reasonable expenses incurred in making the oral motions;[14] and Rule 37(b)(C) similarly requires TMTG to pay the reasonable expenses incurred by The Post caused by TMTG's non-compliance with the October 2 Order.

After the November 19th hearing, the Court yet again granted The Post's oral motions to compel, most of which were again aimed at ensuring TMTG complied with previous Court orders. *See supra* at 5; Nov. 19 Order. Indeed, this order represented the third order directing TMTG to provide a complete and accurate response to The Post's Interrogatory No. 3, to produce the DWAC Documents, and to enforce compliance with document production in response to The Post's RFPs. *See* Nov. 19 Order, *supra* at 3-6. TMTG had no "substantial justifi[cation]" for any of these failures to comply with its discovery obligations.[15] As a result, the Court

---

[13] Even if the Court were to consider any potential justification by TMTG, *see* Rule 37(a)(5)(A), TMTG offered no reason for its failures in its opposition to the Motion to Compel or at the hearing. And, it continued to fall short of its discovery obligations for months after. *See supra* at 4-8.

[14] Because the Court's order granted each oral motion to compel, Rule 37(a)(5)(A) should control. However, if the Court views these as partial grants, fees are warranted under Rule 37(a)(5)(C).

[15] The Post raised TMTG's failure to produce over 100,000 documents. Doc. No. 117 at 12-16. TMTG produced many prior to the hearing, so the Court focused on 18,000 documents withheld

should order TMTG to pay reasonable expenses incurred in making the oral motions at the November 19 hearing under Rule 37(a)(5)(A) and Rule 37(b)(C). Such an order would be consistent with the Court's commentary at the November 19 hearing that there has been "resistance to discovery" by TMTG and its invitation to The Post to renew its motion for sanctions.  Nov. 19 Tr. at 66:8-68:8.

### C.    Fees are Warranted for The Post's February 28, 2026 Motion to Compel and Efforts to Enforce Court Orders.

The Court should also order TMTG to pay the reasonable expenses The Post incurred by  filing its February 28, 2026 motion to compel under Rule 37(a)(5)(C) because the Court granted the majority of The Post's motion; and under 37(b)(2)(C) because the motion sought, in part, to enforce TMTG's compliance with the Court's previous orders.  *See* Feb. 28 Mot.; Mar. 31 Order.

Specifically, the Court granted six of The Post's requests in its February 28 Motion to Compel and denied two as moot.  *See* Mar. 31 Order.[16]  For each item sought, the Court either ordered complete relief or a slightly modified version of it, or (for those denied as moot), TMTG provided it after the filing of the motion.  *See supra* at 6-8.  In these circumstances, expenses under Rule 37(a)(5)(C) is proper: The Post filed its motion following TMTG's repeated discovery failures and

---

based on TMTG's no-waiver agreement in the DWAC Case.  Even if the Court finds that withholding those was justified, the withholding of the other over 80,000 additional documents— for which TMTG cited only production delays—was not.  Thus, if the Court evaluates fees under Rule 37(a)(5)(C), it should nonetheless apportion a large percentage of The Post's expenses to TMTG.

[16] The Court styled several of the Order's components as partial grants because it structured relief in ways that differed slightly from that The Post requested.  *See supra* at 3-8.

noncompliance, which delayed the case, required moving deadlines, and caused The Post unnecessary expenses. *See O'Shea*, 2016 WL 4070145, at \*2.

Further, Rule 37(b)(2)(C) requires that TMTG also pay The Post's reasonable expenses incurred from The Post's requests for information about Mr. Juhan and Mr. Swider's documents, and for TMTG to produce documents in response to RFP No. 36. Each request was an effort to enforce the Court's prior orders, for which TMTG has no justification for its noncompliance.[17]

**CONCLUSION**

The Post respectfully requests that the Court grant The Post's requests for sanctions related to TMTG's repeated discovery violations and failures to follow Court orders, including:

1. An instruction to the jury that it must (or, at a minimum, may) infer that documents contained on Mr. Juhan's phone and computer and not produced in this matter contain information that is harmful to TMTG; specifically, that they contain evidence that (1) TMTG agreed to pay a finder's fee to Entoro in connection with the ES Family Trust loan; and (2) TMTG did not suffer financial harm following publication of the Article.

2. Reasonable expenses associated with The Post's August 7, 2025 Motion to Compel and the subsequent oral motions to compel made at hearings between October 2, 2025 and November 19, 2025, under Rule 37(a)(5), Rule 37(b)(2)(C) and Rule 37(c).

3. Reasonable expenses associated with The Post's February 28, 2026 Motion to Compel under both Rule 37(a)(5) and Rule 37(b)(2)(C).

4. In addition, a further Court order that TMTG produce files from Mr. Juhan's phone and computer, and given the late timing, an order that it produce all non-privileged documents that hit on the search terms in the hit report.

---

[17] There is no justification for TMTG's failures to produce Mr. Juhan's files or provide information about Mr. Swider's documents, forcing The Post to move to compel, or for TMTG to withhold deposition transcripts from the DWAC Case (which TMTG originally agreed to produce).

## CERTIFICATION PURSUANT TO RULE 37 AND LOCAL RULE 3.01(g)

This motion concerns discovery disputes that were discussed numerous times between the parties and discussed in open court on October 2, 2025; October 24, 2025; November 19, 2025; and March 31, 2026.  Most recently, pursuant to Rule 37 and M.D. Fla. R. 3.01(g), The Post has offered to confer with TMTG about the issues raised in this motion multiple times, including on April 14, 2026; April 15, 2026; April 20, 2026; April 22, 2026; and June 17, 2026.  TMTG has not made itself available to confer with The Post and confirmed via email on June 18, 2026 that it opposes the relief sought in this motion.

Dated: June 18, 2026

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Counsel for Defendant*

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

*/s/ Thomas G. Hentoff*
Thomas G. Hentoff (*pro hac vice*)
Nicholas G. Gamse (*pro hac vice*)
Claire R. Cahill (*pro hac vice*)
Samuel M. Lazerwitz (*pro hac vice*)
Isabelle Jensen Beaton (*pro hac vice*)
Catherine A. Reid (*pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
thentoff@wc.com
ngamse@wc.com
ccahill@wc.com
slazerwitz@wc.com
ibeaton@wc.com
creid@wc.com

*Counsel for Defendant*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2026, I electronically filed a true and correct

copy of the foregoing motion with the Clerk of the Court using the CM/ECF system,

which will send notice of the filing to the email address of all counsel of record.


<u>/s/ *Carol Jean LoCicero*</u>
Carol Jean LoCicero
Counsel for Defendant